# EXHIBIT 206

ORANGE COUNTY SHERIFF'S DEPARTMENT
Santa Ana, California

Date: September 17, 2009

Dear: Christine A. Murray

We all continue to feel the effects of these challenging economic times, both in our professional and personal lives. The Fiscal Year 2009/10 budget approved by the Board of Supervisors requires our Department to cut $28 million dollars from our budget this fiscal year. Based on revenue projections, we must prepare for an additional $60 million dollar cut in fiscal year 2010/11. When faced with these unprecedented budget cuts, I directed my Command Staff and Division Commanders to "deconstruct" their commands and look at our core functions – those functions that impact our responsibility for direct public safety services. The decision of who would be laid off was made as a result of what functions could be eliminated and/or combined without directly impacting our core mission. These layoffs were not based on performance; they were based on the elimination or consolidation of functions and were made solely because of our current financial situation.

As a result of the need to make these budget cuts, your position has been affected. Therefore, you are being released from your employment with the Orange County Sheriff-Coroner Department effective **October 9, 2009**. Decisions and procedures governing layoffs are determined by the Personnel and Salary Resolution (PSR) under which you are employed (copy of layoff provision enclosed).

Enclosed in this packet are resources that may be of assistance to you and your family during this challenging time. You will find a "Layoff Notice" that contains relevant, specific data regarding your employment history with the County. It is important that you review the information for accuracy. Once you have completed this review, if you have corrections or are requesting a Liberty Interest Hearing, please complete the appropriate "Layoff Response Form", also contained in your packet, and return it within fourteen calendar days from the date of this notification, to Diane Tapia, Professional Standards Bureau Human Resources, at 550 N. Flower Street, Room 101, Santa Ana, CA 92703.

We are grateful for your dedicated service to the County and wish you every success in your future endeavors.

Sincerely,

Sandra Hutchens
Sheriff-Coroner

Signature

9/17/09.
Date

PIf's EXHIBIT 206
WITNESS RAMIREZ
DATE: 4-12-12
BRANDY L. WILLIAMS CSR# 11084

# EXHIBIT 212

----- Original Message -----
**From:** Leys, Bob
**To:** Christine Murray
**Sent:** Thursday, October 08, 2009 1:43 PM
**Subject:** RE: Liberty Hearing Request

I am following the opinion of County Counsel and I would encourage you to consult with an attorney on these matters.

---

**From:** Christine Murray [mailto:cammac24@att.net]
**Sent:** Thursday, October 08, 2009 12:08 PM
**To:** Leys, Bob
**Subject:** RE: Liberty Hearing Request

Mr. Leys-
Sir, would you please send the supporting information or statutory data, procedures or rules that you are relying on regarding providing for a Liberty Hearing for the involuntary separation or lay off of a peace officer. I have only been able to find reference to misconduct allegations in my research of Liberty Hearings.

Thank you as I would like to make a well informed decision.
Christine Murray

--- On **Wed, 10/7/09, Leys, Bob** ***<Bob.Leys@ocgov.com>*** wrote:

From: Leys, Bob <Bob.Leys@ocgov.com>
Subject: RE: Liberty Hearing Request
To: "Christine Murray" <cammac24@att.net>
Date: Wednesday, October 7, 2009, 9:59 AM

Captain Murray-

As I indicated previously, the right to a hearing is also extended to peace officers when they are involuntarily separated from employment which would include layoffs. It is your choice as to whether or not you would like to participate in a Liberty Interest Hearing so please contact Jennifer Ramirez if you would like to do so. Otherwise, we will consider this matter resolved.

Please let me know if you have any questions.

Plf's EXHIBIT 212
WITNESS Leys
DATE: 2-12-12
BRANDY L. WILLIAMS CSR# 11084

1 of 6

**From:** Christine Murray [mailto:cammac24@att.net]
**Sent:** Tuesday, October 06, 2009 2:52 PM
**To:** Leys, Bob
**Subject:** RE: Liberty Hearing Request

Mr. Leys-

In researching Liberty Hearings it seems apparent that these are held in instances where allegations of wrong doing have been made or the release from employment is tied to discipline or misconduct.

I have been repeatedly told by the Sheriff and her staff that no wrong doing or misconduct against me is alleged, nor were such allegations involved in her selection of me for layoff.

In light of this I do not feel I would need to schedule a Liberty Hearing.

If there is another purpose to the proposed hearing other than challenging accusations of misconduct then please advise, as I would like to reconsider my decision to not have a Liberty Hearing.

Thank you,

Christine Murray

--- On **Thu, 10/1/09, Leys, Bob** <***Bob.Leys@ocgov.com***> wrote:

From: Leys, Bob <Bob.Leys@ocgov.com>
Subject: RE: Liberty Hearing Request
To: " MURRAY,CHRISTINE,ANN [OCSD] " <camurray@ocsd.org>
Cc: cammac24@att.net
Date: Thursday, October 1, 2009, 4:59 PM

No problem. We will wait to hear from you.

---

**From:** MURRAY, CHRISTINE A [mailto:camurray@ocsd.org]
**Sent:** Thursday, October 01, 2009 4:51 PM
**To:** Leys, Bob

2 of 6

**Cc:** 'cammac24@att.net'
**Subject:** Re: Liberty Hearing Request

Thank you for your response. I will schedule an appointment with Jennifer after I identify a rep. But it will be the week of Oct. 12th as I have medical appointments on Oct. 9th.
Captain Christine Murray
Division Commander, Support Services
Orange County Sheriff's Department
714-834-6450 office
714-718-8856 cel

---

**From:** Leys, Bob <Bob.Leys@ocgov.com>
**To:** MURRAY, CHRISTINE A
**Cc:** Crown, Carl [CEO]
**Sent:** Thu Oct 01 16:38:27 2009
**Subject:** RE: Liberty Hearing Request

Here are the answers to your questions:

1. Can I have representation at the hearing?

Yes

2. Can I have witnesses on my behalf?

No. This is not an evidentiary hearing so witnesses are not necessary.

3. Should I obtain evidence to support my position?

Please consult with your representative regarding this issue.

4. Do you need my issues in writing at or prior to the hearing?

No. However, it is helpful to submit notes or something in writing at the hearing to ensure accuracy but we will be taking notes during the presentation of information.

5. who conducts the investigation you refer too?

That is not determined until after the hearing and may depend on any issues raised.

---

**From:** MURRAY, CHRISTINE A [mailto:camurray@ocsd.org]
**Sent:** Thursday, October 01, 2009 2:50 PM
**To:** Leys, Bob
**Cc:** Crown, Carl ; Ramirez, Jennifer
**Subject:** RE: Liberty Hearing Request

Thank you for the response. Jennifer already contacted me to advise that the first available date for a hearing would be Friday, Oct. 9th, or if not that date then the following week.

Prior to making an appointment I did want to ask a few questions.

1. Can I have representation at the hearing?

2. Can I have witnesses on my behalf?

3. Should I obtain evidence to support my position?

4. Do you need my issues in writing at or prior to the hearing?

5. who conducts the investigation you refer too?

Thank you,

Christine

Captain Christine Murray

Support Services Division

Orange County Sheriff 's Department

714-834-6450 office

714-718-8856 cell

---

**From:** Leys, Bob [Bob.Leys@ocgov.com]
**Sent:** Thursday, October 01, 2009 10:18 AM
**To:** MURRAY, CHRISTINE A
**Cc:** Crown, Carl [CEO]; Ramirez, Jennifer [CEO]

**Subject:** RE: Liberty Hearing Request

Christine-

Carl is out of the office until next week so he asked me to respond on his behalf. He and I will be conducting any Liberty Interest Hearings that are requested so I will ask Jennifer Ramirez to schedule this meeting with you for next week. As you indicated in your message these hearings are typically conducted when a peace officer is accused of wrong doing. However, the right to a hearing is also extended to peace officers when they are involuntarily separated from employment which would include layoffs. The hearing is your opportunity to present any information regarding your proposed layoff that you would like to be considered and/or to clear your name regarding any issues you deem necessary. After the hearing any issues that are raised will be investigated and a final determination of the issues would be provided to you.

Please let me know if you have any questions regarding this information.

Bob Leys

Asst. Director of Human Resources

(714)834-5314

**From:** MURRAY, CHRISTINE A <camurray@ocsd.org>
**To:** Crown, Carl
**Sent:** Thu Oct 01 08:48:50 2009
**Subject:** Liberty Hearing Request

Mr. Crown-

Richard Sanchez of OCSD Professional Standards updated me via email on 09-24 regarding the Liberty Hearing for Law Enforcement Managers, which I received this week. In the e-mail he noted that request for a hearing should be directed to you via mail rather than to Undersheriff Scott as I had previously been told on Sept. 17th, at which time the Undersheriff indicated an email request was acceptable.

I am requesting a Liberty Hearing, however in light of the misinformation at the time of my layoff notice, can you provide me with an explanation of the Liberty Hearing purpose and process. I had previously thought this type of hearing was afforded to a terminated employee who had been accussed of wrong doing or poor performance; in affect allowing them to clear their name. The Undersheriff did not have a clear answer to this question and indicated that in addition to advising me of my lay off he would be conducting the hearing too.

Additionally, if this email is sufficient to make the hearing request please advise. If not I will put a written request in the mail tomorrow. I have include my home contact information below to facilitate contact with me, if needed, after my layoff.

Captain Christine Murray

Orange County Sheriff 's Department

714-936-2211 personal cell

cammac24@att.net home email

camurray@ocsd.org work email

# EXHIBIT 209

**LAYOFF NOTICE**

Date Issued: September 17, 2009

Dear: Christine A. Murray

EMPLOYEE ID# 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

Due to budget constraints, a reduction in the workforce in the Sheriff-Coroner Department is necessary and you are being laid off effective at the close of your shift on October 8, 2009.

**CURRENT JOB CLASSIFICATION TITLE:** Captain
(Does not include temporary promotion)

**HIRE DATE:** August 8, 1980

**PLEASE READ ALL OF THE ENCLOSED MATERIALS CAREFULLY**

**ERRORS:** Please check the information above. If you believe there has been an error of any kind, you can and should complete the enclosed LAYOFF RESPONSE FORM.

**LIBERTY INTEREST HEARING:** You are entitled to a Liberty Interest Hearing. To exercise this right and request a hearing, you must notify the Sheriff-Coroner, in writing, within fourteen calendar days from the date of this notification.

discipline

**UNEMPLOYMENT INSURANCE:** Please refer to the handout which has been included in your packet. It should be noted that, under some circumstances, refusal to take a voluntary reduction in lieu of layoff (if you are eligible to do so) may jeopardize your eligibility for unemployment insurance.

**REEMPLOYMENT (Reinstatement):** Please refer to the Personnel and Salary Resolution (PSR), Article XVI, Section 5 of the **Layoff Procedure**.

**ADDITIONAL INFORMATION:** Other materials include information on conversion of insurance coverage, and retirement may be found in the packet.

YOU HAVE AN OPPORTUNITY TO ADVISE DIANE TAPIA, ADMINISTRATIVE MANAGER, PROFESSIONAL STANDARDS BUREAU OF ANY OBJECTIONS OR QUESTIONS YOU MAY HAVE REGARDING THE CONTENT OF THIS NOTICE. PLEASE COMPLETE THE ENCLOSED FORM IF YOU HAVE ANY CORRECTIONS.

Plf's EXHIBIT 209
WITNESS Leys
DATE: 4-12-12
BRANDY L. WILLIAMS CSR# 11084

# EXHIBIT 213

ARTICLE XVI LAYOFF PROCEDURE

Section 1. General Provisions

This procedure shall not apply to a temporary layoff of less than four (4) consecutive weeks.

Section 2. Order of Layoff

A. When a reduction in the work force is implemented, each Agency/Department Head shall determine, subject to CEO approval, which employees are subject to layoff based on the needs of the organization.

B. In considering which employees shall be subject to layoff, consideration shall be given to knowledge and skills related to organizational need and the employee's performance.

Section 3. Notification of Employees

Written notice of layoff shall be given to an employee or sent by mail to the last known mailing address at least fourteen (14) calendar days prior to the effective date of the layoff. Notices of layoff shall be served on employees personally at work whenever practicable.

Section 4. Rehire Lists

A. The names of persons laid off shall be placed on an Agency/Departmental Rehire List for each class in the occupational series at or below the level of the class from which laid off.

B. Persons on the Agency/Departmental Rehire List for that class will be considered prior to eligibles on other types of eligible lists. If rehire is offered to a class other than that from which the person was laid off, such person must first meet the minimum qualifications and pass any required performance test for that class.

C. Names of persons placed on the Agency/Departmental Rehire List shall remain on the list for two (2) years, except that:

1. A person who rejects or fails to respond within five (5) calendar days to an offer of employment in a particular class shall be removed from the list for that class.

2. A person who declines referral for an interview in a particular class shall be removed from the list for that class.

3. A person who retires from the County shall be removed from all lists.

Plf's EXHIBIT 213
WITNESS Leys
DATE: 4-12-12
BRANDY L. WILLIAMS CSR# 11084

1 of

D. In the event two (2) or more agencies/departments are consolidated while Agency/Departmental Rehire Lists are in effect, such lists shall be combined and treated as one (1) list by class in accordance with the preceding provisions. When a transfer of one (1) or more functions of one Agency/Department to another Agency/Department occurs, employees previously laid off from such function(s) who are on an Agency/Departmental Rehire List for the Agency/Department losing such function(s), shall be removed from such list and shall be placed on a Rehire List by class for the agency/department acquiring such function(s) and treated in accordance with the preceding provisions.

Section 5. Status on Rehire

A. An employee who has been laid off under the provisions of this Article and is subsequently rehired in a regular or limited-term position within a two (2) year period from the date of his or her layoff shall receive the following considerations and benefits:

1. All sick leave or annual leave credited to the employee's account when laid off shall be restored.

2. All service hours held upon layoff shall be restored.

3. All prior service shall be credited for the purpose of determining sick leave, vacation and annual leave earning rates and service awards.

4. The employee shall be placed in the salary range as if the employee had been on a Leave of Absence Without Pay.

5. The probationary status of the employee shall be as if the employee had been on a Leave of Absence Without Pay except that a probation period shall be established as determined by Article VIII, Sections 1.B.1. or 1.B.2., if reemployment is in a higher class or an occupational series different from that employed in at the time of layoff.

Section 6. Supplemental Layoff Procedure

A. Layoffs of Administrative Management employees in the Social Services Agency shall be implemented in accordance with the County's Supplemental Layoff Procedure applicable to grant aided agencies and departments.

2 of 2

# EXHIBIT 214

YAHOO! MAIL Classic

**RE: Layoff return eligibility**

Wednesday, December 16, 2009 2:16 PM

**From:** "Leys, Bob" <Bob.Leys@ocgov.com>
**To:** "Christine Murray" <cammac24@att.net>
**Cc:** "Adams, Marguerite" <Marguerite.Adams@ocgov.com>

I will make sure your name remains on the list according to the provisions in the Personnel and Salary Resolution (PSR). Is the department aware of your current status?

---

**From:** Christine Murray [mailto:cammac24@att.net]
**Sent:** Wednesday, December 16, 2009 10:13 AM
**To:** Leys, Bob
**Subject:** Layoff return eligibility

Mr. Leys-
I recently have changed my status and did not retire but am deferring my retirement. This was due in large part to the resolution of an open work comp claim. As a result I realize the possibility for confusion or a mistake exists, so I would like to make sure that I am on the "list" for return to work at the Sheriff's Department / County of Orange if a Division Commander position opens.
Thank you,
Christine Murray
714-936-2211

---

PLF'S EXHIBIT 214
WITNESS Leys
DATE: 4-12-12
BRANDY L. WILLIAMS CSR# 11084

# EXHIBIT 215



Human Resources

Job Opportunities

SHARE

Home >> Human Resources (OCHR) >> Job Opportunities

NEOGOV

Job Title: Director of Support Services (Administrative Manager III)

Salary: $44.34 - $72.67 Hourly
$3,547.20 - $5,813.60 Biweekly
$7,685.60 - $12,596.13 Monthly
$92,227.20 - $151,153.60 Annually

Job Type: Full-Time

Location: Orange County, California

Print Job Information | Apply

Description | Benefits | Supplemental Questions

**Director of Support Services**

**(Administrative Manager III)**

**This recruitment is open to Orange County Sheriff's Department employees only.**

**THE OPPORTUNITY**
The incumbent in this position will have the opportunity to plan, organize, control, direct and coordinate the Support Services Division functions of the Sheriff-Coroner Department.

A **Director of Support Services** plans, assigns and supervises the work of all personnel in the Support Services Division; develops and implements operating policies of the division, subject to the review of executive management; coordinates the operations of the division with responsible officials in other divisions and details of the Sheriff-Coroner Department, with other County agencies/department and with local, state and federal regulatory agencies; speaks to public groups, attends conferences and meetings, and directs correspondence or reports pertaining to the activities of the Division, or the Department in general, coordinates with City, County, State and Federal agencies.

**THE IDEAL CANDIDATE will possess:**

- Experience interfacing effectively with executive managers and with the Orange County government leadership.
- Thorough understanding of the methods of team building, planning and the principles of public administration, including organization, budgeting and the selection, training and discipline of personnel.

**EXPERIENCE/EDUCATION**
One year of experience as an Administrative Manager II with the County of Orange.

OR

Five years of experience directly related to the competencies and attributes noted above. A bachelor's degree in a related area of study may substitute for two years of the required experience.

For additional Minimum Qualification information, click here.

**In Addition to the above, the ideal candidate should demonstrate the following KEY COMPETENCIES:**

**Leadership/Management:**
- Align division priorities and direction with County strategic goals and department objectives.
- Establish effective working relationships within the department and at the county and community levels.
- Develop and interpret departmental policy in accordance with organizational priorities and structure.

**Effective Communication:**
- Builds consensus among diverse groups in order to meet business/departmental objectives.
- Presents oral and written ideas and complex material clearly, concisely, logically and persuasively.

**Planning and Organization:**
- Exhibits cost consciousness and conserves departmental and/or County resources when possible.

Plf's EXHIBIT 215
WITNESS Leys
DATE: 4-12-12
BRANDY L. WILLIAMS CSR# 11084

# EXHIBIT 216

YAHOO! MAIL Classic

**Layoff rehire**

Thursday, January 7, 2010 8:10 AM

From: "Christine Murray" <cammac24@att.net>
To: shutchens@ocsd.org
Cc: jscott@ocsd.org, "BobLeys" <Bob.Leys@ocgov.com>

*Sheriff Hutchens:*

*I have become aware that Division Commander/Director Dean Gialamas has resigned his position with the Department. Coincidently, he is the person who assumed my duties at the time of my layoff. I am aware that you are conducting a promotional recruitment process to replace him, specifically seeking a Division Commander/Director for Support Services*

*My retirement remains in deferred status and I am on the rehire list for laid off employees.*

*Therefore I respectfully request reinstatement and reassignment to the position of Division Commander Support Services. Having recently filled that position I am able to return and fill the role without a lengthy learning or transition process. Additionally, my investigative background has also provided me with an understanding of the role and challenges facing our Forensic Science Bureau. This, coupled with approximately 8 years management experience within the Sheriff's Department, provides an opportunity for a quick and successful transition and will certainly benefit the Department during these difficult times.*

*I look forward to returning to work at the Orange County Sheriff's Department.*
*I have recently moved and include all of my current contact information below.*
*Thank you.*
*Christine Murray*

*cammac24@att.net*
*714-936-2211*
*714-203-1646*
*2419 Berkshire Way*
*Placentia, CA 92870*

---

Plf's EXHIBIT 216
WITNESS Leys
DATE: 4-12-12
BRANDY L. WILLIAMS CSR# 11084

# EXHIBIT 217



SHERIFF-CORONER DEPARTMENT
COUNTY OF ORANGE
CALIFORNIA

550 N. FLOWER STREET
P.O. BOX 449
SANTA ANA, CA 92702-0499
(714) 647-1800

SANDRA HUTCHENS
SHERIFF-CORONER

UNDERSHERIFF
JOHN L. SCOTT

EXECUTIVE COMMAND
RICK DOSTAL
MICHAEL R. HILLMANN
MIKE JAMES

COMMANDERS
TIM BOARD
JAY LEFLORE
W. DAVID WILSON

January 15, 2010

Christine Murray
17372 La Collette Place
Yorba Linda, CA 92886

Captain Murray,

The Sheriff would like to thank you for your interest in returning to the Division Commander position for the Support Services Division. Unfortunately, due to the current budget situation, the Sheriff's Department has decided not to move forward with the recruitment for this Administrative Manager III position. . As a reminder, you may access the County's transfer site to provide updated employment information and express your interest to be considered for any County position that may become open. You may access the transfer site by going to http://www.ocgov.com/hr.asp and clicking on the "Career Finders" link to submit your transfer application. If you should have questions regarding the transfer site, please contact Diane Tapia, Recruitment Manager at (714) 647-4121 in the Sheriff's Human Resources Department.

Sincerely,

Commander W. David Wilson

Pltf's EXHIBIT 217
WITNESS Leys
DATE: 4-12-12
BRANDY L. WILLIAMS CSR# 11084

PROUDLY SERVING THE UNINCORPORATED AREAS OF ORANGE COUNTY AND THE FOLLOWING CITIES AND AGENCIES:

ALISO VIEJO • DANA POINT • LAGUNA HILLS • LAGUNA NIGUEL • LAGUNA WOODS • LAKE FOREST • MISSION VIEJO
RANCHO SANTA MARGARITA • SAN CLEMENTE • SAN JUAN CAPISTRANO • STANTON • VILLA PARK
OC PARKS • DANA POINT HARBOR • JOHN WAYNE AIRPORT • OCTA • SUPERIOR COURT

# EXHIBIT 218

**From:** Christine Murray [mailto:cammac24@att.net]
**Sent:** Friday, February 05, 2010 9:45 AM
**To:** DIANE [OCSD]TAPIA
**Cc:** BobLeys
**Subject:** Layoff return

Good morning Diane.
I wanted to let you know that I received your email, the regular letter, and the registered letter sent regarding the recruitment being cancelled.

In my email requesting reinstatement I mentioned I had a new address, which was apparently overlooked when you did your mailing.

Would you please update your records to reflect my new address and contact numbers. Also, would you insure the County offices and Work Comp unit also has this updated information to share with the county's insureres. Or if not, direct me to who I should make the notifications to.

This is particularly important as I remain interested in returning to work at the Sheriff's Department and I verified through County HR that I am on the rehire list, so I do not want to have a delay in contacting or notifying me of future opportunities due to an old address being on file.

Thank you for your assistance in this regard.
Christine Murray
Home #714-203-1646
Cell#714-936-2211
Home Address:
2419 Berkshire Way
Placentia, CA 92870
--- On **Fri, 1/15/10, TAPIA, DIANE [OCSD]** <*dTapia@ocsd.org*> wrote:

From: TAPIA, DIANE [OCSD] <dTapia@ocsd.org>
Subject: Director of Support Services recruitment
To: "ZZ Christine Murray" <cammac24@att.net>
Date: Friday, January 15, 2010, 3:27 PM

Good afternoon,

Please see memo notification attached.

Plf's EXHIBIT 218
WITNESS Leys
DATE: 4-12-12
BRANDY L. WILLIAMS CSR# 11084

10F

Thank you,

Diane Tapia

OC Sheriff's Department

Professional Standards Bureau

dtapia@ocsd.org

2 of 2

# EXHIBIT 221

# CAPTAIN ELIGIBLE LIST

## FEBRUARY 26, 2009

BARDZIK, JEFFREY
BARNES, DONALD
BETZLER, MICHAEL
BOYNE, THEODORE
BROTHEIM, HAL
CARLSEN, JERRY
CHACON, ROLAND
COLVER, MICHAEL
D'AURIA, PAUL
FINNERAN, TIMOTHY
GALLIVAN, THOMAS
GARCIA, GILBERT
GIUDICE, BRENT
GRIFFIN, WILLIAM P.
HILLER, MICHAEL
KEA, STEVEN
LEVY, MARK
MULLEN, MICHAEL
MURPHY, COLIN
NEUMEISTER, ROGER
RONAN, DORTHA
RUDY, JAMES
SCHMUTZ, BRIAN
SMITH, GARY F.
SOLORZA, LINDA
STRAND, HANS
TAYLOR, STACEY
TOLEDO, MICHAEL
WILMOT, CHARLES

PlPl's EXHIBIT 281
WITNESS Gallivan
DATE: 5-1-12
BRANDY L. WILLIAMS CSR# 11064

# EXHIBIT 222

# ORANGE COUNTY SHERIFF'S DEPARTMENT
Santa Ana, California

EXHIBIT 222
WITNESS: Gullivan
DATE: 5-31-12
BRANDY L. WILLIAMS CSR 13042

TO: All Division Commanders
FROM: Sheriff Sandra Hutchens
DATE: February 5, 2010
RE: Temporary Promotions/Transfers

Temporary Promotions/Transfers effective: Friday, February 19, 2010

| | |
|---|---|
| Trans: | James, Michael, Assistant Sheriff (Custody Operations & Court Services Command) to Field Operations & Investigative Services Command |
| Temp Promo: | Board, Timothy, Commander (Field Operations & Investigative Services Command) to Interim Assistant Sheriff (Professional Services Command) |
| Temp Promo: | Le Fiore, Jay, Commander (Custody Operations & Court Services Command) to Interim Assistant Sheriff (Custody Operations & Court Services Command) |
| Trans: | Wilson, W. D. (Dave), Commander (Professional Services Division) to Custody Operations & Court Services Command |
| Temp Promo/Trans: | Billings, Mark, Captain (Patrol Operations) to Interim Commander (Field Operations & Investigations Services Command) |
| Temp Promo/Trans: | Trujillo, Librado, Captain (Investigations Division) to Interim Commander (Professional Services Command) |
| Temp Promo/Trans: | Barnes, Donald, Lieutenant (Sheriff's Administration) to Interim Captain (South Operations Division) |
| Temp Promo: | Bland, Antoinette, Lieutenant (Professional Services Division/Training Bureau) to Interim Captain (Training Division) |
| Temp Promo: | Gallivan, Thomas, Lieutenant (North Operations) to Interim Captain (North Operations Division) |
| Temp Promo/Trans: | Griffin, William, Lieutenant (South Operations) to Interim Captain (Investigations Division) |
| Temp Promo: | Hiller, Michael, Lieutenant (Court Services Division) to Interim Captain (Court Services Division) |
| Temp Promo: | Kea, Steven, Lieutenant (Professional Services Division/PSB) to Interim Captain (S.A.F.E. Division) |
| Temp Promo: | Krueger, Michael, Lieutenant (James A. Musick Facility) to Interim Captain (James A. Musick Facility) |
| Temp Promo: | Solorza, Linda, Lieutenant (Professional Services Division/PSB) to Interim Captain (Professional Standards Division) |
| Trans: | Ronan, Dottie, Lieutenant (Research and Development) to Sheriff's Administration |
| Trans: | Wilmot, Charles, Lieutenant (Professional Services Division/S.A.F.E.) to South Operations Division |
| Trans: | Wren, Robert, Lieutenant (Homeland Security/ECB) to North Operations Division |

# EXHIBIT 223

**ORANGE COUNTY SHERIFF'S DEPARTMENT**
**Santa Ana, California**

**TO:** All Division Commanders
**FROM:** Sheriff Sandra Hutchens
**DATE:** October 24, 2011
**RE:** Permanent /Temporary Promotions

Permanent Promotions / Temporary Promotion effective: Friday, October 21, 2011
Perm Prom: Billings, Mark, Assistant Sheriff (Administration)
Perm Prom: Board, Tim, Assistant Sheriff (Administration)
Temp Prom: Trujillo, Lee, Captain-Acting Commander to Commander (Administration)
Temp Prom: Reyes, Jane, Senior Director-Acting to Senior Director (Administration)
Perm Prom: Barnes, Donald, Captain-Acting Commander (Administration)
Perm Prom: Kea, Steven, Captain-Acting Commander (Administration)
Perm Prom: Bland, Antoinette, Captain (Training Division)
Perm Prom: Gallivan, Thomas, Captain (North Operations Division)
Perm Prom: Griffin, William, Captain (Professional Standards Division)
Perm Prom: Hiller, Michael, Captain (Court Operations Division)
Perm Prom: Krueger, Michael, Captain (Central Jail Complex)
Perm Prom: Long, Mark, Captain (S.A.F.E. Division)
Perm Prom: Moy, Timothy, Captain (Homeland Security Division)
Perm Prom: Powell, Adam, Captain (Investigations Division)
Perm Prom: Solorza, Linda, Captain (South Operations Division)
Temp Prom: Wilkerson, Kirk, Admin. Manager I to Admin. Manager III-Director of Support Services

Plf's EXHIBIT 223
WITNESS Gallivan
DATE: 5-1-12
BRANDY L. WILLIAMS CSR# 11084

# ORANGE COUNTY SHERIFF'S DEPARTMENT
## Santa Ana, California

SHERIFF
ORANGE COUNTY CALIFORNIA

**TO:** All Division Commanders
**FROM:** Sheriff Sandra Hutchens
**DATE:** March 13, 2009
**RE:** Transfers

The current budget challenges have required all of us, perhaps now more than ever, to evaluate our organization and look for operational efficiencies that will allow us to decrease costs, manage risks, and utilize existing resources wherever possible.

Today we are announcing the reorganization of the S.A.F.E. unit into a Division which will encompass the S.A.F.E. team, Risk Management and Crime Analysis. The S.A.F.E. Division is being assembled using existing resources and personnel and will be under the leadership of Captain Dave Wilson who will report directly to the Undersheriff. Captain Christine Murray will be transferred to Support Services.

As we work to constrain our own costs, we must also be cognizant of our law enforcement partners and contract cities. Last year we divided the command responsibilities of South Operations and added a Captain position. While we all agree this change allowed for better management of span of control and proved to be both positive and successful, the position adds increased costs to our contract cities, which would be difficult to absorb in these economic times. Therefore, South Operations will be consolidated under Captain Ron White. Captain Brian Wilkerson will be assigned to North Operations.

The department must also devote attention to the financial opportunities realized by the recent Federal Economic Stimulus Plan while seeking other funding resources. Additionally, numerous new projects to enhance various operational aspects of the department are also in the planning stages. Accordingly, Captain Bob Eason will be heading up the Department's new Special Projects Initiative which will come under the Investigative Services Command. Beginning March 27th, the Community Services Division will become bureaus within the Training Division under the leadership of Captain Catherine Zurn.

These changes are intended to assist all of us in building upon our already outstanding organization and I call upon each of you to continue to provide feedback on how we can streamline our operation.

Transfers effective: Friday, March 27, 2009
Trans: Eason, Robert, Captain (Community Services Division) to Special Projects Initiative
Trans: Murray, Christine, Captain (North Operations Division) to Support Services Division
Trans: Wilkerson, Brian, Captain (Southwest Operations Division) to North Operations Division
Trans: Wilson, W. David, Captain (Support Services Division) to S.A.F.E.
Trans: Arredondo, Edoardo, Deputy Sheriff II (North Operations Division) to Homeland Security Division/OCTA

Plf's EXHIBIT 229
WITNESS Hutchens
DATE: 5-14-12
BRANDY L. WILLIAMS CSR# 11084

# EXHIBIT 232

| Name | Org Name | Pay Location | Birth Date | Hire Date | Years of Service |
|---|---|---|---|---|---|
| ZURN, CATHERINE E | TRAINING DIVISION | 060043 | [redacted]/1956 | 8/24/1979 | 30 |
| WHITE, RONALD J | SOUTH PATROL BUREAU | 060004 | [redacted]/1957 | 7/25/1980 | 29 |
| MURRAY, CHRISTINE A | RECORDS | 060005 | [redacted]/1961 | 8/8/1980 | 29 |
| WILKERSON, BRIAN L | NORTH PATROL BUREAU | 060001 | [redacted]/1960 | 12/12/1980 | 29 |
| COSSAIRT, BRIAN L | EXECUTIVE MANAGEMENT | 047180 | [redacted]/1957 | 2/20/1981 | 28 |
| LE FLORE, JAY C | THEO LACY FACILITY | 060092 | [redacted]/1954 | 8/7/1981 | 28 |
| WILSON, WILLIAM D | S.A.F.E. | 060202 | [redacted]/1960 | 3/19/1982 | 27 |
| BOARD, TIMOTHY A | INTAKE RELEASE CENTER | 060064 | [redacted]/1960 | 3/26/1982 | 27 |
| NIGHSWONGER, DAVIS W | PROFESSIONAL STANDARDS | 060042 | [redacted]/1962 | 4/6/1984 | 25 |
| TRUJILLO, LIBRADO | SNP (NARCOTICS) | 060027 | [redacted]/1962 | 10/26/1984 | 25 |
| BILLINGS, MARK V | HARBOR PATROL SERVICES | 060003 | [redacted]/1959 | 11/15/1985 | 24 |
| DEMAIO, DENNIS | AIRPORT DETAIL | 060032 | [redacted]/1948 | 7/18/1986 | 23 |
| EASON, ROBERT U | SPECIAL PROJECTS INITIATIVE | 060203 | [redacted]/1945 | 2/1/1988 | 21 |
| BERGQUIST, DEANA J | JAMES A. MUSICK FACILITY | 060014 | [redacted]/1956 | 12/14/1990 | 19 |

Plf's EXHIBIT 232
WITNESS Hutchens
DATE: 5-14-12
BRANDY L. WILLIAMS CSR# 11084

# EXHIBIT 233

YAHOO! MAIL Classic

**FW: Strategic Financial Plan**

**From:** "Robert Eason" [redacted]

**To:** "Christine Murray" [redacted]

Thursday, October 8, 2009 9:59 AM

---

From: REason@ocsd.org
To: [redacted]
Date: Thu, 8 Oct 2009 09:23:02 -0700
Subject: FW: Strategic Financial Plan

Plf's EXHIBIT 233
WITNESS Hutchens
DATE: 5-14-12
BRANDY L. WILLIAMS CSR# 11084

**From:** SCOTT, JOHN
**Sent:** Thursday, July 09, 2009 11:43 AM
**To:** Division Commanders
**Cc:** Administration
**Subject:** Strategic Financial Plan

Ladies & Gentlemen:

Yesterday, began the arduous process of developing our *Strategic Financial Plan* for FY 2010-2011. Difficult decisions will have to be made over the next few months, that will impact the operation of the OCSD for years to come. That plan will be submitted to the CEO in September. Next Wednesday, we will continue the difficult task of reviewing existing services, Division by Division. Many cuts have already been made in the A, C-1 and C-2 lists, with more under final review in the C-3 list. Some of you might think there is no room for further cuts; and during normal times I would agree with you, I would even go so far as to say we are woefully understaffed in many areas. The truth of the matter is, we are still going to be required to make cuts to our operating budget based on dwindling resources; primarily Prop 172 funding. To that end, we will need to cut functions that have become a significant and familiar part of our service delivery; our signature *Customer Service* in many cases. Unfortunately, the economic times we're facing knows no boundaries; we must downsize to survive this period in our department history, providing only those core services we are responsible/mandated to perform, with all else "potentially" being eliminated.

To establish a clear indication to each of you as to just how serious this situation is, and the extent to which the Executive Command is planning for this eventuality, we have "Tentatively" approved a re-organization that consolidates the existing commands into fewer executives at the top; cutting two Assistant Sheriffs and six Captains from the current organization. That is drastic! It also marks a significant departure from the previous management of this department. Yet, it is necessary to set the tone for the type and range of cuts that will be required, department-wide, in order to meet our budget shortfall.

When you walk into the meeting next week, please consider your explanation of the Division you

1of2

command, as a presentation to the Executive Command staff as if you were seeking approval for the first time to implement a "brand new" command with all the functions and justifications necessary to get it off the ground; no frills, no extras, just the bare minimum to operate. With that in mind, you will probably be more successful in obtaining the approval you need. I wish it were different! It just isn't at the moment. EVERYONE in that room next Wednesday needs to be circumspect about their operation and mindful of just how it fits into the overall service delivery that the department will be able to provide in the years to come. Desperate times requires desperate measures. The measures you recommend will be painful, but necessary. The decisions we make as a group will define our leadership in this organization and will impact not only the men and women of this department, but the communities we serve. Please come to Wednesday's meeting prepared!

Thanks, John

---

Hotmail: Powerful Free email with security by Microsoft. Get it now.

---

2 of 2

# EXHIBIT 235

1358 l Sheriff 4/5

1. What criteria was used to identify the Captains who would be affected by job elimination?

2. Can I be transferred into another position?

NO. CAN not achieve savings that way

3. Is demotion an option.

NO.

4. Is extra-help an option?

eliminating positions but it could change.

5. Are furloughs an option?

6. Are salary reductions an option?

Not looked @ for Lts & Capt

7. Was department seniority considered?

NO

8. Was seniority within the rank of Captain considered?

NO

9. Was retirement eligibility or service years considered?

No but everyone is eligible to retire that is impacted

But unaware of any up why being NO.

August 3, 2009 meeting with Sheriff Hutchens – Capt. Murray

Plf's EXHIBIT 235
WITNESS Hutchens
DATE: 5-14-12
BRANDY L. WILLIAMS CSR# 11064
1 of

3/3 1427 complete meeting notes

S By function as opposed to demoting inv line level

alternative chosen

U/S C3 cut

U/S County HR will contact re process list of positions to county this week.

Sheriff Command staff didn't fit into normal procedures

(S) sees benefit of Ex Help if available in future Future

S- Furloughs depends on AOCDS countywide basis department basis

U/S Lts. layoffs to unknown still meetings w/ county Originally 2 but could change retirements or consolidation.

# EXHIBIT 237

# ORANGE COUNTY SHERIFF'S DEPARTMENT
## Santa Ana, California

**TO:** All Division Commanders
**FROM:** Sheriff Sandra Hutchens
**DATE:** July 10, 2009
**RE:** Permanent Promotions

---

Permanent Promotions to Lieutenant effective: Friday, July 17, 2009
Perm Prom: Dubsky, Sheryl, Lieutenant (James A. Musick)
Perm Prom: England, James, Lieutenant (North Operations)
Perm Prom: Ferguson, Andrew, Lieutenant (South Operations)
Perm Prom: Moy, Timothy, Lieutenant (Investigations)
Perm Prom: Wren, Robert, Lieutenant (North Operations)
Perm Prom: Briggs, Jon, Lieutenant (Central Jail Complex)

Permanent Promotions to Sergeant effective: Friday, July 17, 2009
Perm Prom: Baker, William, Sergeant (Theo Lacy)
Perm Prom: Cullen, Timothy, Sergeant (Theo Lacy)
Perm Prom: Faria, Omar, Sergeant (Central Jail Complex)
Perm Prom: Monroe, Joel, Sergeant (Central Jail Complex)
Perm Prom: Stephens, Andrew, Sergeant (Theo Lacy)
Perm Prom: Avant, James, Sergeant (Central Jail Complex)
Perm Prom: Copeland, Bertrand, Sergeant (Central Jail Complex)
Perm Prom: Crouch, Michael, Sergeant (Central Jail Complex)
Perm Prom: Ellis, Michael, Sergeant (Central Jail Complex)
Perm Prom: Olsen, Bradley, Sergeant (Central Jail Complex)

Permanent Promotions to Investigator effective: Friday, July 17, 2009
Perm Prom: Baker, Chad, Investigator (Professional Standards Division)
Perm Prom: Bloom, Daniel, Investigator (Investigations)
Perm Prom: Hall, Seth, Investigator (Investigations)

Permanent Promotions to Deputy Sheriff II effective: Friday, July 17, 2009
Perm Prom: Lucero, Arthur, Deputy Sheriff II (Central Jail Complex)
Perm Prom: Edgerton, James, Deputy Sheriff II (Theo Lacy)
Perm Prom: Duran, Manuel, Deputy Sheriff II (South Operations)
Perm Prom: Fairchild, Denise, Deputy Sheriff II (Central Jail Complex)
Perm Prom: Valdez, Ernesto, Deputy Sheriff II (Central Jail Complex)
Perm Prom: Kelly, Kevin, Deputy Sheriff II (Theo Lacy)
Perm Prom: Eccles, Ronald, Deputy Sheriff II (Theo Lacy)
Perm Prom: Minten, Lyle, Deputy Sheriff II (North Operations)
Perm Prom: Sprague, David, Deputy Sheriff II (Central Jail Complex)
Perm Prom: Robins, Bryan, Deputy Sheriff II (North Operations)
Perm Prom: Monroe, Eric, Deputy Sheriff II (Central Jail Complex)
Perm Prom: Perez-Estrada, Pedro, Deputy Sheriff II (Central Jail Complex)
Perm Prom: Brown, Michael, Deputy Sheriff II (Central Jail Complex)
Perm Prom: Sitton, Michelle, Deputy Sheriff II (Central Jail Complex)
Perm Prom: Dumas, Sean, Deputy Sheriff II (Theo Lacy)
Perm Prom: Fullerton, Ryan, Deputy Sheriff II (Central Jail Complex)

Pltf's EXHIBIT 237
WITNESS Hutchens
DATE 5-14-12
BRANDY L. WILLIAMS CSR# 11064

# EXHIBIT 238

CPBO ROSTER LISTING
DATA IS CURRENT AS OF 08/05/09

| Name | Hire Date | Promotion Date | Title Code | Title Description |
|---|---|---|---|---|
| BERGQUIST, DEANA J | 12/14/1990 | 05/10/2002 | 6141ML | CAPTAIN |
| BILLINGS, MARK V | 11/15/1985 | 08/15/2008 | 6141ML | CAPTAIN |
| BOARD, TIMOTHY A | 03/26/1982 | 03/19/2004 | 6141ML | CAPTAIN |
| COSSAIRT, BRIAN L | 02/20/1981 | 10/14/2005 | 6141ML | CAPTAIN |
| DEMAIO, DENNIS | 07/18/1986 | 04/04/2003 | 6141ML | CAPTAIN |
| EASON, ROBERT U | 02/01/1988 | 12/13/1991 | 6141ML | CAPTAIN |
| LE FLORE, JAY C | 08/07/1981 | 04/27/2007 | 6141ML | CAPTAIN |
| MURRAY, CHRISTINE A | 08/08/1980 | 06/24/2004 | 6141ML | CAPTAIN |
| NIGHSWONGER, DAVIS W | 04/06/1984 | 04/27/2007 | 6141ML | CAPTAIN |
| TRUJILLO, LIBRADO | 10/26/1984 | 08/15/2008 | 6141ML | CAPTAIN |
| WHITE, RONALD J | 07/25/1980 | 04/27/2007 | 6141ML | CAPTAIN |
| WILKERSON, BRIAN L | 12/12/1980 | 07/25/2003 | 6141ML | CAPTAIN |
| WILSON, WILLIAM D | 03/19/1982 | 10/14/2005 | 6141ML | CAPTAIN |
| ZURN, CATHERINE E | 08/24/1979 | 07/31/1998 | 6141ML | CAPTAIN |
| BROTHEIM, HAL J | 02/01/1988 | 04/18/2003 | 6138ML | LIEUTENANT |
| CHACON, ROLAND R | 04/25/1986 | 03/16/2007 | 6138ML | LIEUTENANT |
| MORENO, WILFRED | 07/02/1993 | 01/11/2002 | 6138ML | LIEUTENANT |
| MURPHY, COLIN L | 01/21/1983 | 03/15/1996 | 6138ML | LIEUTENANT |
| TOLEDO, MICHAEL | 11/15/1985 | 06/10/2005 | 6138ML | LIEUTENANT |
| VIRGOE, BRAD C | 04/26/1985 | 06/06/2008 | 6138ML | LIEUTENANT |
| ABBOTT, LAWRENCE F | 04/16/2004 | 09/06/1985 | 6138ML | LIEUTENANT |
| BAILEY, MARK | 09/07/1979 | 07/12/2002 | 6138ML | LIEUTENANT |
| BARDZIK, JEFFREY D | 10/26/1984 | 04/18/2003 | 6138ML | LIEUTENANT |
| BARNES, DONALD D | 04/07/1989 | 06/10/2005 | 6138ML | LIEUTENANT |
| BETZLER, MICHAEL C | 02/19/1982 | 03/19/2004 | 6138ML | LIEUTENANT |
| BLAND, ANTOINETTE D | 02/03/1989 | 04/27/2007 | 6138ML | LIEUTENANT |
| BOYNE, THEODORE A | 01/28/1983 | 03/19/2004 | 6138ML | LIEUTENANT |
| BRIGGS, JON J | 11/06/1992 | 07/17/2009 | 6138ML | LIEUTENANT |
| BYERLEY, WAYNE M | 01/15/1988 | 09/12/2008 | 6138ML | LIEUTENANT |
| CARLSEN, JERRY J | 03/30/1979 | 07/09/2004 | 6138ML | LIEUTENANT |
| COLVER, MICHAEL N | 08/07/1981 | 06/22/2007 | 6138ML | LIEUTENANT |
| D'AURIA, PAUL A | 07/02/1993 | 04/22/2005 | 6138ML | LIEUTENANT |
| DOAN, STEVEN F | 01/04/1985 | 03/19/2004 | 6138ML | LIEUTENANT |
| DOWNING, LLOYD D | 08/17/2007 | 07/12/2002 | 6138ML | LIEUTENANT |
| DOYLE, DOUGLAS S | 10/13/1986 | 09/12/2008 | 6138ML | LIEUTENANT |
| DUBSKY, SHERYL D | 08/01/1988 | 07/17/2009 | 6138ML | LIEUTENANT |
| DWYER, DANIEL P | 02/19/1982 | 04/27/2007 | 6138ML | LIEUTENANT |
| ENGLAND, JAMES R | 04/06/1984 | 07/17/2009 | 6138ML | LIEUTENANT |
| FERGUSON, ANDREW N | 07/02/1993 | 07/17/2009 | 6138ML | LIEUTENANT |
| FINNERAN, TIMOTHY R | 06/28/1985 | 06/28/2002 | 6138ML | LIEUTENANT |
| FUREY, FREDERICK F | 06/23/1989 | 03/16/2007 | 6138ML | LIEUTENANT |
| FUZZARD, PAUL S | 08/16/1985 | 08/31/2007 | 6138ML | LIEUTENANT |
| GALLIVAN, THOMAS H | 09/05/1980 | 07/09/2004 | 6138ML | LIEUTENANT |
| GARCIA, GILBERT | 10/02/1981 | 11/28/2003 | 6138ML | LIEUTENANT |
| GAVIN, MICHAEL J | 01/24/1986 | 01/30/2009 | 6138ML | LIEUTENANT |
| GIUDICE, BRENT M | 11/21/1986 | 01/24/2003 | 6138ML | LIEUTENANT |
| GIUDICE, ERIN L | 05/29/1987 | 06/28/2002 | 6138ML | LIEUTENANT |
| GRIFFIN, WILLIAM P | 05/03/1985 | 12/10/2004 | 6138ML | LIEUTENANT |

Plf's EXHIBIT 238
WITNESS: Hutchens
DATE: 5-14-12

| Name | Hire Date | Promotion Date | Title Code | Title Description |
|---|---|---|---|---|
| HILLER, MICHAEL E | 08/12/1983 | 08/23/2002 | 6138ML | LIEUTENANT |
| JANSEN, MICHAEL R | 07/12/1985 | 04/27/2007 | 6138ML | LIEUTENANT |
| JONES, LARRY W | 04/14/2006 | 02/12/1999 | 6138ML | LIEUTENANT |
| KEA, STEVEN C | 07/18/1986 | 04/28/2006 | 6138ML | LIEUTENANT |
| KRUEGER, MICHAEL J | 04/29/1983 | 02/16/2007 | 6138ML | LIEUTENANT |
| LAPEAN, KIRK W | 01/24/1986 | 06/22/2007 | 6138ML | LIEUTENANT |
| LEVY, MARK A | 10/18/1986 | 04/02/2004 | 6138ML | LIEUTENANT |
| LONG, MARK E | 07/12/1985 | 09/12/2008 | 6138ML | LIEUTENANT |
| LONICH, JANET E | 08/30/1985 | 10/14/2005 | 6138ML | LIEUTENANT |
| MENA, RUDY M | 06/29/1990 | 07/12/2002 | 6138ML | LIEUTENANT |
| MOY, TIMOTHY S | 04/12/1985 | 07/17/2009 | 6138ML | LIEUTENANT |
| MULLEN, MICHAEL W | 11/11/1983 | 09/03/2004 | 6138ML | LIEUTENANT |
| NEUMEISTER, ROGER W | 07/26/1991 | 10/14/2005 | 6138ML | LIEUTENANT |
| OSBORNE, ROBERT G | 03/29/1985 | 09/12/2008 | 6138ML | LIEUTENANT |
| PASSALAQUA, JEFFREY | 01/10/1986 | 06/22/2007 | 6138ML | LIEUTENANT |
| PETERSON, ROBERT J | 10/23/1987 | 10/10/2008 | 6138ML | LIEUTENANT |
| POWELL, ADAM J | 01/05/1987 | 09/12/2008 | 6138ML | LIEUTENANT |
| RONAN, DORTHA M | 06/24/1983 | 03/29/1996 | 6138ML | LIEUTENANT |
| RUDY, JAMES A | 06/14/1985 | 07/12/2002 | 6138ML | LIEUTENANT |
| SCHMUTZ, BRIAN J | 07/02/1993 | 04/27/2007 | 6138ML | LIEUTENANT |
| SLAYTON, THOMAS F | 10/27/1986 | 10/14/2005 | 6138ML | LIEUTENANT |
| SMITH, GARY F | 04/25/1986 | 09/03/2004 | 6138ML | LIEUTENANT |
| SOLORZA, LINDA C | 01/23/1987 | 07/12/2002 | 6138ML | LIEUTENANT |
| STRAND, HANS O | 10/14/1977 | 03/19/2004 | 6138ML | LIEUTENANT |
| TAYLOR, STACEY N | 08/29/1986 | 04/28/2006 | 6138ML | LIEUTENANT |
| TURRENTINE, DONALD R | 10/31/1980 | 04/22/2005 | 6138ML | LIEUTENANT |
| TYNES, MICHAEL W | 09/23/1977 | 07/12/2002 | 6138ML | LIEUTENANT |
| VARELA, ANDREW | 04/20/1979 | 06/28/2002 | 6138ML | LIEUTENANT |
| VASENTINE, KURT E | 04/27/2007 | 04/18/2003 | 6138ML | LIEUTENANT |
| WILMOT, CHARLES F | 08/29/1986 | 04/28/2006 | 6138ML | LIEUTENANT |
| WREN, ROBERT W | 06/06/1986 | 07/17/2009 | 6138ML | LIEUTENANT |
| BEAVER, ROBERT D | 09/26/2007 | 09/26/2007 | 8013MA | ADMINISTRATIVE MANAGER III |
| BERNDT, JACQUE J | 10/14/1983 | 12/04/1998 | 8013MA | ADMINISTRATIVE MANAGER III |
| GIALAMAS, DEAN M | 07/30/2004 | 07/30/2004 | 8013MA | ADMINISTRATIVE MANAGER III |
| GIBSON, SHARRON K | 06/15/1979 | 09/03/2004 | 8013MA | ADMINISTRATIVE MANAGER III |
| REYES, JANE R | 06/30/1978 | 10/24/2008 | 8013MA | ADMINISTRATIVE MANAGER III |
| STOFFEL, ROBERT A | 11/27/1989 | 04/27/2007 | 8013MA | ADMINISTRATIVE MANAGER III |

2 of 2

# EXHIBIT 239

# Orange County Sheriff's Department Executive and Command Staff

| | Apr 2009 | Aug 2009 | Org change eff. Sep 11, 2009 | Oct 9, 2009 | Eff. Feb 19, 2010 | Eff. Feb 25, 2011 |
|---|---|---|---|---|---|---|
| Executive Command | Sheriff (Hutchens) | | Sheriff (Hutchens) | | Sheriff (Hutchens) | Sheriff (Hutchens) |
| | Undersheriff (Scott) | | Undersheriff (Scott) | | Undersheriff (Scott) | Undersheriff (Scott) |
| | Asst Sheriff (Anderson) | 2 A/S, 5 Captains notified positions "eliminated" | Asst Sheriff (James) | Actual date of termination ~ Anderson, Davis; Bergquist, Cossairt, Eason, Murray ~ | Asst Sheriff (James) | Asst Sheriff (James) |
| | Asst Sheriff (Davis) | | Asst Sheriff (Hillmann) | | Asst Sheriff (Board)* | Asst Sheriff (Board)* |
| | Asst Sheriff (James) | | | | Asst Sheriff (LeFlore)* | Asst Sheriff (Billings)* |
| | Asst Sheriff (Hillmann) | | Commander (Board)* | | Commander (Billings)* | Commander (Barnes)* |
| | | | Commander (LeFlore)* | | Commander (Trujillo)* | Commander (Trujillo)* |
| | | | | | Commander (Wilson)* | Commander (Wilson)* |
| Command Staff ~ Captains | JAMF (Bergquist) | | JAMF/TLF (Nighswonger) | | JAMF (Krueger)* | JAMF (White) |
| | TL (LeFlore) | | | | TLF (Nighswonger) | TLF (Nighswonger) |
| | CJX (Board) | | CJX/Court Svs (White) | | CJX (White) | CJX (Kea)* |
| | Court Services (Cossairt) | | | | Court Svs (Hiller)* | Court Svs (Hiller)* |
| | North Ops (B. Wilkerson) | | Patrol Ops (Billings) | | North Ops (Gallivan)* | North Ops (Gallivan)* |
| | South Ops (White) | | | | South Ops (Barnes)* | South Ops (Solorza)* |
| | Support Services (Murray) | | Support Svs / Crime Lab | | Supp. Svs (Dir. K. Wilkerson) | Supp Svs (Dir. K. Wilkerson) |
| | Crime Lab (Director Gialamas) | | (Director Gialamas) | | Crime Lab (Dir.Tom Nassar)* | Crime Lab (Dir. Bruce Houlihan) |
| | Special Projects (Eason) | | position eliminated | | | |
| | S.A.F.E. (Wilson) | | position eliminated | | S.A.F.E. (Kea)* | S.A.F.E. (Long)* |
| | P.S.D. (Nighswonger) | | P.S.D. (Wilson) | | P.S.D. (Solorza)* | P.S.D. (Griffin)* |
| | Homeland Security (Billings) | | Homeland Security (B. Wilkerson) | | Homeland Security (B. Wilkerson) | Homeland Security (B. Wilkerson) |
| | Airport Operations (DeMaio) | | Airport Operations (DeMaio) | | Airport Operations (DeMaio) | Airport Operations (DeMaio) |
| | Investigations (Trujillo) | | Investigations (Trujillo) | | Investigations (Griffin)* | Investigations (Krueger)* |
| | Training (Zurn) | | position eliminated | | Training (Bland)* | Training (Bland)* |

Plf's EXHIBIT 239
WITNESS Hutchens
DATE: 5-14-12
BRANDY L. WILLIAMS CSR# 11064

# EXHIBIT 244

# ORANGE COUNTY SHERIFF'S DEPARTMENT
## Santa Ana, California

SHERIFF ORANGE COUNTY CALIFORNIA

**TO:** All Division Commanders

**FROM:** Sheriff Sandra Hutchens

**DATE:** May 4, 2010

**RE:** Transfers/Temporary Promotions

---

Transfers/Temporary Promotions effective May 21, 2010

Trans: Murphy, Colin, Lieutenant (Theo Lacy) to North Operations/ECB
Trans: Furey, Frederick, Lieutenant (North Operations/ECB) to Central Jail Complex
Temp Prom: McHenry, Michael, Sergeant (South Operations) to Lieutenant
Temp Prom: Meyer, John, Sergeant (South Operations/Mission Viejo) to Lieutenant
Temp Prom: Peters, Michael, Sergeant (Homeland Security Division/SWAT) to Lieutenant
Temp Prom: Wilson, Christopher, Sergeant (Theo Lacy) to Lieutenant
Temp Prom: Danciulescu, Mihail, Deputy Sheriff II (Airport Operations Division) to Sergeant
Temp Prom: Finn, Robert, Deputy Sheriff II (Homeland Security Division/OCTA) to Sergeant
Temp Prom: Johnson, Matthew, Deputy Sheriff II (South Operations/Dana Point) to Sergeant
Temp Prom: Johnson, Richard, Deputy Sheriff II (North Operations) to Sergeant
Temp Prom: Packard, Lawrence, Deputy Sheriff II (South Operations/Dana Point) to Sergeant
Temp Prom: Dunham, Robert, Deputy Sheriff II (Homeland Security Division/OCTA) to Sergeant
Temp Prom: Moodie, David, Investigator (Investigations/RNSP) to Sergeant
Temp Prom: Prince, Matthew, Deputy Sheriff II (South Operations/Laguna Niguel) to Sergeant
Temp Prom: Thomas, Milton, Deputy Sheriff II (North Operations/Stanton) to Sergeant
Temp Prom: Tinoco, Gary, Investigator (Investigations Division) to Sergeant

Plf's EXHIBIT 244
WITNESS Hutchens
DATE: 5-14-12
BRANDY L. WILLIAMS CSR# 11084

# EXHIBIT 245

# ORANGE COUNTY SHERIFF'S DEPARTMENT
## Santa Ana, California

**TO:** All Department Personnel
**FROM:** Sheriff Sandra Hutchens
**DATE:** March 19, 2010
**RE:** Appointment of Support Services Director

---

I am pleased to announce the appointment of Kirk Wilkerson to the position of Interim Director of Support Services, effective March 19,.2010.

Kirk has been with the Sheriff's Department for over 23 years assigned to the Communications Division. In his career he has held several positions ranging from Technical/Engineering to Supervisory/Management, with the last five years as an Administrative Manager/Assistant Director. His educational background is in Industrial Electronics with an Associate's degree from United Electronics Institute.

Please join me in welcoming and congratulating Kirk on his appointment to Director of Support Services.

Plf's EXHIBIT 245
WITNESS Hutchens
DATE: 5-14-12
BRANDY L. WILLIAMS CSR# 11084

# EXHIBIT 250

**ORANGE COUNTY**
Department of Human Resources
333 W. Santa Ana Blvd,
Santa Ana, CA 92701
ochr@ocgov.com
http://www.ocgov.com/jobs

**INVITES APPLICATIONS FOR THE POSITION OF:**
**CAPTAIN**

**SALARY**
$10,954.67 - $12,996.53 Monthly

**ISSUE DATE:** 03/15/10

**FINAL FILING DATE:** 03/29/10

**THE POSITION**

**The Sheriff's Department will accept applications through March 29, 2010.** PLEASE NOTE, ONLY ON-LINE APPLICATIONS WILL BE ACCEPTED.

**Only employees of the Sheriff-Coroner Department who meet the minimum qualifications and persons laid off from employment within the preceding two years who possess the minimum qualifications will be considered.**

**RECRUITMENT/POSITION INFORMATION**

This recruitment is being held to establish a Promotional Eligible List to fill future vacancies in this class until the next recruitment.

General Duties: A Captain plans, organizes, controls and directs the work of a major division of the Sheriff-Coroner Department. A Captain is able to demonstrate excellent leadership and managerial skills as well as having keen awareness of financial implications and how it impacts a law enforcement agency.

**MINIMUM QUALIFICATIONS**

Special Requirements: Only current California P.O.S.T. certified law enforcement officers will be considered.

Experience: Five years experience as a law enforcement officer in a civilian agency, including one year of experience at the rank of Lieutenant with the Orange County Sheriff's Department. Candidates must have successfully passed probation at the rank of Lieutenant with the Orange County Sheriff-Coroner Department. Completion of two years of education at a recognized college in police science or criminology may be substituted for one year of the non-supervisory

experience. Graduation from a recognized college with a degree in police science or criminology may be substituted for two years of the non-supervisory experience.

Knowledge of: Modern police planning, principles and methods of law enforcement; principles of public administration, including organization, budgeting, and the selection, training, and disciplining of personnel; modern principles of law enforcement related to the work of a division of the Sheriff's Department; criminal law including the laws of arrest, rules of evidence and courtroom procedure, search and seizure, and laws governing jail procedures and facilities; leadership concepts and their application within a large law enforcement agency; ethical decision making models and professional development processes.

Ability to: Plan, organize, direct, and evaluate the work of others; devise methods, procedures, and regulations, and evaluate their effects; analyze and interpret crime statistics and reports; speak effectively before a large group; write reports, manuals, and guides; establish and maintain effective and cooperative working relationships with others; successfully lead, motivate and mentor subordinate personnel as well as cross functional workgroups; make ethical and sound decisions; identify trends and provide creative solutions to current issues while projecting and planning for future needs.

License Required: Possession of a valid California Driver's License.

## SELECTION PROCEDURE

The Professional Standards Division, Sheriff Human Resources screens all applications and supplemental information to identify those candidates who meet the minimum qualifications. The qualified candidates will be placed on an eligible list.

## PROMOTION

The Sheriff will have the flexibility to promote in no particular order off the Eligible List.

## HOW TO APPLY

Only online applications will be accepted at www.ocgov.com. Your application should demonstrate your professional experience and education related to the specific qualifications/duties listed in this bulletin, including the areas in which you have developed expertise. Please print a copy of your confirmation page for your records. Specific information pertaining to this recruitment can be obtained by calling Paige West at 714-834-5859.

## FREQUENTLY ASKED QUESTIONS

Orange County, as an equal employment opportunity employer encourages applicants from diverse backgrounds to apply.

APPLICATIONS MAY BE OBTAINED AND FILED ONLINE AT:
http://www.ocgov.com/jobs
OR
333 W. Santa Ana Blvd,
Santa Ana, CA 92701

EXAM #6141ML 0310 060 (AP)
CAPTAIN
PW

**CAPTAIN Supplemental Questionnaire**

* 1. Are you currently an Orange County Sheriff-Coroner Department employee?

❑ Yes ❑ No

* 2. This supplemental form is designed to help you present your qualifications in terms relative to the requirements for the position. Please provide concise, descriptive and detailed information for each requested item. Resumes and other unsolicited materials will not be accepted in lieu of the specific information requested herein. **Please limit your complete response to the supplemental questionnaire to no more than three (3) typewritten pages. To accomplish this, it is recommended you type your responses in a Word document and number your responses to correlate with the question answered. Then copy and paste your completed responses into the supplemental questionnaire text box.**

**Requested Information**

Briefly describe the steps you have taken to prepare for the position of Captain. Include the following in your response:

- 1. Training, education and/or certification.
- 2. The two most significant administrative projects you have completed and the positive impact on the department.
- 3. Your experience in strategic and efficient budgeting and staffing.
- 4. Explain why you want to be a Captain.
- 5. What are your professional goals?
- 6. Describe how your leadership style attains effective results (provide examples).

* Required Question

# EXHIBIT 251



**SHERIFF-CORONER DEPARTMENT**
**COUNTY OF ORANGE**
CALIFORNIA

320 N. FLOWER STREET
SANTA ANA, CA 92703
(714) 647-7000

SANDRA HUTCHENS
SHERIFF-CORONER

UNDERSHERIFF
JOHN L. SCOTT

EXECUTIVE COMMAND
RICK DOSTAL
MICHAEL R. HILLMANN
MIKE JAMES

COMMANDERS
TIM BOARD
JAY LEFLORE
W. DAVID WILSON

April 1, 2010

Christine A. Murray
2419 Berkshire Way
Placentia, California 92870

Dear Ms. Murray,

We received your interest and application for the position of Captain. Your eligibility for the position of Captain remains active on the Reinstatement/Rehire List for two years from the date of your layoff.

> Per Article XXV Terms and Conditions of Employment for Law Enforcement Management Employees, Section 1 General Provisions, of the 2003 Personnel And Salary Resolution, "Except as otherwise provided in this Article, the wages, hours and terms of conditions of employment for employees in Law Enforcement Management (Appendix E) shall be the same as adopted for employees in Administrative Management."
>
> Per Article XI Layoff Procedure, Section 5 (Rehire Lists) of the 2007-2010 Administrative Manager Unit, Memorandum of Understanding (MOU):
>
> A) "The names of persons laid off shall be placed on an Agency/Departmental Rehire List for each class in the occupational series at or below the level of the class from which laid off."
>
> B) "Persons on the Agency/Departmental Rehire List for that class will be considered prior to eligibles on other types of eligible lists. If rehire is offered to a class other than that from which the person was laid off, such person must first meet the minimum qualifications and pass any required performance test for that class."
>
> C) "Names of persons placed on the Agency/Departmental Rehire List shall remain on the list for two (2) years."

If you file for retirement, you will no longer be eligible to remain on the Reinstatement List or eligible to apply for Captain. Captain recruitments are opened internally only to

*PROUDLY SERVING THE UNINCORPORATED AREAS OF ORANGE COUNTY AND THE FOLLOWING CITIES AND AGENCIES:*

ALISO VIEJO • DANA POINT • LAGUNA HILLS • LAGUNA NIGUEL • LAGUNA WOODS • LAKE FOREST • MISSION VIEJO
RANCHO SANTA MARGARITA • SAN CLEMENTE • SAN JUAN CAPISTRANO • STANTON • VILLA PARK
OC PARKS • DANA POINT HARBOR • JOHN WAYNE AIRPORT • OCTA • SUPERIOR COURT

DRUG USE
IS
LIFE ABUSE

employees and former employees of the department who were laid-off (for two years after the layoff date) and have not filed for retirement.

> Per Article XI Layoff Procedure, Section 5 (Rehire Lists), C.3 of the 2007-2010 Administrative Manager Unit, Memorandum of Understanding (MOU) "Names of persons placed on the Agency/Departmental Rehire List shall remain on the list for two (2) years, except that:", "A person who retires from the County shall be removed from all lists".

Thank you for your continued interest with the County of Orange, Sheriff's Department. As noted above, your name shall remain on the Reinstatement/Rehire List for the position of Captain, for a total of two years after the layoff date, provided you do not retire and are no longer eligible for consideration.

Sincerely,

Diane Tapia, Recruitment Manager
Orange County Sheriff's Department
Professional Standards Division
(714) 834-5818

# EXHIBIT 252

# PERSONNEL

# AND

# SALARY RESOLUTION

COUNTY OF ORANGE

January 10, 2003

## TABLE OF CONTENTS

DEFINITIONS ..... 1

PART 1 ..... 4

ARTICLE I GENERAL POLICIES AND PRACTICES ..... 4

- SECTION 1. REGULATION OF EMPLOYEES ..... 4
  - *D. County Policy on Employment of Relatives ..... 5*
  - *E. Drug and Alcohol Policy ..... 7*
  - *G. Catastrophic Leave Donation Procedure ..... 8*
  - *H. Policy for the Prevention of Workplace Violence ..... 8*
  - *I. Information Technology Usage Policy ..... 10*
- SECTION 2. POSITION CLASSIFICATION PLAN ..... 16
- SECTION 3. NUMBER AND CLASSIFICATION OF ACTIVATED POSITIONS ..... 16
- SECTION 4. SELECTION PROCEDURES ..... 17
- SECTION 5. PERFORMANCE EVALUATIONS ..... 18
- SECTION 6. AUTHORITY FOR DISCIPLINARY ACTION ..... 18
- SECTION 7. LEAVE OF ABSENCE WITH PAY ..... 18
- SECTION 8. MILITARY LEAVE OF ABSENCE ..... 19
- SECTION 9. TIME OFF FOR VOTING ..... 19
- SECTION 10. DEDUCTIONS FOR MAINTENANCE ..... 20
- SECTION 11. PROVISIONAL APPOINTMENT ..... 20
- SECTION 12. EMPLOYEE PARKING ..... 20

ARTICLE II PAY PRACTICES ..... 21

- SECTION 1. METHOD OF COMPENSATION FOR EMPLOYEES ..... 21
- SECTION 2. SALARY PAYMENT PROCEDURE ..... 21
- SECTION 3. AUTHORIZATION FOR SALARY INCREASES ..... 21
- SECTION 4. SALARY ON EMPLOYMENT AS A DEPUTY SHERIFF EMERGENCY SERVICE ..... 21
- SECTION 5. LIMITATIONS UPON COMPENSATION ..... 22
- SECTION 6. AUTHORITY TO RESOLVE EMPLOYEE COMPLAINTS/ GRIEVANCES/AND TO SELECT AND COMPENSATE ARBITRATORS ..... 22
- SECTION 7. PAY CHECK DEPOSIT ..... 23

ARTICLE III EDUCATIONAL AND PROFESSIONAL REIMBURSEMENT PROGRAM ..... 24

- SECTION 1. OBJECTIVE ..... 24
- SECTION 2. ELIGIBLE EMPLOYEES ..... 24
- SECTION 3. REIMBURSEMENT ELIGIBILITY ..... 24
- SECTION 4. NATURE OF REIMBURSEMENT ..... 25
- SECTION 5. REQUEST PROCEDURE ..... 26

ARTICLE IV PAYOFF PROVISIONS .......... 27
SECTION 1. SICK LEAVE PAYOFF .......... 27
SECTION 2. VACATION PAYOFF .......... 27
SECTION 3. ANNUAL LEAVE PAYOFF .......... 27

ARTICLE V INSURANCE FOR VOLUNTARY SERVICES PERSONNEL 28
RESERVE DEPUTY SHERIFFS .......... 28

PART 2 - ADMINISTRATIVE MANAGEMENT .......... 29

ARTICLE VI WORK PERIOD AND PAY PRACTICES .......... 29
SECTION 1. WORK PERIOD .......... 29
SECTION 2. PAY FOR NEW EMPLOYEES .......... 29
SECTION 3. SALARY ON PROMOTION .......... 30
SECTION 4. SALARY ON REASSIGNMENT .......... 31
SECTION 5. SALARY ON REDUCTION .......... 32
*A. Disciplinary Reductions .......... 32*
*B. Nondisciplinary Reductions .......... 32*
SECTION 6. SALARY ON RECLASSIFICATION .......... 33
SECTION 7. SALARY ON REEMPLOYMENT .......... 34
SECTION 8. CHANGE IN SALARY ALLOCATION .......... 34
SECTION 9. ADDITIONAL COMPENSATION .......... 35
SECTION 10. ELECTION WORK .......... 35
SECTION 11. PREMIUM PAY .......... 35
*A. Night Shift Differential .......... 35*
*B. Bilingual Pay .......... 35*
*C. Attorney Special Duty Pay .......... 36*

ARTICLE VII MERIT INCREASES WITHIN RANGE .......... 37
SECTION 1. MERIT INCREASES WITHIN RANGE .......... 37

ARTICLE VIII GENERAL PERSONNEL PROVISIONS .......... 39
SECTION 1. PROBATION .......... 39
*A. New Probation .......... 39*
*B. Promotional Probation .......... 39*
*C. Failure of Probation .......... 40*
*D. General Provisions .......... 41*
*E. Extension of Probation Periods .......... 41*
SECTION 2. PERFORMANCE EVALUATION .......... 42
SECTION 3. CONTENTS OF PERSONNEL FILE .......... 42
SECTION 4. STATUS OF LIMITED-TERM EMPLOYEES .......... 43
SECTION 5. TEMPORARY PROMOTION .......... 44
SECTION 6. REEMPLOYMENT OF EMPLOYEES ON DISABILITY RETIREMENT .. 44

SECTION 7. REEMPLOYMENT OF REGULAR EMPLOYEE . . . . . 45
SECTION 8. TIME OFF FOR SELECTION PROCEDURES . . . . . 45

ARTICLE IX LEAVE PROVISIONS ..... 46
SECTION 1. SICK LEAVE . . . . . 46
*A. Annual Leave ..... 46*
*B. Accumulation of Sick Leave ..... 46*
*C. Permitted Uses of Sick Leave ..... 46*
*D. Prohibited Uses of Sick Leave ..... 47*
*E. General Provisions ..... 48*
SECTION 2. BEREAVEMENT LEAVE . . . . . 49
SECTION 3. AUTHORIZED LEAVE WITHOUT PAY . . . . . 49
*A. Agency/Departmental Leave ..... 49*
*B. Official Leave ..... 49*
*C. General Provisions ..... 51*
SECTION 4. OFFICIAL LEAVE FOR NONOCCUPATIONAL DISABILITY . . . . . 51
SECTION 5. ABSENCES CAUSED BY ILLNESS, INJURY OR PREGNANCY . . . . 52
SECTION 6. JURY DUTY LEAVE . . . . . 52
SECTION 7. WITNESS LEAVE . . . . . 52
SECTION 8. ABSENCE WITHOUT AUTHORIZATION . . . . . 52
SECTION 9. PARENTHOOD LEAVE . . . . . 53
SECTION 10. WORKERS' COMPENSATION LEAVE . . . . . 54
SECTION 11. FAMILY LEAVE . . . . . 55
*A. General Provisions ..... 55*
*B. Notification Requirements ..... 56*
*C. Verification ..... 56*

ARTICLE X VACATION ..... 57
SECTION 1. ACCUMULATION OF VACATION . . . . . 57
SECTION 2. GENERAL PROVISIONS . . . . . 58
SECTION 3. VACATION INCENTIVES FOR CRITICAL MANAGEMENT APPOINTMENTS . . . . . 59

ARTICLE XI HOLIDAYS ..... 60
SECTION 1. HOLIDAYS OBSERVED . . . . . 60
SECTION 2. ELIGIBILITY FOR HOLIDAY PAY . . . . . 61
SECTION 3. HOLIDAY PAY . . . . . 61
*B. Compensation for Holidays Falling on Scheduled Days Off ..... 62*
*C. Compensation for Work on Holidays ..... 62*

ARTICLE XII REIMBURSEMENT PROGRAMS ..... 63
SECTION 1. MILEAGE REIMBURSEMENT . . . . . 63
SECTION 2. PERSONAL PROPERTY REIMBURSEMENT . . . . . 63

SECTION 3. OPTIONAL BENEFIT PLAN . . . . . . . . . . . . . . . . . . . . . . . . . 63

ARTICLE XIII FLEXIBLE SPENDING ACCOUNTS .................................... 66
SECTION 1. FLEXIBLE SPENDING ACCOUNTS . . . . . . . . . . . . . . . . . . . . 66
*A. Health Care Reimbursement Account (HCRA)......................... 66*
*B. Dependent Care Reimbursement Account (DCRA).................. 66*

ARTICLE XIV DISCIPLINARY ACTION.................................................... 67
SECTION 1. REPRIMAND AND SUBSTANDARD PERFORMANCE EVALUATION . 67
SECTION 2. EMERGENCY SUSPENSIONS OF FIVE DAYS OR LESS . . . . . . . . 67
SECTION 3. PRE-DISCIPLINARY HEARING FOR SUSPENSION, REDUCTION OR DISCHARGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
SECTION 4. SUSPENSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
SECTION 5. REDUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
SECTION 6. DISCHARGE AND RIGHT OF APPEAL . . . . . . . . . . . . . . . . . . 69
SECTION 7. POLYGRAPH EXAMINATION . . . . . . . . . . . . . . . . . . . . . . . 69

ARTICLE XV GRIEVANCE PROCEDURE AND DISCIPLINARY APPEALS70
SECTION 1. SCOPE OF GRIEVANCES . . . . . . . . . . . . . . . . . . . . . . . . . 70
SECTION 2. BASIC RULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
SECTION 3. SUBMISSION OF GRIEVANCES . . . . . . . . . . . . . . . . . . . . . . 71
SECTION 4. EMPLOYEE REPRESENTATION . . . . . . . . . . . . . . . . . . . . . . 71
SECTION 5. TIME OFF FOR PROCESSING GRIEVANCES/APPEALS . . . . . . . . 71
SECTION 6. INFORMAL DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . 72
SECTION 7. GRIEVANCE/APPEAL STEPS . . . . . . . . . . . . . . . . . . . . . . 72
SECTION 8. REFERRALS TO ARBITRATION . . . . . . . . . . . . . . . . . . . . . 74
*A. Disciplinary Appeals ..................................................................... 74*
*B. Probationary Releases Alleging Discrimination......................... 75*
*C. General Provisions........................................................................ 76*
SECTION 9. SUPPLEMENTAL LAYOFF APPEAL PROCEDURE . . . . . . . . . . . . 78

ARTICLE XVI LAYOFF PROCEDURE ..................................................... 79
SECTION 1. GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . 79
SECTION 2. ORDER OF LAYOFF . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
SECTION 3. NOTIFICATION OF EMPLOYEES . . . . . . . . . . . . . . . . . . . . . 79
SECTION 4. REHIRE LISTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
SECTION 5. STATUS ON REHIRE . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
SECTION 6. SUPPLEMENTAL LAYOFF PROCEDURE . . . . . . . . . . . . . . . . . 80

ARTICLE XVII ON-THE-JOB INJURY, WORKERS' COMPENSATION SUPPLEMENT PAY ........................................................ 81
SECTION 1. TREATMENT OF INDUSTRIAL INJURIES . . . . . . . . . . . . . . . . . . 81
SECTION 2. WORKERS' COMPENSATION SUPPLEMENT PAY . . . . . . . . . . . 81

SECTION 3. EXPOSURE TO CONTAGIOUS DISEASES . . . . . . . . . . . . . . . . 82
SECTION 4. INJURY TO RESERVE DEPUTY SHERIFF . . . . . . . . . . . . . . . . 82

ARTICLE XVIII SAFETY .......... 83
SECTION 1. GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . 83
SECTION 2. ABATEMENT OF VIOLATIONS . . . . . . . . . . . . . . . . . . . . . . 83

ARTICLE XIX INSURANCE .......... 84
SECTION 1. HEALTH PLANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
SECTION 2. OTHER INSURANCE COVERAGE AND PHYSICAL EXAMINATION . . 84
SECTION 3. PREMIUM ONLY PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . 86
SECTION 4. RETIREE MEDICAL BENEFIT . . . . . . . . . . . . . . . . . . . . . . 86
*A. Retiree Medical Insurance Grant* .......... *86*
*B. Eligibility Requirements for Retiree Medical Insurance Grant* .. *87*
*C. Employee Contribution* .......... *88*
*D. Cash Benefit* .......... *88*
*E. Survivor Benefits* .......... *89*

ARTICLE XX DEFERRED COMPENSATION .......... 90

ARTICLE XXI RETIREMENT .......... 91

ARTICLE XXII COMPENSATION FOR CLASSES ON THE MANAGEMENT SALARY RANGES .......... 93
SECTION 1. SALARY ADJUSTMENTS . . . . . . . . . . . . . . . . . . . . . . . . . 93
SECTION 2. SALARY ADJUSTMENT FOR EXTRA HELP EMPLOYEES . . . . . . . 93
SECTION 3. EQUITY ADJUSTMENTS . . . . . . . . . . . . . . . . . . . . . . . . . 93
SECTION 4. RANGE CONSTRAINTS . . . . . . . . . . . . . . . . . . . . . . . . . . 93

PART 3 - EXECUTIVE POLICY UNIT .......... 94

ARTICLE XXIII EXECUTIVE POLICY UNIT .......... 94
SECTION 1. CONFIDENTIAL EMPLOYEES . . . . . . . . . . . . . . . . . . . . . . 94
SECTION 2. BENEFITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
*A. Represented Employees* .......... *95*
*B. Executive Secretary, County Executive Officer* .......... *95*
*C. Management Employees* .......... *95*
SECTION 3. REQUESTS TO DESIGNATE EMPLOYEES AS CONFIDENTIAL . . . . 96

PART 4 - EXECUTIVE MANAGEMENT .......... 97

ARTICLE XXIV TERMS AND CONDITIONS OF EMPLOYMENT FOR MEMBERS OF THE BOARD OF SUPERVISORS, EXECUTIVE MANAGEMENT EMPLOYEES, EXECUTIVE AIDES AND EXECUTIVE ASSISTANTS TO MEMBERS OF THE BOARD OF SUPERVISORS AND ELECTED OFFICIALS .......... 97

SECTION 1. GENERAL PROVISIONS . . . . . 97
SECTION 2. EMPLOYEES OF THE BOARD OF SUPERVISORS - GENERAL PROVISIONS . . . . . 97
SECTION 3. EMPLOYEES OF ELECTED AGENCY/DEPARTMENT HEADS . . . . . 98
SECTION 4. NON-ELECTED AGENCY/DEPARTMENT HEADS (EXECUTIVE MANAGEMENT - GROUP II) . . . . . 98
SECTION 5. SENIOR MANAGEMENT OFFICIALS (EXECUTIVE MANAGEMENT - GROUP III) . . . . . 99
SECTION 6. LIFE INSURANCE . . . . . 100
SECTION 7. SICK LEAVE - ELECTED COUNTY OFFICERS . . . . . 100
SECTION 8. OPTIONAL BENEFIT PLAN . . . . . 100
SECTION 9. HEALTH PLAN PREMIUMS . . . . . 100
SECTION 10. SALARY ADJUSTMENTS . . . . . 101
SECTION 11. COUNTY 401(A) PLAN . . . . . 101

PART 5 - LAW ENFORCEMENT MANAGEMENT ..... 103

ARTICLE XXV TERMS AND CONDITIONS OF EMPLOYMENT FOR LAW ENFORCEMENT MANAGEMENT EMPLOYEES ..... 103
SECTION 1. GENERAL PROVISIONS . . . . . 103
SECTION 2. WORK PERIOD . . . . . 103
SECTION 3. LIFE INSURANCE . . . . . 103
SECTION 4. COMPENSATION FOR CLASSES ON THE LM SALARY RANGES . 103
*C. Market Differential ..... 104*
*D. Equity Adjustments ..... 104*
*E. Performance Based Increases Within Range ..... 104*
*F. Police Services Chiefs Premium ..... 105*
*G. Special Assignment Premium ..... 105*
SECTION 5. ON-THE-JOB INJURIES, WORKERS' COMPENSATION . . . . . 105
*A. Medical Treatment ..... 105*
*B. Disability Payments and Leave ..... 105*
*C. Exhaustion of 4850 Benefits ..... 105*
*D. Exposure to Contagious Diseases ..... 106*
SECTION 6. ANNUAL LEAVE . . . . . 106
*A. Accumulation of Annual Leave ..... 107*
*B. Use of Annual Leave for Illness or Injury ..... 107*
*C. General Provisions ..... 108*
*D. Payoff of Unused Annual Leave ..... 109*

PART 6 - JUDGES, COMMISSIONERS AND COURT ADMINISTRATORS AND DESIGNATED MANAGERS ..... 111

ARTICLE XXVI ..... 111
SECTION 1. SUPERIOR COURT JUDGE . . . . . 111

PART 7 - IMPLEMENTATION .......... 113

ARTICLE XXVII IMPLEMENTATION .......... 113

PERSONNEL AND SALARY RESOLUTION AMENDMENTS .......... A-1 – A-21

PERSONNEL AND SALARY RESOLUTION

## DEFINITIONS

The following terms as used in this Resolution shall, unless the context clearly indicates otherwise, have the respective meanings herein set forth:

AGENCY/DEPARTMENT HEAD shall mean the person who is the principal officer or employee of an agency, department or district for the discharge of duties provided by law or particular delegated functions.

AT WILL EMPLOYEES shall mean employees who have entered into an At Will agreement or have been appointed to At Will positions.

AT WILL POSITION shall mean a position so designated by the Board of Supervisors.

BOARD shall mean Board of Supervisors of the County of Orange.

CONTINUOUS SERVICE shall mean employment in a regular position which has not been interrupted by resignation, discharge or retirement. Official Leaves of Absence shall not be credited toward continuous service.

COUNTY shall mean the County of Orange and special districts governed by the Board of Supervisors.

EMERGENCY means an unforeseen circumstance requiring immediate action, a sudden unexpected happening, an unforeseen occurrence or condition, a pressing necessity.

EMPLOYEE shall mean a person employed by the County and covered by terms of this Resolution except where the natural construction of this Resolution otherwise indicates and except elected officers.

EXECUTIVE MANAGEMENT EMPLOYEE shall mean a person employed in one (1) of the classes as listed in Appendix A.

EXTRA HELP EMPLOYEE shall mean a person employed in an extra help position. An extra help employee serves at the pleasure of the County in an extra help position and may be removed from an extra help position at any time with or without notice or cause and without a hearing.

EXTRA HELP POSITION shall mean a position which is intended to be occupied on less than a year-round basis including, but not limited to, the following: to cover seasonal peak workloads; emergency extra workloads of limited duration; necessary vacation relief, paid Sick Leave and other situations involving a fluctuating staff.

FULL-TIME EMPLOYEE shall mean an employee employed in one (1) or more regular or limited-term positions whose normally assigned work hours equal those of a full workweek or work period as described hereinafter.

LIMITED-TERM EMPLOYEE shall mean an employee employed in a limited term position except where a regular position is converted to a limited-term position, the incumbent shall retain his or her former status. As an exception to this definition, a limited-term employee may also be used to fill a regular position when the incumbent employee is on Official Leave of Absence.

LIMITED-TERM POSITION shall mean a position which the County has determined has no anticipated long-range funding or has uncertain future funding.

PART-TIME EMPLOYEE shall mean an employee employed in one (1) or more regular or limited-term positions whose normally assigned work hours do not equal those required of a full-time employee.

HUMAN RESOURCES DIRECTOR shall mean the Assistant CEO, Human Resources or his or her designee.

PRACTICABLE means economically or operationally feasible; reasonably able to accomplish.

PROBATIONARY EMPLOYEE shall mean a person who is serving a probation period and is employed in a regular or limited-term position.

PROMOTION shall mean the movement of a regular, limited-term, or probationary employee from one (1) class to another class where the maximum rate on the new salary range is at least one (1) full step (for E range classes) or 2.75 percent (for management range classes) higher than the maximum step of the old salary range.

PROVISIONAL APPOINTMENT shall mean an appointment of a qualified person, who is not a regular, probationary or limited-term employee of the County, to a regular or limited-term position on a temporary basis.

PROVISIONAL EMPLOYEE shall mean an employee who occupies a regular or limited-term position as the result of a provisional appointment.

REASSIGNMENT shall mean the movement of a regular, limited-term or probationary employee from one (1) class to another class on the same salary range or to a class where the minimum rate on the new salary range is less than one (1) full step (for E range classes) or 2.75 percent (for management range classes) higher or lower than the minimum step of the old salary range.

RECRUITING RATE shall be the minimum rate of the salary range allocated to a class unless otherwise authorized by the Board or the Human Resources Director.

<u>REDUCTION</u> shall mean the movement of a regular, limited-term or probationary employee from one (1) class to another class where the minimum step of the new salary range is at least one (1) full step (for E range classes) or 2.75 percent (for management range classes) lower than the minimum step of the old salary range.

<u>REGULAR EMPLOYEE</u> shall mean a person who is not on probation and is employed in a regular or limited-term position.

<u>REGULAR POSITION</u> shall mean a position established on a permanent year-round basis requiring work on a regular schedule unless otherwise authorized by Minute Order of the Board.

<u>SENIORITY</u> shall mean total continuous full-time equivalent service as a regular employee.

<u>Y-RATE</u> shall mean a pay rate outside of the assigned salary range of a class.

PART 1

ARTICLE I          GENERAL POLICIES AND PRACTICES

Section 1.          Regulation of Employees

A.   There is hereby adopted a merit system for the personnel administration of this County, basing appointments, promotions, demotions and discharges specifically on merit for all employees except for extra help employees, assistants and clerical employees to members of the Board of Supervisors, and secretaries and Executive Assistants to elected Department Heads and other at will employees.

B.   All employees shall hold their positions subject to rules and regulations established by Resolution of the Board.

C.   County employees shall refrain from engaging in any activities which constitute a conflict of interest due to the nature, conditions, or some other aspect of the activity. It shall be the responsibility of each Agency/Department Head to ensure that employees in his or her agency/department refrain from engaging in any activities which constitute a conflict of interest. The following are examples of activities which may involve a conflict of interest:

1.   The use of County time, facilities, equipment, badge or uniform for private gain or advantage, or private gain or advantage of another.

2.   The use of prestige or influence of County employment for private gain or advantage, or the private gain or advantage of another.

3.   The use of confidential information acquired by virtue of County employment for the employee's private gain or advantage, or private gain or advantage of another.

4.   The acceptance of money or other consideration by an employee from any person except the County for the performance of an act which the employee would be required or expected to render in the regular course or hours of his or her County employment, or as a part of his or her duties as a County employee.

5.   The performance of an act in other than his or her capacity as a County employee, knowing that such act may later by subject directly or indirectly, to the control, inspection, review, audit or enforcement by the employee or the agency/department in which he or she is employed.

6.   The representation of, or assisting in the representation of private interests for profit before any board or commission of the County or in court when the County is a party.

7. The solicitation of future employment with a business doing business with the County over which the employee has some control or influence in his or her official capacity at the time of transaction.

D. County Policy on Employment of Relatives

1. Purpose:

To provide guidelines for employment of close relatives as situations involving relatives working in the same County agency/department may result in morale problems, inappropriate supervision, conflict of interest, or public criticism. The intent is to avoid the opportunity for an officer or employee of the County to use personal influence to aid or hinder another in the employment setting or situation because of a personal relationship.

2. Policy:

a. General: No person may be appointed, promoted, reduced, transferred or reassigned to a position in which that person is in the direct line of supervision of a close relative; nor shall close relatives have the same immediate supervisor. "Supervision" includes the assignment of work, evaluation of performance and setting or influencing the pay or granting of benefits to the other.

b. Definition: A close relative shall be defined as an individual related by blood, adoption or marriage, e.g., spouse, parent, child, sibling, grandparent, grandchild, uncle, aunt, first cousin, nephew, niece, mother/father in-law, son/daughter in-law, sister/brother in-law, stepparent, stepchild, stepbrother/sister or half brother/sister.

c. Disclosure: All applicants for employment, promotion, reduction, transfer or reassignment to a position in an agency/department shall be required to disclose the name(s) and position title(s) of any close relative currently employed in that agency/department prior to appointment, promotion, reduction, transfer or reassignment. An employee who becomes a "close relative" by marriage subsequent to appointment shall disclose the new relationship(s) to his/her supervisor.

The Human Resources Director shall provide appropriate forms and procedures for the disclosure process.

d. Exemptions: The Agency/Department Head may grant exemptions required for the effective and efficient operation of the agency/department. Each Agency/Department Head shall

develop appropriate procedures to ensure the objective review of requests for exemption.

3. Procedure For Exemption From Policy:

    a. The hiring supervisor shall request authority for an exemption from policy from the Agency/Department Head prior to appointing, promoting, reducing, transferring or reassigning a close relative of an employee if such action will result in a violation of policy above.

    b. The written request for exemption from policy shall include:

        1) Names of prospective employee and known close relative employee(s) and relationship(s).

        2) Titles and summary of duties, and work relationship of affected positions.

        3) Qualifications of applicant indicating why the selected applicant is the best qualified or better qualified than other candidates.

        4) Justification for exemption, indicating why it is necessary for the effective and efficient operation of the agency/department and including a statement of why supervisor believes problems will not result.

    c. The Agency/Department Head will approve or disapprove supervisor's recommendation and notify the Agency/Department Human Resources Manager of specific reasons for decision.  Upon request, the Agency/Department Human Resources Manager (or in those departments without an on-site personnel team, the manager of the Human Resources Department General Government/Law Enforcement Team) and/or the County Affirmative Action Office will review and provide comments to the Agency/Department Head.  The Human Resources Director shall maintain a listing of exemptions granted after the effective date of this policy.

    d. If an exemption is granted for a close relative of the Agency/ Department Head, the Board of Supervisors shall be promptly notified.

E.   Drug and Alcohol Policy

    1.   Purpose:

It is the purpose of this policy to articulate the position of the Orange County Board of Supervisors with respect to the use of drugs or alcohol by County employees while on County time, in County vehicles, on County property or in County facilities.

    2.   Policy:

In recognition of the duties entrusted to the employees of the County and with knowledge that drugs and alcohol do hinder a person's ability to perform duties safely and effectively, the Board of Supervisors adopts the following policy:

It is the policy of the County of Orange to maintain a safe, healthful, lawful and productive work place.  Members of the Board of Supervisors are committed to discouraging alcohol and drug abuse and to achieving a work force free from the influence of drugs and alcohol.

It is the intent of this policy to deter the misuse or abuse of legal or illegal substances which create a threat to the safety and health of any County employee or member of the public.  The County is concerned with those situations where the use of alcohol and drugs interferes with any employee's safety and job performance, adversely affects the job performance or safety of other employees, or affects the safety of the public.

The County has established a voluntary employee assistance program to assist all County employees who wish to seek help for alcohol and drug problems.  The County also makes available a variety of insurance coverages which provide treatment for drug and alcohol abuse.  Employees may contact their supervisors, insurance provider, or the Employee Assistance Program for additional information.

The use, possession, or sale of illegal drugs is unlawful, dangerous and prohibited.  The use of alcohol in the workplace, or prior to coming to the workplace, so that the employee's performance is impaired, is dangerous to the employee, to other employees and the general public and is prohibited.  The abuse of all drugs, including alcohol, by employees is unacceptable since it can adversely affect health and safety, security, and productivity as well as public confidence and trust.

Violation of this policy may be grounds for disciplinary action up to and including discharge from County service.  Departments or

agencies may develop additional policies or work rules to augment the above policy statement.

Employees who experience drug or alcohol problems are encouraged to seek referral for rehabilitation through the Employee Assistance Program (EAP) or their insurance provider.  It is the responsibility of each employee to seek assistance before alcohol or drug problems lead to performance problems.  Once a violation of this policy occurs, subsequent use of the Employee Assistance Program or other programs, on a voluntary basis, will not necessarily lessen disciplinary action.

F.  Attorneys employed by the County are prohibited from engaging in the private practice of law.

G.  Catastrophic Leave Donation Procedure

The County shall administer a Catastrophic Leave procedure designed to permit limited individual donations of vacation, compensatory, annual leave and/or PIP time to an employee who is required to be on an extended unpaid leave due to a catastrophic medical condition or other serious circumstances.  Such policies and procedures shall establish a two-hour minimum and an eight-hour maximum donation for each donating employee.  Such policies and procedures shall also require that an employee on a leave without pay at the time he or she receives a Catastrophic Leave donation will be treated as if on an Official Leave of Absence for purposes of probation and merit increase eligibility.   In addition, the policies and procedures shall provide for payment to the recipient employee's estate of any unused donated time if the recipient employee dies during the Catastrophic Leave.  The Human Resources Director may implement changes to the Catastrophic Leave procedure, subject to the meet and confer process if applicable.

H.  Policy for the Prevention of Workplace Violence

1.  Purpose:

To establish a County Policy that threats and acts of violence by and against County employees, contractors and the public while engaged in County business or related to the performance of their official duties will not be tolerated.

2.  Policy:

The County of Orange is committed to the principle that a work environment free of threats of violence, threatening behavior and acts of violence is essential to providing effective and efficient government services.  Civility, understanding, and mutual respect

toward fellow employees and members of the public we serve are intrinsic to providing effective and efficient government services.

Towards this end, threats of violence, however communicated, threatening behavior, and acts of violence, by anyone, including County employees, contractors, their employees or the public, directed at County employees, contractors, their employees or members of the public, while engaged in County business or related to the performance of their official duties, will not be tolerated.

Violations of this policy by County employees will lead to disciplinary action up to and including termination from County employment. If violations of this policy by County employees, contractors, their employees or members of the public involve suspected criminal misconduct, the County will report such incidents and cooperate fully with law enforcement authorities.

All County employees are responsible for notifying their immediate supervisor, or another member of the management team, of any threats of violence, threatening behavior or acts of violence they have received, witnessed, or of which they otherwise have knowledge.

If furtherance of the County Policy for the Prevention of Workplace Violence, the possession or use of dangerous weapons by County employees is prohibited, except as provided for below, while the employee is acting within the course and scope of employment or traveling in a County-owned vehicle. A dangerous weapon is a firearm, or any other instrument capable of producing bodily harm when used in a manner and under circumstances that manifests an intent to harm, or intimidate another person, or that would cause a reasonable person to have concern for their safety or the safety of another. This provision does not apply to peace officers authorized by law and their Agency/Department to carry firearms on duty or to County employees legally in possession of a firearm for which the employee holds a valid permit to carry a concealed firearm and the Agency/Department is made aware of and approves the carrying of the weapon.

Employees with a valid permit or who are otherwise legally in possession of a firearm but who are not authorized to carry a firearm on duty shall safely store the weapon while on duty.

Employees may be authorized by their Agency/Department to carry personal defense devices such as pepper spray while on duty on a case by case basis or in accordance with written Agency/Department policy.

Agencies/Departments may develop additional policies or work rules to augment the above policy statement.

I.   Information Technology Usage Policy

    1.   Purpose:

To provide a Policy that defines conditions for the authorized use of information technology and associated electronic information devices, including personal computers, laptops and related peripheral equipment and software; Internet/Intranet connectivity and access to related services; E-mail and any other electronic information device.

    2.   Scope:

The County of Orange (County) provides employees with an e-mail system, a network connection, and Internet and Intranet access. This Policy governs all use of the County and its Departmental networks, Internet/Intranet access, and e-mail systems, whether for electronic mail, chat rooms, the Internet, newsgroups, electronic bulletin boards, or the County or Department Intranet.

The e-mail system, network, and Internet/Intranet access are primarily for official business only. Employees are authorized to access the Internet for limited personal business only during nonworking time, and in strict compliance with the other terms of this Policy.

All information created, sent, or received via the e-mail system, network, Internet, telephones or the Intranet is the property of the County. Employees should not have any expectation of privacy regarding such information. This includes all e-mail messages and all electronic files. The County reserves the right to, at any time and without notice, access, read and review, monitor, and copy all messages and files on its computer system as it deems necessary. When it believes necessary, the County may disclose text or images to law enforcement without the employee's consent.

    3.   Personal Responsibility:

By accepting the account password and other information from the County and accessing the Network or the Internet, employees agree to follow the rules in the Policy. Misuse means any violations of this Policy, or any other use that, while not included in this Policy, has the effect of knowingly harming another or another's property. Once logged on, employees should normally not leave their computer unattended or available for someone else to use.

4.   Purposes and Use:

The County is providing access to its Network and the Internet only for County business purposes. If there is any doubt about whether a contemplated activity is appropriate for County business purposes, employees may consult with their Department Head or his/her designee to help decide if a use is appropriate.

5.   Netiquette and Prohibited Activity:

All users must abide by rules of network etiquette, which include being polite and using the Network and the Internet in a safe and legal manner. The County or authorized County officials will make a good faith judgment as to which materials, files, information, software, communications, and other content and activity are permitted and prohibited based on the following guidelines and under the particular circumstances. Unless employees are specifically authorized due to their work assignment, the following are among uses that are considered unacceptable and constitute a violation of this Policy:

a.   Using, transmitting, or seeking inappropriate, offensive, swearing, vulgar, profane, suggestive, obscene, abusive, harassing, belligerent, threatening, or defamatory (harming another's reputation by lies) language or materials.

b.   Revealing personal information without permission such as the employee's or another's home address, telephone number, or social security number.

c.   Making offensive or harassing statements or jokes about language, race, color, religion, national origin, veteran status, ancestry, disability, age, sex, or sexual orientation.

d.   Sending or soliciting sexually oriented messages or images.

e.   Visiting sites featuring pornography, terrorism, espionage, theft, or drugs.

f.   Gambling or engaging in any other activity in violation of local, state, or federal law.

g.   Uses or activities that violate the law or County policy or encourage others to violate the law or County policy. This includes, for example:

1)   Offering for sale or use any substance the possession or use of which is prohibited by law.

2) Without proper authorization, accessing, transmitting, or seeking confidential information about clients or co-workers.

3) Conducting unauthorized business.

4) Viewing, transmitting, downloading, or seeking obscene or pornographic materials or materials that violate or encourage others to violate the law.

5) Intruding, or trying to intrude, into the folders, files, work, networks, or computers of others, or intercepting communications intended for others.

6) Knowingly downloading or transmitting confidential information.

h. Uses that cause harm to others or damage to their property. This includes, for example:

1) Downloading or transmitting copyrighted materials without permission from the owner of the copyright in those materials. Even if materials on the Network or the Internet are not marked with the copyright symbol, ©, employees should assume that the materials are protected under copyright laws unless there is explicit permission on the materials to use them.

2) Using another's password or some other user identifier that misleads message recipients into believing that someone other than the employee is communicating or otherwise using the other's access to the Network or the Internet.

3) Intentionally uploading a virus or other harmful component or corrupted data, or vandalizing any part of the Network.

4) Using any software on the Network other than that licensed or approved by the County.

i. Uses that jeopardize the security of access and of the Network or other networks on the Internet. For example, the disclosing or sharing of a password with others, or impersonating another.

j. Accessing or attempting to access controversial or offensive materials. Employees are advised that access to the Network and the Internet may include the potential for access to materials inappropriate for use for County business purposes, including materials that may be illegal, defamatory, or offensive.

Certain of these areas on the Internet may contain warnings as to their content, and users are advised to heed these warnings. Not all sites that may contain inappropriate material, however, will include warnings. Employees must take responsibility for the use of the Network and the Internet and stay away from these sites.

k.  Commercial uses. For example, employees shall not:

   1)  Sell or buy anything over the Internet.

   2)  Solicit or advertise the sale of any goods or services (whether to one recipient or many, such as "junk e-mail").

   3)  Give others private information about themselves or others, including credit card numbers and social security numbers.

   4)  Use County information technology for unauthorized outside fund-raising activities, participate in any lobbying activity, or engage in any prohibited partisan political activity.

   5)  Use County information technology to post County, Department and/or other public agency information to external news agencies, services bureaus, bulletin boards or other forums except if authorized prior.

l.  Operating a business, or soliciting money for personal gain.

m.  Uses that waste limited resources. For example:

   1)  Don't waste toner or paper in printers, and don't send chain letters, even for noncommercial or apparently "harmless" purposes, as these, like e-mail with large graphic attachments and "junk e-mail," use up limited Network capacity resources.

   2)  Only copy others on an e-mail who should be "in the loop" on that e-mail.

   3)  Be careful with distribution lists, determining first whether it is appropriate for everyone on that list to receive the e-mail.

   4)  "All hands" e-mails are only to be sent if permission is obtained prior.

n. Suggesting to other associates that they view, download, or seek materials, files, information, software, or other content that may be offensive, defamatory, infringing, or illegal.

6. Confidential Information:

Employees may have access to confidential information of the County, its employees, and clients of the County. E-mail makes it very easy to send and receive information and attachments. It is also easy to send confidential e-mail to more than those intended. If employees have a business need to communicate confidential information within the County, with permission of management, they may do so by e-mail, but only sending the e-mail to those who have a need to know the information, and marking it "CONFIDENTIAL." County management may from time-to-time issue guidelines to those whose responsibilities include the internal e-mail communication of confidential information. Again, when in doubt, employees should not send it by e-mail. Memoranda and reports on paper, telephone calls, and face-to-face meetings should be used in some contexts, such as with respect to personnel matters.

7. Use and Maintenance of Equipment and Facilities:

The County may occasionally issue rules for use and maintenance of computers and other equipment. These include the following:

a. Liquids or magnets are not to be kept on or near your computer, as these can cause serious damage.

b. All original software assigned to employees must be available when the system needs to be serviced--it may need to be reinstalled.

c. When employees have a computer problem, they should record/communicate <u>all</u> the details about the problem on the appropriate form and/or when called into the service hotline, working with Information Technology staff, etc.

d. Computers are not to be removed from the building without written permission from County management.

e. Software that is not licensed or authorized by the County is not to be installed and disks are not to be transported back and forth. (Viruses can easily be picked up onto your computer or the Network from the Internet or other computers.)

f. Keep equipment plugged into a surge protector at all times.

g. Report any damage to equipment to the appropriate authorities.

8.    Privacy:

Network and Internet access is provided as a tool for County business. The County reserves the right to monitor, inspect, copy, review, and store at any time and without prior notice any and all usage of the Network and the Internet access and any and all materials, files, information, software, communications, and other content transmitted, received, or stored in connection with this usage. All such information, content, and files shall be and remain the property of the County, and employees should not have any expectation of privacy regarding those materials including those relative to personal computers or laptops used at home for business use.    Network administrators may review files and intercept communications for any reason, including, but not limited to, purposes of maintaining system integrity and ensuring that users are using the system consistently with this Policy.

9.    Failure to Follow Policy:

Employees' use of the Network and the Internet is a privilege, not a right. If employees violate this Policy, they may be subject to having their access to the Network and the Internet terminated, which the County may refuse to reinstate for the remainder of an employee's tenure in the County. Further, except if authorized in specific job related circumstances, if employees violate this Policy, or if employees permit another to use their account or password to access the Network or the Internet, including, but not limited to, someone whose access has been denied or terminated, if the person the employee allows to use the account violates this Policy using their account, it is considered to be the same as the employee violating this Policy. Both are then subject to the consequences of that violation. The County may take other disciplinary action under County policy. A violation of this Policy may also be a violation of the law and subject the user to investigation and criminal or civil prosecution.

10.   Updates:

Employees may be asked from time-to-time to provide new or additional registration and account information, for example, to reflect developments in the law or technology. Employees must provide this information if they wish to continue to receive service. If after employees have provided their account information, some or all of the information changes, employees must notify the person designated by the County to receive this information. This Policy may also be updated by the County from time-to-time, for example, to reflect developments in the law or technology.

11. Management Responsibility:

Managers and supervisors are responsible for following the Policy and for ensuring that their employees follow this Policy. Any employee who violates this Policy or uses the County e-mail system, network, Internet, or Intranet access for improper purposes shall be subject to discipline, up to and including discharge.

Section 2.    Position Classification Plan

A.    The Position Classification Plan of the County shall consist of the class titles and the class specifications adopted by the Board. There shall be a class specification for each class, unless exempted by the Board, which includes the title of the class and indicates the type of work performed and the minimum qualifications for employment. Class specifications shall be established by Minute Order or Resolution of the Board.

B.    The Human Resources Director shall administer the Position Classification Plan for all positions in the County service, including special districts governed by the Board, except elected officers and others designated by the Board as being exempted. The Human Resources Director shall make recommendations to the Board as to the establishment of classes. The Human Resources Director shall establish procedures to administer the Position Classification Plan.

C.    The Human Resources Director is authorized to conduct studies of the duties and responsibilities of the various positions in order to maintain the Position Classification Plan.

D.    An Agency/Department Head shall immediately notify the Human Resources Director of a permanent change in the assigned duties of a position if the class to which the position is currently allocated may no longer be appropriate. Such notification shall include the reason for the change in duties necessitating the classification change.

Section 3.    Number and Classification of Activated Positions

A.    The number of activated regular positions shall be as designated by the Board. No Agency/Department Head shall appoint regular or probationary employees in excess of the positions activated by the Board except that an Agency/Department Head, with approval of the County Executive Officer, may fill a regular position with a replacement up to twenty-eight (28) calendar days in advance of the separation of a terminating employee.

B.    The Human Resources Director is authorized to reclassify positions when, a) such reclassifications are consistent with classification concepts, classification specifications and salaries adopted by the Board, b) when the Agency/Department Head agrees with the classification change and c) the classification change is not the result of a major reorganization. Major

reorganizations are defined as any change in reporting relationships, authority or functions which, 1) involves ten (10) percent or more of the positions in an Agency/Department, or 2) has a net cost increase or decrease of fifty thousand (50,000) dollars or more per fiscal year, or 3) includes positions in more than one (1) Agency/Department. The Human Resources Director is authorized to reclassify positions resulting from minor reorganizations.

C.    The Human Resources Director may authorize that a regular position may be used as one (1) or more part-time regular positions provided that the total regularly scheduled hours of the part-time positions do not exceed the number of hours per week authorized for the activated regular positions.

D.    An Agency/Department Head may, upon the approval of the County Executive Officer, appoint limited-term or extra help employees subject to a determination by the Human Resources Director as to the appropriate classification of the positions. Ordinarily a full-time extra help position will not be authorized for a period exceeding six (6) months. In unusual circumstances, and at the discretion of the County Executive Officer and the Human Resources Director, a full-time extra help position may be authorized for a period longer than six (6) months, provided such period shall not exceed one (1) year.

E.    When a regular or limited-term position is vacant due to Leave of Absence, the position may be filled for the length of the immediately preceding Departmental Leave, Official Leave, Disability Leave or Parenthood Leave and any extensions of such leaves.

F.    When an employee who is separating from County service by way of paid County retirement elects to take time off for vacation, the position to be vacated may be filled by the agency/department for the length of vacation time off prior to the employee's paid retirement.

G.    When a regular or limited-term employee is on a leave of absence with pay and the cost of the employee's salary and benefits is fully reimbursed to the County, the employee's position may be filled by the agency/department for the length of the paid leave.

Section 4.    <u>Selection Procedures</u>

A.    Consistent with Section I.A. of this Article, the Human Resources Director shall determine the method of evaluating the qualifications of applicants and employees. The Human Resources Director shall administer the Orange County Merit System Selection Rules and Appeals Procedure. Such Rules may be revised by the Human Resources Director provided that no revision which nullifies the basic principle of a merit system shall be effective unless approved by the Board of Supervisors.

B. Consistent with Section I.A. of this Article, the Human Resources Director shall determine the selection methods for the filling of all positions. Agency/ Department Heads shall appoint and promote only from among those persons who are certified to them by the Human Resources Director as being eligible for the particular class, except as provided in the Orange County Merit System Selection Rules and Appeals Procedure. A copy of the appropriate form, signed by the Agency/Department Head and approved by the Human Resources Director shall be delivered to the Auditor-Controller before payment shall be made to any employee.

C. When the County assumes or absorbs the functions and personnel of another government agency, the Human Resources Director may waive or modify the regularly established minimum qualifications and selection procedures for the employees involved.

Section 5. Performance Evaluations

The Human Resources Director is authorized to establish a performance evaluation program for each agency/department.

Section 6. Authority for Disciplinary Action

Discipline may be imposed as follows: 1) within an agency by the Agency Head or his/her delegated representative; 2) for departments not within an agency by a Department Head or his/her delegated representative; and 3) in all instances by the County Executive Officer. The County Executive Officer shall take no disciplinary action unless he/she has requested the agency or department to do so in writing and the agency or department has refused or failed to take such action within a reasonable time, not to exceed ten (10) calendar days of such a request. In his/her written request to the agency or department, the County Executive Officer may suggest the discipline he/she considers appropriate under the particular circumstances. Before the above mentioned time limit has elapsed, the agency or department may impose a lesser discipline (if a suggestion for discipline is made) on the employee only with the concurrence of the County Executive Officer. Suspensions and/or reductions imposed by the County Executive Officer may be appealed to arbitration. Suspensions by the County Executive Officer of forty (40) working hours or less shall be treated as a suspension of more than forty (40) working hours for purposes of appeal. All other discipline imposed by the County Executive Officer except discharge shall be final.

Section 7. Leave of Absence With Pay

A. An Agency/Department Head may authorize an employee to be absent with pay from his or her regular work area for reasons other than physical or mental illness for a period of time not to exceed one hundred twenty (120) regularly scheduled working hours if the Agency/Department Head finds that such absence:

    1. contributes to the employee's effectiveness in his or her assigned duties and responsibilities; or

2. contributes to the functions and goals of the County.

B. An employee may be absent with pay from his or her regular work area in excess of one hundred twenty (120) regularly scheduled working hours upon a request by the Agency/Department Head, if the Human Resources Director or his/her designee and the County Executive Officer approve. Forms requesting an absence with pay from the regular work area in excess of one hundred twenty (120) regularly scheduled hours shall be prescribed by the Human Resources Director and shall state specifically the reason for the request and the beginning and ending dates of the absence. For purposes of this Section, regular work area shall mean the geographic area to which the employee is typically and appropriately assigned to work during the usual course of employment.

Section 8. Military Leave of Absence

A request for Military Leave of Absence shall be made upon forms prescribed by the Human Resources Director and shall state specifically the reason for the request, the date when it is desired to begin the Leave of Absence, and the probable date of return. Military Leave is governed by provisions of the Military and Veterans Code of the State of California, Section 395 to 395.5. and the Uniformed Services Employment and Reemployment Rights Act (USERRA). An employee receiving pay for a portion of such Leave shall not be deemed to be occupying a position during such paid Leave period. When a regular position is vacant due to a Military Leave of Absence, the position may be filled for the length of that Leave.

Section 9. Time Off for Voting

A. If an employee does not have sufficient time outside of working hours to vote at a State-wide election, the employee may, without loss of pay, take off enough working time which when added to the voting time available outside of working hours will enable the employee to vote.

B. No more than two (2) hours of the time taken off for voting shall be without loss of pay. The time off for voting shall be only at the beginning or end of the regular working shift, whichever allows the most free time for voting and the least time off from the regular working shift, unless otherwise mutually agreed.

C. If the employee on the third working day prior to the day of election, knows or has reason to believe that time off will be necessary to be able to vote on election day, the employee shall give his or her supervisor at least two (2) working days' notice that time off for voting is desired, in accordance with the provisions of this Section.

Section 10.     Deductions for Maintenance

A.     Whenever full, part, or any maintenance is furnished to any County officer or employee, an amount equal to the value of such maintenance as determined by Resolution of the Board shall, except as hereinafter in this Section provided, be deducted from the compensation to be paid such officer or employee, provided that the Board may, by Resolution, establish rules and regulations requiring advance cash payments for meal tickets in lieu of payroll deductions.

B.     The Sheriff-Coroner may authorize free meals for personnel who are restricted to the jail facility during their meal period on a regularly assigned shift in the maximum security area of the County Jail.

Section 11.     Provisional Appointment

A.     A provisional appointment shall not extend beyond the time needed to establish an eligible list and permit a regular appointment to be made. A provisional appointment shall not be continued for more than six (6) months from date of appointment unless an extension to no more than one (1) year from the original date of the provisional appointment is approved by the Human Resources Director.

B.     A probationary, regular or limited-term employee shall not be eligible for a provisional appointment.

C.     A provisional employee shall not serve a probationary period. If a provisional employee receives a regular appointment, the employee shall serve a new probationary period. A provisional employee who receives a regular appointment shall maintain his or her original hire date for purposes of vacation and sick leave accrual, retirement and layoff.

D.     A provisional employee may be released from service at any time without right of appeal or hearing.

E.     Provisional employees shall earn all other benefits which accrue to regular employees, except for rights and benefits pursuant to the Layoff Procedure provided for in the applicable Memoranda of Understanding or Personnel and Salary Resolution.

Section 12.     Employee Parking

With the concurrence of the County Executive Officer, the Agency/Department Head may pay for additional parking access when doing will further the achievement of operational needs and business goals.

ARTICLE VIII       GENERAL PERSONNEL PROVISIONS

Section 1.       Probation

A.    New Probation

    1.    Full-Time Employee

        A new or reemployed employee employed in a regular or limited-term position shall be placed on new probation for fifty-two (52) weeks from the date of appointment ending with the first day of the pay period following completion of said period.

    2.    Part-Time Employee

        A new or reemployed employee employed in a part-time regular or limited-term position shall be placed on new probation for two thousand eighty (2080) paid hours exclusive of overtime ending with the first day of the pay period following completion of said period.

B.    Promotional Probation

    1.    A full or part-time employee who is promoted, except on a temporary promotion, shall be placed on promotional probation, except as provided in B.2., below. A full-time employee shall serve a probation period of fifty-two (52) weeks ending with the first day of the pay period following completion of said period. A part-time employee shall serve a promotional probation period of two thousand eighty (2080) paid hours exclusive of overtime ending with the first day of the pay period following completion of said period.

    2.    When a regular or regular limited-term employee is promoted, reduced or reassigned as a result of the employee's position being reclassified and the class from which the employee is promoted, reduced or reassigned is subsequently deleted or abolished, the incumbent employee shall not serve a promotional probation period.

    3.    Except as provided in B.2. above, when a regular, limited-term or probationary employee, employed in a class other than Administrative Management, Executive Management or Law Enforcement Management, is reassigned or reduced to an Administrative Management class, such employee shall be placed on promotional probation for a period equal to the new probation periods set forth in Sections 1.A.1 and 1.A.2, above.

4.  When an employee who has been on a temporary promotion or a regular employee who was promoted to a limited-term position at the discretion of the employee's Agency/Department Head is reduced to a class the employee formerly occupied, the employee shall serve the remainder of any uncompleted probationary period in that class.

C.  <u>Failure of Probation</u>

1.  <u>New Probation</u>

An employee on new probation may be released from the service at any time without notice, cause or right of appeal or hearing except as provided in C.3., below.

2.  <u>Promotional Probation</u>

a.  An employee on promotional probation may be failed at any time without notice, cause or right of appeal or hearing except as provided in C.3., below.

b.  When an employee fails his or her promotional probation, the employee shall have the right to return to his or her former class provided the employee was not in the previous class for the purpose of training for a promotion to the higher class.

When an employee is returned to his or her former class under the provisions of this Section, the employee shall serve the remainder of any uncompleted probationary period in the former class. A regular employee who accepts promotion to a limited-term position other than at the direction of the employee's Agency/Department Head shall not have the right to return to his or her former class.

c.  If the employee's former class has been deleted or abolished, the employee shall have the right to return to a class in his or her former occupational series closest to, but no higher than, the salary range of the class which the employee occupied immediately prior to promotion and shall serve the remainder of any probationary period not completed in the former class.

3.  An employee who alleges that his or her probationary release was based on unlawful discrimination by the County may submit a grievance at Step 3 of the grievance procedure within ten (10) days after receipt of notice of failure of new probation/

D.   General Provisions

1.   When an employee's record consists of a combination of full-time and part-time service in regular or regular limited-term positions, except as provided in Section 4.C., below, part-time service shall be applied proportionately by using total hours worked to appropriate full-time requirements. For purposes of this Section, two thousand eighty (2080) hours shall equal fifty-two (52) weeks.

2.   When an Agency/Department Head or his or her representative passes an employee on probation, that determination shall be based upon a written performance evaluation and shall be discussed with the employee. A probation period may not be extended, except as provided in Section E 1. of this Article, below, and an employee who is permitted by the Agency/Department to work beyond the end of a probation period shall be deemed to have passed such probation period.

3.   An employee who is on probation may not transfer from one (1) Agency/Department to another in the same class without the approval of the Human Resources Director.

E.   Extension of Probation Periods

1.   The granting of an Official or Military Leave of Absence shall cause the employee's probation period to be extended by the length of the Official Leave or by the length of the Military Leave in excess of fifteen (15) calendar days. If the employee is on probation, the extended period resulting from the Official or Military Leave of Absence shall end with the first day of the pay period after said extended date. An employee who is suspended shall have his or her probation extended by the length of the suspension, with the extended probation period ending with the first day of the pay period after said extended date.

2.   The Human Resources Director shall extend the new or promotional probationary periods of incumbents appointed as a result of a selection procedure which is appealed. Such probationary periods shall be extended no longer than sixty (60) calendar days from the date on which the County receives the Appeals Officer's findings and decision. In the event an employee's probationary period is extended by the provisions of this Section, and such an employee has served a probationary period which is longer than the probationary period normally prescribed for new or promotional probation, such an employee may fail probation during the extended period only upon recommendation of the Appeals Officer and final determination of the Board of Supervisors.

3. Upon recommendation of the Agency/Department or request of the employee with concurrence of the Agency/Department, the probation period of an employee may be extended at the sole discretion of the Human Resources Director for a period not to exceed one hundred eighty (180) calendar days provided such action is approved by the Human Resources Director before the normal probation period is completed.

   Denial of a request to extend a probation period shall not be subject to appeal or hearing.

4. The Human Resources Director shall extend the probationary period of employees with an employment authorization document which has an expiration date which would occur after the end of the probation period. Such probation periods shall be extended to coincide with the expiration date of the employment authorization document. In the event an employee's probationary period is extended by the provisions of this Section, and such an employee serves a probationary period which is longer than the normal probation period, such an employee may fail probation during the extended period only for failure to obtain a new, valid employment authorization document by the expiration date of the expiring employment authorization document.

Section 2. Performance Evaluation

A. The County shall maintain a system of employee performance ratings designed to give a fair evaluation of the quantity and quality of work performed by an employee. Such ratings shall be prepared and recorded in the employee's personnel file for all regular and limited-term full and part-time employees at least once each year; and in addition, for employees on probationary status, at least once near the middle of the probation period.

B. The County shall discuss with the employee the specific ratings prior to such ratings being made part of the employee's personnel file.

C. When a performance evaluation is recorded in the personnel file of an employee, a copy of such evaluation, together with any attachment relating thereto, shall be given to the employee.

Section 3. Contents of Personnel File

A. Adverse statements prepared by the County shall not be included in an employee's official personnel file unless a copy is provided to the employee.

B. An employee shall have the right to inspect and review the contents of his or her official personnel file at reasonable intervals.

C.   In addition, an employee shall have the right to inspect and review the contents of his or her official personnel file in any case where the employee has a grievance related to performance, to a performance evaluation, or is contesting his or her suspension or discharge from County service.

D.   Letters of reference and reports concerning criminal investigations concerning the employee shall be excluded from the provisions of B. and C., above.

E.   An employee shall have the right to respond in writing or personal interview to any information contained in his or her official personnel file, such reply to become a permanent part of such employee's official personnel file.

F.   Any contents of an employee's official personnel file may be destroyed pursuant to an agreement between the Human Resources Director and the employee concerned or by an order of an arbitrator, court or impartial hearing officer unless the particular item is otherwise required by law to be kept.

Section 4.     Status of Limited-Term Employees

A.   All limited-term employees shall be subject to the same hiring standards and shall earn all benefits, except Article XVI, LAYOFF PROCEDURE, which accrue to employees in regular positions.

B.   A regular employee who transfers, promotes or reduces to a limited-term position on a voluntary basis and not at the direction of the Agency/Department Head shall become a limited-term regular employee.

C.   Limited-term employees hired under programs which involve special employment standards shall serve a new probation period upon transfer to permanent funded positions. Upon transfer to permanent positions such employees shall maintain their original hire date for purposes of vacation, sick leave and annual leave accrual, retirement and layoff. The requirement that such employees serve a new probation period may be waived by the County.  Limited-term employees not hired under programs which involve special employment standards shall, upon transfer to permanent funded positions, maintain their original hire date for purposes of vacation, sick leave and annual leave accrual, retirement, layoff and new employee probation.

D.   When funding ceases for a limited-term position or when the position is no longer necessary, the limited-term position shall be abolished and the incumbent shall be removed from the payroll except as provided in E., below.

E.   Regular employees who transfer, promote or reduce to limited-term positions at the direction of the Agency/Department Head shall retain their former status and retain their layoff benefits in their former layoff unit. The Agency/Department Head shall make such an order in writing prior to the date of transfer or promotion.

Section 5.   Temporary Promotion

A.   A regular, probationary or limited-term employee who is assigned on a temporary basis to a higher level vacant regular or limited-term position shall be promoted on a temporary basis to that class when such employee has been assigned to the higher class for one hundred twenty (120) consecutive regularly scheduled hours of work and the employee has been performing all of the significant duties and responsibilities of the higher class unless the employee requests to be reassigned to his or her former class. In such a case the employee shall be reassigned within five (5) working days.

B.   An Agency/Department may, at its option, waive the one hundred twenty (120) hour requirement when it is necessary to utilize a regular, probationary or limited-term employee in a higher level vacant regular or limited-term position for a period that is expected to be at least one hundred twenty (120) regularly scheduled hours but not to exceed eighteen (18) months.

C.   An employee on temporary promotion shall not be placed on promotional probation. Upon return from temporary promotion, an employee shall serve the remainder of any uncompleted probationary period in the employee's former class and shall have the salary status he or she would have achieved if the employee had remained in the lower class throughout the period of his or her service in the higher class.

D.   At the end of the employee's assignment to the higher class, the employee shall have the right to return to his or her former class and Agency/Department. A temporary promotion shall not exceed a period of eighteen (18) months.

Section 6.   Reemployment of Employees on Disability Retirement

A.   The County will counsel and advise employees retired for physical disability about reemployment opportunities with the County.

B.   Employees retired for physical disability who, within two (2) years from date of retirement, or date their disability retirement is discontinued, request and qualify for positions in the County service shall be placed on the County Preferred Eligible List with respect to such positions. They will be placed on such list in chronological order of retirement but following the last person on layoff status. They will remain on such list for a period of two (2)

years from date of retirement, or date their disability retirement is discontinued, except that:

1. a person appointed to a regular position in the County service shall be removed from the list;

2. a person who, on two (2) separate occasions, rejects or fails to respond within three (3) calendar days to offers of employment in a class for which he or she is qualified, shall be removed from the list;

3. a person who on three (3) separate occasions, declines referral for interviews in a class for which he or she is qualified, shall be removed from the list.

Section 7. <u>Reemployment of Regular Employee</u>

A regular employee who leaves County employment and is reemployed within fifteen (15) calendar days shall be deemed to have been on Agency/ Departmental Leave for such period of time.

Section 8. <u>Time Off for Selection Procedures</u>

A regular, limited-term or probationary employee shall be entitled to necessary time off with pay to participate in tests of fitness, examinations and interviews required by the Human Resources Director during working hours for the purpose of determining eligibility for movement to another class in the County service or transfer from one (1) Agency/Department to another.

## ARTICLE XIV DISCIPLINARY ACTION

### Section 1. Reprimand and Substandard Performance Evaluation

A. No regular, limited-term or probationary employee shall receive a written reprimand or a substandard performance evaluation except for reasonable cause.

B. A substandard performance evaluation given to a regular, limited-term or probationary employee must be reviewed and approved by the Agency/ Department Head before it is given to the employee. A written reprimand or substandard performance evaluation given to a regular, limited-term or probationary employee may be appealed through the grievance/appeal procedure. Such appeal shall be initiated at Step1of the grievance/appeal procedure.

### Section 2. Emergency Suspensions of Five Days or Less

A. In suspending a regular, limited-term or probationary employee for five (5) days or less, when it is necessary to remove the employee from the work site immediately because of a potential emergency situation, including, but not limited to, situations that may endanger life or property the employee shall:

1. whenever practicable, be given an opportunity to respond to the proposed suspension to a designated Agency/Department representative with the authority to make an effective recommendation on the proposed suspension prior to the suspension becoming effective;

2. be informed of the employee's right to representation in the response;

3. be informed of the employee's right to appeal should the proposed suspension become final.

B. In such emergency suspensions, the procedural requirements of Section 3., below, shall be complied with within ten (10) days following the effective date of the disciplinary action.

### Section 3. Pre-Disciplinary Hearing for Suspension, Reduction or Discharge

A. In suspending an employee in a nonemergency situation or in reducing a regular, limited-term or probationary employee for reasons of unsatisfactory performance or physical disability, or in discharging a regular or limited-term regular employee, a written notice of such proposed disciplinary action shall be served on the employee personally, or by certified mail, at least ten (10) calendar days prior to the effective date of the proposed action. Such written notice shall contain:

1.    a description of the proposed action and its effective date(s);

2.    a statement of the reasons for such proposed action, including the acts or omissions on which the proposed action is based;

3.    copies of material on which the proposed action is based;

4.    a statement of the employee's right to respond, either orally or in writing, prior to the effective date of such proposed action;

5.    a statement of the employee's right to representation;

6.    a statement of the employee's right to appeal should such proposed action become final.

B.    Prior to the effective date of such suspension, reduction or discharge, an employee will be given an opportunity to respond, either orally or in writing, at the employee's option, to a designated agency/ department representative with the authority to make an effective recommendation on the proposed disciplinary action.

C.    An employee shall be given reasonable time off without loss of pay to attend a hearing pursuant to this Article.

D.    An employee may represent himself or herself or may be represented by the recognized employee organization in a hearing pursuant to this Article.

E.    An employee shall receive written notice either sustaining, modifying, or canceling the proposed disciplinary action on or prior to the effective date of such action except that such written notice may be given after suspensions pursuant to Section 2., above.

F.    Should a proposed reduction or suspension become final, an employee shall have the right to appeal such action pursuant to Sections 4. and 5. of this Article.

G.    Should a proposed discharge become final, an employee shall have the right to appeal such action pursuant to Section 6. of this Article.

Section 4.    <u>Suspension</u>

A.    No regular, limited-term or probationary employee shall be suspended except for reasonable cause.

B.    A written notice of such suspension stating specifically the cause of the suspension shall be given to the employee.

C.     In accordance with the provisions of Article XIV, an appeal of suspension shall be initiated at Step 3 of the grievance/appeal procedure, except for suspensions imposed by the County Executive Officer, which may be referred directly to arbitration.

D.     No regular, limited-term or probationary employee shall be suspended for less than 5 days (40 hours) except for a serious safety violation.

Section 5.     Reduction

A.     No regular employee or limited-term regular employee shall be reduced to a position in a lower class for reasons of unsatisfactory performance or physical disability except for reasonable cause.

B.     A written notice of such reduction stating specifically the cause of the reduction shall be given to the employee.

C.     In accordance with the provisions of Article XIV, an appeal of reduction for reasons of unsatisfactory performance or physical disability shall be initiated at Step 3 of the grievance/appeal procedure, except for reductions imposed by the County Executive Officer which may be referred directly to arbitration.

Section 6.     Discharge and Right of Appeal

A.     No regular or limited-term regular employee shall be discharged except for reasonable cause. No proposed discharge shall be effected unless approved by the Human Resources Director except for discharges imposed by the County Executive Officer.

B.     A written notice of such discharge stating specifically the cause of the discharge shall be given to the employee.

C.     In accordance with the provisions of Article XIV, a discharge may be appealed directly to arbitration.

Section 7.     Polygraph Examination

No employee shall be compelled to submit to a polygraph examination. No disciplinary action whatsoever shall be taken against an employee refusing to submit to a polygraph examination; nor shall any comment be anywhere recorded indicating that an employee offered to take, took or refused to take a polygraph examination unless otherwise agreed to in writing by the parties; nor shall any testimony or evidence of any kind regarding an employee's offer to take or refusal to take or the results of a polygraph examination be admissible in any proceeding pursuant to this Resolution, unless otherwise agreed to in writing by the parties.

## ARTICLE XV GRIEVANCE PROCEDURE AND DISCIPLINARY APPEALS

### Section 1. Scope of Grievances

A. A grievance may be filed if a management interpretation or application of the provisions of Article VI through Article XXIII (Administrative Management) of this Personnel and Salary Resolution adversely affects an employee's wages, hours or conditions of employment.

B. Specifically excluded from the scope of grievances are:

1. subjects involving the amendment or change of Board of Supervisors resolutions, ordinances, minute orders, which do not incorporate the provisions of this Personnel and Salary Resolution;

2. matters which have other means of appeal including, but not limited to, matters which may be appealed through the Orange County Merit System Selection Rules and Appeals Procedure or the Workers' Compensation Appeals Board;

3. position classification;

4. standard or better performance evaluations.

### Section 2. Basic Rules

A. If an employee does not present a grievance/appeal or does not appeal the decision rendered regarding his or her grievance/appeal within the time limits, the grievance/appeal shall be considered resolved.

B. If a County representative does not render a decision to the employee within the time limits, the employee may within seven (7) calendar days thereafter appeal to the next step in the procedure.

C. If it is the judgment of any management representative that he or she does not have the authority to resolve the grievance/appeal, he or she may refer it to the next step in the procedure. By mutual agreement of the County and the employee or the recognized employee organization any step of the procedure may be waived.

D. The Human Resources Director may temporarily suspend grievance/appeal processing on a section-wide, unit-wide, division-wide, Agency/Department-wide or County-wide basis in an emergency situation. The recognized employee organization may appeal this decision to the Board of Supervisors.

E. Upon written consent of the parties, i.e., the representatives of the County and the employee or his or her representative, the time limits at any step in the procedure may be extended.

F. Every reasonable effort shall be made by the employee and the County to resolve a grievance/appeal at the lowest possible step in the grievance/appeal procedure.

G. No claim shall be granted for retroactive adjustment of any grievance prior to sixty (60) calendar days from the date of filing the written grievance.

Section 3. Submission of Grievances

A. Any employee or group of employees shall have the right to present a grievance. No employee or group of employees shall be hindered from or disciplined for exercising this right.

B. If any two (2) or more employees have essentially the same grievance, they may, and if requested by the County must, collectively present and pursue their grievance if they report to the same immediate supervisor.

C. If the grievant is a group of more than three (3) employees, the group shall, at the request of the County, appoint one (1) or two (2) employees to speak for the collective group.

Section 4. Employee Representation

A. An employee may represent himself or herself or may be represented in the formal grievance/appeal procedure.

B. Representation at Step 1 of the grievance procedure shall be limited to an employee grievance/appeal representative employed in the Agency/ Department or representation unit in which the grievance is filed.

Section 5. Time Off for Processing Grievances/Appeals

A. Reasonable time off without loss of pay shall be given to:

1. An employee who has a grievance/appeal, in order to attend a meeting with his or her supervisor or other person with authority under the grievance/appeal procedure to resolve the matter, or to meet with his or her grievance/appeal representative.

2. An employee grievance/appeal representative, in order to attend a meeting with the represented grievant's/appellant's supervisor or other person with authority under the grievance/appeal procedure to resolve the grievance/appeal, or to obtain facts concerning the action grieved/appealed through discussion with the grievant/appellant or other employees, or through examination of appropriate County records or locations relating to the grievance/appeal.

B. The following restrictions shall apply in all cases to activity authorized in Section 5.A., above:

1. Before performing grievance/appeal work, the grievant/appellant or employee grievance/appeal representative shall obtain permission of his or her supervisor and shall report back to the supervisor when the grievance/appeal work is completed.

2. Neither the grievant/appellant nor the employee grievance/appeal representative shall interrupt or leave his or her job to perform grievance/appeal work if his or her supervisor determines that such interruption or absence will unduly interfere with the work of the unit in which the grievant/appellant or employee representative is employed. However, an effort will be made to grant such time off as soon as it is feasible to do so.

3. When an employee grievance/appeal representative must go into another section or unit to investigate a grievance/appeal, the employee representative shall be permitted to do so provided that:

   a. the employee representative checks in and checks out with the supervisor of the unit; and

   b. such investigation does not unduly interfere with the work of the unit.

Section 6. <u>Informal Discussion</u>

If an employee has a problem relating to a work situation, the employee is encouraged to request a meeting with his or her immediate supervisor to discuss the problem in an effort to clarify the issue and to work cooperatively towards settlement.

Section 7. <u>Grievance/Appeal Steps</u>

The grievance/appeal procedure shall consist of the following steps, each of which must be completed prior to any request for further consideration of the matter unless waived by mutual consent or as otherwise provided herein.

Step 1: <u>Immediate Supervisor</u>

An employee may formally submit a grievance to the immediate supervisor within fourteen (14) calendar days from the occurrence which gives rise to the problem. Such submission shall be in writing and shall state the nature of the grievance and the suggested solution. Within seven (7) calendar days after receipt of the written grievance, the immediate supervisor and/or such other representative(s) as may be designated by the Agency/Department

shall meet with the grievant. Within seven (7) calendar days thereafter, a written decision shall be given to the grievant.

Step 2:     Agency/Department Head

If the grievance is not settled under Step 1, it may be presented to the Agency/Department Head. The grievance shall be submitted within seven (7) calendar days after the receipt of the written decision from Step 1. Within seven (7) calendar days after the receipt of the written grievance, the Agency/Department Head or his or her representative(s) shall meet with the grievant. Within seven (7) calendar days thereafter, a written decision shall be given to the grievant.

Step 3:     Human Resources Director

If the grievance/appeal is not settled under Step 2 and it concerns:

A.    an interpretation or an application of this Personnel and Salary Resolution;

B.    a substandard performance evaluation;

C.    a written reprimand; or

D.    a probationary release alleging discrimination,

it may be appealed in writing to the Human Resources Director within seven (7) calendar days after receipt of the written decision from Step 2.  Appeal of a suspension and/or a reduction ordered by an Agency/Department Head or his or her designated representative may be submitted in writing at Step 3 within ten (10) calendar days after receipt of the notice of suspension and/or reduction. Within fourteen (14) calendar days after receipt of the written grievance/appeal, the Human Resources Director or his or her representative shall meet with the grievant/appellant. Within fourteen (14) calendar days thereafter, a written decision shall be given to the grievant/appellant. The decision of the Human Resources Director in A., B., and C., above shall be final and binding and shall not be referable to higher County authority or arbitration, except as described in Section 9. of this Article.

Section 8.       Referrals to Arbitration

A.    Disciplinary Appeals

    1.    Submission Procedure

        a.    If an appeal from suspension or reduction is not settled at Step 3, it may be presented to the Human Resources Director within seven (7) calendar days from the date the decision was rendered.

        b.    An appeal from any discharge or from a suspension or reduction imposed by the County Executive Officer may be presented to the Human Resources Director within ten (10) calendar days from the date the action becomes final.

        c.    All disciplinary appeals shall be signed by an employee or by a representative of the recognized employee organization and shall be submitted in writing.

        d.    The issues in all disciplinary appeals shall be:

        was (employee's name) suspended/reduced/ discharged for reasonable cause?  If not, to what remedy is the appellant entitled under the provisions of Article XIV, Section 8. of the Personnel and Salary Resolution?

        e.    As soon as practicable after a suspension, reduction or discharge appeal is presented to the Human Resources Director, an arbitrator shall hear the appeal.

    2.    Findings of Facts and Remedies

An arbitrator may sustain, modify, or rescind an appealed disciplinary action as follows and subject to the following restrictions:

        a.    All Disciplinary Actions

        If the arbitrator finds that the disciplinary action was taken for reasonable cause, he or she shall sustain the action.

        b.    Suspensions/Reductions

        If the action is modified or rescinded, the appellant shall be entitled to restoration of pay and/or fringe benefits in a manner consistent with the arbitrator's decision.

c. Discharges

1) If the arbitrator finds that the order of discharge should be modified, the appellant shall be restored to a position in his or her former class subject to forfeiture of pay and fringe benefits for all or a portion of the period of time the appellant was removed from duty, as determined by the arbitrator.

2) If the arbitrator finds that the order of discharge should be rescinded, the appellant shall be reinstated in a position in his or her former class and shall receive pay and fringe benefits for all of the period of time he or she was removed from duty.

3) Restoration of pay and benefits shall be subject to reimbursement of all unemployment insurance and additional outside earnings which the appellant received since the date of discharge.

B. Probationary Releases Alleging Discrimination

1. The issues to be submitted to the arbitrator in grievances filed pursuant to Article VIII, Section 1.C.3., shall be as follows and shall be submitted consistent with Section 8.A., above.

a. Was the probationary release of (employee's name) in whole or in part the result of unlawful discrimination by the County?

b. If so, what shall the remedy be under the provisions of Article XV, Section 8.2 a., Findings of Facts and Remedies, of the Personnel and Salary Resolution?

2. Findings of Facts and Remedies

a. In the event the arbitrator finds no unlawful discrimination, the grievance shall be denied and the issue of remedy becomes moot.

b. In the event the arbitrator finds unlawful discrimination, but also finds such violation was not a substantial cause of the employee's probationary release, the grievance shall be denied and the issue of remedy becomes moot.

c. In the event the arbitrator finds unlawful discrimination, and also finds that the discrimination was a substantial cause of the probationary release of the employee, the arbitrator's award shall depend upon the significance of the violation and shall be in keeping with the following alternatives:

1) The probationary release may be sustained.

2) The employee may be reinstated in a position in his or her former class subject to forfeiture of pay and fringe benefits for all or a portion of the period of time the employee was removed from duty. The employee may be required to serve the remainder of any outstanding probation period.

3) The employee may be reinstated in a position in his or her former class with full back pay and benefits for all of the period of time the employee was removed from duty. The employee may be required to serve the remainder of any outstanding probation period.

C. General Provisions

1. The cost of an arbitrator shall be shared equally in all costs by the County and the appealing party except when the appealing party solely alleges unlawful discrimination, in which case the County shall bear the full cost. When the grievance involves both discrimination and other arbitrable issues, the proper division of costs shall be determined by the arbitrator.

2. Grievance/Appeal hearings by an arbitrator shall be private.

3. Arbitration appeal hearings of suspensions of less than forty (40) hours shall be limited to one (1) day unless both parties agree that a longer hearing is necessary. Both parties shall be allotted equal time during arbitration hearings involving such suspensions. The one (1) day limitation for arbitration appeal hearings shall not apply to suspensions imposed by the County Executive Officer.

4. The arbitrator shall be selected by the mutual agreement of the parties. If the parties cannot agree upon an arbitrator, a list of seven (7) arbitrators shall be obtained from the California State Conciliation Service, the American Arbitration Association or some other agreed upon source, and each party shall alternately strike one (1) name from the list until only one (1) name remains.

5. Upon written request by the opposing party in a pending hearing given at least twenty (20) calendar days prior to the scheduled hearing date, the party requested shall supply to the party submitting the request copies of all documentary evidence to be used by that party at the hearing. Such evidence shall be provided no later than ten (10) calendar days prior to the scheduled hearing date. Any evidence not so provided may not be admitted or offered as evidence at the subsequent hearing except that any such documentary evidence discovered by a party after such a request for

copies but not soon enough to comply with the above time limits may be admitted providing it could not have been discovered sooner by reasonable means and provided further that a copy or copies of such evidence be afforded the requesting party as soon as practicable after such discovery.  Nothing contained herein shall operate to prevent either party from presenting additional documents by way of rebuttal.

6.   An employee shall not suffer loss of pay for time spent as a witness at an arbitration hearing held pursuant to this procedure. The number of witnesses requested to attend, and their scheduling, shall be reasonable.

7.   At the hearing, both the appealing employee and the County shall have the right to be heard and to present evidence. The following rules shall apply:

   a.   Oral evidence shall be taken only on oath or affirmation.

   b.   Each party shall have these rights: to call and examine witnesses, to introduce exhibits, to cross-examine opposing witnesses on any matter relevant to the issues even though that matter was not covered in the direct examination, to impeach any witness regardless of which party first called the witness to testify, and to rebut the evidence against the witness. If the employee does not testify in his or her own behalf, the employee may be called and examined as if under cross-examination.

8.   The hearing need not be conducted according to technical rules relating to evidence and witnesses. Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might have made improper the admission of such evidence over objection in civil actions. Hearsay evidence may be used for the purpose of supplementing or explaining any direct evidence but shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions. The rules of privilege shall be effective to the same extent that they are now or hereafter may be recognized in civil actions, and irrelevant and unduly repetitious evidence shall be excluded.

9.   The County shall be allowed to have one (1) employee, who may be called upon to testify as a witness, present at the arbitration hearing at all times.

10.   The parties agree to forego the use of briefs and transcripts whenever practicable.

11. The decision of the arbitrator shall be final and binding on all parties.

Section 9. Supplemental Layoff Appeal Procedure

An Administrative Management employee in the Social Services Agency may appeal an alleged misapplication of the County's Supplemental Layoff Procedure through the County's Supplemental Layoff Appeal Procedure applicable to grant-aided agencies/departments.

ARTICLE XVI     LAYOFF PROCEDURE

Section 1.     General Provisions

This procedure shall not apply to a temporary layoff of less than four (4) consecutive weeks.

Section 2.     Order of Layoff

A.     When a reduction in the work force is implemented, each Agency/Department Head shall determine, subject to CEO approval, which employees are subject to layoff based on the needs of the organization.

B.     In considering which employees shall be subject to layoff, consideration shall be given to knowledge and skills related to organizational need and the employee's performance.

Section 3.     Notification of Employees

Written notice of layoff shall be given to an employee or sent by mail to the last known mailing address at least fourteen (14) calendar days prior to the effective date of the layoff. Notices of layoff shall be served on employees personally at work whenever practicable.

Section 4.     Rehire Lists

A.     The names of persons laid off shall be placed on an Agency/Departmental Rehire List for each class in the occupational series at or below the level of the class from which laid off.

B.     Persons on the Agency/Departmental Rehire List for that class will be considered prior to eligibles on other types of eligible lists.  If rehire is offered to a class other than that from which the person was laid off, such person must first meet the minimum qualifications and pass any required performance test for that class.

C.     Names of persons placed on the Agency/Departmental Rehire List shall remain on the list for two (2) years, except that:

    1.     A person who rejects or fails to respond within five (5) calendar days to an offer of employment in a particular class shall be removed from the list for that class.

    2.     A person who declines referral for an interview in a particular class shall be removed from the list for that class.

    3.     A person who retires from the County shall be removed from all lists.

D. In the event two (2) or more agencies/departments are consolidated while Agency/Departmental Rehire Lists are in effect, such lists shall be combined and treated as one (1) list by class in accordance with the preceding provisions. When a transfer of one (1) or more functions of one Agency/Department to another Agency/Department occurs, employees previously laid off from such function(s) who are on an Agency/Departmental Rehire List for the Agency/Department losing such function(s), shall be removed from such list and shall be placed on a Rehire List by class for the agency/department acquiring such function(s) and treated in accordance with the preceding provisions.

Section 5. <u>Status on Rehire</u>

A. An employee who has been laid off under the provisions of this Article and is subsequently rehired in a regular or limited-term position within a two (2) year period from the date of his or her layoff shall receive the following considerations and benefits:

1. All sick leave or annual leave credited to the employee's account when laid off shall be restored.

2. All service hours held upon layoff shall be restored.

3. All prior service shall be credited for the purpose of determining sick leave, vacation and annual leave earning rates and service awards.

4. The employee shall be placed in the salary range as if the employee had been on a Leave of Absence Without Pay.

5. The probationary status of the employee shall be as if the employee had been on a Leave of Absence Without Pay except that a probation period shall be established as determined by Article VIII, Sections 1.B.1. or 1.B.2., if reemployment is in a higher class or an occupational series different from that employed in at the time of layoff.

Section 6. <u>Supplemental Layoff Procedure</u>

A. Layoffs of Administrative Management employees in the Social Services Agency shall be implemented in accordance with the County's Supplemental Layoff Procedure applicable to grant aided agencies and departments.

ARTICLE XXI      RETIREMENT

A.    For employees hired on or before September 20, 1979.

    1.    Such employees are provided a one-fiftieth (1/50) retirement benefit formula per Section 31676.12 of the Government Code for general members and Section 31664.0 for safety members.

    2.    The retirement allowance will be computed on the highest one (1) year of final compensation per Government Code Section 31462.1.

    3.    Members' normal contribution rates shall continue to be established as provided by Section 31621.5 of the Government Code for general members and 31639.5 for safety members.

    4.    The County will adopt employee contribution rates equal to County contributions for full reserve funding of cost-of-living increases to retirees for all active members of the retirement system as recommended by the actuary.

    5.    The County will pay toward the employee's total retirement contribution, as determined by A.3. and 4., above, the statutory maximum allowable under the provisions of Government Code Section 31581.1 up to one-half (1/2) for general and safety members.

B.    For employees hired on or after September 21, 1979.

    1.    General members will be provided a one-sixtieth (1/60) retirement benefit allowance as provided in Section 31676.1 of the Government Code.

    2.    Safety members will be provided a one-fiftieth (1/50) benefit formula per Section 31664.0 of the Government Code, except as provided in E. below.

    3.    The retirement allowance of general and safety members will be computed upon the employee's highest three (3) years of compensation per Government Code Section 31462.

    4.    Members' normal contribution rates shall be as provided by Government Code Section 31621 for general members and 31639.25 for safety members.

    5.    The County will adopt employee contribution rates equal to County contributions for full reserve funding of cost-of-living increases to retirees for all active members of the retirement system as recommended by the actuary.

6.  The County will pay toward an employee's total retirement contribution as determined by B.4. and 5., above, the statutory maximum allowable by Government Code Section 31581.1 up to one-half (1/2) for general and safety members.

C.  Members' normal cost-of-living contributions will be adjusted subsequent to and in accordance with actuarial recommendations adopted by the Retirement Board and the Board of Supervisors.

D.  Effective June 29, 2001, the County will pay any remaining employee retirement contributions normally required of general and safety members, pursuant to government code Section 31581.2.

E.  Effective June 28, 2002, the retirement benefit formula for safety members in the Sheriff-Coroner Department and District Attorney's Office is provided for in Government Code Section 31664.1.  Effective June 28, 2002 and continuing through October 16, 2003, Law Enforcement Management employees shall pay an amount equal to 1.78% of their basic hourly rate for each hour paid in each pay period.  Effective October 17, 2003, the 1.78% payment shall cease.

ARTICLE XXII      COMPENSATION FOR CLASSES ON THE MANAGEMENT
                  SALARY RANGES

Section 1.      Salary Adjustments

A.    The Human Resources Director has the authority to allocate classes to
      management ranges, and to determine the salary level of employees
      assigned to a new range.

B.    All employees on the LM, ML-A-C and  MU salary ranges shall be eligible
      for performance based salary increases in accordance with the
      Management Performance Plan.

Section 2.      Salary Adjustment for Extra Help Employees

At the discretion of the Agency/Department Head, all extra help employees
compensated on the management salary ranges (LM, ML-A-C, ML-E and MU)
shall be eligible to receive up to a 3.75% salary increase effective January 10,
2003.

Section 3.      Equity Adjustments

Upon recommendation of the Agency/Department Head, the County Executive
Officer may, based on consideration of such factors as external market data,
internal salary relationships, position responsibilities, individual performance and
sound management principles, approve additional individual salary increases
which shall not exceed twenty-five (25) percent; however, no such increase shall
cause an employee's salary to exceed the maximum of the applicable salary
range.

Section 4.      Range Constraints

A.    No employee's salary shall exceed the maximum of the salary range,
      except pursuant to Y-Rate provisions of Article VI.

B.    No employee's salary shall be less than the minimum rate in the range
      assigned to the class in which he or she is employed.

## PART 3 - EXECUTIVE POLICY UNIT

### ARTICLE XXIII EXECUTIVE POLICY UNIT

Effective September 7, 2001, an Executive Policy Unit, comprised of employees designated as "confidential" shall be established. The Meyers-Milias-Brown Act (MMBA), as set forth in the California Government Code, Sections 3500-3510, governs labor-management relationships in California local government. MMBA permits employers to adopt rules for designating confidential employees, and excluding them from representing any employee organization that represents other employees in the agency. "Confidential Employee" is broadly defined as an employee who is privy to information that affects employee relations.

#### Section 1. Confidential Employees

A. Confidential employees shall be those individuals who, in the course of their daily work activities, are required to develop or present management positions with respect to employer-employee relations, or whose duties normally require access to confidential information contributing significantly to the development of management positions on issues.

B. Effective September 7, 2001, the following employees shall be designated as confidential:

1. Executive Secretary to the County Executive Officer
2. Executive Secretaries to Assistant County Executive Officers
3. Assistant to the County Executive Officer
4. All represented staff and administrative management employees assigned to CEO/Office of Human Resources.
5. CEO/Office of Finance, Senior Budget Services Managers
6. Senior Manager, CEO/Risk Management
7. County Counsel Personnel and Labor Relations Attorneys

#### Section 2. Benefits

Effective September 7, 2001, in addition to any and all benefits accorded to employees as part of this Personnel and Salary Resolution and/or any applicable Memoranda of Understanding, the following benefits shall be assigned to employees designated as confidential:

A.    Represented Employees

All represented employees designated as confidential shall receive a premium pay of five and one-half (5½) percent of the hourly rate of pay, while functioning in a position designated as confidential.

B.    Executive Secretary, County Executive Officer

In addition to A. above, the Executive Secretary to the County Executive Officer shall receive an additional premium pay of five(5)percent of the hourly rate of pay.

C.    Management Employees

County 401(a)Plan

1.    Beginning September 7, 2001, the County shall contribute an amount equal to 3% of biweekly salary to the County 401(a) plan on behalf of each administrative management employee designated as confidential, up to an amount not to exceed the maximum annual contribution allowed by law.

2.    The Human Resources Director or his/her designee shall administer the plan in accordance with the stated purpose.  Each employee to be eligible for this plan will be notified of his/her investment options under the plan.   The eligible employee will be able to make investment changes to his/her plan through the 401(a) provider.  The Assistant CEO, Human Resources or his/her designee shall set up each eligible employee in the County's system in accordance with plan provisions so that a specified percentage of his/her biweekly salary is transferred by the Auditor-Controller directly to the Plan provider on his/her behalf.

3.    Eligibility – Full time regular, limited term employees and part time employees working twenty (20) hours or more per week, hired, appointed or promoted after the commencement of this plan will be eligible for the 401(a) benefit upon his/her hire, appointment or promotion date.  County contributions to the plan will be based on an eighty (80) hour pay period and dollars paid.

4.    If an eligible employee subsequently transfers to an ineligible job classification, he/she will receive the County contribution through the last day of the pay period in which he/she remained eligible.  The employee must leave his/her assets in the County 401(a) Plan until either death, total and permanent disability, retirement or separation from the County of Orange.

Optional Benefit Plan

1. Effective January 2002, each eligible administrative management employee designated as confidential shall be entitled to select benefits from those listed in Article XII, Section 3, 5., at a cost to the County not to exceed three thousand five hundred (3,500) dollars, effective the beginning of each calendar year.

2. All provisions which apply to Administrative Management shall also apply to management employees designated as confidential, except that the amount of the Optional Benefit Plan will be three thousand five hundred (3,500) dollars, per plan year.

Section 3. Requests to Designate Employees as Confidential

Annually, in September of each year, a Department/Agency Head may request specific employees, fitting the description of "confidential" be so designated. Requests shall be submitted in a form and format to be determined by the Human Resources Director. Upon review and approval of the County Executive Officer and the Human Resources Director, employees designated as confidential will be entitled to the benefits described in this article, effective the first pay period in January of the following year.

PART 4 - EXECUTIVE MANAGEMENT

ARTICLE XXIV TERMS AND CONDITIONS OF EMPLOYMENT FOR MEMBERS OF THE BOARD OF SUPERVISORS, EXECUTIVE MANAGEMENT EMPLOYEES, EXECUTIVE AIDES AND EXECUTIVE ASSISTANTS TO MEMBERS OF THE BOARD OF SUPERVISORS AND ELECTED OFFICIALS

Section 1. General Provisions

Except as otherwise provided in this Article or by State law or action of the Board of Supervisors and except where the natural construction of a provision indicates otherwise, the wages, hours and terms and conditions of employment for members of the Board of Supervisors, Executive Management employees, Executive Aides and Executive Assistants to members of the Board of Supervisors and elected officials shall be the same as adopted for employees in the Administrative Management Representation Unit. However, any provision requiring Agency/Department Head approval for Administrative Management employees shall be interpreted to require Board of Supervisors' approval in the case of nonelected Agency/Department Heads.

Section 2. Employees of the Board of Supervisors - General Provisions

A. Employees in the classes of Executive Aide I, Executive Aide II, Executive Assistant shall be appointed and serve at the pleasure of the individual supervisors holding the offices to which such employees are assigned. They may be terminated at any time by the Supervisor holding that office and in such an event, shall have no right to any appeal or grievance procedure under any rule or regulation of the County.

B. Each member of the Board of Supervisors shall determine the number of assistants for his or her office and the class and step or rate at which they will be employed, except that the salary for any individual Aide or Assistant shall not exceed the maximum rate of the applicable range. The classes to which they are assigned shall be one (1) of the following:

Executive Aide I
Executive Aide II
Executive Assistant

The qualifications, testing and methods of selection of the above described employees shall be determined by and at the discretion of the Supervisor appointing them. Each Supervisor shall promptly notify the Human Resources Department in writing of the name and compensation for each person appointed by him or her hereunder. The Supervisor shall notify the Human Resources Department of any change in the status of such persons as will affect their rate of compensation.

C.     Salaries of Executive Aides and Executive Assistants

Salaries of the employees in the classes of Executive Aide I, Executive Aide II and Executive Assistant may be increased or decreased at any time at the discretion of the appointing Supervisor. The Board may, at any time, establish new salary ranges for such classes.

Section 3.     Employees of Elected Agency/Department Heads

Employees in the class of Executive Assistant shall be appointed by and serve exclusively at the pleasure of the elected Agency/Department Head holding the office to which such employee is appointed. Employees in this class may be terminated at any time by the elected Agency/Department Head holding the office to which they were appointed without right of appeal under any rule or regulation of the County. Appointments ended under this provision are specifically excluded from the disciplinary grievance and appeals procedure.

The number of positions authorized in the class of Executive Assistant for elected Agency/Department Heads shall be established by the Board of Supervisors.

Each elected Agency/Department Head shall recommend for approval, by the County Executive Officer, the salary-range step or rate at which an employee will be compensated, except that the salary for any Executive Assistant shall not exceed the maximum rate of the range established by the Board of Supervisors for the class. The determination of the qualifications required and the testing and methods of selection used to appoint employees under this provision are at the discretion of the elected official holding the office to which the employees are appointed.

Section 4.     Non-Elected Agency/Department Heads (Executive Management - Group II)

A.     To the extent permitted by law, Agency/Department Heads appointed after July 4, 1986 shall serve at the pleasure of the County Executive Officer, (i.e. At Will).  Prior to such an appointment, the Human Resources Director shall obtain written acknowledgement from the prospective appointee acknowledging his or her At Will status.  Agency/Department Heads who have voluntarily entered into At Will agreements prior to July 4, 1986 shall continue to serve as At Will employees.  Such employees may be released from service at any time, without notice, cause, or rights of appeal, by the County Executive Officer.   Non-elected Agency/Department Heads appointed after July 4, 1986 will be required to sign At Will agreements as a condition of employment.

B.     The provisions of Section A. above shall not apply to:

1.     The County Counsel and the Agricultural Commissioner whose

tenures are governed by statute.

2. The Public Defender who may be discharged, suspended or reduced for reasonable cause and only by a 3/5 vote of the Board of Supervisors.

3. The Retirement Administrator who shall serve at the pleasure of the Retirement Board pursuant to Government Code 31522.2.

C. To the extent permitted by law, the County Executive Officer may include a severance package, including pay and or health benefits in an At Will agreement entered into on or after November 9, 1999 for all Group II Executive Management employees as deemed necessary to recruit and retain qualified personnel.  The severance package shall not exceed 90 calendar days from the date of termination of employment by the County. This severance provision shall not apply to any termination for cause implemented in accordance with the provisions of Article XIV and XV.

Section 5. <u>Senior Management Officials (Executive Management - Group III)</u>

A. All Executive Management employees, other than Agency/Department Heads, shall serve at the pleasure of the Agency/Department Head (i.e. At Will).   Prior to and as a condition of such appointment, the Human Resources Director shall obtain a written agreement from the prospective appointee acknowledging his or her At Will status.

B. Except as provided for in C. and D. of this Section, upon removal, Group III Executive Management employees may be released from County service at any time, without notice, cause or rights of appeal or right to reduce to a lower level position, by the Agency Department Head.

Effective on or after November 9, 1999 the County Executive Officer may include a severance package, including pay and or health benefits in an At Will Agreement for Executive Management employees serving At Will as deemed necessary to recruit and retain qualified personnel.   The severance package shall not exceed 90 calendar days from the date of termination of employment by the County.  This severance provision shall not apply to any termination for cause implemented in accordance with the provisions of Article XIV and XV.

C. Group III Executive Management employees in the Social Services Agency who do not share overall responsibility for all major agency/department functions and who serve At Will  may be removed from their position at any time without notice, cause or rights of appeal.   Upon removal, such employees have the right to return to a non-executive management position in which they passed probation prior to becoming At Will employees.   Employees entering such positions from outside County service shall have no rights to a lower level position.

D.   Group III Executive Management employees in agencies/departments other than Social Services who do not share overall responsibility for all major agency/department functions and who serve At Will pursuant to agreements signed prior to November 9, 1999 may be removed from their position at any time without notice, cause, or rights of appeal.   Upon removal, such employees have the right to return to a non-executive management position in a lower class or its equivalent in which they passed probation prior to becoming At Will employees.   Employees entering such positions from outside the County service shall have no rights to a lower level position.

This provision shall not preclude an Executive Management employee from entering into a new At Will agreement pursuant to this Section.

Section 6.       Life Insurance

Executive Management employees shall receive life and accidental death and dismemberment insurance in the amount of $125,000, regardless of age, with the option to purchase additional coverage including dependent coverage.

Section 7.       Sick Leave - Elected County Officers

Upon death or paid retirement of an elected County officer who was a County employee immediately preceding his or her term of office, the officer or his or her estate shall be entitled to be paid for a portion of the unused Sick Leave accumulated during that time the County official was a County employee, on the same basis as provided for County Administrative Management employees at the time of said death or retirement; provided, however, that the percent of unused Sick Leave paid for shall be based upon the years of service the officer was a regular County employee and at a rate determined by his or her final salary as a County employee. If the official elects to take deferred retirement, he or she shall not be eligible for the benefits set forth by this Section.

Section 8.       Optional Benefit Plan

All provisions which apply to Administrative Management shall also apply to Executive Management, except that the amount of the Optional Benefit Plan will be three thousand five hundred (3,500) dollars per plan year for Executive Management at the beginning of each calendar year.

Section 9.       Health Plan Premiums

All provisions which apply to Administrative Management shall also apply to Executive Management except that for Group I Executive Management employees the County will pay one hundred (100) percent of the total health plan premium for such employees and their dependents.

Section 10. Salary Adjustments

Except as otherwise provided by law, the County Executive Officer is authorized to increase or decrease the salaries of Group II and Group III Executive Managers based on consideration of such factors as position responsibilities, performance, external market data and internal salary relationships. Salaries shall not be greater than the maximum or less than the minimum of the assigned salary range.

Section 11. County 401(a) Plan

A. Beginning calendar year 1999, the County shall contribute an amount equal to 3% of biweekly salary to the County 401(a) Plan on behalf of each Executive Management Group II and III employee, up to an amount not to exceed the maximum annual contribution allowed by law.

B. Beginning calendar year 1999, the County shall contribute an amount equal to 6% of biweekly salary to the County 401(a) Plan on behalf of Executive Management Group I employees, Board Members, County Executive Officer and Executive Director of the Local Redevelopment Authority, and the Director of Internal Audit up to an amount not to exceed the maximum annual contribution allowed by law.

C. The Human Resources Director or his/her designee shall administer the plan in accordance with the stated purpose. Each employee to be eligible for this plan will be notified of his/her investment options under the plan. The eligible employee will be able to make investment changes to his/her plan through the 401(a) provider. The Assistant CEO, Human Resources or his/her designee shall setup each eligible employee in the County's system in accordance with plan provisions so that a specified percentage of his/her biweekly salary is transferred by the Auditor-Controller directly to the Plan provider on his/her behalf.

D. Eligibility - Each employee as specified in the classifications listed in (A) and (B) above are eligible for this benefit. Eligible employees will be eligible for the 401(a) benefit upon his/her hire, appointment or promotion date. County contributions to the plan will be based on an 80 hour pay period and dollars paid.

E. If an eligible employee subsequently transfers to an ineligible job classification, he/she will receive the County contribution through the last day of the pay period in which he/she remained eligible. The employee must leave his/her assets in the County 401(a) Plan until either death, total & permanent disability, retirement or separation from the County of Orange.

F. The County 401(a) Plan may also serve as a qualified retirement plan for Board Members and Executive Management Group I employees provided that at the beginning of his/her term the elected official irrevocably elects to

participate in the 401(a) Plan in lieu of joining the Orange County Employees Retirement System (OCERS). For this purpose, the 401(a) Plan is a defined contribution plan with a minimum employer contribution of 7.5%. The additional 1.5% of salary contribution into the plan is added onto the 6% as mentioned above in (B) for a total County contribution of 7.5%.

# PART 5 - LAW ENFORCEMENT MANAGEMENT

## ARTICLE XXV TERMS AND CONDITIONS OF EMPLOYMENT FOR LAW ENFORCEMENT MANAGEMENT EMPLOYEES

### Section 1. General Provisions

Except as otherwise provided in this Article, the wages, hours and terms of conditions of employment for employees in Law Enforcement Management (Appendix E) shall be the same as adopted for employees in Administrative Management.

### Section 2. Work Period

If any Law Enforcement Management employee is required to work an unusually large number of hours as a result of civil disturbances, barricaded suspects, hostage situations, police emergencies, floods, fires, storm conditions, high tides, etc., or due to extraordinary circumstances, the Department Head may authorize additional compensation for such an employee or group of employees whom the Department Head determines should receive additional compensation. The rate of such compensation shall not exceed the employee's regular biweekly pay rate.

### Section 3. Life Insurance

Life insurance and accidental death and dismemberment insurance will be provided at amounts based upon the coverage as listed in the following table:

| Salary Grade | Insurance |
|---|---|
| LM 1 | $85,000 |
| LM 2 | $90,000 |

Employees will have the option to purchase additional life and accidental death and dismemberment coverage including dependent coverage.

### Section 4. Compensation for Classes on the LM Salary Ranges

Salary Adjustments:

A. The Human Resources Director has the authority to allocate classes to management ranges, and to determine the salary level of employees assigned to a new range.

B. All employees on the LM salary range shall be eligible for performance based salary increases in accordance with the Management Performance Plan.

C.   Market Differential

Adjustments to the LM 1 and LM 2 salary ranges will be agendized for Board of Supervisors approval when range adjustments to the Peace Officer and Supervising Peace Officer salary ranges are approved, in order to maintain consistent salary differentials implemented in 1998.

D.   Equity Adjustments

1.   Any other provision of this Personnel and Salary Resolution notwithstanding, any newly appointed Lieutenant or Supervising Attorney's Investigator whose salary is below the top of the second quartile on the salary range and whose performance is rated standard or better shall have his or her salary advanced to approximately the top of the second quartile on the salary range.

2.   Upon recommendation of the Department Head, the County Executive Officer, may, in those instances where he or she determines that it is in the best interest of the County, approve additional individual salary increases which, when added to the amount the individual received pursuant to the above section, shall not exceed twenty (20) percent; however, no such increase shall cause an employee's salary to exceed the maximum of the applicable salary range.

E.   Performance Based Increases Within Range

1.   A performance based salary increase eligibility date shall be established for each regular, limited-term and probationary employee.  This annual performance based salary increase eligibility date shall be the beginning of the last pay period in October of each year.   Salary increases authorized for eligible employees by the Department Head pursuant to this section shall be effective on the performance based salary increase eligibility date.

2.   Except as provided herein, all regular, limited term and probationary employees employed in a Law Enforcement Management class on the performance based salary increase eligibility date described above, shall be eligible to be considered for an annual performance based salary increase within range as provided in this section. Employees appointed to a Law Enforcement Management class after the performance based salary increase eligibility date of one year shall not be eligible for a performance based salary increase until the next performance based salary increase eligibility date.

3.   Extra Help employees shall not be eligible for performance based salary increases within range.

4. Regular, limited term and probationary employees shall have their performance evaluated at least annually prior to their performance based salary increase eligibility date.

5. The amount of a performance based salary increase, if any, for individual employees shall be determined by the Department Head, and shall be based on the evaluation of each eligible employee's performance.

F. Police Services Chiefs Premium

The Sheriff-Coroner may authorize a 5% premium, based on assignment and performance, for Lieutenants who are appointed to positions that function as Police Services Chiefs in jurisdictions that contract with the County for police services.

G. Special Assignment Premium

The District Attorney may authorize a five (5) percent premium for Commanders and Assistant Chiefs functioning in specialty assignments which have significant responsibility for the management and coordination of countywide regional or federal programs.

Section 5. On-The-Job Injuries, Workers' Compensation

A. Medical Treatment

Whenever an employee sustains an injury or disability arising out of and in the course of County employment which requires medical treatment, the employee shall obtain treatment pursuant to the appropriate California Labor Code sections.

B. Disability Payments and Leave

Whenever an employee is compelled to be absent from duty by reason of injury or disease arising out of and in the course of County employment, the employee shall be compensated and placed on Leave pursuant to California Labor Code Section 4850. An employee who is eligible for benefits under California Labor Code Section 4850 shall be placed on 4850 Leave.

C. Exhaustion of 4850 Benefits

1. When an employee has exhausted all rights and benefits provided by California Labor Code Section 4850, and such employee continues to be unable to return to work due to an injury or disease arising out of and in the course of County employment, such employee shall be treated in the following manner:

a. he or she shall be entitled to all benefits provided by California Workers' Compensation Law; and

b. he or she shall be placed on Workers' Compensation Leave; and

c. at the employee's option, all sick leave, compensatory time, vacation and/or annual leave shall be added to the workers' compensation temporary disability benefit, if eligible for such benefit, which shall equal one hundred (100) percent of the employee's base salary until such accruals are exhausted; or

d. if the employee is not eligible for temporary disability or exhausts his or her temporary disability benefit, at the employee's option such accruals shall be continued until they are exhausted.   An election to continue accruals shall be irrevocable.

2. Upon exhaustion of all sick leave, compensatory time, vacation and/or annual leave the employee shall not accrue sick leave, vacation and/or annual leave for the remainder of Workers' Compensation Leave.

3. The probation period of any employee who receives workers' compensation benefits shall be extended by the length of time the employee receives such benefits.

4. Time during which an employee receives workers' compensation temporary disability benefits shall be counted toward the computation of County seniority and determination of sick leave, vacation and/or annual leave earning rates.

D. Exposure to Contagious Diseases

Whenever an employee is compelled by direction of a County-designated physician to be absent from duty due to on-the-job exposure to a contagious disease, the employee shall receive regular compensation for the period absent from duty.

Section 6.    Annual Leave

The Annual Leave provisions shall apply to regular and limited term Law Enforcement Management employees hired on or after July 15, 1977, and shall become effective on February 15, 2000.   Law Enforcement Management employees hired prior to July 15, 1977 shall be governed under Article IX, LEAVE PROVISIONS and Article X, VACATION in the Personnel and Salary Resolution.  Upon adoption of the Annual Leave Plan, annual leave will consist of the combined sick leave, vacation balances and accruals for employees covered by the Annual Leave Plan Provisions.

PERSONNEL AND SALARY RESOLUTION AMENDMENTS

ADOPTED MARCH 18, 2003

| | | | |
|---|---|---|---|
| PSR AMENDMENT 1 | NEW ARTICLE | ANNUAL LEAVE PLAN | A - 1 |
| PSR AMENDMENT 2 | ARTICLE IX | LEAVE PROVISIONS | A - 5 |
| PSR AMENDMENT 3 | ARTICLE X | VACATION | A - 6 |
| PSR AMENDMENT 4 | ARTICLE XII | REIMBURSEMENT PROGRAMS | A - 7 |
| PSR AMENDMENT 5 | ARTICLE XIV | DISCIPLINARY ACTION | A - 8 |
| PSR AMENDMENT 6 | ARTICLE XV | GRIEVANCE PROCEDURE AND DISCIPLINARY APPEALS | A - 11 |
| PSR AMENDMENT 7 | ARTICLE XVII | ON THE JOB INJURY, WORKER'S COMPENSATION SUPPLEMENT PAY | A - 19 |
| PSR AMENDMENT 8 | ARTICLE XXIV | EXECUTIVE MANAGEMENT | A - 20 |

ARTICLE XIV DISCIPLINARY ACTION

This article applies to unrepresented Administrative Management in the Executive Policy Unit and Executive Management employees, Executive Aides and Executive Assistants. Law Enforcement Management employees continue to be covered by Article XIV of the existing Personnel and Salary Resolution.

No regular, limited-term or probationary employee shall receive a disciplinary action except for reasonable cause.

Section 1. Pre-Disciplinary Hearing for Suspension, Reduction or Discharge

A. In suspending an employee or in reducing a regular, limited-term or probationary employee for reasons of unsatisfactory performance or physical disability, or in discharging a regular or limited-term regular employee, a written notice of such proposed disciplinary action shall be served on the employee personally, or by certified mail, at least ten (10) calendar days prior to the effective date of the proposed action. Such written notice shall contain:

1. a description of the proposed action and its effective date(s);

2. a statement of the reasons for such proposed action, including the acts or omissions on which the proposed action is based;

3. copies of material on which the proposed action is based;

4. a statement of the employee's right to respond, either orally or in writing, prior to the effective date of such proposed action;

5. a statement of the employee's right to representation;

6. a statement of the employee's right to appeal should such proposed action become final.

B. Prior to the effective date of such suspension, reduction or discharge, an employee will be given an opportunity to respond, either orally or in writing, at the employee's option, to a designated agency/ department representative with the authority to make an effective recommendation on the proposed disciplinary action.

C. An employee shall be given reasonable time off without loss of pay to attend a hearing pursuant to this Article.

D. An employee may be represented in a hearing pursuant to this Article.

E. An employee shall receive written notice either sustaining, modifying, or canceling the proposed disciplinary action on or prior to the effective date of such action.

F. Should a proposed reduction or suspension become final, an employee shall have the right to appeal such action pursuant to Sections 2 and 3 of this Article.

G. Should a proposed discharge become final, an employee shall have the right to appeal such action pursuant to Section 4. of this Article.

Section 2. Suspension

A. No regular, limited-term or probationary employee shall be suspended except for reasonable cause.

B. A written notice of such suspension stating specifically the cause of the suspension shall be given to the employee.

C. In accordance with the provisions of Article XV (Grievance Procedure), an appeal of suspension shall be initiated at Step 2 of the grievance/appeal procedure, except for suspensions imposed by the County Executive Officer, which may be referred directly to arbitration.

D. No regular, limited-term or probationary employee shall be suspended for less than 5 days (40 hours) except for a serious safety violation.

Section 3. Reduction

A. No regular employee or limited-term regular employee shall be reduced to a position in a lower class for reasons of unsatisfactory performance or physical disability except for reasonable cause.

B. A written notice of such reduction stating specifically the cause of the reduction shall be given to the employee.

C. In accordance with the provisions of Article XV, an appeal of reduction for reasons of unsatisfactory performance or physical disability shall be initiated at Step 2 of the grievance/appeal procedure, except for reductions imposed by the County Executive Officer which may be referred directly to arbitration.

Section 4. Discharge and Right of Appeal

A. No regular or limited-term regular employee shall be discharged except for reasonable cause. No proposed discharge shall be effected unless approved by the Human Resources Director except for discharges imposed by the County Executive Officer.

B.   A written notice of such discharge stating specifically the cause of the discharge shall be given to the employee.

C.   In accordance with the provisions of Article XV, a discharge may be appealed directly to advisory arbitration.

ARTICLE XV GRIEVANCE PROCEDURE AND DISCIPLINARY APPEALS

This article applies to unrepresented Administrative Management in the Executive Policy Unit and Executive Management employees, Executive Aides and Executive Assistants. Law Enforcement Management employees continue to be covered by Article XV of the existing Personnel and Salary Resolution.

Section 1. Scope of Grievances

A. A grievance may be filed if a County interpretation or application of the provisions of this Personnel and Salary Resolution adversely affects an employee's wages, hours or conditions of employment.

B. Specifically excluded from the scope of grievances are:

1. subjects involving the amendment or change of Board of Supervisors resolutions, ordinances, minute orders, which do not incorporate the provisions of this Personnel and Salary Resolution;

2. matters which have other means of appeal including, but not limited to, matters which may be appealed through the Orange County Merit System Selection Rules and Appeals Procedure or the Workers' Compensation Appeals Board;

3. position classification;

4. performance evaluations.

Section 2. Basic Rules

A. If an employee does not present a grievance/appeal or does not appeal the decision rendered regarding his or her grievance/appeal within the time limits, the grievance/appeal shall be considered resolved.

B. If a County representative does not render a decision to the employee within the time limits, the employee may within seven (7) calendar days thereafter appeal to the next step in the procedure.

C. If it is the judgment of any County representative that he or she does not have the authority to resolve the grievance/appeal, he or she may refer it to the next step in the procedure. By mutual agreement of the County and the employee, any step of the procedure may be waived.

D. The Human Resources Director may temporarily suspend grievance/appeal processing on a section-wide, unit-wide, division-wide, agency/department-wide or County-wide basis in an emergency situation.

E. Upon written consent of the parties, i.e., the representatives of the County and the employee or his or her representative, the time limits at any step in the procedure may be extended.

F. Every reasonable effort shall be made by the employee and the County to resolve a grievance/appeal at the lowest possible step in the grievance/appeal procedure.

G. No claim shall be granted for retroactive adjustment of any grievance prior to sixty (60) calendar days from the date of filing the written grievance.

Section 3. Submission of Grievances

A. Any employee or group of employees shall have the right to present a grievance. No employee or group of employees shall be hindered from or disciplined for exercising this right.

B. If any two (2) or more employees have essentially the same grievance, they may, and if requested by the County must, collectively present and pursue their grievance if they report to the same immediate supervisor.

C. If the grievant is a group of more than three (3) employees, the group shall, at the request of the County, appoint one (1) or two (2) employees to speak for the collective group.

Section 4. Employee Representation

An employee may represent himself or herself or may be represented in the formal grievance/appeal procedure.

Section 5. Time Off for Processing Grievances/Appeals

A. Reasonable time off without loss of pay shall be given to:

1. An employee who has a grievance/appeal, in order to attend a meeting with his or her supervisor or other person with authority under the grievance/appeal procedure to resolve the matter, or to meet with his or her grievance/appeal representative.

2. An employee grievance/appeal representative, in order to attend a meeting with the represented grievant's/appellant's supervisor or other person with authority under the grievance/appeal procedure to resolve the grievance/appeal, or to obtain facts concerning the action grieved/appealed through discussion with the grievant/appellant or other employees, or through examination of appropriate County records or locations relating to the grievance/appeal.

B.    The following restrictions shall apply in all cases to activity authorized in Section 5.A., above:

    1.    Before performing grievance/appeal work, the grievant/appellant or employee grievance/appeal representative shall obtain permission of his or her supervisor and shall report back to the supervisor when the grievance/appeal work is completed.

    2.    Neither the grievant/appellant nor the employee grievance/appeal representative shall interrupt or leave his or her job to perform grievance/appeal work if his or her supervisor determines that such interruption or absence will unduly interfere with the work of the unit in which the grievant/appellant or employee representative is employed.  However, an effort will be made to grant such time off as soon as it is feasible to do so.

    3.    When an employee grievance/appeal representative must go into another section or unit to investigate a grievance/appeal, the employee representative shall be permitted to do so provided that:

        a.    the employee representative checks in and checks out with the supervisor of the unit; and

        b.    such investigation does not unduly interfere with the work of the unit.

Section 6.    <u>Informal Discussion</u>

If an employee has a problem relating to a work situation, the employee is encouraged to request a meeting with his or her immediate supervisor to discuss the problem in an effort to clarify the issue and to work cooperatively towards settlement.

Section 7.    <u>Grievance/Appeal Steps</u>

The grievance/appeal procedure shall consist of the following steps, each of which must be completed prior to any request for further consideration of the matter unless waived by mutual consent or as otherwise provided herein.

Step 1: Agency/Department Head

An employee may formally submit a grievance to the Agency/Department Head within fourteen (14) calendar days from the occurrence which gives rise to the problem. Such submission shall be in writing and shall state the nature of the grievance and suggested solution. Within seven (7) calendar days after the receipt of the written grievance, the Agency/Department Head or his or her representative(s) shall meet with the grievant. Within seven (7) calendar days thereafter, a written decision shall be given to the grievant.

Step 2: Human Resources Director

If the grievance/appeal is not settled under Step 1 and it concerns:

A. an interpretation or an application of this Personnel and Salary Resolution;

B. a written reprimand; or

C. a probationary release alleging discrimination,

it may be appealed in writing to the Human Resources Director within seven (7) calendar days after receipt of the written decision from Step 1. Appeal of a suspension and/or a reduction ordered by an Agency/Department Head or his or her designated representative may be submitted in writing at Step 2 within ten (10) calendar days after receipt of the notice of suspension and/or reduction. Within fourteen (14) calendar days after receipt of the written grievance/appeal, the Human Resources Director or his or her representative shall meet with the grievant/appellant. Within fourteen (14) calendar days thereafter, a written decision shall be given to the grievant/appellant. The decision of the Human Resources Director in A., B., and C., above shall be final and binding and shall not be referable to higher County authority or arbitration.

Section 8. Referrals to Arbitration

A. Appeals of Suspensions/Reductions

1. Submission Procedure

a. If an appeal from suspension or reduction is not settled at Step 2, it may be presented for arbitration within seven (7) calendar days from the date the decision was rendered.

b. An appeal from any suspension or reduction imposed by the County Executive Officer may be presented to the Human Resources Director within ten (10) calendar days from the date the action becomes final.

c. All appeals shall be signed by an employee or by the employee's representative and shall be submitted in writing.

d. The issue in all appeals of suspensions/reductions shall be:

Was (employee's name) suspended/reduced for reasonable cause? If not, what is the remedy?

e. As soon as practicable after a suspension/ reduction appeal is presented to the Human Resources Director, an arbitrator shall hear the appeal.

B. Appeals of Discharges

1. Submission Procedure

a. A discharge may be appealed directly to arbitration within ten (10) calendar days from the date the decision was rendered.

b. All appeals shall be signed by an employee, or the employee's representative and shall be submitted in writing.

c. The issue in all appeals of discharge shall be:

Was (employee's name) discharged for reasonable cause? If not, what is the remedy?

d. As soon as practicable after a discharge appeal is presented to the Human Resources Director, an arbitrator shall hear the appeal.

2. Findings of Facts and Remedies

An arbitrator may sustain, rescind or modify an appealed disciplinary action as follows and subject to the following restrictions:

a. Suspensions/Reductions

1) If the arbitrator finds that the suspension/reduction was taken for reasonable cause, he or she shall sustain the action.

    2) If the action is modified or rescinded, the appellant shall be entitled to restoration of pay and/or fringe benefits in a manner consistent with the arbitrator's decision.

3) The decision of the arbitrator in matters of suspension/reduction shall be binding on all parties.

b. Discharges

1) The arbitrator shall advise that the order of discharge be sustained, modified or rescinded.

2) The decision of the arbitrator in matters of discharge shall be advisory and non-binding.

C. Probationary Releases Alleging Discrimination

1. The issue to be submitted to the arbitrator in grievances filed pursuant to Article VIII, Section 1.C.3., shall be as follows and shall be submitted consistent with Section 8.A., above.

a. Was the probationary release of (employee's name) in whole or in part the result of unlawful discrimination by the County?

b. If so, what shall the remedy be under Article XV, Section 8.2.a. of this Personnel and Salary Resolution?

2. Findings of Facts and Remedies

a. In the event the arbitrator finds no unlawful discrimination, the grievance shall be denied and the issue of remedy becomes moot.

b. In the event the arbitrator finds unlawful discrimination, but also finds such violation was not a substantial cause of the employee's probationary release, the grievance shall be denied and the issue of remedy becomes moot.

c. In the event the arbitrator finds unlawful discrimination, and also finds that the discrimination was a substantial cause of the probationary release of the employee, the arbitrator's award shall depend upon the significance of the violation and shall be in keeping with the following alternatives:

1) The probationary release may be sustained.

2) The employee may be reinstated in a position in his or her former class subject to forfeiture of pay and fringe benefits for all or a portion of the period of time the employee was

removed from duty. The employee may be required to serve the remainder of any outstanding probation period.

3) The employee may be reinstated in a position in his or her former class with full back pay and benefits for all of the period of time the employee was removed from duty. The employee may be required to serve the remainder of any outstanding probation period.

d. The decision of the arbitrator in matters of probationary releases alleging discrimination shall be binding on all parties.

D. General Provisions

1. The cost of an arbitrator shall be shared equally in all cases by the County and the appealing party except in matters of discharge and when the appealing party solely alleges unlawful discrimination, in which case the County shall bear the full cost. When the grievance involves both discrimination and other arbitable issues, the proper division of costs shall be determined by the arbitrator.

2. Grievance/Appeal hearings by an arbitrator shall be private.

3. The arbitrator shall be selected by the mutual agreement of the parties. If the parties cannot agree upon an arbitrator, a list of seven (7) arbitrators shall be obtained from the California State Conciliation Service, the American Arbitration Association or some other agreed upon source, and each party shall alternately strike one (1) name from the list until only one (1) name remains.

4. Upon written request by the opposing party in a pending hearing given at least twenty (20) calendar days prior to the scheduled hearing date, the party requested shall supply to the party submitting the request copies of all documentary evidence to be used by that party at the hearing. Such evidence shall be provided no later than ten (10) calendar days prior to the scheduled hearing date. Any evidence not so provided may not be admitted or offered as evidence at the subsequent hearing except that any such documentary evidence discovered by a party after such a request for copies but not soon enough to comply with the above time limits may be admitted providing it could not have been discovered sooner by reasonable means and provided further that a copy or copies of such evidence be afforded the requesting party as soon as practicable after such discovery. Nothing contained herein shall operate to prevent either party from presenting additional documents by way of rebuttal.

5.  An employee shall not suffer loss of pay for time spent as a witness at an arbitration hearing held pursuant to this procedure. The number of witnesses requested to attend, and their scheduling, shall be reasonable.

6.  At the hearing, both the appealing employee and the County shall have the right to be heard and to present evidence. The following rules shall apply:

    a.  Oral evidence shall be taken only on oath or affirmation.

    b.  Each party shall have these rights: to call and examine witnesses, to introduce exhibits, to cross-examine opposing witnesses on any matter relevant to the issues even though that matter was not covered in the direct examination, to impeach any witness regardless of which party first called the witness to testify, and to rebut the evidence against the witness. If the employee does not testify in his or her own behalf, the employee may be called and examined as if under cross-examination.

7.  The hearing need not be conducted according to technical rules relating to evidence and witnesses. Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might have made improper the admission of such evidence over objection in civil actions. Hearsay evidence may be used for the purpose of supplementing or explaining any direct evidence but shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions. The rules of privilege shall be effective to the same extent that they are now or hereafter may be recognized in civil actions, and irrelevant and unduly repetitious evidence shall be excluded.

8.  The County shall be allowed to have one (1) employee, who may be called upon to testify as a witness, present at the arbitration hearing at all times.

9.  The parties agree to forego the use of briefs and transcripts whenever practicable.

10. The decision of the arbitrator shall be binding on both parties except in matters of discharge. In matters of discharge the arbitrator's decision shall be advisory and non-binding.

PART 4 – EXECUTIVE MANAGEMENT

ARTICLE XXIV TERMS AND CONDITIONS OF EMPLOYMENT FOR MEMBERS OF THE BOARD OF SUPERVISORS, EXECUTIVE MANAGEMENT EMPLOYEES, EXCEUTIVE AIDES AND EXECUTIVE ASSISTANTS TO MEMBERS OF THE BOARD OF SUPERVISORS AND ELECTED OFFICIALS

Section 1. General Provisions

Except as otherwise provided in this Article or by State law or action of the Board of Supervisors and except where the natural construction of a provision indicates otherwise, the wages, hours and terms and conditions of employment for members of the Board of Supervisors, Executive Management employees, Executive Aides and Executive Assistants to members of the Board of Supervisors and elected officials shall be the same as adopted for *unrepresented administrative management* employees. However, any provision requiring Agency/Department Head approval for *unrepresented administrative management* employees shall be interpreted to require Board of Supervisors' approval in the case of non-elected Agency/Department Heads.

PERSONNEL AND SALARY RESOLUTION

INDEX

**A**

Absence for Personal Business (Sick Leave), 47
Absence Without Authorization, 52
Absences Caused by Illness, Injury or Pregnancy, 52
Activated Positions, Number and Classification, 16
Additional Compensation, 27, 35
Administrative Leave, 18
Advance Step Appointment, 29
Agency/Department Head, Definition of, 1
Agency/Department Leave, 49
Annual Leave, A-1
  Accumulation of, A-1
  General Provisions, A-3
  Payoff, 27
  Unused, Payoff of, A-3
  Use of, For Illness or Injury, A-2
Appeals. (See specific subject)
Arbitration. (*See* Grievance Procedure and Disciplinary Appeals)
At Will, Employees/Position, 97
At Will, Employees/Positions, Definitions of, 1
Attorney Special Duty Pay, 36
Authority for Disciplinary Action, 18
Authority to Resolve Employee Complaints/Grievances and to Select and Compensate Arbitrators, 22
Automatic Resignation, 51

**B**

Bereavement Leave, 49
Billingual Pay, 35
Board, Definition of, 1

**C**

Catastrophic Leave Donation Procedure, 8
Clasification Review, 16
Compensation
  Additional, 27, 35, 103
  For Classes on Management Salary Ranges, 93
  For Employees, 21
  Limitations Upon, 22
Compensatory Time, 62
  Earning of, 62, (*See also* Holidays)

Payment of, 62, (*See also* Holidays)
Confidential Employees, 94
Conflict of Interest, 4
Contagious Diseases, Exposure to, 82
Contents of Personnel File, 42
Continuous Service, Definition of, 1
Coordinated Trial Courts of Orange County, 112
County, Definition of, 1

**D**

Deductions for Maintenance, 20
Deferred Compensation, 64, 90
Definitions, 1
Demotion. (See Reduction)
Departmental Leave of Absence (Agency/Departmental Leave), 49
Dependent Care Reimbursement, 66
Disability
Insurance, 85
Leave of Absence, 51, (*See also* Workers' Compensation)
Retirement, Reemployment of Employees on, 44
Disciplinary Action, 67, A-8
Authority for, 18
Discharge and Right of Appeal, 69, A-9
Disciplinary Appeals, 74
Polygraph Examination, 69
Pre-Disciplinary Hearing for Suspension, Reduction or Discharge, 67, A-8
Reduction, 32, 69, *74*, A-9
Reprimand, 67
Substandard Performance Evaluation, 67
Suspension, *74*, A-9
Discrimination
Probationary Releases Alleging, 40, *75*, 16
Remedies, *75*
Drug and Alcohol Policy, 7

**E**

Educational and Professional Reimbursement Program, 24
Election Work, 35
Emergency Leave (Personal Business), 47
Emergency Suspension, 67
Emergency, Definition of, 1
Employee
Confidential, 94
Definition of, 1
Parking, 20
Employees of
Elected Agency/Department Heads, 98
The Board of Supervisors, 97

Employment of Relatives, 5
Equity Adjustments, 93
Executive Management Employees, 94, 97, A-20
    401 (a) Plan, 95, 101
    Benefits, 94
    Confidential Employees, 94
    Definition of, 1
    Educational and Professional Reimbursement Program, 24
    General Provisions, 97, A-20
    Health Plan Premiums, 100
    Life Insurance, 100
    Nature of Reimbursement, 25
    Non-Elected Agency/Department Heads (Executive Management - Group II),
      98
    Objectives, for Reimbursement, 24
    Optional Benefit Plan, 96, 100
    Reimbursement Eligibility, 24
    Request Procedure, Reimbursement, 26
    Salary Adjustments, 93, 101
    Senior Management Officials (Executive Management - Group III), 99
    Sick Leave - Elected County Officers, 100
Extension of Probation Periods, 41
Extra Help
    Employees, Definition of, 1
    Position, Definition of, 1

**F**

Failure of Probation, 40
Failure to Return to Work (Absence Without Authorization), 52
Family Leave, 55
File, Personnel, Contents of, 42
Flexible Spending Accounts, 66
Full-Time Employee, Definition of, 2

**G**

Grievance Procedure and Disciplinary Appeals, 70, A-11
    Basic Rules of, 70, A-11
    Employee Representation, 71, A-12
    Informal Discussion, 72, A-13
    Referrals to Arbitration, 74, A-14
    Scope of, 70, A-11
    Steps in, 72, A-13
    Submission of Grievances, 71, A-12
    Supplemental Layoff Appeal, 78
    Time Off for Processing Grievances/Appeals, 71, A-12

## H

Health Care Reimbursement Account, 66
Health Insurance (Medical Insurance), 84
Holidays, 60
    Compensation for Work on, 62
    Eligibility for Holiday Pay, 61
    Holiday Pay, 61
    Holidays Observed, 60
Human Resources Director, Definition of, 2

## I

Illness, Absence Cause by, 52
Implementation, 113
Industrial Injuries, Treatment of, 81
Information Technology Usage Policy, 10
Injury to Reserve Deputy Sheriff, 82
Injury, Absence Caused by, 51
Insurance for Voluntary Services Personnel, 28
    Reserve Deputy Sheriffs, 28
Insurance, Health, 84
    Health Plans, 84
    Other Insurance Coverate, 84
    Physical Examination, 84
    Retiree Medical Benefit, 86
Insurance, Life, 85

## J

Judges, Commissioners and Court Administrators and Designated Managers, 111
Jury Duty Leave, 52

## L

Law Enforcement Management, 103
Layoff Procedure, 79
    General Provision, 79
    Notification of Employees, 79
    Order of Layoff, 79
    Rehire Lists, 79
    Status of Rehire, 80
    Supplemental Layoff Procedure, 80
Leave of Absence With Pay, 18
Leaves, Authorized
    Administrative, 18
    Agency/Departmental, 49
    Annual, 46
    Bereavement, 49

Departmental, 49
Disability, 51
Family, 55
General Provisions, 51
Jury Duty, 52
Military, 19
Nonoccupational Disability, 51
Official, 49, A-5
Parenthood, 53, A-5
Personal Business (Sick Leave), 47
Pregnancy, 52, (*See* also Leave of Absence, Disability Leave and Parenthood Leave)
Provisions, A-5
Sick, 46
Without Pay. (*See specific type of leave*)
Witness Leave, 52
Workers' Compensation, 54, A-5
Limitations Upon Compensation, 22
Limited-Term
Employee, Status of, 43
Employees, Definition of, 2
Position, Definition of, 2

**M**

Management Optional Benefit Plan, 63, 96, 100
Medical Insurance, 84, (*See* Insurance)
Merit Increases Within Range, 37
Mileage Reimbursement, 63
Military Leave of Absence, 19

**N**

New Employee, Pay for, 29
New Probation, 39
Night Shift Differential, 35
Nondisciplinary Reductions, 32

**O**

Official Leave of Absence, 49, A-5
On-the-Job Injury (see also Workers' compensations), 105, A-19
Optional Benefit Plan, 63, 96, 100, A-7

**P**

Parenthood Leave, 53, 5
Parking, 20
Part-Time Employee, Definition of, 2
Pay Check Deposit, 23
Pay

For New Employees, 29
Holiday, 61
Practices, 21
Premium, 35
Unused Sick Leave, 27
Payoff Provisions, 27
Annual Leave, 27
Sick Leave, 27
Vacation, 27
Performance Evaluation, 18, 42
Substandard, 67
Personal Business, Absence for, 47
Personal Property Reimbursement, 63
Personnel File, Contents of, 42
Physical Examnation, 84
Polygraph Examination, 69
Position Classification Plan, 16
Practicable, Definition of, 2
Pre-Disciplinary Hearing ("Skelley"), 67
Pregnancy. *(See* Sick Leave, Leave of Absence, Nonoccupational Disability and Parenthood Leave)
Premium Only Plan, 86
Premium Pay, 35
Prevention of Workplace Violence Policy, 8
Probation, 39, *(See* also Limited-Term Employee, Status of; Temporary Promotion; Leave Provisions; Layoff Procedures)
Extension of Probation Periods, 41
Failure of, 40
General Provisions, 41
New, 39
Probationary Releases Alleging Discrimination, 75
Promotional, 39
Probationary Employee, Definition of, 2
Promotion
Definition of, 2
Salary on, 30
Provisional Appointment, 20
Definition of, 2
Provisional Employee, Definition of, 2

**R**

Range Constraints, 93
Reassignment
Definition of, 2
Salary on, 31
Reclassification. *(See* Position Classification)
Reclassification, Salary on, 33
Recruiting Rate, Definition of, 2

Reduction
Appeal of, 69
Definition of, 3
Salary on, 32
Reemployment
Lists, 79
Of Employees on Disability Retirement, 44
Of Employees on Layoff, 80
Of Regular Employee, 45
Of Retired Employees, 34
Salary on, 34
Regular Employee
Definition of, 3
Reemployment of, 80
Regular Position, Definition of, 3
Regulation of Employees, 4
Reimbursement Programs, 63, A-7
Educational and Professional Reimbursement, 24
Mileage, 63
Optional Benefit Plan, 63, 7
Personal Property, 63
Reprimand, 67
Requests to Designate Employees as Confidential, 96
Reserve Deputy Sheriff, Injury to, 82
Retirement
Reemployment of Employee on Paid County Retirement, 34
Tax-Deferred Retirement Plan, 64, 91

S

Safety, 83
General Provisions, 83
Violations, Abatement of, 83
Salaries, 18, 21, 94, 97
Salary Adjustments, 101
Salary Allocation, Change in, 34
Salary Continuance (Long-term Disability) Insurance, 85
Salary on
Employment as a Deputy Sheriff - Emergency Services, 21
Executive Aides and Executive Assistants, 98
Promotion, 30
Reassignment, 31
Reclassification, 33
Reduction, 32
Reemployment, 34
Salary Payment Procedure, 21
Selection Procedures, 17
Time Off for, 45
Seniority, Definition of, 3

Shift Premium, 35
Sick Leave
  Accumulation of, 46
  Annual Leave, 46
  General Provisions, 48
  Payoff, 27
  Permitted Uses of, 46
  Prohimited Uses of, 47
  Unused, Payment for, 27, 48
  Verification by Physician, 48
Substandard Performance Evaluation, 67
Supplemental Layoff Appeal Procedure, 78, 80
Suspension, 68
  Emergency, 67
  Suspensions/Reductions, 74

## T

Tax-Deferred Retirement Plan, 64, 91
Temporary Promotion, 44
Time Off for Selection Procedures, 45
Time Off for Voting, 19
Transfer, of Probationary Employees, 41
Tuition Reimbursement. (*See* Educational and Professional Reimbursement Program)

## V

Vacation, 57, A-6
  Accumulation of, 57
  General Provisions, 58
  Incentives for Critical Management Appointments, 59
  Payoff, 27
Verification of Illness, 48
Violence, Policy for Prevention of Workplace Violence, 8
Voting, Time Off for, 19

## W

Witness Leave, 52
Work Period, 29
  Administrative Management, 29
  Law Enforcement Management, 103
Workers' Compensation, 81
  Exposure to Contagious Diseases, 82
  Injury, Reserve Deputy Sheriff, 82
  Leave of Absence, 5
  On-the-Job Injury, 19
  Supplement Pay, 81, A-19
  Treatment of Industrial Injuries, 81

## Y

Y-Rate
    Definition of, 3
    Salary on Reduction/Reclassification, 32–34
    Schedule, 33

APPENDIX A

Classes designated as Executive Management as of January 10, 2003.

Group I - Elected Officials

0005E1 Assessor
0010E1 Auditor-Controller
0182E1 County Clerk/Recorder
0030E1 District Attorney
0070E1 Sheriff-Coroner
0087E1 Treasurer-Tax Collector

Group II - Appointed Agency/Department Heads

8324E2 Airport Director
0642E2 Clerk of the Board of Supervisors
2325E2 County Counsel
8145E2 County Executive Officer
2547E2 County Librarian
7421E4 County Probation Officer
6560E2 Director, Child Support Services
8424E2 Director, Community Services Agency *
4578E2 Director, Health Care Agency
2131E2 Director, Housing and Community Development
8120E2 Director, Integrated Waste Management Department
7840E2 Director, Internal Audit
2142E2 Director, Planning and Development Services
8180E2 Director, Public Facilities and Resources
7039E2 Director, Social Services Agency
8525E2 Human Resources Director
0065E2 Public Administrator
2373E2 Public Defender
0656E2 Registrar of Voters

* Combined with class of Public Administrator.

(Note: Department Heads and other executive management not appointed by the Board of Supervisors are included in Appendix C.)

Group III - Agency/Department Principal Assistants

8325E3 Assistant Airport Director*
8140E3 Assistant County Executive Officer*
4576E3 Assistant Director, HCA*
8119E3 Assistant Director, Integrated Waste Management Department
2342E3 Assistant District Attorney
6146E3 Assistant Sheriff

| | |
|---|---|
| 7848E3 | Assistant Treasurer-Tax Collector |
| 2322E3 | Chief Assistant County Counsel* |
| 2344E3 | Chief Assistant District Attorney |
| 6539E3 | Chief, Bureau of Investigation, District Attorney |
| 7823E3 | Chief Deputy Auditor-Controller* |
| 7038E3 | Chief Deputy Director, SSA* |
| 7420E8 | Chief Deputy Probation Officer |
| 2372E3 | Chief Deputy Public Defender* |
| 8173E3 | Deputy Director/Chief Engineer, PFRD |
| 7033E3 | Director of Adult and Employment Services |
| 8322E3 | Director of Agency Administration |
| 7032E3 | Director of Agency Financial Assistance |
| 7031E3 | Director of Children and Family Services |
| 2132E3 | Director of Housing and Redevelopment |
| 4575E3 | Director of Medical Services |
| 4563E3 | Director of Mental Health |
| 4579E3 | Director of Public Health |
| 8010E3 | Executive Manager |
| 0380E3 | Public Guardian |
| 6145E3 | Undersheriff* |

* Share with agency/department heads authority over all major agency/department functions.

APPENDIX B

Classes designated as Unrepresented Administrative Management (in the Executive Policy Unit) as of January 10, 2003:

| | |
|---|---|
| 8006MU | Administrative Manager I |
| 8007MU | Administrative Manager II |
| 2319MU | Assistant County Counsel |
| 2318MU | Deputy County Counsel V |
| 7815MU | Senior Accountant/Auditor II |
| 8008MU | Senior Administrative Manager I |
| 8009MU | Senior Administrative Manager II |
| 8005MU | Senior Staff Analyst |
| 8001MU | Staff Analyst I |
| 8003MU | Staff Analyst II |
| 8004MU | Staff Analyst III |

APPENDIX C

Except as otherwise provided in Part 4, Article XXIV, Executive Management, the incumbents in the following classes are entitled to the same benefits as provided by this Personnel and Salary Resolution to County Administrative Management employees.

8107MB   Executive Aide I
8108MB   Executive Aide II
8362MB   Executive Assistant

APPENDIX D

Classes included in the Law Enforcement Management Unit as of January 10,
2003:

6534ML   Assistant Chief Investigator, District Attorney
6141ML   Captain
3940ML   Director, Forensic Science Services
6138ML   Lieutenant
6531ML   Investigative Commander, DA

# EXHIBIT 253

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CHRISTINE MURRAY,

Plaintiff,

vs.

COUNTY OF ORANGE, a municipal corporation; ORANGE COUNTY SHERIFF-CORONER DEPARTMENT; SANDRA HUTCHENS, individually and as Sheriff of the Orange County Sheriff-Coroner Department; JOHN SCOTT, individually and as Undersheriff of the Orange County Sheriff-Coroner Department; MICHAEL HILLMANN, individually and as Former Assistant Sheriff of the Orange County Sheriff-Coroner Department; and DOES 1 THROUGH 10 inclusive,

Defendants.

CASE NO. CV10-01675 JVS (MLGx)

DEPOSITION OF SANDRA HUTCHENS

MONDAY, MAY 14, 2012

Reported by: BRANDY L. WILLIAMS, CSR, RPR #11084

I N D E X

DEPOSITION OF SANDRA HUTCHENS

MONDAY, MAY 14, 2012 PAGE

Examination By Mr. Gaspard 8

EXHIBITS

| PLAINTIFF'S EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| 227 | Memorandum dated November 25, 2008 | 39 |
| 228 | Memorandum dated May 04, 2010 | 40 |
| 229 | Memorandum dated March 13, 2009 | 58 |
| 230 | Division Commander Meeting Agenda | 68 |
| 231 | Management Positions as a Percentage of Total Positions | 69 |
| 232 | Document with Captains listed | 77 |
| 233 | Email from Robert Eason to Christine Murray | 94 |
| 234 | Los Angeles Times Article | 97 |
| 235 | Printed Questions | 106 |
| 236 | Email from Burris, Ryan K On Behalf of Hutchens to OCSD Distribution | 109 |
| 237 | Memorandum dated July 10, 2009 | 136 |
| 238 | CRPA Roster Listing | 138 |
| 239 | Orange County Sheriff's Department Executive and Command Staff | 143 |
| 240 | Orange County Sheriff-Coroner Department April 2009 | 144 |

(Index continued on following page)

EXHIBITS (Continued)

| PLAINTIFF'S EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| 241 | Orange County Sheriff-Coroner Department August 2009 | 144 |
| 242 | Orange County Sheriff-Coroner Department February 2010 | 145 |
| 243 | Los Angeles Times Article | 145 |
| 244 | Memorandum dated May 4, 2010 | 184 |
| 245 | Memorandum dated March 19, 2010 | 188 |
| 246 | Letter dated September 22, 2009 | 189 |
| 247 | DVD | 200 |
| 248 | Sandra Hutchens, Candidate for Sheriff-Coroner; County of Orange | 205 |
| 249 | Memorandum dated March 24, 2010 Re: Good to Great Outline | 207 |

EXHIBITS

(Previously marked and attached for reference.)

| PLAINTIFF'S EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| 201 | Memorandum dated September 29, 2008 | 34 |
| 203 | Memorandum dated November 10, 2008 | 49 |
| 205 | Document entitled "Orange County Sheriff's Department From Good to Great" | 194 |
| 206 | Memorandum dated September 17, 2009 | 110 |

(Index continued on following page)

EXHIBITS (Continued)

(Previously marked and attached for reference.)

| PLAINTIFF'S EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| 209 | Document entitled "Layoff Notice" | 111 |
| 210 | Document dated 9/17/09 | 111 |
| 211 | Document entitled "Layoff Meeting Follow-Up | 143 |
| 213 | Document entitled "Article XVI" | 116 |
| 215 | Job Bulletin | 185 |
| 216 | E-mail dated January 7, 2010 | 180 |
| 217 | Memorandum dated January 15, 2010 | 186 |
| 221 | Captain Eligible List | 170 |
| 222 | Document entitled "Temporary Promotions/ Transfers" | 169 |

QUESTIONS ASKED, WITNESS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 84 | 9 |
| 91 | 5 |
| 91 | 13 |
| 102 | 5 |

TRANSCRIPT MARKED AT THE REQUEST OF COUNSEL

| PAGE | LINE |
|---|---|
| 87 | 15 |

APPEARANCES

For the Plaintiff, CHRISTINE MURRAY:

LACKIE, DAMMEIER & McGILL APC
BY: CHRISTOPHER L. GASPARD
367 North Second Avenue
Upland, California 91786
(909) 985-4003

For the Defendants, COUNTY OF ORANGE, ORANGE COUNTY SHERIFF'S DEPARTMENT, SANDRA HUTCHENS, JOHN SCOTT and MICHAEL HILLMANN:

LYNBERG & WATKINS
BY: S. FRANK HARRELL
1100 Town & Country Road
Suite 1450
Orange, California 92868
(714) 937-1010

Also Present:

CHRISTINE MURRAY

BILL VARBLE, VIDEOGRAPHER

DEPOSITION OF SANDRA HUTCHENS

Pursuant to Notice to Take Deposition, on the 14th day of May, 2012, commencing at the hour of 10:02 o'clock a.m., at 367 North Second Avenue, in the City of Upland, County of San Bernardino, State of California, before me, Brandy L. Williams, Certified Shorthand Reporter, State of California, Personally Appeared:

SANDRA HUTCHENS,

called as a witness by the Plaintiff, who, being by me first duly sworn, was thereupon examined as a witness in said cause.

THE VIDEOGRAPHER: Good morning. I'm Bill Varble, your Videographer. And I represent Stearns Williams Reporting in Alta Loma, California. I'm not financially interested in this action, nor am I a relative or employee of any attorney or any of the parties.

The date today is May 14th, 2012. The time right now is 10:05 a.m. This deposition is taking place at the Law Firm of Lackie, Dammeier & McGill, 367 North Second Avenue in Upland, California.

And this is Case No. CV10-01675 JVS in the United States District Court for the Central District of California, entitled Christine Murray versus County of Orange, et al. This deposition is being taken on behalf of the Plaintiff in this action.

And this is the beginning of Tape No. 1 of the Videotaped Deposition of Sandra Hutchens. Your Court Reporter today is Brandy Williams.

Counsel, would you please state your appearances for the record.

MR. GASPARD: Chris Gaspard for Plaintiff, Christine Murray.

MR. HARRELL: Shel Harrell for the County of Orange, the Witness and others.

THE VIDEOGRAPHER: Thank you. Would the

Court Reporter please swear in the Witness.

(The Witness was duly sworn in by the Court Reporter.)

EXAMINATION

BY MR. GASPARD:

Q Good afternoon, Sheriff Hutchens.

Could you please state and spell your name for the record.

A Sandra Hutchens, H-u-t-c-h-e-n-s.

Q Sheriff Hutchens, have you been deposed before?

A Yes.

Q All right. Roughly, how many times?

A Probably five or six.

Q And you were deposed in the Anderson matter as well?

A Yes.

Q Okay. And of course, then, you know the Court Reporter has given you an oath, and it's the same oath you would take in a court of law. And you've -- you're sworn in under penalty of perjury.

You do understand that?

A Yes.

Q Okay. I'll ask you questions and ask you to verbally respond. And your response will be taken down by the Court Reporter.

In order to make a clear record, please respond with audible responses as opposed to gestures -- hand gestures or movements of your head.

After the deposition, you'll get a chance to review your deposition transcript and make any changes if you need to. But any substantive changes you make could call into question your veracity.

Do you understand?

A Yes.

Q Okay. I may ask you for your estimates.

You understand the difference between estimates and guesses; right?

A Yes.

Q We'll ask you not to guess at any answer to any questions; only provide estimates.

Have you recently consumed any alcohol or any other substances that would interfere with your ability to testify today?

A No.

Q All right. Any other reasons you couldn't give your best testimony today?

A No.

Q All right. Did you bring any notes or written documents with you today?
A No.
Q Did you review any notes or written documents to refresh your recollection for today's deposition?
A Yes.
Q What documents did you review?
A My prior deposition.
Q Okay. And you mean your deposition in the Anderson matter?
A Yes.
Q All right. Did -- other than your attorney, did you discuss today's deposition with anybody?
A No.
Q Have you ever been named as a Defendant in a lawsuit before?
A Yes.
Q All right. On how many occasions?
A I couldn't tell you. It's in L.A. County. It was several times -- a handful of times.
Q Were you ever named as a Defendant in an employment case?
A Yes.
Q All right. Other than this case and the Anderson case, have you been named as a Defendant in any

lawsuits in Orange County?

A No.

Q All right. So --

A Well, I -- there's a Correctional Service Assistant lawsuit with AOCDS that I'm named.

Q Okay.

MR. HARRELL: And it does lack foundation and call for speculation. The record may show that sometimes she's named and she doesn't even know.

MR. GASPARD: Right.

MR. HARRELL: The lawyers wall her off from that.

BY MR. GASPARD:

Q True. And I know you've been deposed before, so you probably know this. But your attorney may raise objections from time-to-time regarding the form of the question. He can also instruct you not to answer based on legal privileges, like privacy issues.

But I would ask, if you understand my question and there are no privileges asserted, that you still answer the question. So in other words, the more objections we get through, the faster we move the deposition along, essentially.

If you don't understand any of my questions, please ask me to clarify or restate or break it down for

you.

Let's see. Have you ever sued anyone as a Plaintiff in a lawsuit?

A No.

Q No? Not litigious.

A I had to stop and think. No, I don't think I have.

Q I'm going to get some real quick background information from you.

What year did you attend high school?

A I graduated in 1973.

Q What high school did you graduate from?

A Woodrow Wilson.

Q Where is that?

A Long Beach.

Q Okay. And after that, did you obtain an undergraduate degree?

A Yes.

Q All right. What year did you obtain your undergraduate degree?

A I think in 1990.

Q What school was that from?

A La Verne.

Q All right. University of La Verne.

And what was your major?

A Business Administration.

Q All right. After that, did you receive any sort of advanced degrees?

A No.

Q All right. So your highest level of education is a Bachelor's degree?

A Yes.

Q Are you a member of any professional organizations now?

A Yes.

Q All right. Which organizations are you a member of?

A California Peace Officers Association, California State Sheriff's Association, National Executive Institute, FBI National Academy Associates. I'm sure there's some others.

Q Okay. You currently work as the Sheriff of the Orange County Sheriff's Department; correct?

A Yes.

Q All right. And when did you begin working for Orange County in that capacity?

A In June of 2008.

Q Now, just prior to June 2008, you were employed by the L.A. County Sheriff's Department?

A No. I was retired.

Q Okay. But you previously worked for the Los Angeles County Sheriff's Department?

A Yes.

Q When did you retire from LASO?

A In 200- -- let's see -- -7.

Q And when you retired from LASO, what position were you at?

A Division Chief.

Q Of which division?

A Homeland Security.

Q And when you were working in that capacity as Division Chief of Homeland Security, did you have some exposure to Federal grant monies?

A Yes.

Q Okay. So you have some experience with how Federal grants are administered within the County; correct?

A Yes.

Q How did you -- how did you find out about the open position in Orange County? Did someone approach you, or did you reach out to someone else?

A It was in the newspapers.

Q All right. So you saw, in the newspapers, that Orange County had a vacancy. And that was from Sheriff Corona; right?

A I saw it in the newspaper that the Board was conducting a nationwide search to replace Sheriff Corona.

Q And what did you do in response to that?

A I applied to the search firm.

Q All right. So some sort of executive search firm and you gave them your resume and such?

A I contacted them, yes.

Q Okay. And who contacted you after that?

A A member of that search firm. I don't recall the name.

Q Okay. And was an interview set up with the Board of Supervisors; or what happened next?

A What happened next was, I was interviewed by the search firm. And then ultimately nine names went to the Board of Sup- -- well, nine of us -- I don't know how many names they submitted to the Board, but nine of us did interview in front of the Board.

Q Okay. And sometime after your interview, you were, in fact, appointed to the position of Sheriff?

A Yes.

Q Okay. Do you recall the date that you were appointed to Sheriff?

A No.

Q Could you estimate about when you were

appointed?

A I think it was -- I don't want to guess. I want to say it's May or June. I don't remember the exact date of the decision. And then there was a couple of weeks before I was actually sworn in. So --

Q Okay. And you mean May or June of 2008; right?

A Yes.

Q And you said -- about how long after that when you were sworn in?

A A couple of weeks.

Q Okay. So the first couple weeks, you were in some sort of acting Sheriff capacity or --

A Well, I showed up to work.

Q Okay.

A I wasn't getting paid.

Q Got it.

A And -- but I wanted to get right to work. So I couldn't tell you exactly if it was considered acting or what it was considered.

Q I understand. Now -- now, at some point after that, you were -- you were elected to the Sheriff's position; correct?

A Right.

Q And when was that?

A That was a year and a half ago, 2010.

Q Okay. So that would be late 2010?

A June. June.

Q June?

A June 2010.

Q And how long is that -- when do you have to run again if you want to remain in the position of Sheriff?

A 2014.

Q Okay. Now, I noticed that today you showed up in civilian clothes.

A Uh-huh. Yes.

Q Yeah.

A Sorry.

Q And are you carrying a firearm with you today?

A Yes.

Q All right. Sometimes, as Sheriff, do you wear an Orange County Sheriff's Uniform?

A Yes.

Q All right. So you have the election of wearing a civilian attire or a uniform; right?

A Yes.

Q Okay. Are you required to carry a firearm at all times even when you're in civilian clothes?

A No.

MR. HARRELL: Are you asking for a legal conclusion?

MR. GASPARD: Well, it's her department.

Q I -- you're the highest ranking person when it comes to the policies of the Orange County Sheriff's Department; right?

A Right.

Q And you're aware of the policies that deal with when officers have to carry a firearm or when they may carry a firearm?

A I don't have to carry one.

Q All right. The reason I'm asking -- and I'll -- we've kind of discussed this in some of the other depositions, so I want to get a little bit more background on that.

You have some Assistant Sheriffs that work for you as well; right?

A Yes.

Q Okay. How many Assistant Sheriffs do you currently employ?

A There are three --

Q Okay.

A -- and Executive Director. I have to stop and think. We've changed it so many times.

Q The Executive Director, you consider him -- as

far as the organizational chart, is the Executive Director on the same level as the Assistant Sheriffs, but runs the civilian side?

A He is on the same level as the Assistant Sheriffs, but the Assistant Sheriffs also have civilian --

Q Okay --

A -- employees in their commands. The Executive Director has more of the non-sworn component, but it's finance and facilities; those kinds of things.

Q All right. And you also employ a certain number of Captains as well; right?

A Yes.

Q Do you know how many Captains you currently employ?

A I couldn't tell you the number. I want to say it's around 20 or so, but I'm not sure.

Q Okay. And I just asked you about when you can wear civilian clothes versus when you wear a uniform.

Is -- what's the policy for Assistant Sheriffs as far as when they have to wear a uniform versus when they can come to work in plain clothes?

MR. HARRELL: Vague as to time.

BY MR. GASPARD:

Q All right. On a general work day now.

A It really depends on what they are doing that date. I don't monitor them day-to-day on what they wear. If they're attending, say -- we have a memorial service coming up -- a ceremonial-type function, a graduation, they're typically -- not always, but typically in uniform. But they can wear either -- just like I can, they can wear business attire or uniform.

Q What's the term that you use when you refer to this group of individuals, the Captains and the Assistant Sheriff, the Executive Director? Do you call them your command staff, or is there --

A Command staff.

Q Okay. I'll use that term. So kind of what I'm getting from you is that your command staff has some discretion as to when they should show up in uniform and when they should show up in plain clothes; right?

A Yes.

Q Okay. Is there a policy that requires them to carry a firearm when they're working in plain clothes?

A I don't know.

Q All right. Are you aware of times when members of your command staff work in plain clothes but do not carry a firearm?

A Could you ask it again?

Q Yeah. Sorry. I talk fast.

A No. That's okay.
Q I'll slow down.
A I just lost you there.
Q Are you aware of instances in which members of your command staff have shown up for work in plain clothes, but were not carrying a firearm?
A I wouldn't know. I don't really inspect to see whether they're carrying a gun or not.
Q Okay. Are you concerned about whether or not they carry a firearm in plain clothes when they're working?
A I'm only concerned that they're able to use it; that they've had the qualification and they're capable of using it if they're going to carry a firearm.
Q Okay. And the qualification you mentioned, how often do members of the command staff have to qualify with their firearms?
A Well, four times a year. There are some that only do it three times a year, but I think all the command staff does it four times a year.
Q Okay. Members of your command staff are generally in management positions; correct?
A Yes.
Q All right. And other members of the Sheriff's Department that are sworn -- the Lieutenants and

below -- tend to work more on the ground, like in Patrol Operations; correct -- in uniform positions?

A Um --

MR. HARRELL: I lost the question.

MR. GASPARD: Sure.

MR. HARRELL: Can you read that back?

And if you don't talk slower, she's going to throw something at you.

MR. GASPARD: Sorry, Brandy. I had two huge cups of coffee today, and I tend to run fast.

MR. HARRELL: We're going to switch you to decaf.

MR. GASPARD: I have a lot of material to get through.

MR. HARRELL: Can you read that back?

(Last question was read.)

THE WITNESS: Well --

BY MR. GASPARD:

Q I'll actually take that question back because --

A Yeah.

Q -- it doesn't make any sense.

MR. HARRELL: All right.

BY MR. GASPARD:

Q Here's what I'm trying to get to. I recently

deposed Michael Hillmann. We had this discussion about when command staff members are on light duty in civilian clothes, whether or not they have to carry firearms or if they have some discretion as to not carry firearms. That's what I want to ask you about.

If a member of the command staff is on light duty but still comes to work in civilian clothes, would it be okay for them not to carry a firearm?

MR. HARRELL: It's an incomplete hypothetical. Have they qualified on the range or not?

BY MR. GASPARD:

Q Assuming they're qualified.

A Would they -- what was the question? Would they be required to?

Q Right. Is there a policy that mandates that they would have to carry a firearm even if they're not working out in the field?

MR. HARRELL: You're asking about a written policy as opposed to a judgment-call order made by a supervising officer?

BY MR. GASPARD:

Q Well, I'll just say a policy, whether or not it's written or otherwise.

A I don't know --

Q Okay.

A -- if there's a policy specifically for command staff.

Q All right. Now, shortly after you became Sheriff, around August of 2008, do you recall holding one-on-one meetings with all of your Captains and Administrative Manager III's?

A Yes.

Q All right. What was the purpose of those meetings?

A To get to know who the managers were and to learn about their various commands.

Q Uh-huh. And did you meet with Captain Murray here during one of those meetings?

A Yes.

Q All right. And to back up a little bit, when you first came to Orange County to take the Sheriff's position, you were aware that the County had financial difficulties; right?

A Yes.

Q And I mean, you had those conversations with the Board of Supervisors around the time you were being hired about the challenges with the finances?

A We didn't get in depth. But, yes, I think everybody knew that the County was facing financial difficulties.

Q When you were hired, did the Board of Supervisors express to you why they liked you as a candidate? Did they say why they felt that you were more qualified than the others?

A No.

Q Okay. You were just their favorite?

A Well, it was a 3-2 vote. It wasn't a resounding victory.

Q That's all it takes; right? You only need five in Supreme Court. That's good enough.

Okay. So you scheduled one-on-one meetings with the Captains, and that was to get to know them.

A And their commands.

Q And their commands. And at some point later on, there was a reorganization and restructuring of the department; correct?

A There were several.

Q Yeah. But at this point, was one of the purposes of the meetings to understand, maybe, what transfers you might need to make, or was it just clearly a meet-and-greet?

A Meet-and-greet.

Q Okay. Now, when you met with Captain Murray, was that the first time you had met her?

A I'm not sure.

Q All right. It was the first time you sat down and had a real conversation?

A Yeah, that's what -- yeah, that's what I was going to say. It's actually the first time I actually sat down and had a chance to chat. I don't -- we may have met briefly, but I don't recall.

Q Okay. So during this meeting around August of 2008 with Captain Murray, do you recall that she was the Division Commander of Emergency Management?

A Yes.

Q All right. And did you understand that, in that position, in Emergency Management, that she was responsible for some of the Federal grant monies related to the department?

A That's what she told me.

Q Did you tell Captain Murray that you had some experience in that area?

A Yes. We commiserated.

Q Okay. And do you recall that you also talked to Captain Murray about some of her past assignments and accomplishments that she had with the department?

A We -- I don't specifically recall, but that's what I was doing with everyone, so I probably did.

Q Now, at that point, did Captain Murray express to you some concerns she had about problems with the

grants at Orange County?

A She said that she was actually assigned there to clean up some problems with the grants. And I think I expressed that there are a lot of problems in grants because there was not a lot of guidance from the Federal Government or the State when these Homeland Security monies started to be given out. So I think that was the gist of the conversation.

Q And do you remember if Captain Murray also expressed to you that there were corrective measures under way with the grant program?

A I don't remember that.

Q Prior to the meeting that we're talking about in August of 2008 with Captain Murray, what did you know about Captain Murray?

A Not much.

Q All right. Had you had discussions with other members of the Orange County Sheriff's Department about Captain Murray?

A No.

Q All right. Now, at this time -- well, when you met with Captain Murray during the same meeting in August of 2008, did -- did you recall the former Sheriff's name, Mike Corona, coming up in that discussion?

someone that we could funnel some of those projects to; not specifically for S.A.F.E. I'm just using that as an example.

And so in the midst of dealing with a -- tremendous financial cuts to the department, we also were in the midst of a lot of change and making a lot of innovations on the department. So -- and Bob Eason is a great project person. In fact, he -- when I interviewed him, he said he enjoyed doing projects, so we thought that he would be a good person for that.

Q And did you have some concern that creating new positions in a budget crisis would be tough for the County financially?

A We move people around. It's not like we're spending additional money. We -- it's restructuring more than anything else.

Q Okay. Now, around the same time, did Mike Hillmann create a second Captain position in South Operations?

MR. HARRELL: Around what time? Same time as Exhibit --

BY MR. GASPARD:

Q Early 2009 -- earlier than that, around August of 2008.

A Well, that's what this memo says in the third

paragraph, that we -- it's a huge command, the Patrol Operations. And so -- or South Operations. So we added a Captain, and then it looks like that got changed.

Q It didn't work out; right?

A It did work out. But, again, we are facing tremendous budget problems, and we have to prioritize where we put our personnel.

Q Sure. When did you first become aware of the -- what you described as the financial crisis? When did you first become aware of the financial problems the County was having?

A I think we talked about that earlier.

MR. HARRELL: It is asked and answered.

THE WITNESS: When I interviewed with the Board and prior to that, and it was in the papers. And I think everybody knew the County was going through a financial problem.

BY MR. GASPARD:

Q Sure. So that was -- you were aware of the financial problems before the second Captain position was created in South Operations; right?

A Yes.

Q And you were also aware of the financial problems before the Special Projects position was created; right?

A Yes.

Q Now, you mentioned that Captain Murray replaced Dave Wilson in Support Services?

MR. HARRELL: Asked and answered. Yes, she did.

BY MR. GASPARD:

Q I'm not done with my question.

Do you recall that -- prior to that transfer, that Captain Wilson had recommended the position be civilianized?

A I don't remember who brought that up. I don't recall if Captain Wilson did or not.

Q Okay. When Captain Murray was transferred to Support Services, was that considered a sworn position?

A Yes.

Q All right. Is Support Services now a sworn position?

A No.

Q Okay. So it's been -- I used the term "civilianized."

It's now been changed so a civilian can run that department?

A Right.

Q When did that change occur?

A That occurred when we did the reorganization

for the budget cuts. And, in fact, Dean Gialamas, who was the Director of the Crime Lab, was doing both for a period of time. So it was all part of our budget issues.

MR. GASPARD: Let's take a quick break.

MR. HARRELL: Okay.

THE VIDEOGRAPHER: We're going off the record at 11:18 a.m.

(Brief recess taken.)

THE VIDEOGRAPHER: And we're back on the record at 11:36 a.m.

BY MR. GASPARD:

Q Okay. So we started talking about the restructuring right before the break. And I want to go over that a bit.

At what point did you first understand that there would have to be some restructuring within the department?

MR. HARRELL: Chris, if I could have a running objection --

MR. GASPARD: Sure.

MR. HARRELL: -- based on this:

It's our contention that any issues with regard to how or why the money is spent, this witness has an immunity for any of those calls. And it comes

with good reason.

If any time somebody was upset with regard to how money was allocated, there would be more lawsuits, judges and juries that any of us could count.

MR. GASPARD: Right.

MR. HARRELL: So if I can just have a running objection with regard to that.

MR. GASPARD: Noted.

MR. HARRELL: Thank you.

BY MR. GASPARD:

Q Did you understand my question?

A Well, it's difficult to answer because we did a number of reorg- -- reorganizations, restructuring from the moment I became Sheriff. The budget was primarily -- you know, the reason -- and I alluded to some of the other reasons. Moving people around to get additional experience as well was part of that. So when you say, at what moment, I mean --

Q Let me provide a little more foundation, I guess.

Once you were hired, was it your understanding that there was a budget shortfall within Orange County?

A Yes.

Q And is one of the things you were tasked with was to reduce the Sheriff's Department's budget?

A Yes. The -- our primary source of funding is Prop 172 funds. When that declined, the Board said, "Sheriff, how are you going to deal with your budget shortfall?" So that is my budget shortfall, what is not coming in on Prop 172. There's a variety of other revenue sources that are -- you know -- have some impact, but that is the biggest impact, I would say.

Q Did the Board of Supervisors put a number on it?

A 28 million.

Q Okay. So they asked you to reduce your annual budget by 28 million?

A Right, originally, yeah. And then we were looking at a 60 million the following year. So --

Q Okay. When were you aware of the 28-million-dollar figure?

A Shortly after coming into office.

Q All right. So that was around mid- to late 2008?

A Yeah. Yes.

Q All right. And roughly when did that figure become -- did you say 60 million?

A That was the projected shortfall for '10/'11, I think it was, yeah.

Q Okay. Do you recall a meeting that occurred

with your Division Commanders around June 10th of 2009 to discuss some of the restructuring?

A I don't recall a specific meeting on that date. We had a number of meetings and discussions over the years, so --

Q I'm going to mark as Exhibit 230 a document entitled "Division Commander meeting agenda" dated June 10th, 2009. I'll submit to you that the handwritten portions are from Captain Murray.

But other than that, the handwritten portions, do you -- have you ever seen this document?

A I can't tell you.

(Plaintiff's Exhibit 230 was marked for identification.)

BY MR. GASPARD:

Q Okay.

A It looks like the format is a Division Commander meeting, but I don't specifically recall this one. We have one every week.

Q All right. Do you recall having a Division Commander meeting around this time, around June of 2009, in which you explained to your command staff that it was your opinion that the command staff was lean already?

A Yes.

Q Okay.

A I couldn't tell you what date I said that, but I said it several times, so --

Q Is it your opinion that, notwithstanding any budget issues, you needed more Commanders, not less?

A Yes.

Q I'm going to mark, as Exhibit 231, a document entitled "Management Positions As a Percentage of Total Positions." And this is part of the County's disclosures. I don't know why there's a staple in there.

Have you ever seen this slide before?

A Yes.

(Plaintiff's Exhibit 231 was marked for identification.)

BY MR. GASPARD:

Q Where did you see it?

A I directed my financial staff to come up with it.

Q Okay. Do you recall showing this slide to your Commanders -- to your command staff at a Division Commander meeting?

A No.

Q All right. Do you recall showing this slide at the June 23rd, 2009 Board of Supervisors meeting?

A I don't -- I'm not saying I didn't. I don't

recall.

Q All right. Do you recall showing this slide to the Board of Supervisors?

A Yes.

Q All right. Now, you weren't sure about the June 10th, 2009 date, but you mentioned earlier that you did attend a command staff and explained to your command staff that you felt that the staff was lean and --

A I had made that statement that the command staff of -- based on the size of our department, that I felt that the command staff was pretty lean when you look at other agencies.

Q Uh-huh. Does this slide -- do you believe that this slide supports your position that the command staff was lean?

A Well, this is in comparison -- this had more to do with County departments, so it's not comparing us to other law enforcement agencies. It's really showing how lean we are in terms of our command structure. So, yes -- yeah. I guess the answer would be, yes.

Q Right. And can you just generally explain what these figures mean?

A Yeah. The -- what we were doing is Sheriff Coroner Admin Management only. Now, that is -- I believe that that is the non-sworn -- Admin Management

is non-sworn. And then -- so it broke it down, the percentage, because we have both. And Sheriff Coroner Admin Management and Law Management, you know, is a truer figure in my mind, but it's like comparing apples to apples, you know, dealing with the other county agencies. They don't have sworn staff.

So -- so the 3.66 is really -- if you take in our Admin Managers, our civilian component and our sworn Managers, it's 3.66 percent is Management. And then the other County departments, you can see it's quite higher.

Q And when you had the meeting, the Division Commander meeting, where you discussed this issue --

A I didn't say I discussed this issue; a Division Commander meeting.

Q I'm not trying to trick you. The --

A I know you're not. I just wanted to clarify, I discussed it with members of the Board.

Q Okay.

A Now, I don't -- I could have given a PowerPoint. What I remember is having individual discussions in their offices with this.

Q Okay.

A I'm not saying it didn't happen. It could have. But I'm just telling you what I recall today. And I -- this could have been discussed at a Division

Commander meeting. I don't remember specifically discussing it, but it could have been discussed by, say, Rick Dostal. I think he's the one -- and his staff -- that put this together. So it's not unusual for us to discuss those things, if that helps.

I'm going to start keeping notes, too, from now on of everything I do and talk about, when I say something.

MR. HARRELL: We need to rent some more warehouse space.

THE WITNESS: I won't have time to do anything else.

BY MR. GASPARD:

Q You don't have to tell us. Believe me.

MR. GASPARD: We need some more warehouse space then.

BY MR. GASPARD:

Q You don't have to tell us.

Well, take a look at Captain Murray's notes on the agenda. And I'm not asking you to agree that that's correct. But I do want to talk about them. And it might jog your memory as to what was discussed at this particular meeting.

Do you see where it says, "Layoffs will now proceed" --

A Uh-huh.

Q -- by the "Opening Remarks"?

A Yeah.

Q Do you recall around this time, June of 2009, telling your command staff that there would be some layoffs?

A No.

Q Okay.

A Again, I don't remember when -- I know we discussed it, but I couldn't tell you when.

Q Uh-huh. Do you -- well, do you remember talking with your command staff and representing your opinion that the command staff was lean and that they were 50 percent below the County average?

A I don't remember that.

Q Okay. Do you remember expressing to your command staff -- and this was earlier on, around June of 2009 -- that you thought that the Captains would be okay; that there probably wouldn't be Captain layoffs?

A I don't remember.

Q Okay.

A We had budget discussions every week, so --

Q Right. Well, you would agree that Captains and Assistant Sheriffs are your inner circle, correct, in Management?

A I don't know what you mean by "inner circle."

Q I've read a lot of legal decisions that talk about how important it is that Sheriff be surrounded by people that he or she can trust and, at those executive-level positions, it's very important that everybody's on the same page of music -- I mean, the same -- they have the same goal in mind for the organization.

Would you agree with that?

A Yes. Yes, I would agree with that.

Q So laying off Captains would be a big deal, right, for the Sheriff?

A It was a big deal.

Q Right. So I think some of this -- hopefully some of this may stand out a bit.

What I'm asking is, do you recall a meeting, before the layoffs, where you expressed the opinion that, as a preliminary matter, it looked like the Captains might be okay; they might not be laid off?

A No, I don't remember saying that.

Q Now, do you see underneath the "but Management okay" comment where Captain Murray wrote "5 percent exec" -- actually, I don't know what she wrote there.

But do you recall a conversation about there being a 5-percent concession offered by your

Assistant Sheriffs so they not be laid off?

MR. HARRELL: Are you asking about salary now?

MR. GASPARD: Come again?

MR. HARRELL: Are you asking about their salary now?

BY MR. GASPARD:

Q Right. There were -- do you recall discussions with your command staff about avoiding layoffs by way of concessions or pay reductions?

A No.

Q All right.

A I -- I took a 5-percent cut. And I think some of the Assistant Sheriffs did, but -- and the Undersheriff.

Q Okay.

A But if that's -- I don't know if that's what you're referencing. But that wouldn't have saved any positions.

Q Right.

A It wasn't that much money, but it was --

Q Yeah.

A -- something that County asked us to do.

Q All right. And was that more of, like you said, to set an example for the others?

A You'd have to ask the County. That was

their -- that would be my interpretation, that they wanted to set an example that Senior, you know, Management was -- that the electeds had to agree to that. I don't think the others did.

Q Right. Okay. Did all the Assistant Sheriffs take the 5-percent pay reduction?

A I don't -- if I remember right, I don't think they had a choice. I think the only folks that had a choice were the -- they couldn't tell the electeds. And I agreed to take the 5 percent.

Q Okay. And at the time, you were making roughly 200,000?

A Yeah. Yes.

Q Did you have a discussion with Undersheriff Scott around June of 2009 in which you asked him to obtain a list of the Captains reflecting their age and their years of service?

A I don't know if I asked him. I did ask somebody to get me a list, and I don't recall when I did that.

Q Okay. Did you ultimately receive that list?

A Yes.

Q Okay. I'm going to mark, as Exhibit 231 --

CHRISTINE MURRAY: 2. I have the slide; that's why.

BY MR. GASPARD:

Q -- I'm sorry -- Exhibit 232 a document with several of the Captains listed on it.

Is that the document you received?

A I don't remember getting it in this format. I don't remember anything that had a birthdate on it. So I don't recognize this specific document.

(Plaintiff's Exhibit 232 was marked for identification.)

BY MR. GASPARD:

Q Okay. And I'm not overly concerned about the birthdates. But what I wanted to ask you about is the list of Captains and their years of service.

And do you see the column where it says, "Org Name," the second column?

A Yes.

Q As you look over this, is it your recollection that these were the assignments that the individual Captains were in at the time?

A Again, I didn't see this document. This is not the one that I remember seeing. I did ask for the Captains and their -- I may have asked for their assignments and years of service.

Q Okay.

A So I -- this is not one that I did see. I

don't know where this came from.

Q All right. So the list that you received looked different from this list; right?

A Yes. It was much larger, more detail.

Q Okay. Oddly, I don't think I got that in written discovery. But let's go through the names then. And keep in mind, I'm going to -- all the questions I'm about to ask you involve the same time frame and that's around June of 2009.

Do you recall that Catherine Zurn was running the training division?

A Yes.

Q All right. And was Ronald White in charge of the South Patrol Bureau?

A Again, I'm not sure about the time frame.

Q Okay. Well, sometime in 2009, was Ronald White running the South Patrol Bureau?

A I believe so, yeah.

Q Okay. And I'm not doing this to grind you down. The fact is, the assignments and where everybody was and when is very important to our case.

A Well, okay. And just so you understand, there have been a lot of movement on the department. So it's difficult for me to say, with certainty -- you know, it's not like they've been in there for five years and

they've always been there. So it's hard for me. And I'm not trying to be difficult. I'm trying to be accurate.

Q Yeah. And I've got a bunch of documents to help you out with that; CPRA request stuff. And so we'll go through the organizational charts and everything, and I think that might be helpful.

But as you look through --

A So what does my testimony change if you've got all that? You're asking me to guess.

Q I need you to authenticate it as the Sheriff.

A Okay. So is there something else that --

MR. HARRELL: Well, as I stated previously, Counsel, if you want to know where individuals were, where and when, you and I both know what the information is.

MR. GASPARD: Right.

MR. HARRELL: And I think we can reach a stipulation in terms of the facts --

MR. GASPARD: Okay.

MR. HARRELL: -- on that issue. Asking this Witness to guess or to speculate, I don't know if it's of any value.

MR. GASPARD: Okay. Well, the problem is that -- and I agree. I think stipulations are going to

help us when we get towards trial.

So I'll ask you some general questions about this. And just answer to the best you can. If you don't know the answer, you don't. And feel free to clarify. If you know that somebody worked in an area that year, but you're not sure about that month, just explain that; because I do think this will be non-controversial at the end of the day.

MR. HARRELL: See, it's especially tough since she's never seen this sheet of paper prior to you showing it to her. So --

MR. GASPARD: Okay. Well, it's tough because the County didn't give me their version of it. If --

MR. HARRELL: Well, the County gave you what the County had. I don't know whether things were thrown away or were no longer important or -- I have no idea.

BY MR. GASPARD:

Q This list -- and you can see the hire dates over to the right. This list purportedly is the list of your Captains from -- from senior to junior.

Would you agree that, as far as seniority goes, from top to bottom is correct?

A I don't know.

Q Okay. Do you have any reason to believe any of this is not correct?

MR. HARRELL: As of what date?

BY MR. GASPARD:

Q June 2009.

A I don't know.

Q All right. Who is Jack Anderson?

A Who is he?

Q Uh-huh. Just foundation for the questions I'm about to ask.

A Well, he's -- was an Assistant Sheriff --

Q Right.

A -- with the Orange County Sheriff's Department.

Q Okay. So Jack Anderson was one of your Assistant Sheriffs.

And would it surprise you to know that he prepared this particular document?

A I don't know if it would or not.

MR. HARRELL: What do you want her to say?

THE WITNESS: I don't know. I don't know.

MR. HARRELL: What do you want her to say?

THE WITNESS: I've never seen him type in columns like that. But, no, I don't know. I don't know whether he did or not.

BY MR. GASPARD:

Q Are you aware of whether or not it was

Undersheriff Scott that you tasked with creating or obtaining the list of --

A You know --

Q -- Captains?

A I had asked somebody to prepare a list, and I don't know if it was Undersheriff Scott. And the purpose that I asked for this list was for longevity, to make plans for the future in terms of -- so I asked for it early on. I don't know. This looks like this was done later. So I don't know anything about this list, if that helps.

Q Okay. Well, let's talk about the purpose of the list then.

What do you mean by the "longevity"?

A Well, not longevity. "Longevity" is a bad word. You know, the future of the department and who I'm looking at to promote and, you know, long-term planning. "Succession planning" is probably a better term. So, you know, I asked for that on a lot of, you know, folks. Captains, you know, you try and plan ahead for when positions become available.

So when I asked for it, it was not probably not in this time frame. So your, you know, concern about not receiving it had nothing to do with whatever this is. It had to do with my succession planning and

looking at people and their experience level, learning more about the people that work for me. So --

Q When do you believe you requested the list?

A I don't remember.

Q Okay.

A Yeah. The two are separate, though. This -- this is the first time I've seen this one.

Q Okay. I understand.

A I was trying to clarify for you.

Q Could it have been in March of 2009 that you asked for the list?

A I don't know. I can't remember when I asked for it.

Q I understand.

A Yeah. Could have been 2008, for all I know.

Q Well, that's why I'm asking for an estimate. And sometimes I'll try to clarify if you don't know the date. I'll say, "Could it have happened in 2009"?

A Yeah. I don't -- the answer would be, I don't know. I don't recall if it was 2008, 2009.

Q When you asked for this list, did it have anything to do with layoff plans?

A No.

Q Okay.

A I think I just said that.

MR. HARRELL: We are starting to repeat ourselves a bit.

MR. GASPARD: Okay. I apologize.

MR. HARRELL: I know it's not intentional.

BY MR. GASPARD:

Q Taking a look at that list on Exhibit 232, Catherine Zurn retired; correct?

A Yes.

Q All right. Captain Murray was obviously laid off.

Brian Cossairt was laid off as well?

MR. HARRELL: Are we starting to get into the private files of other law enforcement members?

MR. GASPARD: I don't think so.

MR. HARRELL: I think we are. His employment status -- we'll let you know whether or not he's still with us.

MR. GASPARD: Yeah. Well, aside from being all over the newspaper articles and in CPRA requests that we've done, I don't know how that would possibly be private.

MR. HARRELL: Well, we went through this in the Anderson case --

MR. GASPARD: I understand.

MR. HARRELL: -- and the Court actually issued

an order in that case for things to be done and things to be said, and that's the way it was done in that case. That's the way it needs to be done in this case, I will submit with respect.

MR. GASPARD: Are you telling me that we can't talk about anyone else that was laid off, other than Captain Murray? Because if that's the fact, then we're going to have to shut down and go to Court. And unfortunately, the Sheriff will have to come back again. And I don't really think that's necessary.

MR. HARRELL: That's the same thing that the attorney in Anderson said.

MR. GASPARD: That's exactly what happened. I read the Court's order in that case. So you're going to push the Federal Court on an order that's already been made in a sister lawsuit?

MR. HARRELL: It's not pushing anything. Go look at the statute. As you, yourself, know from your time in law enforcement, your personnel file is protected by California statute. If material is released from a personnel file, that can give grounds to a lawsuit against me and my law firm. I'm not going to create a lawsuit when there's a statute that says that.

I stood up for Ms. Murray's rights to privacy in the Anderson case. I did not have a waiver from her.

I did not have a Court order. Eventually, all those things were obtained, and it was done the right way. That's what we need to do here, with respect.

I mean, I just have what the law says. You might not agree with the law. Maybe I don't either. But the law says what the law is. And crazier things have happened and somebody filed a lawsuit because the law was not followed. And I just don't want that to happen.

I think we can work around it. I mean, if you say that it is the way that it is, then that's maybe something that you already know and you don't need to establish here. Why does it matter?

We can let you know if they're still with us. We can let you know when we recall them leaving. As to why they left or what their reasons were, that's something that we can't get into without a Court order.

MR. GASPARD: Okay. Thank you for those tips on police officer privacy.

MR. HARRELL: They're not tips. It's just the road that we've walked.

MR. GASPARD: Right. And I read the Superior Court judge -- the order that the Superior Court judge issued in Anderson that said Plaintiffs didn't have to do a Pitchess order on themselves in order to get their

files in.

MR. HARRELL: Well, then ask about Ms. Murray. Ask about Ms. Murray, and maybe we can talk. But now you're branching out. You're asking about others.

MR. GASPARD: Okay. Are you instructing your client not to answer about who was laid off?

MR. HARRELL: Their names?

MR. GASPARD: Yes.

MR. HARRELL: Yes, I am.

BY MR. GASPARD:

Q Okay. And Sheriff Hutchens, are you going to not answer questions as to who was laid off?

A Yes.

Q Okay.

MR. GASPARD: Can we mark the deposition there?

And I'll show you some Public Records Act Requests as we go forward with those names on them. So I don't know how we're going to get past that.

MR. HARRELL: Well, if you want to ask about -- what you get through the California Public Records Act is one thing. What is said and released without a Court order in a Civil lawsuit is something else.

We can go just one question at a time. We're

not saying that we won't answer any questions that relate to -- for example, Brian Cossairt is the individual name that you brought up.

MR. GASPARD: Correct.

MR. HARRELL: We aren't saying that we won't answer any questions with regard to him. Maybe we will. We just have to hear them first.

MR. GASPARD: Okay. Well, I'm going to have to revise my time estimate on this deposition, unfortunately, but I will have to go through all the individual questions.

Our firm publishes the book on Peace Officer Bill of Rights, and we just litigated this issue in U.C. Davis.

MR. HARRELL: Then you should know better.

MR. GASPARD: Oh, I know. If you believe that Brian Cossairt has privacy as to the simple fact that he was laid off, unless you're taking the position it was disciplinary, you're wrong. And if you can show me some legal authority otherwise, then I would agree with you.

MR. HARRELL: A meet-and-confer, maybe, is a -- something for another time and another place. For right now, it would be good to make effective use of this Witness' time that, with respect, has a lot of responsibilities she needs to attend to.

MR. GASPARD: We've put this issue in front of the Court already.

Q Sheriff Hutchens, I'm not trying to be difficult. I don't think you need to come back for a second deposition. The issues I'm asking you about are not protected by any privacy statutes. I've heard the advice of your Counsel, but you have to make the decision as to whether or not you're going to stand on that. If you do, we'll probably have to put in front of the Court and come back for a second day of deposition.

MR. HARRELL: Let's put it in front of the Court. You're arguing with the Witness now.

MR. GASPARD: I'm not.

MR. HARRELL: She's already told you that she's going to follow the advice of Counsel and not respond to questions with regard to how individuals separated from the Orange County Sheriff's Department. We need a new question --

MR. GASPARD: Okay.

MR. HARRELL: -- if there is one.

MR. GASPARD: I'm going to reiterate the fact that it wasn't disciplinary, according to the County. So I don't understand what privacy grounds you're talking about.

If you can cite a statute -- because we're on

the record -- I'd like to know what that is. It's not Penal Code 832.7. It's not in the Public Safety Officer Procedural Bills of Rights. It's not in Evidence Code 1043 or 1045. So I would like to know what your privacy objection is.

MR. HARRELL: We don't agree. And with respect under Local Rule 7, the time and place for a meet-and-confer between and among the attorneys is not when we have the Sheriff of a county of 3 million individuals sitting here. So if you have a new question, now would be a good time to ask it.

MR. GASPARD: It's my deposition. I'm going to run it as I see fit. I've explained to the Sheriff what my question is, and she said she's not going to answer it. So we're going to go through the rest of them.

I've also advised her that it's her decision, not yours, as to whether or not she's going to answer the questions. And you know very well that she still has to say, "I'm not going to answer that question." It can't just be you.

MR. HARRELL: Unless we have a running agreement that she will follow the advice of Counsel, which is typically done, in my experience.

MR. GASPARD: I think we'll require individual

answers, actually.

MR. HARRELL: Again, we don't agree. Do you have a new question?

BY MR. GASPARD:

Q Sheriff Hutchens, was Robert Eason laid off from the Orange County Sheriff's Department?

MR. HARRELL: Same objection; same instruction.

BY MR. GASPARD:

Q Okay. You're not going to answer that question?

A I'm going to follow the advice of my Counsel.

Q Okay. Was Deana Bergquist laid off from the Orange County Sheriff's Department?

MR. HARRELL: Same objection; same instruction.

THE WITNESS: I'm going to follow the advice of my Counsel.

MR. GASPARD: Okay. How much time do we have left?

THE VIDEOGRAPHER: We have 13 minutes.

BY MR. GASPARD:

Q Do you recall a conversation that occurred in 2009, Sheriff Hutchens, where you directed Jack Anderson to review the layoff procedures for law enforcement

Managers?

A Yes.

Q All right. Why did you do that?

A Because we were facing a budget crisis and I wanted to find out what the rules were.

Q Okay. Did you have an understanding -- whether it was right or wrong, did you have some sort of belief in how the layoffs would affect Captains prior to having Jack Anderson do that research?

A No.

Q Okay. But you're aware that some agencies have things like bumping rights?

A Yes.

Q Yeah. And rehire lists?

A Yes.

Q But you weren't sure what they were for Orange County, at this point; right?

A No.

Q And did Jack Anderson, in fact, do that research?

A Yes.

Q All right. Did he -- did he brief you on what he discovered in his research?

A Yes.

Q All right. Do you recall around when that

occurred?

A It would be around that same time frame. I couldn't tell you.

Q Okay. So around June 2009?

A Probably.

Q Did -- did he explain to you that Captains, in fact, do not have bumping rights?

A Yes.

Q Were you surprised to hear that?

A Yes.

Q Did he also tell you that you didn't have to necessarily consider seniority?

A Yes.

Q Were you surprised to hear that as well?

A Yes.

Q Did you and Jack Anderson review the PSR together when you had this discussion?

A I don't remember.

Q Okay. But the PSR, as you understand it, governed the layoff procedures for the County at the time?

A Yes.

Q Do you know if Jack Anderson met with Bob Leys regarding the same issue?

A I don't know if Jack specifically met with

Bob Leys. I know members of my staff had many, many meetings with Bob and Carl Crown as we went through the entire layoff process, both command staff and other employees on the department.

Q At some point, did you review the PSR with regard to layoffs?

A I don't recall specifically reviewing it. I think I was briefed on it.

Q I'm going to mark, as Exhibit 233, a two-page document. It's an e-mail from Bob Eason to Captain Murray.

And as you can see, it's a forwarded e-mail, and the original e-mail is the bottom. And that one's from Undersheriff Scott to the Division Commanders that occurred on July 9th, 2009.

MR. GASPARD: Shel, if you're okay with it, I'm actually going to redact the personal e-mail addresses at the top. I didn't realize that was still on there.

MR. HARRELL: Yeah. Yeah, sure.

(Plaintiff's Exhibit 233 was marked for identification.)

BY MR. GASPARD:

Q Can you let me know once you have a chance to review this e-mail, Sheriff?

A Okay.

Q Have you ever seen this e-mail before?

A I don't specifically recall it, but I usually get cc'd. It went out to Executive. I usually get cc'd on the Undersheriff's e-mails.

Q Okay. Do you agree with the substance of the e-mail?

A Yes.

Q Now, if you take a look at the second paragraph on Page 1, it explains -- it says that "We have tentatively approved a reorganization that consolidates the existing commands into fewer executives at the top, cutting two Assistant Sheriffs and six Captains from the current organization."

Do you see that?

A I do.

Q And then the next line says, "That is drastic."

Do you agree that that's drastic?

A Yes.

Q Did -- did you ultimately end up, in fact, cutting two Assistant Sheriff positions and six Captains?

A Yes.

Q And Captain Murray was one of the six

Captains; right?

A Eventually. No one had been identified on the date of this memo. This was a structure. Talking about a command structure.

Q And, in fact, isn't this the first time that the Captains had received notice that there would be actual layoffs?

A I don't know.

Q Okay.

A We had been talking about layoffs and the budget forever, every week, so it shouldn't be a surprise.

Q So this e-mail, as you can see, was sent on July 9th of 2009. It's your understanding that the layoffs occurred within only a few months after that date; right?

A Yes.

MR. GASPARD: We're actually at a really good stopping point in my notes.

MR. HARRELL: Okay.

MR. GASPARD: I know you're almost out of tape. I don't know how much -- we're off the record.

THE VIDEOGRAPHER: Off the record at 12:17 p.m. This marks the end of Media No. 1.

(Lunch recess taken.)

THE VIDEOGRAPHER: We're now back on the record in the continuing Deposition of Sheriff Sandra Hutchens. The time right now is 1:01 p.m. This marks the start of Media No. 2.

BY MR. GASPARD:

Q Sheriff Hutchens, before we went on the lunch break, we were discussing the January 9, 2009 e-mail from Undersheriff Scott referencing the layoffs.

Do you recall that?

A The July 9th --

Q Sure. That's Exhibit 233.

A Yes.

Q Do you recall giving an interview to the L.A. Times around that same time frame?

A Yes.

MR. GASPARD: I'm going to mark, as Exhibit 234, an L.A. Times article entitled "O.C. Sheriff Reveals Major Reorganization."

MR. HARRELL: This is 234, Chris?

MR. GASPARD: Correct.

MR. HARRELL: Thanks.

(Plaintiff's Exhibit 234 was marked for identification.)

BY MR. GASPARD:

Q Have you seen this L.A. Times article before,

Sheriff Hutchens?

A I have.

Q Okay. And do you recall giving the interview for this article?

A I do.

Q All right. I had to print this off of my computer, so there's a bunch of ads scattered throughout it. But if you look on the first page of the printout, underneath the "Pension Reform Facts" ad, ironically, there's a paragraph that says, "Over the last three weeks, Hutchens has personally informed each member of her command staff whether they will stay or go.

"Those leaving include Assistant Sheriffs Jack Anderson and John B. Davis, as well as Captains Deana Bergquist, Brian Cossairt, Robert Eason and Christine Murray. Captain Catherine Zurn decided to retire earlier this month."

Do you see that article?

A I do.

Q Okay. And the next line says, "The layoffs will take effect in September."

Do you see that?

A I do.

Q All right. Is that the information you provided to the L.A. Times for this article?

MR. HARRELL: I'll object to that as compound. Which information?

BY MR. GASPARD:

Q Okay. Did you tell the L.A. Times that Assistant Sheriff Jack Anderson was going to be laid off?

A I don't recall giving her names, but she talked to some other people in the department in preparation for doing the interview. So --

Q Okay. When you first saw this article published, did you have any concerns for those individuals listed in the article that their privacy rights were being violated?

MR. HARRELL: I'll object to that on attorney/client privilege grounds.

MR. GASPARD: What?

MR. HARRELL: You're asking her to interpret legal principles now. So it also lacks foundation; calls for speculation.

BY MR. GASPARD:

Q Okay. Sheriff Hutchens, did you understand my question?

A Could you ask it again?

MR. GASPARD: Sure. Go ahead and read it back for me, Brandy.

(Last question was read.)

MR. HARRELL: Same objections.

BY MR. GASPARD:

Q You can still answer.

A I'm not going to answer.

Q Come again?

A I'm not going to answer. I don't -- I did not give them the names.

Q Okay.

A I'll answer it that way.

MR. HARRELL: We don't know if the information came from the individuals. We just don't know. You're asking her to speculate.

MR. GASPARD: If you're going to take the position that every person that was transferred and laid off is entitled to privacy in District Court, we're not going to get much further in the deposition. I'll go as far as I can. But just to be clear, this information is going to come out.

MR. HARRELL: Let me stop you there before we get a big speech. In terms of transfers, nobody said anything about that.

MR. GASPARD: Okay.

MR. HARRELL: Okay. And if you want to talk about whether or not they're still employed, whether

they're separated, that's something that we can answer for you, if you must. Ask this Witness --

MR. GASPARD: Well, the Court will take Judicial Notice of the fact that they're laid off. There's Declarations in Court from both sides about the layoffs of all of these individuals. There's L.A. Times article that millions of people have read. Frankly, I just don't understand what the privacy privilege is that you're asserting.

MR. HARRELL: If everything you say is true, why are you wasting this time of this Witness on such matters?

MR. GASPARD: Because she's my deponent. I have to create a record. I plan on filing a Summary Judgment against the County. I plan on prevailing on that Summary Judgment. But in order to do that, I have to put certain factual issues that, as you know, require that I provide foundation for those factual issues.

MR. HARRELL: If you have Declarations to that effect, then I suppose that you'll attach them and there won't be a problem.

MR. GASPARD: I need to ask the Sheriff questions about the layoffs and transfers.

MR. HARRELL: Such as? Ask.

MR. GASPARD: I've asked --

MR. HARRELL: Maybe we can answer.

MR. GASPARD: Okay.

MR. HARRELL: Let's just go one at a time.

MR. GASPARD: Let's do.

Q Sheriff Hutchens, did you lay off Assistant Sheriff Jack Anderson?

MR. HARRELL: We've been there. We've done that. She's not going to answer that. You can ask about your client if you like.

MR. GASPARD: Because we're going to have to go to Court on this issue, I do have to create a record. It's not a 7.3 meet-and-confer. I need to know specifically what privacy right that you're alleging, given the fact that all of this information is out in the public arena.

MR. HARRELL: With respect, we have already talked about this. And this is the same thing that Plaintiff's attorney in Anderson used to say. Okay. The Court said that inquiry could be made with regard to his clients. His clients are not your clients. Your client is not his clients.

In the Anderson case, I stood up for Ms. Murray, as I was required to do under California law, and I asserted her right to privacy. A Court order is needed under California statutory scheme. It is

needed. We have to have one. If we don't have one, the law is -- and I'll send this to you in a meet-and-confer letter.

The law is that I can be criminally prosecuted if I don't respect what California law says about peace officer rights to privacy. I've got to make the objection. I went around and around in the Anderson case about this and it was ruled that I was right; okay?

So I'm not hearing you saying that you will be my lawyer if the D.A. prosecutes me. And with respect, I might have another choice of a lawyer if you did offer. So I can't do it. The law says what I have to do. I didn't write the law. Whether I agree with it or not does not matter.

MR. GASPARD: Okay.

MR. HARRELL: Okay. Ask about Captain Murray. If you wanted to ask about other individuals --

MR. GASPARD: Uh-huh.

MR. HARRELL: -- with respect, you should have filed a Motion. Ask the Judge to waive the rights to privacy. That's what should have happened here. You knew that this day was going to come. If you wanted to ask, you should have gone to Court ahead of time and gotten clearance, but you haven't.

MR. GASPARD: Okay. The Anderson matter was

in State Court; correct?

MR. HARRELL: Sure.

MR. GASPARD: And is it your contention that the Pitchess process applies to Federal cases?

MR. HARRELL: I'm not sure what you're asking.

MR. GASPARD: You're citing State Court and Federal law. And I'm telling you those private privacy statutes that you're talking about, that you're alluding to, do not apply in Federal Court. I sent you case law to that effect.

MR. HARRELL: Then that's an argument, I suppose, that you would make in your Motion.

MR. GASPARD: Okay.

MR. HARRELL: In the meantime, the statute is on the books. Once a Federal Court orders, if it does, information to be turned over, then I have the shield that I need that would protect me in State Court, if the D.A. wanted to file charges there. I don't have that order yet.

MR. GASPARD: All right.

MR. HARRELL: And so your next question is what?

MR. GASPARD: I'm getting to it. You should know that we will be here a second day of deposition.

MR. HARRELL: Well, I think the Judge will

have the final call there.

MR. GASPARD: Just as he did on whether or not the Sheriff would have to show up for a deposition today.

MR. HARRELL: Nobody said that she couldn't. I said how about show some courtesy and come to Santa Ana. You chose not to do that. So here we are.

MR. GASPARD: Uh-huh. I'm sure the Judge will be glad to see a second Discovery Motion in front of him.

Q All right. Sheriff Hutchens, at some point, you met with Captain Murray to tell her that she was going to be laid off; correct?

A Yes.

Q Okay. Do you recall that meeting occurring on August 3rd of 2009?

A No. I couldn't tell you the day.

Q You're not certain of the specific day, but was it roughly around August 3rd, 2009?

A Yes.

Q When you met with Captain Murray to tell her that you were going to be laying her off, did -- did she bring you a printed list of questions?

A I don't remember.

MR. GASPARD: Okay. I'm going to mark, as

Exhibit 235, a document that contains a list of printed questions and some handwritten notes as well.

MR. HARRELL: Aren't we at 234?

THE WITNESS: The L.A. Times is 234.

MR. HARRELL: Okay.

(Plaintiff's Exhibit 235 was marked for identification.)

BY MR. GASPARD:

Q Have you had a chance to review this document, Sheriff?

A Just the top page, or you want the other -- you want me to review that, too?

Q Well, here's my question if you had a chance to look at the -- I guess the first page, is -- ignoring all the handwriting, have you seen this printed list of questions before?

A I don't remember --

Q Okay.

A -- seeing it.

Q Do you recall Captain Murray asking these questions during the August 3rd, 2009 meeting?

A I'm not saying she didn't. I don't remember it. I met with a lot of people during that time, and I don't specifically recall this.

Q All right. Do you recall that when you met

with Captain Murray to notify that she was being laid off, that Undersheriff Scott was also present?

A Yes. He was present for all of the discussions.

Q Do you remember any specific conversations that occurred during that meeting?

A No.

Q When you made the decision to lay off Captain Murray, what criteria did you consider in laying her off?

A The -- when the decision was made to cut positions at the command-staff level, I looked at restructuring the department and collapsing the divisions that were stand-alone into each other, putting Lieutenants in charge of some divisions where I could.

And so the -- when I selected Captain Murray, it was, in essence, Support Services was an area that we could eliminate that function. So it had everything to do with the function.

Q Okay.

A And where we could either put a Lieutenant or eliminate, in this case, for a period of time, that function was covered by one Director, thereby saving the salary of a Captain.

Q Uh-huh. Now, at the time that you made

that -- am I right in characterizing it, then, as your decision was to lay off certain positions, and whichever Captain happened to be in that position at the time got laid off?

A Right.

Q Okay.

A So it was done by function.

Q So you didn't think this Captain's better than that Captain, or I like this Captain more than that Captain?

A No. I thought that this would be the most judicious way to do it. And so, again, where we're able to have a Lieutenant instead of a Captain, there's some savings there; or where we had two Assistant Sheriffs, we then have -- for two divisions, we have one and collapse those, would save a larger command. So that's how it was done.

Q Why was the decision made to lay off Captains instead of laying off Lieutenants?

A Cost savings would not be there.

Q Okay. So during this process, no Lieutenants were laid off; right?

A Correct.

Q And no Sergeants were laid off; right?

A Correct.

Q Were any line-level officers laid off?

A No.

Q Okay. So it was only Captains and Assistant Sheriffs?

A Correct.

Q All right. And ultimately, you said it was six Captains and two Assistant Sheriffs; right?

A Yes.

Q Okay. I'm going to mark, as Exhibit 236, an e-mail from Ryan Burris on behalf of Sandra Hutchens dated Monday, August 17, 2009. It's two pages. Sorry.

Sheriff, let me know once you've had an opportunity to review this.

A Okay. Okay.

(Plaintiff's Exhibit 236 was marked for identification.)

BY MR. GASPARD:

Q All right. If I can direct your attention to the first full paragraph. And the second to the last sentence I think addresses what you were just talking about.

Do you see where it says, "The decision of who would be laid off was made as a result of what functions could be eliminated and/or combined without directly impacting our core mission."

Do you see that sentence?

A I do.

Q Do you still agree with that statement?

A Yes.

Q And does that apply to Captain Murray's layoff?

A Yes.

Q All right. Now, it says the decision was made as a result of what functions would be eliminated.

What other considerations came into play when you decided to --

A None.

Q Okay. I'm going to have the Court Reporter hand you what's already been entered as Exhibit 206. And that is a letter to Captain Murray regarding her layoff notice dated September 17, 2009. And at the same time, I'm going to have the court reporter hand you Exhibits 209 and 210, which are also related.

THE WITNESS: Thank you.

(Plaintiff's Exhibit 206 was previously marked for identification in the Deposition of Jennifer Monique Ramirez and is attached for reference.)

///

(Plaintiff's Exhibits 209 and 210 were previously marked for identification in the Deposition of Robert Mark Leys and is attached for reference.)

BY MR. GASPARD:

Q If I can have you look at Exhibit 206 first.

A Okay. Okay.

Q Have you seen this letter before?

A I have.

Q Okay. And is that your signature at the bottom?

A It is.

Q Did you prepare this letter, or did someone prepare it for you?

A I believe it was prepared for me.

Q Okay. And it was your understanding this is the letter that would be given to Captain Murray when she was laid off; right?

A Yes.

Q Do you see the second paragraph where it says that her layoff is actually effective October 9th, 2009?

A Yes.

Q Do you recall that being the date she was laid off?

A I -- that's what it looks like, according to this document.

Q Okay. Now, are you aware that Captain Murray received this letter during a meeting?

A No.

Q Okay. You didn't present this letter to Captain Murray, did you?

A I don't remember.

Q All right. Take a look at Exhibit 209.

And as you see, it's already dated September 17th, 2009?

A Yes.

Q All right. Have you ever seen this document before?

A No.

Q Okay. Now, other than this specific document, have you seen this layoff notice -- in other words, not addressed to Captain Murray -- but had you seen these that were going out to the individuals being laid off?

A No.

Q Okay. Do you know who was tasked with preparing this?

A No.

Q All right. Was your role in the layoffs broader than this? Did you just, say, effect the

layoffs and make sure that the packet's done right, there's a layoff notice and then --

A Yes.

Q -- somebody else -- okay. Who was ultimately responsible for that?

A I don't know.

Q All right. Actually, take a look halfway down. And you see the bolded headings. One of them says, "Liberty Interest Hearing."

Do you see that?

A I do.

Q And in the following sentence says, "You are entitled to a Liberty Interest Hearing."

A Yes.

Q Was that your understanding, at the time that Captain Murray was laid off, is that she was entitled to a Liberty Interest Hearing?

MR. HARRELL: Lacks foundation; potentially invades the attorney/client privilege. And she's also said she's never seen this document, Counsel.

BY MR. GASPARD:

Q Okay. At the time you laid off Captain Murray, Sheriff Hutchens, were you -- was it your understanding that Captain Murray was entitled to a Liberty Interest Hearing?

MR. HARRELL: Same objections.

BY MR. GASPARD:

Q Okay.

A I don't know.

Q All right. Prior to Captain Murray's layoff, did you have discussions with anyone, other than County Counsel, regarding whether or not Captain Murray would be entitled to a hearing to challenge her layoff?

A Did I have discussions with somebody on?

Q Regarding whether or not Captain Murray would be entitled to a hearing to challenge her layoff.

MR. HARRELL: Who are you referring to? Carl Crown, Bob Leys or somebody internally at the Sheriff's Department or --

BY MR. GASPARD:

Q Sure. Any of those people.

A Yeah, internally at the Sheriff's Department, after their consultation with Carl Crown and/or Bob Leys; so somebody in County Human Resources.

Q Okay. Do you recall if you had those conversations before or after Captain Murray was laid off?

A Before.

Q All right. What was the substance of what you learned in those conversations about whether or not

Captain Murray was entitled to a hearing?

A They felt that it would be a good idea to offer it even though it was not a disciplinary matter.

Q Okay.

MR. HARRELL: Counsel neglected to mention this at the outset. But if, at any time, you'd like a break to stretch or make a phone call, that is your right here today.

THE WITNESS: Okay.

BY MR. GASPARD:

Q It is, absolutely. The only caveat I would place on that is that, if I have a pending question, that you answer the question before we take the break.

A Okay. I won't do that.

Q But otherwise -- okay.

MR. HARRELL: Not a problem.

BY MR. GASPARD:

Q Take a look at 210 -- the other exhibit, 210. And you can see that that's dated 9-17 of '09. And the subject is Layoff Response Form.

Do you see that document?

A I do.

Q All right. Have you ever seen it before?

A No.

Q All right. Are you aware of whether or not

Captain Murray requested a hearing when she was notified that she was being laid off?

MR. HARRELL: You're excluding what she may have heard from her attorneys in this case?

BY MR. GASPARD:

Q Other than conversations with County Counsel in which you'd seek a legal --

A I don't know whether she did or not.

Q All right. I'm going to mark as -- strike that.

I'm going to have the Court Reporter hand you what we've already marked as Exhibit 213, which is the Layoff Procedure from the PSR.

Have you seen this before?

A I have.

(Plaintiff's Exhibit 213 was previously marked for identification in the Deposition of Robert Mark Leys and is attached for reference.)

BY MR. GASPARD:

Q Okay. You're familiar with it then?

A I am.

Q All right. Is it your understanding that this particular article of the PSR Layoff Procedure governed

the process for laying off Captain Murray?

MR. HARRELL: Calls for a legal conclusion.

BY MR. GASPARD:

Q You can still answer it.

A I don't know.

Q Okay. Did you refer to this document, at any time, prior to laying off Captain Murray?

A I don't recall if I saw it before or after.

Q All right. Earlier, you discussed the fact that you tasked someone else with -- with researching the Layoff Procedures; right?

A Yes.

Q Okay. Is this the information you were asking --

A No.

Q "No." How is it different?

A I don't recall this -- whether I saw this before or after.

Q I understand. Now, you've been doing this for a long time, so to save us all a bunch of time here, I just want to ask you your understanding, really quickly, of a for-cause employee versus an at-will employee. And I think you've dealt with some of this in the past. If I use the term an "at-will employee" versus a "just-cause employee," would you understand what I was

talking about?

MR. HARRELL: Are you asking for a legal opinion now? Attorneys fight about that all day long.

MR. GASPARD: Okay.

MR. HARRELL: It hasn't been established that this Witness, talented though she is, is an attorney. Maybe her expertise is someplace else.

MR. GASPARD: I'm not quite sure you have to be that talented to be an attorney.

Q Sheriff Hutchens, is it your understanding that the two Assistant Sheriffs were at-will employees?

MR. HARRELL: Do you feel comfortable answering those questions?

THE WITNESS: I don't. I don't.

MR. GASPARD: Okay.

MR. HARRELL: Yeah. We can --

MR. GASPARD: Well --

MR. HARRELL: -- work that out another way.

THE WITNESS: That's a subject of debate.

MR. HARRELL: Yeah.

MR. GASPARD: Let's do the long form then.

MR. HARRELL: Let's see if we can get a long form.

BY MR. GASPARD:

Q If you wanted to terminate -- prior to the

layoffs, if you thought that Captain Murray was not performing well as a Captain and you wanted to get rid of her, you wanted her to get out of the Sheriff's Department, what tools would you have available to you to do that?

MR. HARRELL: Isn't this a hypothetical question best asked of an expert?

MR. GASPARD: I would say that the Sheriff of Orange County is the best expert for this particular question.

MR. HARRELL: Has she been named as an expert?

MR. GASPARD: Shel, you know --

MR. HARRELL: Now, only one of us can speak at a time. We're not going to make it hard on the Court Reporter. Her job's hard enough.

MR. GASPARD: Go ahead. Speak your peace.

MR. HARRELL: Has she been named as an expert in this case?

MR. GASPARD: No.

MR. HARRELL: Is this the right day to do this, then?

MR. GASPARD: Are you instructing her not to answer this question?

MR. HARRELL: I'm trying to figure out what's going on, which is my right.

MR. GASPARD: You're just making this a long day.

Q Sheriff Hutchens, prior to the layoffs, who would have had the ultimate authority to fire Captain Murray?

MR. HARRELL: That, itself, calls for a legal opinion.

THE WITNESS: It's not a simple question.

MR. GASPARD: Okay.

MR. HARRELL: Right. There are teams of employment attorneys at the County Counsel that work through all this. It's not a simple answer, certainly not for a lay individual.

BY MR. GASPARD:

Q Okay. If you thought that Captain Murray was not performing up to par as a Captain -- well, let's say that she was violating policies as a Captain -- could you initiate discipline against her?

A Yes.

Q Okay. Could that discipline be up to and including termination?

MR. HARRELL: Incomplete hypothetical. What is she doing wrong?

MR. GASPARD: I don't think I have to go that far.

Q Do you have authority to terminate Captain Murray's employment as the Sheriff of Orange County?

A Depends.

Q Okay. Explain.

MR. HARRELL: Well, again, it's a legal opinion.

MR. GASPARD: This is not a controversial question. I would surmise that the Sheriff has the authority to fire a Captain at the Orange County Sheriff's Department.

THE WITNESS: One would think, but that's not the case.

BY MR. GASPARD:

Q I understand it may be -- I understand that it may be subject to --

A I've been around a long time. That's not the case. And you know that, too; so it's not simple.

Q I understand that it may be subject to challenges, but --

MR. HARRELL: It's hard to get to be a peace officer. It's hard to get one out of your organization --

MR. GASPARD: Okay.

MR. HARRELL: -- even for-cause.

MR. GASPARD: Apparently it's not that hard because we're here today.

THE WITNESS: I hope you never have to go through a layoff procedure.

MR. GASPARD: I've been fired. You tell me.

Q Here's the thing, Sheriff -- let's do this:

Who would have authority, within the Orange County Sheriff's Department, to fire Captain Murray?

MR. HARRELL: It's an incomplete hypothetical. What is she doing? And it assumes facts not in evidence that that authority would lie in the Orange County Sheriff's Department as opposed to a Grievant Rights Hearing Board or some other avenue that your client never pursued.

MR. GASPARD: That's a different question. I didn't ask her about her appeal rights.

MR. HARRELL: But that's why it's an incomplete hypothetical.

MR. GASPARD: It doesn't matter. That's not even a good objection at a deposition. Do you have a privilege to assert?

MR. HARRELL: Yes.

MR. GASPARD: Okay. What is that?

MR. HARRELL: Okay. You assume facts not in

evidence.

MR. GASPARD: That's not a privilege. That's an objection.

MR. HARRELL: Okay. If you let me finish.

MR. GASPARD: Go ahead.

MR. HARRELL: You assume facts not in evidence; okay?

MR. GASPARD: Uh-huh.

MR. HARRELL: Your question assumes --

MR. GASPARD: It's hypothetical. Of course it assumes.

MR. HARRELL: Well, are we back in the expert area again?

MR. GASPARD: I don't have to call her as an Expert Witness.

MR. HARRELL: Well, you have to limit your questions to her percipient knowledge, which is what you need to do.

BY MR. GASPARD:

Q Okay. All right. Sheriff Hutchens, are there offenses for which a Captain at the Orange County Sheriff's Department could be fired?

A There would be offenses which any member of the Sheriff's Department could be fired.

Q Okay. So that's a "yes"?

A I wouldn't restrict it to Captain.

Q All right. I just want the deposition to go smoothly, so I'm going to ask "yes" or "no" questions. And I'd ask you to answer them that way.

MR. HARRELL: And we'll work with you if we can, but everything's not a "yes," "no."

MR. GASPARD: All right. Read back the last question, would you, Brandy.

(Previous question was read.)

MR. HARRELL: And we have an answer to that?

(Previous answer was read.)

MR. GASPARD: That's nonresponsive. The question's "yes" or "no."

MR. HARRELL: Are you just fighting just to fight now?

MR. GASPARD: No.

MR. HARRELL: Is this really a subject of controversy or debate?

MR. GASPARD: You're making it one.

MR. HARRELL: No, it's not. There's certain things we can stipulate to --

BY MR. GASPARD:

Q Okay. Sheriff Hutchens --

MR. HARRELL: -- if they're phrased the right way.

MR. GASPARD: Okay. If they're phrased the right way. Shel, I've read your other depositions. I know that you like to fight over this stuff.

Q Sheriff Hutchens, have you ever fired a law enforcement officer?

A Yes.

Q Okay. Have you ever fired a law enforcement officer from the Orange County Sheriff's Department?

A Yes.

Q Okay. Have you ever fired a Lieutenant from the Orange County Sheriff's Department?

MR. HARRELL: Don't say a name.

MR. GASPARD: Right.

MR. HARRELL: He's just asking in the abstract.

Is there a Lieutenant that you've ever fired? It's his day; it's his question. Do you have an answer?

THE WITNESS: I don't recall firing a Lieutenant.

BY MR. GASPARD:

Q Okay. Have you ever fired a Captain?

A No.

Q All right.

A On the Orange County Sheriff's Department?

Q Right.

A No.

Q Okay. Do you have the authority to terminate an Orange County Captain's -- Sheriff Captain's employment?

MR. HARRELL: Isn't that the same question?

MR. GASPARD: Shel, your objection is noted for ten minutes. I get it.

Q Do you understand the question, Sheriff? I understand you're hearing all his objections, but they're --

MR. HARRELL: Listen to your question. You are asking her to give you a legal opinion.

MR. GASPARD: I depose police Chiefs all the time. They tell me they can fire their employees. I don't understand what the obstacle is here.

MR. HARRELL: That's another day and another time, and I wasn't there and I don't know. I do know that this question right here, right now, to this Witness, you're asking her if she had the authority -- listen to your question. You're asking her to interpret the law. You can ask her --

MR. GASPARD: She's a cop.

MR. HARRELL: Listen. I'm going to help you even though I said I wasn't.

MR. GASPARD: Okay.

MR. HARRELL: You can ask her as to her understanding.

BY MR. GASPARD:

Q All right. Sheriff Hutchens, do you understand -- do you have an understanding of whether or not you possess the authority to terminate an Orange County Sheriff's Captain?

A Yes.

Q Okay. And is it your understanding that you do possess that authority?

A Yes.

Q Okay. Although you haven't had to do that yet; right?

A No.

Q Okay. That's good. If you were going to terminate a Captain's employment with the Orange County Sheriff's Department, is there a written procedure for doing that?

A There's a disciplinary procedure.

Q And for Captains, is that contained in the PSR as well --

A I don't know.

Q -- if you know.

Okay. Well, going back to the Layoff Procedure, if you take a look at Article -- well, if you

take a look at Section 2 on the first page -- Section 2, Subsection A, do you see where it says, "When a reduction in the work force is implemented"? Do you see that portion?

A I do.

Q Now, when Captain Murray was laid off, was it your understanding that, indeed, that was a reduction in the work force being implemented?

A Yes.

Q Okay. And then it goes on to say, "each agency or department head."

At this time, you were Captain Murray's department head; right?

A I'm not a department head. I'm an elected official.

Q Okay. Who is the department head for the Orange County Sheriff's Department?

MR. HARRELL: Assumes facts not in evidence that there is one.

BY MR. GASPARD:

Q All right. Who was Captain Murray's department head at the time she was laid off?

MR. HARRELL: Assumes facts not in evidence that there is one, that that's the term that they use.

BY MR. GASPARD:

Q Is it your understanding that when Captain Murray was laid off, there was no department head for the Orange County Sheriff's Department?

A There's a distinction between department heads. I am the leader of that organization, but I'm an elected official. So there's a bit of a distinction there.

Q Okay. It says, "each agency, slash, department head."

Do you see that?

A Uh-huh. I do.

Q And are you the agency head for the Orange County Sheriff's Department?

A I've never been called "the agency head" or "the department head." I'm the elected Sheriff in charge of the Orange County Sheriff's Department. So I think we're just talking semantics here.

Q We are. I'm just trying to figure out if this --

A I don't know why we have to get so far into the weeds, but --

Q If this section applies to Captain Murray's layoff is really where I'm ultimately trying to get. And it says that her "agency or department head shall

determine, subject to CEO approval" --

A Yes.

Q -- "which employees are subject to layoff based on the needs of the organization."

A Yes.

Q And I'm trying to figure out who the agency/department head would be in the case of Captain Murray's layoff.

A It would be me.

Q Okay.

A But I'm not a department head. It's a little different for an elected Sheriff.

Q I understand.

A I don't think you do.

Q Okay. But you would be the person that -- regardless of semantics, that this applies to; is that right?

MR. HARRELL: Counsel, rather than --

THE WITNESS: Yeah.

MR. HARRELL: -- debate --

MR. GASPARD: That's what she just said.

MR. HARRELL: Let's not argue with the Witness.

BY MR. GASPARD:

Q Okay. Did -- yeah.

When were you elected?

A 2008 -- or wasn't elected. I was appointed. I was elected in 2010.

Q Okay.

MR. HARRELL: Asked and answered.

BY MR. GASPARD:

Q So, in fact, at the time that Captain Murray was laid off, you were not an elected official; right?

A I held an elected position.

Q Okay. So that's a --

A It has the same force and effect as being elected.

Q Well, Sheriff, I understand that. And I'm not trying to be confrontational.

I'm just asking, when Captain Murray was laid off, were you --

A I held an elected position by the State of California.

Q I understand.

MR. HARRELL: Yeah. Everybody got along fine this morning. I don't see any reason why we can't go back to that. Just ask --

MR. GASPARD: Well, these are very simple questions of educated people.

Q I'm simply asking, were you or were you not

elected?

A I held an elected position.

Q That's nonresponsive.

A It has the same force and effect. I had all the powers and duties of an elected official.

Q Okay.

A So I think I answered your question.

Q I don't think you did, Sheriff. But we'll just call it nonresponsive.

MR. HARRELL: Or else we can call it fully responsive and --

MR. GASPARD: No. She told me -- no. Hang on.

MR. HARRELL: Are you going to argue with me now?

MR. GASPARD: I will. She told me what force and effect being in a appointed position of an elected official is. The question I asked was, were you appointed or were you elected at the time Captain Murray was laid off. It's very simple.

MR. HARRELL: Ask your question one more time --

MR. GASPARD: Okay.

MR. HARRELL: -- just the way you just said it right then and there.