133

1          MR. GASPARD:  Okay.

2          MR. HARRELL:  Don't add on anything to fight

3    with anybody.  Don't add on any loaded words.

4          MR. GASPARD:  You're making it a long day,

5    man.

6          MR. HARRELL:  I think the record is what the

7    record is.

8          MR. GASPARD:  Agreed.

9      Q    Sheriff Hutchens, at the time you laid off

10   Captain Murray, were you an elected Sheriff, or were you

11   an appointed Sheriff for Orange County?

12          MR. HARRELL:  It does lack relevance.  It

13   doesn't matter one way or the other, but --

14          THE WITNESS:  Yeah.  I was an appointed --

15   BY MR. GASPARD:

16     Q    Thank you.

17     A    -- the appointed Sheriff to an elected

18   position.

19     Q    Thank you.  Did you, in fact, obtain CEO

20   approval to lay off Captain Murray?

21          MR. HARRELL:  Lacks foundation; calls for

22   speculation.

23   BY MR. GASPARD:

24     Q    You can still answer.

25          MR. HARRELL:  Do you know how it was handled?

134

1          MR. GASPARD:  Shel, you're coaching your

2    Witness.

3          MR. HARRELL:  I'm not coaching.  I'm laying

4    the foundation that you refuse to lay.

5          THE WITNESS:  Yeah.  All of the layoff

6    discussions, procedures were done by my staff with

7    Carl Crown and Bob Leys who both work for CEO.

8    BY MR. GASPARD:

9      Q    Okay.  All right.

10     A    So I would suggest you ask them about that.

11     Q    Okay.

12          MR. HARRELL:  Maybe he already has.

13          THE WITNESS:  I think he has.

14   BY MR. GASPARD:

15     Q    That -- that's -- thank you, but that doesn't

16   answer my question, which is, did you personally obtain

17   CEO approval prior to laying off Captain Murray?

18          MR. HARRELL:  That's not a question.  You're

19   asking what she personally did now.

20          THE WITNESS:  I did not personally, no.

21   BY MR. GASPARD:

22     Q    Okay.  Thank you.  Did you direct a --

23     A    By that, I mean I did not have a personal

24   conversation with the CEO.

25     Q    Okay.  Are you aware of whether or not you

135

```
 1   obtained CEO approval prior to laying off
 2   Captain Murray?
 3            MR. HARRELL:  Excluding what she's talked
 4   about with her attorneys?
 5            MR. GASPARD:  Correct.
 6            THE WITNESS:  Could you ask it again?
 7   BY MR. GASPARD:
 8       Q    Sure.  Are you aware of whether or not you
 9   actually obtained CEO approval prior to laying off
10   Captain Murray?
11       A    It was my understanding that CEO approval was
12   obtained, yes.
13       Q    Okay.  And who told you that?
14       A    I don't remember specifically.  I had staff
15   members working with him.
16       Q    Okay.  So you had a general understanding that
17   there was CEO approval to lay off Captain Murray?
18       A    Well --
19            MR. HARRELL:  Asked and answered.  One more
20   time unless your answer's changing.
21            THE WITNESS:  No, it's not.
22            MR. HARRELL:  Fine.
23   BY MR. GASPARD:
24       Q    If you're aware, how was the CEO notified that
25   you intended to lay off Captain Murray?
```

136

1          MR. HARRELL:  Excluding anything you may have

2   heard from your attorneys.  If you have any knowledge,

3   tell him.

4          THE WITNESS:  I don't.

5   BY MR. GASPARD:

6      Q    Okay.  So you don't know?

7      A    I -- I don't -- I had a number of staff

8   working with CEO's office --

9      Q    Okay.

10     A    -- advising them of our plans and going over

11  the layoff procedures.  So they would be better people

12  to ask than I.

13     Q    Who would -- who would be?

14     A    I think it was -- you know, I can't remember

15  who was doing it now.  But there's Buffy Reynoso and

16  Diane Tapia and folks that were assigned to Personnel at

17  the time.

18     Q    Okay.  I'm going to mark, as Exhibit 237, a

19  memo from you dated July 10th, 2009.

20          Have you ever seen this memo before,

21  Sheriff Hutchens?

22     A    I don't remember seeing this one.  I see a lot

23  like this, but --

24          (Plaintiff's Exhibit 237 was marked

25          for identification.)

STEARNS WILLIAMS REPORTING (909) 803-0091

137

1    BY MR. GASPARD:

2        Q    Okay.

3        A    -- this one in particular, no.

4        Q    Whose initials are those next to your name?

5        A    John Scott.

6        Q    Uh-huh.  And do you delegate authority to

7    John Scott to authorize memos like this one?

8        A    Yes.

9        Q    All right.  Do you have any reason to believe

10   that the information in this memo is not correct?

11       A    No.

12       Q    And you can see this is July 10th, 2009, the

13   day after Captain Murray was laid off; right?

14            MR. HARRELL:  I don't --

15            CHRISTINE MURRAY:  Wrong date.

16            MR. GASPARD:  Actually, that is wrong.

17   Looking at the wrong memo.

18            MR. HARRELL:  Let's get the dates straightened

19   out.

20            CHRISTINE MURRAY:  232.

21   BY MR. GASPARD:

22       Q    Actually, I'm done with that.

23            Okay.  I'm going to mark, as Exhibit 238, a

24   document entitled "CPRA Roster Listing.  Data is current

25   as of 8-5 of '09."  And I'll submit that this is a

138

1    product of a Public Records Act Request.

2         Can you look at Captain Mark Billings, second

3    name from the top?

4         A    Yes.

5              (Plaintiff's Exhibit 238 was marked

6              for identification.)

7    BY MR. GASPARD:

8         Q    All right.  Now, he was promoted 8-15 of '08.

9              Do you see that?

10        A    I do.

11        Q    Did you promote Mark Billings?

12        A    Yes.

13        Q    Okay.  Now, when you promote someone to

14   Captain -- well, when you promoted Mark Billings to

15   Captain, how long was the term of his probationary

16   period as a Captain?

17        A    I don't know.

18        Q    All right.  Is it one year?

19        A    I think it's one year.

20        Q    Take a look at -- a little bit further,

21   probably about ten slots or so down, Trujillo.

22        A    Yes.

23        Q    And do you see that he was promoted as well on

24   8-15 of '08?

25        A    Yes.

139

1      Q    All right.  Did you promote him as well?

2      A    I did.

3      Q    Okay.  Would he have been subject to the same

4   one-year probation?

5      A    Yes.

6      Q    Okay.  I'm going to have to skip around here a

7   bit.

8           Do you see Brad Virgoe?  It's probably about

9   20 spots or so down on the first page.

10     A    Yes.

11     Q    All right.  And do you see his promotion date

12  was 6-6 of 2008?

13     A    Yes.

14     Q    Did you promote him?

15     A    I don't remember.

16     Q    All right.  All right.  If you move down a

17  little bit, you'll see Jon Briggs, a little further than

18  halfway down the page.

19          Do you see him?

20     A    Yes.

21     Q    And the promotion date's 7-17 of '09?

22     A    Yes.

23     Q    Did you promote Jon Briggs?

24     A    Yes.

25     Q    Okay.  And if you move down about another

140

1    eight or nine spots, you'll see Douglas Doyle with a

2    promotion date of 9 of 20- -- 9-12 of 2008.

3            Do you see him?

4    A    Yes.

5    Q    All right.  Did you promote Douglas Doyle?

6    A    Yes.

7    Q    All right.  And just below Lieutenant Doyle is

8    Sheryl Dubsky with a promotion date of 7-17 of '09.

9            Do you see her?

10   A    I do.

11   Q    Okay.  Did you promote her to Lieutenant?

12   A    I did.

13   Q    And then two slots down is James England with

14   a promotion date of 7-17 of '09.

15           Did you promote James England?

16   A    Yes.

17   Q    Is it your understanding that these

18   Lieutenants would also be subject to a one-year

19   probationary period?

20   A    Yes.

21   Q    Underneath James England is Andrew Ferguson.

22           Do you see him?

23   A    Yes.

24   Q    And he was promoted on 7-17 of '09?

25   A    Yes.

141

1    Q    Did you promote him to Lieutenant?

2    A    Yes.

3    Q    I'm sorry?

4    A    Yes.

5    Q    Okay.  Towards the bottom, about four slots

6    from the bottom, is Michael Gavin.

7         Do you see that one?

8    A    Yes.

9    Q    And his promotion date is 1-30 of '09.

10        Did you promote Michael Gavin?

11   A    Yes.

12   Q    Okay.  On the second page, about seven or

13   eight slots down, is Mark Long, L-o-n-g, with a

14   promotion date of 9-12 of 2008.

15        Did you promote Mark Long to Lieutenant?

16   A    Yes.

17   Q    And if you go down another five or six spots,

18   you'll see Robert Osborne with a promotion date of 9-12

19   of 2008.

20        Did you promote Robert Osborne to Lieutenant?

21   A    Yes.

22   Q    Two slots down is Robert Peterson with a

23   promotion date of 10-10 of '08.

24        Did you promote Robert Peterson to Lieutenant?

25   A    Yes.

142

1      Q      The next slot down is Adam Powell with a

2   promotion date of 9-12 of '08.

3             Did you promote Adam Powell to Lieutenant?

4      A      Yes.

5      Q      And towards the bottom, about seven or eight

6   slots from the bottom, is Robert Wren with a promotion

7   date of 7-17 of '09.

8             Did you promote Robert Wren?

9      A      Yes.

10     Q      Now, second from the bottom is Jane Reyes who

11  was promoted on June 30 -- I'm sorry -- on 10-24 of '08

12  to Admin Manager III.

13            Did you promote Jane?

14     A      Yes.

15     Q      Okay.  Would the Admin Manager III position

16  also be subject to a one-year probationary period?

17     A      Yes.

18     Q      Sheriff Hutchens, I'm going to have my

19  Court Reporter hand you a document previously entered as

20  Exhibit 211.  And it's an e-mail from Rich Sanchez to

21  Captain Murray dated September 24th of '09.

22            Have you ever seen this e-mail before,

23  Sheriff?

24     A      No.

25  ///

143

1          (Plaintiff's Exhibit 211 was

2          previously marked for

3          identification in the Deposition of

4          Robert Mark Leys and is attached

5          for reference.)

6    BY MR. GASPARD:

7     Q    All right.  Are you aware that Captain Murray,

8    at some point, was having these discussions with

9    Richard Sanchez about obtaining a Liberty Interest

10   Hearing?

11    A    No.

12        MR. GASPARD:  Okay.  I'd like to move into

13   something a little bit -- a different area right now,

14   and that's some of the movement within the department

15   during the restructuring.  And I have some documents

16   that may help refresh your recollection if you need it.

17   So we may as well enter these all exhibits together.

18        The first document is a document that we

19   created, so it's not something you would have seen

20   before.  It's entitled "Orange County Sheriff Department

21   Executive Staff and Command Staff."  And I'm going to

22   label it as Exhibit 239.

23          (Plaintiff's Exhibit 239 was marked

24          for identification.)

25        MR. HARRELL:  Counsel, you said this is

144

1     something done in-house by your office?

2              MR. GASPARD:  Correct.

3              MR. HARRELL:  Okay.  Thanks.

4              MR. GASPARD:  And I'm going to mark, as

5     Exhibit 240, a document entitled "Orange County

6     Sheriff-Coroner Department April 2009."  And I'll submit

7     to you that Exhibit 240 is the product of a CPRA

8     Request.

9              (Plaintiff's Exhibit 240 was marked

10             for identification.)

11             MR. HARRELL:  Do you have one with larger

12    print?

13             THE WITNESS:  That would be too easy.

14             MR. GASPARD:  The original might be a little

15    bit better than the copies.  I'm going to mark, as

16    Exhibit 241, a document entitled "Orange County

17    Sheriff-Coroner Department August 2009."

18             (Plaintiff's Exhibit 241 was marked

19             for identification.)

20             MR. HARRELL:  Off the record.

21             (Discussion was held off the

22             record.)

23             MR. GASPARD:  I'm going to enter, as

24    Exhibit 242, a document entitled "Orange County

25    Sheriff-Coroner Department February 2010."  And I think

145

1    you'll see that the document that we created is trying

2    to summarize what happened with the different stages of

3    the reorganization.  So I want to ask you a few

4    questions about that.

5            I'm just going to enter in one more exhibit

6    before we get there.  I'm going to mark, as Exhibit 243,

7    an L.A. Times article dated November 13 of 2010 entitled

8    "Sandra Hutchens:  Cleanup duty."

9            (Plaintiff's Exhibits 242 and 243

10           were marked for identification.)

11   BY MR. GASPARD:

12       Q    My apologies.  I'll get back to Exhibit 243,

13   Sheriff Hutchens.  But I actually meant to reference the

14   other L.A. Times article, which you should still have as

15   Exhibit 234.  So if I can direct your attention back to

16   that.

17           MR. HARRELL:  Here you go.

18           THE WITNESS:  Oh, thanks.  Oh, here it is.

19   It's at the very bottom.

20           MR. HARRELL:  Right.

21           THE WITNESS:  I knew I had it.  Okay.  I have

22   it.

23   BY MR. GASPARD:

24       Q    If you can take a look at Page 2, this article

25   addresses something we talked about earlier.

146

1          Do you see where the article says, at the top

2     of Page 2, "Murray also had links to Corona.  She was

3     indicted on multiple misdemeanor counts of illegal

4     campaign fundraising for him.  In exchange for having

5     criminal charges dropped, Murray agreed to perform

6     community service, cooperate in an internal affairs --

7     I'm sorry -- an internal investigation and write letters

8     of regret to colleagues she had asked to support

9     Corona's re-election"?

10          Do you see that?

11     A     I see it.

12     Q     Do you recall reading this article -- do you

13     recall reading that when it was published?

14     A     No.

15     Q     Okay.  Do you recall ever reading that in the

16     news?

17     A     Again, I said earlier, I saw in the news

18     something about Christine's case.

19     Q     Okay.  But that didn't change your opinion

20     about her; right?

21     A     No.  As I said, it was over, in my mind.  The

22     L.A. Times and the Register like to dig up old stuff all

23     the time.

24     Q     And I won't comment on the accuracy of the

25     statement.

147

1      A    I think we could all stipulate to it.

2      Q    Right.

3      A    They never -- they're like elephants.

4      Q    Yeah.  I tend to agree.

5           If you look further down on Page 2, though,

6    this is why I was getting here, as you can see, it talks

7    about the layoffs.  And there's a paragraph that

8    starts -- it says, "By cutting from the top, Hutchens

9    saves the department 2.2 million and avoids laying off

10   16 investigators and two sergeants."

11     A    Yes.

12     Q    Can you explain -- can you explain the context

13   of that sentence?  Was there a debate about laying off

14   investigators?

15          MR. HARRELL:  Lacks foundation that she ever

16   said that to anybody.

17          MR. GASPARD:  Right.

18          MR. HARRELL:  Lacks foundation as to if she's

19   ever seen that before.

20   BY MR. GASPARD:

21     Q    Do you have an understanding as to why they

22   mentioned that --

23     A    Yes.

24     Q    Okay.  Can you explain that?

25     A    That was one of the alternatives we were

148

1    looking at, was not laying off command staff, but laying

2    off line staff.

3        Q     Okay.

4        A     And I chose the latter, to lay off command

5    staff.

6        Q     Do you know where the L.A. Times got the

7    2.2-million-dollar figure from?

8        A     Probably from either me or Rick Dostal;

9    probably me.  It was a well-known figure at the time.

10       Q     How did that figure come to be?

11       A     That's the salary savings.

12       Q     All right.  Is that a number that you and your

13   staff computed prior to the layoffs?  Was that a

14   projection, in other words?

15       A     Yes.

16       Q     All right.  And the thinking was that by

17   laying off the -- eight positions that were ultimately

18   laid off, that the savings would be 2.2 million?

19       A     It was.

20       Q     All right.  So that came to fruition?

21       A     Yes.

22       Q     All right.  What was the entire amount that --

23   let me back up.

24             Do you recall earlier when you testified to

25   two different figures, projections that the County was

149

1    looking at in asking you --

2         A    In two different fiscal years.

3         Q    Right.

4         A    They're not -- they're two different fiscal

5    years, so --

6         Q    Okay.  And the first fiscal year, which was --

7         A    28 million.

8         Q    Okay.  28 million budget shortfall for fiscal

9    year 2008/2009?

10        A    '9/'10.

11        Q    '9/'10.  And for fiscal year '9/'10, the

12   budget shortfall was how much?

13        A    '10/'11 was projected to be 60 million dollars

14   beyond the 28 million --

15        Q    Oh, it's in addition.

16        A    -- just so you see what I'm dealing with.

17        Q    Good.  Good.  And how much money were you able

18   to save the County --

19        A    Over two years, with the command-staff cuts?

20        Q    Uh-huh.

21        A    4.5 million.

22        Q    Okay.  How much did they ask you to save over

23   the course of the two years?

24             MR. HARRELL:  We're vague.  Who is "they" now?

25             MR. GASPARD:  Well, the County Board of

150

1    Supervisors.

2            MR. HARRELL:  All right.

3            THE WITNESS:  I think it worked out to a

4    little over 53 million dollars.

5    BY MR. GASPARD:

6       Q    And of the 53 million they wanted you to save,

7    you were only able to save, you said --

8       A    That's just on the command-staff cuts.  We

9    made other cuts.

10      Q    That's what I'm getting to.  And I'm not

11   trying to trick you.

12           But what was the overall savings that you were

13   able to accomplish?

14      A    With the command-staff cuts?

15      Q    With everything.

16      A    53 -- a little over 53 million dollars.

17      Q    Okay.  Did you -- were they satisfied?  Did

18   you meet the mark that --

19      A    They're never satisfied.  We work with Boards

20   of Supervisors.

21      Q    Right.  Did --

22           MR. HARRELL:  I was going to say it calls for

23   speculation, but really, it doesn't.

24           MR. GASPARD:  True enough.

25           THE WITNESS:  It's really not -- it's a

151

1    complex process.  It doesn't lend itself to an easy

2    answer.  But essentially, it's about 53 million dollars

3    in cuts.  But we did a number of cuts.  We laid off

4    civilian personnel.  We eliminated positions.

5    BY MR. GASPARD:

6         Q    Right.

7         A    So, yeah, we're still working on it today.

8         Q    Uh-huh.  Okay.  So going back to -- I don't

9    want to get too far off track.

10             Going back to the 2.2 million you were able to

11   save by way of the command-staff cuts, that's what I

12   want to talk about.

13             And if you take a look at the organizational

14   chart, Exhibit 240 -- and this is from April 2009 -- can

15   you look over the organizational chart for a minute and

16   tell me if that looks accurate to you as you review it

17   today?

18        A    I can't tell from this.  I can tell you that

19   people work in certain positions.  I can't tell you if

20   these dates are correct.  I don't know.

21        Q    Okay.

22             MR. HARRELL:  And like I said, Counsel, we can

23   probably stipulate with you start and stop times for

24   various individuals.

25             MR. GASPARD:  Okay.

STEARNS WILLIAMS REPORTING (909) 803-0091

152

1          MR. HARRELL:  I don't think that's going to be

2     a problem.

3     BY MR. GASPARD:

4          Q     Well, take a look at -- I think it is easier

5     boiled down.  And if there's any questions you have to

6     Exhibit 239, the summary, you can reflect back to the

7     various organizational charts.

8               But if you look at the first column, which is

9     April 2009, on Exhibit 239 --

10         A     Right.

11         Q     -- it shows you as the Sheriff and John Scott

12    as the Undersheriff, and that remains constant

13    throughout.

14         A     That's the only thing that does.

15         Q     Okay.  Do you recall, in April 2009, that the

16    four Assistant Sheriffs listed below were, in fact, your

17    Assistant Sheriffs Anderson, Davis, James and Hillmann?

18         A     Yes.

19         Q     All right.  And going across the page, it

20    skips to September 11th, 2009, which would have been

21    after the Captain layoffs.

22               Do you see now it lists Assistant Sheriffs as

23    being James and Hillmann?

24         A     Yes.

25         Q     Is that correct?

153

1      A     Yes.

2      Q     And instead of having four Assistant Sheriffs,

3  you went to having two Commanders; right?

4      A     Yes.

5      Q     And is it correct to say that Board and

6  LeFlore, the two Commanders, were actually --

7      A     Captains.

8      Q     They were interim Captains; correct?

9      A     No.  They were Captains.  They were --

10      Q     Okay.

11      A     They were Captains serving in a Commander

12  position.

13      Q     Oh, I see.  Thank you for that clarification.

14            And moving across the chart, again, along the

15  same rows, it goes to February of 2010.  And, again,

16  that area shifts to having three Assistant Sheriffs,

17  James, Board and LeFlore; is that correct?

18      A     Tim Board -- oh, James, Board.  I thought you

19  said, "James Board."  James and Board and LeFlore.

20  Sorry.  Yeah.

21      Q     Okay.

22      A     Yes.  And Board -- Assistant Sheriff Board and

23  LeFlore are being paid as Captains.

24      Q     Okay.  So they're interim --

25      A     They're fill-in -- I didn't call it --

154

1    Q    -- Assistant Sheriffs?

2    A    Well, yeah, they're interim, if you want to

3  call it that.

4    Q    Okay.  Well, I've seen, in reviewing all these

5  documents -- correct me if I'm wrong -- but I think in

6  some places they call them "temporary" and some they

7  call them "interim."

8    A    Correct.

9    Q    But do you understand what I'm talking about?

10   A    I do.  I do.

11   Q    And to be clear, for the record, is it correct

12  that, when you talk about these interim or temporary

13  positions, they're performing the role of, in this case,

14  Assistant Sheriff?

15   A    Yes.

16   Q    But they're still receiving Captains pay;

17  right?

18   A    Yes.

19   Q    Okay.  And then so you have three

20  Assistant Sheriffs there in February of 2010, and two of

21  them are still only receiving their Captains pay?

22   A    Right.

23   Q    And then underneath, you see the three

24  Commanders, Billings, Trujillo and Wilson?

25   A    Yes.

155

1    Q    Is that correct?

2    A    Yes.

3    Q    And they're also -- they're interim

4  commanders; right?

5    A    Yeah, they're Captains -- payroll of Captains,

6  interim Commanders.

7    Q    Okay.  Was there an understanding, at the time

8  these promotions were made, how long they would continue

9  to receive the lower pay?

10   A    I asked them to do it for 18 months.

11   Q    Okay.  And everyone you promoted to the

12  interim positions were agreeable to that?

13   A    Yes.

14   Q    All right.  And then moving across the final

15  column, it looks like, again, there's a shift.  You have

16  three Assistant Sheriffs still, but it's James, Board

17  and Billings; right?

18   A    Yes.  Jay Le Flore retired.

19   Q    Okay.  And the asterisks next to the names

20  indicate that they were working in an interim position.

21        Is it correct that Board and Billings were

22  both interim Assistant Sheriffs?

23   A    Yes.

24   Q    And are the three Commander positions right

25  below that correct as well?

156

1        A     Yes.

2        Q     All right.  Here's where it gets a bit

3   trickier.

4              So going all the way back to the left, the

5   command-staff Captains --

6        A     That's going to get tricky.

7        Q     Because this hopefully will reflect what

8   positions were consolidated as well.

9              MR. HARRELL:  That's what this is supposed to

10  show?

11  BY MR. GASPARD:

12       Q     Well, I'll explain.  If you look back in April

13  2009 and you look in the first two positions there under

14  "Captains," you see Bergquist and LeFlore.

15             Do you see that?

16       A     I do.

17       Q     Okay.  And do you understand what JAMF means?

18       A     Yes.

19       Q     What does that mean?

20       A     James A. Musick Facility.

21       Q     Right.  And TL?

22       A     Theo Lacy.

23       Q     Just creating a record.  I understand.

24             Now, you see that these two were actually

25  consolidated if you move to the right.

157

1          Is that what happened?

2     A     Yes.

3     Q     You decided to consolidate those two

4  positions.  And then Captain Nighswonger was in charge

5  of that consolidated position?

6     A     Yes.

7     Q     Okay.  And keeping -- moving along to the

8  right, when you get to February of 2010, the positions

9  were, in fact, unconsolidated; right?

10    A     Yes.

11    Q     Why did you decide to do that?

12    A     I'm trying to remember February of 2010.  Oh,

13 I think -- you see, that's why it's hard.  There's a lot

14 of things that are in context that aren't here.

15          Well, Krueger agreed to serve as the

16 Captain -- as an interim Captain.  He's actually getting

17 paid as a Lieutenant.  That's what it was.  So it really

18 is, in a sense, still -- it got to be too big, and we

19 had more ICE inmates.  And then Krueger agreed to serve

20 there as getting paid as a Lieutenant, so there was no

21 cost impact, as I recall.

22    Q     Okay.

23    A     You're testing my memory now.

24    Q     And that's what I was trying --

25    A     It's a short test, too.

158

1      Q    I was just trying to figure out if the two

2   facilities ended up being kind of too big of a project

3   for one person.

4      A    They always were.  I mean, it's -- it

5   wasn't -- certainly not anything that we wanted to do.

6   It was necessity.

7      Q    Okay.  And then apparently somehow Krueger

8   went away and White took his place at JAMF?

9      A    Yeah.  Ron White, yes.

10     Q    Okay.  And going down the list, starting on

11  the left again, do you see the "CJX"?

12     A    Yes.

13     Q    What does that mean?

14     A    Central Jail Complex.

15     Q    And Court Services, do you recall that Board

16  and Cossairt were in those positions?

17     A    Yes.

18     Q    And then those positions were consolidated;

19  right?

20     A    Yes.

21     Q    And Captain White ended up taking over that

22  consolidated position?

23     A    Yes.

24     Q    So moving across all the way, does that look

25  correct that White and Hiller -- it was, again,

159

1    unconsolidated; right?

2        A    Yes.  And Hiller is now a -- serving in a

3    Captain position getting paid as a Lieutenant.

4        Q    Okay.  And he stayed in the same position, and

5    then Captain Kea took Captain White's place in CJX?

6        A    For a short period of time, I think.

7        Q    Okay.  Who's serving in that capacity now?

8        A    At CJX, it's Krueger.

9        Q    Okay.  The next one down is North Ops and

10   South Ops.

11           Do you recall, in April of 2009, that it was

12   Brian Wilkerson in North Ops and Captain White in South

13   Ops?

14       A    Yes.

15       Q    All right.  And those positions were

16   consolidated and Captain Billings took over?

17       A    Yes.

18       Q    And moving across, is the rest of it accurate

19   for those time frames?

20       A    Yes.

21       Q    The next column or next row is Support

22   Services.  And this is where Captain Murray was in the

23   Crime Lab with Director Gialamas.

24       A    Yes.

25       Q    Do you recall that?

160

1      A    Yes.

2      Q    Now, what was -- is Director Gialamas, at the

3  time -- do you know what his classification was?

4      A    Admin Manager III, I believe.

5      Q    Okay.  And I think we've had some testimony

6  about this before.

7           But is it your understanding that an Admin

8  Manager III is the civilian equivalent of Captain?

9      A    Yes.

10     Q    Okay.  So those two positions were

11 consolidated, and that's when Captain Murray was laid

12 off; right?

13     A    Yes.

14     Q    And Director Gialamas took over the

15 consolidated position?

16     A    Yes.

17     Q    And shortly thereafter, they were, again,

18 unconsolidated.

19          Was it for the same reason?  Was it just

20 determined that there was too much work for one person?

21     A    Well, no.  In this case, there was too much

22 work for one person.  But Director Gialamas left the

23 department and went to L.A. County Sheriff's.

24     Q    So when Director Gialamas went to L.A., did

25 you make the decision to place Wilkerson and Nassar into

161

1   those spots?

2       A    No.  Tom Nassar is -- he was placed as an

3   interim.  It was not by me.  It was -- Crime Lab is run

4   by three individuals in the County; myself, the District

5   Attorney and the CEO.  So it was collective decision --

6       Q    Okay.

7       A    -- for the Crime Lab.

8       Q    Now --

9       A    That eventually became Bruce Houlihan.

10      Q    And the Support Services spot, staying in the

11  same place, which was filled by Director Wilkerson, was

12  Director Wilkerson an Admin Manager III at the time?

13      A    I don't remember.

14      Q    Okay.

15      A    I want to say he was an Admin Manager II and

16  agreed to do it, but I can't remember specifically.

17      Q    All right.  Do you recall -- when

18  Director Gialamas left the department, do you recall

19  that being around December of 2009?

20      A    I don't remember.

21      Q    All right.  Do you recall whether or not that

22  position for Support Services, was there an advertised

23  opening for that position?

24      A    I can't recall.

25      Q    Okay.

1      A    That's not something I would get involved in.

2      Q    Okay.  Who would -- who would have been most

3 directly involved with, you know, filling these

4 positions?

5      A    Probably Personnel.

6      Q    Okay.  I mean, on your end, would it be the

7 Undersheriff would be more involved?

8      A    No, he wouldn't get involved in this.  It

9 would be Personnel -- our Personnel, Sheriff's

10 Department Personnel.

11     Q    All right.  Would there be -- there's normally

12 an application process; right?  So the Support Services

13 position opens up --

14     A    I don't know.  You'll have to ask Personnel.

15 Again, I don't get involved in that.

16     Q    Well, who does Director Wilkerson answer to in

17 this role?

18     A    He reports to Rick Dostal --

19     Q    Okay.

20     A    -- through Jane Reyes.  Jane Reyes would be

21 his immediate supervisor, and then Rick Dostal.

22     Q    Okay.  Who's Jane Reyes?

23     A    She works for Rick Dostal.

24     Q    What's her job title?

25     A    She is -- she was an Admin Manager III, I

163

1    think you had her on here.  But she's a -- she got

2    promoted, so she's like a supervis- -- I forget the

3    title, but supervising something or other.

4        Q    All right.

5        A    But she's like the equivalent of a Commander

6    position, if that helps.

7        Q    Oh, I see.  It does.  It does, actually.

8        A    Okay.

9        Q    Now, I'm going to move on to the right here.

10   The Support Services, Wilkerson stayed in that spot.

11   And it looks like Bruce Houlihan took Tom Nassar's spot,

12   right, in Crime Lab?

13       A    Yes.

14       Q    Okay.  Now, moving all the way to the left

15   again -- we talked about this earlier -- but Bob Eason,

16   that position was created for him, Special Projects, and

17   then eliminated; right?

18       A    The position was not created for him.

19       Q    Okay.

20       A    The position was created and filled by him.

21       Q    Right.

22       A    But we have not been able to fund that again.

23       Q    Okay.

24       A    It's not in the priority.

25       Q    That position remains eliminated?

164

1       A     Yes.

2       Q     Now, the next position down is the S.A.F.E.,

3   and that's an acronym.   What does that acronym stand

4   for?

5       A     Strategy Accountability Focus and Evaluation.

6       Q     All right.   What's the general purpose of that

7   assignment?

8       A     Accountability, Risk Management.

9       Q     Okay.   Does the grant stuff fall under

10  S.A.F.E.?

11      A     No.

12      Q     Okay.   What kind of --

13      A     What grant stuff, first?

14      Q     Well, when Federal grant monies come in --

15      A     No.

16      Q     How do you mean by "accountability," I guess

17  I'm trying to figure out?

18      A     Accountability of Personnel and Performance

19  and Workers' Comp, Risk Management --

20      Q     So these would be like the

21  Personnel-and-Training type of people?

22      A     No, it's not Personnel and Training; totally

23  different, totally separate.

24      Q     And I'm not trying to box you in.   I have no

25  idea what this position is.

1      A    You're not boxing me in.

2      Q    I'm trying to get --

3      A    I answered it.  I answered it.

4           THE REPORTER:  You guys are talking over each

5      other.

6           MR. HARRELL:  Chris, we're all doing good, but

7      if you could please wait.  And I know you got a lot on

8      your mind.  I know you've got a lot you want to get

9      done.  We'll work with you, but just let -- just one at

10     a time.

11          MR. GASPARD:  Okay.

12          MR. HARRELL:  It's in everybody's interest we

13     have a clear transcript.

14          MR. GASPARD:  Thank you.

15     Q    Sheriff Hutchens, what is generally the role

16     of the S.A.F.E. Captain position when Captain Wilson was

17     there?

18     A    Accountability, Workers' Comp, Risk

19     Management; those types of issues is what they deal

20     with.

21     Q    Okay.  And how many -- how many people answer

22     to Captain Wilson in his role --

23     A    He's not there anymore.  He's retired.

24     Q    Right.  When he was in that position, how many

25     people answered to him?

166

1        A     I don't know.

2              MR. GASPARD:  Okay.  Now -- let's take a quick

3    break.

4              MR. HARRELL:  All right.

5              THE VIDEOGRAPHER:  Going off the record.  It's

6    now 2:29 p.m.  This is the end of Media No. 2.

7              (Brief recess taken.)

8              THE VIDEOGRAPHER:  We're now back on the

9    record in the ongoing deposition of

10   Sheriff Sandra Hutchens.  The time is now 2:41 p.m.

11   This marks the start of Media No. 3.

12   BY MR. GASPARD:

13       Q     Okay.  Sheriff Hutchens, when we left off, we

14   were still talking about Exhibit 239.  So if I can

15   direct your attention and get through this one.

16             Do you see in the first column, the "P.S.D."

17   and then (Nighswonger) in parentheses?

18       A     Yes.

19       Q     Do you know what "P.S.D." stands for here?

20       A     Yes, Professional Services Division.

21       Q     Okay.  And do you recall that that's correct,

22   that Captain Nighswonger was in that position?

23       A     Yes.

24       Q     And do you see that, after the organizational

25   change in September of '09, that Captain Wilson took

1    over that position.  Is that correct?

2        A    Yes.

3        Q    And -- well, moving across to the right, in

4    February of 2010, it became interim Captain Solorza;

5    correct?

6        A    Yes.

7        Q    And then after that, in February of 2011, it

8    was interim Captain Griffin; correct?

9        A    Yes.

10       Q    All right.  The next one is Homeland Security.

11            Do you recall that Captain Mark Billings was

12   in that position in April of '09?

13       A    Yes.

14       Q    And do you recall that, by September of '09,

15   Brian Wilkerson took over that spot?

16       A    Yes.

17       Q    And he's remained in that position.

18            Is he still in that position?

19       A    He's retired.

20       Q    Okay.  But do you -- is this correct, he

21   stayed in that position at least until February of 2011?

22       A    I -- probably, yeah.  I'm trying to think when

23   he retired.  Probably in April of '11; so, yeah.

24       Q    All right.  Down to the next one, Airport

25   Operations, it was Captain DeMaio in April of 2009?

168

1     A   Yes.

2     Q   And then --

3     A   It's the one that hasn't been changed.

4     Q   Oh, okay.  So --

5     A   Well, he's no longer there because he's -- he

6 got another position.

7     Q   All right.  Is this chart correct, though,

8 that throughout this time period?

9     A   Yes.  Yeah.

10     Q   Now, Investigations was Captain Trujillo in

11 April of 2009?

12     A   Yes.

13     Q   And he remained in that position through 2009.

14     And do you recall that, by February of 2010,

15 it became interim Captain Griffin?

16     A   Yes.

17     Q   And do you recall that by February of 2011, it

18 became interim Captain Krueger?

19     A   For a short period of time, I think, Krueger.

20     Q   Okay.  And the last one is Training.

21     And do you recall the Training Captain in

22 April of 2009 was Captain Zurn?

23     A   Yes.

24     Q   And her position was eliminated later in 2009;

25 correct?

169

1        A    Yes.

2        Q    But you reinstituted that position in early

3   2010?

4        A    Yes.

5        Q    And it became interim Captain Bland?

6        A    Yes.

7        Q    And Captain Bland stayed in that position

8   through February of 2011?

9        A    Yes.

10        Q    Excuse me for one moment.  I'm just looking

11   for one of my exhibits here.

12              MR. HARRELL:  One that's already been marked?

13              CHRISTINE MURRAY:  Here it is.  This is the

14   one.

15   BY MR. GASPARD:

16        Q    I'm going to have the Court Reporter hand you

17   what we've previously marked as Exhibit 222.  It's a

18   memo from you to your Division Commander dated

19   February 5 of 2010.  And this shows -- it's regarding

20   Temporary Promotions and Transfers.

21              (Plaintiff's Exhibit 222 was

22              previously marked for

23              identification in the Deposition of

24              Thomas Gallivan and is attached for

25              reference.)

170

1    MR. HARRELL:  I don't think it's been

2 identified by this witness.

3    MR. GASPARD:  Right.

4  Q Sheriff Hutchens, have you seen this document

5 before?

6  A Well, my signature's on it, so I think I

7 probably have.

8  Q Okay.  And this shows the Temporary Promotions

9 and Transfers that were effective on February 19th of

10 2010; right?

11  A Yes.

12  Q Does this look accurate?

13  A Yes.

14  Q Now, I'm going to have the Court Reporter hand

15 you what we've marked as Exhibit 221.  And this is a

16 Captain Eligibility List dated February 26 of 2009.

17    Is that your signature on that document as

18 well?

19  A It is.

20    (Plaintiff's Exhibit 221 was

21    previously marked for

22    identification in the Deposition of

23    Thomas Gallivan and is attached for

24    reference.)

25

BY MR. GASPARD:

Q    Okay.  Do you remember -- did you create this eligibility list?

A    No.

Q    Who created it?

A    I don't know.

Q    Was it given to you for your approval?

A    Yes.

Q    All right.  Do you know how these individuals were selected for the eligibility list?

A    No.

Q    All right.  Do you know if they --

A    I say, "no" because the process has changed over time, so I couldn't tell you.  Personnel would be better equipped to tell you that, on this date that it was obtained.

Q    Is it your understanding that these individuals went through some sort of process to --

A    I don't know.

Q    Okay.

A    I don't know.  As I said, it's changed over time.  So I like to give you more accurate information.

Q    Well, let me finish real quick.

Is it your understanding that, when you signed this document -- did you sign this document around that

172

1    time, February 26 of 2009?

2         A    I don't know.  I have no way of knowing.

3         Q    All right.  Was it your understanding, when

4    you signed this list, that you approved this list of

5    individuals as potential promotions to Captain at some

6    point?

7         A    That they're eligible, but they're not getting

8    promoted.  This is not a list saying they're getting

9    promoted.  They're eligible to be promoted, yeah.

10        Q    Was it your understanding, at the time, that

11   someone has to be on this list in order to get promoted

12   to Captain?

13        A    Yes.

14        Q    All right.  Can you take a look back down at

15   Exhibit 222.  And --

16        A    What is -- which one is that?

17        Q    That's the -- that's the memo with the

18   Temporary Promotions and Transfers.

19             CHRISTINE MURRAY:  It might be the top one.

20   BY MR. GASPARD:

21        Q    It might be on top there.

22        A    This one?

23        Q    Is it a dark -- yeah.

24        A    Oh, okay.

25        Q    Can I see that real quick?  I don't know if

173

1    that's a very good copy.

2        A    It's probably from a blue slip.

3        Q    Yeah.

4        A    They don't Xerox too well.

5        Q    I have a better copy if you can't read it.

6        A    I can read it.

7        Q    Okay.  If you look at the top of the list, the

8    first person on there is Michael James; right?

9        A    Yes.  That's a transfer, yeah.

10       Q    Oh, yeah.  I'm sorry.  The first Temporary

11   Promotion is --

12            CHRISTINE MURRAY:  He's a Captain, he's a

13   Captain and he's a Captain.

14   BY MR. GASPARD:

15       Q    Yeah, still getting my head wrapped around

16   these lists.

17       A    Me too.

18       Q    If you go about halfway down, you'll see

19   Donald Barnes --

20       A    Uh-huh, yes.

21       Q    -- Lieutenant Donald Barnes.

22            And is it your understanding that -- well, and

23   if you look back at Exhibit 221, you'll see that

24   Donald Barnes is the second name on the eligibility

25   list.

174

1          Do you see that?

2     A     Yes.

3     Q     Okay.  So is it your understanding that

4     effective February 19th, 2010, Lieutenant Donald Barnes

5     was being promoted to an interim Captain position?

6     A     Yes.

7     Q     All right.  And he's promoted off the

8     eligibility list; right?

9     A     No, because he wasn't promoted.  He was still

10    serving -- he wasn't getting paid as a -- I'm sorry.

11    Where are we at?  What was he getting promoted to at

12    that time?

13    Q     Oh, interim Captain.

14    A     Yeah.

15    Q     Okay.

16    A     He's still getting paid as a Lieutenant.

17    Q     All right.  Good.  That brings me to my next

18    question.

19          The next name down on Exhibit 222 is

20    Lieutenant Antoinette Bland.

21          Do you see that?

22    A     I do.

23    Q     But if you look back at Exhibit 221, you can

24    see that she's not on the eligibility list; right?

25    A     Right.

175

1        Q     And on February 5th, 2010, the date of the

2    memo, it looks like -- I'm sorry -- effective

3    February 19th, 2010, she's going to become an interim --

4    interim Captain of North Operations Division; right?

5    I'm sorry.

6        A     No.  Training Division.

7        Q     Correct, interim Captain of the Training

8    Division.

9        A     Right.

10       Q     Why is it that Antoinette Bland doesn't have

11   to be on the eligibility list to get --

12       A     That's what you're going to have to ask

13   Personnel about.  I can't answer that question.

14       Q     Okay.  Who would know the answer to that

15   question?

16       A     Probably Buffy Reynoso would be a good place

17   to start.

18       Q     Okay.  Did -- so who made the decision to

19   promote Antoinette Bland to interim Captain?

20       A     Well, ultimately me.

21       Q     Okay.  Did you understand, at the time you

22   made that decision, that Antoinette Bland was not on the

23   eligibility list?

24       A     I don't recall even considering that or

25   looking at it.

176

1       Q     Okay.  Is -- I mean, earlier, you testified

2   that normally to be promoted to Captain, you would have

3   to be on the eligibility list.

4       A     This is a little different.  They were

5   interims.  They were not -- and there was no guarantee

6   that they would continue to be or ever get paid as a

7   Captain.

8       Q     And that's what I wanted to clarify --

9       A     Yeah.  That's the best as I can tell you.  But

10  the other details, you'll have to talk to Personnel.

11      Q     Were there any individuals that you promoted

12  to interim Captain that were not subsequently promoted

13  to full-time Captain?

14      A     Well, let's see.  Do we have the list of the

15  interim Captains?  Let's see.  Krueger was promoted.

16  Hiller was promoted; Gallivan, Barnes, Kea, Solorza

17  Griffin, Long, Bland.  I think that's everybody.  They

18  were promoted to Captain.

19      Q     Was Antoinette Bland ever on a Captain

20  eligibility list?

21      A     I don't know.

22      Q     All right.  Was Michael Krueger ever on a

23  Captain eligibility list?

24      A     I don't know.

25      Q     I'm going to direct your attention back to the

1    PSR Layoff Procedure, and that's Exhibit 213.  And if I

2    can direct your attention to Section 4, Subsection A.

3    And I'll read it.

4            It says, "The names of persons laid off shall

5    be placed on an agency/departmental rehire list for each

6    class in the occupational series at or below the level

7    of the class from which laid off."

8            Do you see that?

9    A    I do.

10   Q    Are you aware of whether or not

11   Captain Murray's name was placed on the rehire list once

12   she was laid off?

13   A    I do not know.

14   Q    All right.  Is it your read of that section

15   that being placed on the rehire list would be automatic?

16   A    I do not know.

17   Q    All right.

18   A    That's not something that I would be

19   responsible for doing.

20   Q    Okay.  Did you have any discussions with any

21   other employees for Orange County regarding whether or

22   not Captain Murray was on the rehire list?

23   A    No.

24   Q    So as of today, you have no idea whether or

25   not she was ever on the rehire list?

178

1          A     I don't know.  I've never seen it.

2          Q     Looking back at that same paragraph, it says,

3     "for each class in the occupational series at or below

4     the level of class from which laid off."  I want to talk

5     about how -- how that would apply to Captain Murray.

6                What class in the occupational series was

7     Captain Murray at, if you're aware?

8          A     Captain.

9          Q     Right.  And would this also include

10    Admin Manager III's?

11         A     I don't know.

12         Q     Okay.  Would it include Lieutenants?

13         A     I don't know.

14         Q     All right.  Is your understanding that the

15    occupational series below Captain would be Lieutenant?

16               MR. HARRELL:  It does lack foundation and call

17    for speculation.  There's been no record established

18    that this witness has experience applying those terms.

19    There might be somebody else that's better suited to do

20    that.

21    BY MR. GASPARD:

22         Q     Okay.  Well, you explained that the

23    occupational series that Christine Murray was at was

24    Captain.

25               Is it your understanding that the occupational

179

1      series below the level of Captain would be Lieutenant?

2          A     I don't know.  Again, this is something I

3      would rely on County HR for.

4          Q     Okay.  Can you take a look at Subsection B

5      under Section 4 of that same document, under "Rehire

6      Lists."  And I'll direct your attention to the first

7      sentence which says, "Persons on the agency, slash,

8      departmental rehire list for that class will be

9      considered prior to eligibles on other types of eligible

10     lists."

11             MR. HARRELL:  And the question is?

12     BY MR. GASPARD:

13         Q     Do you see that, Captain -- or I'm sorry -- do

14     you see that, Sheriff?

15         A     I do.

16         Q     Okay.  Is it your understanding, from reading

17     that, that a Captain on the rehire list would have to be

18     considered before others who were applying for the

19     position of Captain?

20             MR. HARRELL:  Lacks foundation; calls for

21     speculation as to this Witness.  She's already told you

22     you need to talk to HR.

23             MR. GASPARD:  I have.  That's what Bob Leys

24     says it means.  I'm asking her opinion of reading

25     that --

STEARNS WILLIAMS REPORTING  (909) 803-0091

180

1              THE WITNESS:  I don't know.

2    BY MR. GASPARD:

3         Q      Okay.

4         A      That's why I rely on County HR.

5         Q      Okay.

6         A      They're the experts.

7         Q      Are you aware that Captain Murray tried to get

8    rehired with the Sheriff's Department after she was laid

9    off?

10        A      I had heard that she had some question about

11   the rehire list, but that's the extent of it.

12        Q      Okay.  Who did you hear that from?

13        A      I don't recall.

14        Q      All right.  I'm going to have the

15   Court Reporter hand you a document that we've marked

16   Exhibit 216.  This is an e-mail to you from

17   Captain Murray dated January 7 of 2010.  Let me know

18   once you've had an opportunity to read it.

19        A      Okay.

20               (Plaintiff's Exhibit 216 was

21               previously marked for

22               identification in the Deposition of

23               Robert Mark Leys and is attached

24               for reference.)

25

181

BY MR. GASPARD:

    Q    All right.  Do you recall receiving this
e-mail?

    A    I do.

    Q    All right.  Does this jog your memory as to
your knowledge of Captain Murray trying to gain
reemployment with the County?

    A    Yes.

    Q    All right.  Now, she wrote this e-mail in
January of 2010, and she's pointing out that
Dean Gialamas has resigned from the department; is that
correct?

    A    Is what correct?

    Q    That Dean Gialamas resigned from the
department.

    A    He took another position, yes.

    Q    That's right, with L.A. County; right?

    A    Uh-huh.

    Q    And she's pointing out to you that he's the
guy that had taken her place when she was laid off.

    Is that correct?

    A    Yes.

    Q    Now, when she says, "I'm aware that you're
conducting a promotional recruitment process to replace
him, specifically seeking a Division Commander, slash,

182

1    Director of Support Services," do you see that?

2         . A    Where's that?

3         Q    It's the --

4         A    Oh, at the top paragraph, "I am aware that you

5    are conducting a" -- yes.

6         Q    Do you recall that, in fact, you were trying

7    to fill that spot left by Dean Gialamas' departure?

8         A    I recall that, yes, at some point we were

9    trying to fill his spot -- actually, the Crime Lab spot.

10   I can't recall what was happening at Support Services.

11        Q    Do you see in the last paragraph, where she

12   says, "Having recently filled that position, I'm able to

13   return and fill the role without a lengthy learning or

14   transitional process"?  Do you agree with that?

15        A    I don't know.

16        Q    What did you do in response to this e-mail, if

17   anything, when you received it?

18        A    I forwarded it to a member of my staff to look

19   into it.

20        Q    Okay.  Do you recall who you forwarded it

21   to --

22        A    No.

23        Q    -- to look into it?

24        A    No.

25        Q    Now, we spoke to Bob Leys.  As you can see,

STEARNS WILLIAMS REPORTING (909) 803-0091

183

1    he's cc'd on this particular e-mail.  And he testified

2    that after receiving this e-mail, he -- there was a

3    meeting.  And the people present at the meeting were,

4    let's see, County Counsel, Steve Kea, Buffy Reynoso,

5    Diane Tapia and a couple of Service Team Managers,

6    Alicia Cavasos and Paul Alvarez.

7              Are you aware of that meeting?

8        A    No.

9        Q    Okay.  Did -- are you aware of any meeting

10   that was convened for the purposes of discussing

11   Captain Murray's attempt to gain reemployment with the

12   County?

13       A    No.

14             MR. GASPARD:  What number are we on?

15             THE REPORTER:  Is it -- 244, I think.

16             MR. GASPARD:  244?

17             MR. HARRELL:  Yes.

18   BY MR. GASPARD:

19       Q    I'm going to mark, as Exhibit 244, a memo

20   dated May 4th, 2010, from you to the Division

21   Commanders.

22             Have you ever seen this document before,

23   Sheriff Hutchens?

24       A    I see documents like that all the time.  I

25   don't know if I've seen that one.  John Scott signed

STEARNS WILLIAMS REPORTING (909) 803-0091

184

1    that for me.   That's the Undersheriff's initials.   So I

2    don't know.

3           (Plaintiff's Exhibit 244 was marked

4           for identification.)

5    BY MR. GASPARD:

6       Q    Well, can you look over it and tell me if you

7    recall these temporary promotions listed in the memo.

8    And specifically, do you recall Michael McHenry being

9    temporarily promoted to or given a promotion to

10   temporary Lieutenant effective May 1st, 2010?

11      A    Not specifically, no.

12      Q    Do you recall him getting -- you do recall

13   promoting him to temporary Lieutenant; right?

14      A    Not specifically.   Obviously, he did get

15   promoted.

16      Q    Do you recall promoting John Meyer?

17      A    Same answer.

18      Q    All right.   Michael Peters?

19      A    Same answer.

20      Q    And Christopher Wilson?

21      A    Same answer.

22      Q    All right.   Is there any reason to doubt that

23   these --

24      A    No.

25      Q    -- people were not promoted?

185

1      A    No.  You're asking for my memory.  I'm just

2    saying --

3      Q    I don't get to talk to Undersheriff Scott for

4    a couple weeks --

5      A    Yeah.

6      Q    -- but we'll run it by him as well.  Thank

7    you.  I apologize for skipping around a bit here, but I

8    want to go back to a topic we were just talking about,

9    and that was filling Dean Gialamas' position.

10          I'm going to have the Court Reporter hand you

11   a document we've marked Exhibit 215.

12          (Plaintiff's Exhibit 215 was

13          previously marked for

14          identification in the Deposition of

15          Robert Mark Leys and is attached

16          for reference.)

17          MR. HARRELL:  I think we're ready, Counsel.

18   BY MR. GASPARD:

19     Q    Oh, okay.  Have you had an opportunity to

20   review it, Sheriff?

21     A    I have.

22     Q    All right.  Have you ever seen that bulletin

23   before?

24     A    No.

25     Q    You do recall, though, that you were trying to

STEARNS WILLIAMS REPORTING (909) 803-0091

186

1     fill the Director of Support Services position in the

2     wake of Dean Gialamas' departure?

3             MR. HARRELL:  Asked and answered.

4             Has your answer changed?

5             THE WITNESS:  No.

6     BY MR. GASPARD:

7         Q    Okay.  Was your answer "yes"?

8         A    Yes.  My answer's not changed.

9         Q    I don't recall what you said the first time,

10    actually.

11            Did -- I think you did say, "yes," that you

12    were trying to fill the Department of Support Services

13    Admin Manager III position when Dean Gialamas left;

14    right?

15        A    Sometime after he left, yes.

16        Q    Okay.  Well, I want to show you what we've

17    marked as Exhibit 217 as well.

18            Have you had an opportunity to review

19    Exhibit 217?

20        A    I just did.

21            (Plaintiff's Exhibit 217 was

22            previously marked for

23            identification in the Deposition of

24            Robert Mark Leys and is attached

25            for reference.)

STEARNS WILLIAMS REPORTING (909) 803-0091

187

BY MR. GASPARD:

2      Q    Okay.  And you see this is a letter dated

3  January 15th, 2010 to Captain Murray from

4  Commander Wilson.

5           Have you ever seen this letter before?

6      A    No.

7      Q    All right.  In the letter, he's saying, "Due

8  to the current budget situation, the Sheriff's

9  Department has decided not to move forward with the

10  recruitment for this Administrative Manager III

11  position."

12           Do you see that?

13      A    I see that.

14      Q    Do you recall that as being true?

15      A    I don't know.  I didn't see this letter until

16  today.

17      Q    Okay.

18      A    So --

19           CHRISTINE MURRAY:  245.

20           MR. GASPARD:  You have a better system.

21      Q    I'm going to mark, as Exhibit 245, a memo

22  dated March 19th of 2010.  And this is a memo from you

23  to All Personnel dated March 19th of 2010 regarding

24  Appointment of Support Services Director.

25           Have you ever seen this memo before,

188

1    Sheriff Hutchens?

2         A    Not that I recall.

3              (Plaintiff's Exhibit 245 was marked

4              for identification.)

5    BY MR. GASPARD:

6         Q    Okay.  Do you recall appointing Kirk Wilkerson

7    to the position of interim Director of Support

8    Services --

9         A    Yes.

10        Q    -- effective March 19th of 2010?

11        A    Yes.

12        Q    Okay.  Do you recall considering anyone else,

13   other than Kirk Wilson -- Wilkerson, for the position of

14   interim Director of Support Services?

15        A    I don't recall.

16        Q    All right.  Did you consider rehiring

17   Captain Murray to fill the position of Director of

18   Support Services?

19        A    I didn't have anything to do with

20   Captain Murray's request.  She'll have to direct her

21   questions to County HR.

22        Q    Okay.  But you were aware, from the e-mail she

23   sent you, that she wanted this position; right?

24        A    And I forwarded that e-mail, and that's not

25   something that I would deal with.

189

1    Q    Okay.

2    A    I'm sure if she was eligible, they would have

3    told me.

4    Q    Okay.  And, in fact, no one ever notified you

5    that Captain Murray was qualified for rehire to the

6    position of Director of Support Services?

7    A    I don't recall having any discussion about

8    Captain Murray.

9    Q    Okay.  You mentioned earlier that you thought

10   that Captain Murray was a good employee while she worked

11   for the Orange County Sheriff's Department; right?

12   A    Yes.

13   Q    How did she perform specifically in the

14   position of Director of Support Services?

15   A    Very well, good reports.

16   Q    Okay.  I'm going to enter, as Exhibit 246, a

17   document that we received from the County in written

18   discovery.  This is a letter dated September 22nd of

19   2009 to Nick Berardino from you, but it's -- it doesn't

20   have your signature on it.

21        Have you ever seen this letter before?

22   A    I don't remember.

23        (Plaintiff's Exhibit 246 was marked

24        for identification.)

25   ///

STEARNS WILLIAMS REPORTING (909) 803-0091

190

1    BY MR. GASPARD:

2        Q    Okay.  Do you recall having any correspondence

3    with -- well, it says, "Nick Berardino" at the top,

4    "General Manager, OCEA."

5            Can you tell me what the OCEA is?

6        A    Orange County Employees Association.

7        Q    All right.  Do you recall correspondence with

8    their General Manager regarding the impact of potential

9    layoffs?

10       A    I remember discussing it with them verbally.

11       Q    All right.  If you look at Paragraph 1 -- and

12   I'm not sure if -- I guess if you sent this letter out,

13   but I just want to have you take a look at a couple

14   lines in it.

15           In the middle of Paragraph 1, it says, "The

16   layoff list will include Assistant Sheriffs, Captains,

17   an Admin Manager and members of your bargaining unit."

18           Is that correct?

19       A    That's what it says.

20       Q    I mean, is that what happened?

21       A    I don't know.  I know Assistant Sheriffs,

22   Captains.  I don't know about the Admin Manager.

23       Q    Okay.

24       A    But members of his bargaining unit, yes.

25   Admin Manager, I'm not sure what that's referencing.

1        Q      Towards the bottom, the second to the last

2    paragraph, it says, "On another note, per your

3    suggestion, I have directed my staff to begin organizing

4    a job fair for Sheriff's Department Employees who are

5    scheduled for layoff."

6        A      Yes.

7        Q      Did that job fair occur?

8        A      To my knowledge, yes.

9        Q      And at the very bottom of that paragraph, it

10   says, "I will do my utmost to provide alternatives for

11   them as they become available."

12              And by "them," I think you mean those

13   individuals laid off; right?

14       A      Specifically his bargaining unit because this

15   was addressed to him.

16       Q      Is it your position that you were not going to

17   do your utmost --

18       A      No.  But this is directed to him for his

19   members.

20       Q      All right.  I just noticed that the intro

21   paragraph, you included the Assistant Sheriffs.

22       A      I did because he felt that his members were

23   the only ones impacted.

24       Q      I see.

25       A      So that was done for another reason.

```
 1   STATE OF CALIFORNIA        )
                                ) ss.
 2   COUNTY OF SAN BERNARDINO   )

 3

 4        I, Brandy L. Williams, certified shorthand

 5   reporter, license No. 11084, do hereby certify:

 6

 7        That, prior to being examined, the witness

 8   named in the foregoing deposition, to wit,

 9   SANDRA HUTCHENS, was by me duly sworn to testify the

10   truth, the whole truth and nothing but the truth;

11

12        That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to computer-aided transcription under

15   my direction.

16

17        I further certify that I am not interested in

18   the event of the action.

19

20   WITNESS my hand this _____ day of

21   _____, 2012.

22

23

     BRANDY L. WILLIAMS, CSR #11084

24

25
```



# LYNBERG
# & WATKINS

## ATTORNEYS AT LAW
### A PROFESSIONAL CORPORATION

Los Angeles
888 South Figueroa Street
Sixteenth Floor
Los Angeles, California 90017
Tel 213·624·8700
Fax 213·892·2763

Orange County
1100 Town & Country Road, Suite 1450
Orange, California 92868
Tel 714·937·1010
Fax 714·937·1003

Reply to:          Orange

June 18, 2012

Christopher Gaspard, Esq.
**LACKIE, DAMMEIER & MCGILL**
367 North Second Avenue
Upland, CA 91786

Re:   *Murray v. County of Orange, et al.*
      Date of Incident:   October 9, 2009
      USDC Case No.:   8:10 – CV-1675 JVS (MLGx)
      Our File No.:   1794-0049

Dear Mr. Gaspard:

Please be advised that Sheriff Hutchens has signed her original deposition
transcript and has made no changes.   I am enclosing a copy of her signature
page for your file.

Should you have any questions or wish to discuss this matter further please
do not hesitate to contact my office directly.

Very truly yours,

**ALEX D. MIHAI**

ADM/sms
Enclosure

```
1   STATE OF CALIFORNIA   )
                          ) ss.
2   COUNTY OF_____ )

3

4

5        I, SANDRA HUTCHENS, say I have read the

6   foregoing deposition and declare under penalty of

7   perjury that my answers, as indicated, are true and

8   correct.

9

10

11

12   6/14/2012
        (Date)

13

14

15

16   _____
            (Signature)
```

# EXHIBIT 254

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


CHRISTINE MURRAY,                    )
                                     )
                    Plaintiff,       )
                                     )   CASE NO. CV10-01675
          VS.                        )        JVS (MLGx)
                                     )
COUNTY OF ORANGE, a municipal        )
corporation; ORANGE COUNTY           )
SHERIFF-CORONER DEPARTMENT;          )
SANDRA HUTCHENS, individually        )
and as Sheriff of the Orange         )
County Sheriff-Coroner               )
Department; JOHN SCOTT,              )
individually and as Undersheriff )
of the Orange County Sheriff-        )
Coroner Department; MICHAEL          )
HILLMANN, individually and as        )
Former Assistant Sheriff of the      )
Orange County Sheriff-Coroner        )
Department; and DOES 1 THROUGH        )
10 inclusive,                        )
                                     )
                    Defendants.      )
_____)


DEPOSITION OF JOHN L. SCOTT

THURSDAY, MAY 24, 2012

Reported by:  BRANDY L. WILLIAMS, CSR, RPR #11084

2

1                        I N D E X

2   DEPOSITION OF JOHN L. SCOTT

3   THURSDAY, MAY 24, 2012                      PAGE

4          Examination By Mr. Gaspard            7

5

6                        EXHIBITS

7      (Previously marked and attached for reference.)

8   PLAINTIFF'S
    EXHIBIT      DESCRIPTION                   MARKED
9
    201   Memorandum dated September 29, 2008    26
10
    206   Memorandum dated September 17, 2009    80
11
    209   Document entitled "Layoff Notice"      82
12
    210   Document dated 9/17/09                 93
13
    211   Document entitled "Layoff Meeting      94
14         Follow-Up"

15   213   Document entitled "Article XVI"       60

16   215   Job Bulletin                         125

17   216   E-mail dated January 7, 2010         120

18   217   Memorandum dated January 15, 2010    128

19   219   Article XIV, Disciplinary Action      60

20   220   Memorandum dated March 19, 2010      130

21   227   Memorandum dated November 25, 2008    34

22   228   Memorandum dated May 04, 2010         36

23   229   Memorandum dated March 13, 2009       28

24   232   Document with Captains listed         57

25          (Index continued on following page)

3

1                    EXHIBITS (Continued)

2        (Previously marked and attached for reference.)

3    PLAINTIFF'S
     EXHIBIT          DESCRIPTION                    MARKED

4    233    Email from Robert Eason to              73
5           Christine Murray

6    235    Printed Questions                       83

7    237    Memorandum dated July 10, 2009          76

8    239    Orange County Sheriff's Department      97
            Executive and Command Staff
9

10

11

12      QUESTIONS ASKED, WITNESS INSTRUCTED NOT TO ANSWER

13                   PAGE      LINE

14                    9          14

15

16

17

18

19

20

21

22

23

24

25

4

1                          APPEARANCES

2

3        For the Plaintiff, CHRISTINE MURRAY:

4            LACKIE, DAMMEIER & McGILL APC
             BY:  CHRISTOPHER L. GASPARD
5            367 North Second Avenue
             Upland, California  91786
6            (909) 985-4003

7

8        For the Defendants, COUNTY OF ORANGE,
             ORANGE COUNTY SHERIFF'S DEPARTMENT,
9            SANDRA HUTCHENS, JOHN SCOTT and
             MICHAEL HILLMANN:
10
             LYNBERG & WATKINS
11           BY:  S. FRANK HARRELL
             1100 Town & Country Road
12           Suite 1450
             Orange, California  92868
13           (714) 937-1010

14

15       Also Present:

16           CHRISTINE MURRAY

17           BILL VARBLE, VIDEOGRAPHER

18

19

20

21

22

23

24

25

5

1            DEPOSITION OF JOHN L. SCOTT

2        Pursuant to Notice to Take Deposition, on the

3    24th day of May, 2012, commencing at the hour of

4    10:13 o'clock a.m., at 367 North Second Avenue, in the

5    City of Upland, County of San Bernardino, State of

6    California, before me, Brandy L. Williams, Certified

7    Shorthand Reporter, State of California, Personally

8    Appeared:

9

10            JOHN L. SCOTT,

11    called as a witness by the Plaintiff, who, being by me

12    first duly sworn, was thereupon examined as a witness in

13    said cause.

14

15

16

17

18

19

20

21

22

23

24

25

6

1          THE VIDEOGRAPHER:  Good morning.  I'm

2    Bill Varble, your Videographer.  And I represent

3    Stearns Williams Reporting in Alta Loma, California.

4          I'm not financially interested in this action,

5    nor am I a relative or employee of any attorney or any

6    of the parties.

7          The date today is May 24th, 2012.  The time

8    right now is 10:13 a.m.  This deposition's taking place

9    at 367 North Second Avenue in Upland, California.  And

10   this is Case No. CV10-01675 JVS in the United States

11   District Court for the Central District of California,

12   entitled Christine Murray versus County of Orange,

13   et al.  This deposition's being taken on behalf of the

14   Plaintiff in this action.  And this is the beginning of

15   Videotape No. 1 of the Videotaped Deposition of

16   John L. Scott.

17          The court reporter is Brandy Williams.

18          Counsel, would you state your appearances,

19   please.

20          MR. GASPARD:  Chris Gaspard for Plaintiff,

21   Christine Murray.

22          MR. HARRELL:  Good morning.  Shel Harrell for

23   the County of Orange, the Witness and others.

24          THE VIDEOGRAPHER:  Thank you very much.

25          Would the Court Reporter please swear in the

7

1     witness.

2              (The Witness was duly sworn in by

3              the Court Reporter.)

4

5                         EXAMINATION

6

7     BY MR. GASPARD:

8         Q     Good morning, Undersheriff Scott.

9         A     Good morning.

10        Q     Could you please state and spell your name for

11    the record.

12        A     It's John L. Scott, S-c-o-t-t.

13        Q     Okay.  Have you ever been deposed before?

14        A     Yes.

15        Q     How many times?

16        A     Probably 30.

17        Q     All right.  What sort of cases have you been

18    deposed in?

19        A     Well, would be Civil cases and primarily

20    involving Los Angeles County where I worked 36 years.

21        Q     Okay.  Were any of those employment cases?

22        A     Yes.

23        Q     All right.  The Court Reporter, Brandy, gave

24    you an oath, and it's the same oath you would take in a

25    court of law.  So you're testifying today under penalty

8

1    of perjury.

2         Do you understand that?

3    A    Yes.

4    Q    Now, I'll ask you questions and ask you to

5    respond verbally.  And the Court Reporter will take down

6    your testimony and transcribe it into a booklet.  At

7    some point, you'll have an opportunity to review your

8    testimony and make any changes if you misspeak.  Any

9    substantive changes you make could cast some doubt on

10   the credibility of your testimony, though.

11        Do you understand?

12   A    Understood.

13   Q    All right.  In order to establish a clear

14   record, I'll try to make sure that you've completed your

15   answers before I ask another; not step on you.  And I'd

16   ask that you do the same and wait for me to finish my

17   questions before you answer as well.

18        I may ask you for your estimate at times, but

19   please refrain from guessing.

20        So you understand the difference between an

21   estimate and a guess; right?

22   A    Yes.

23   Q    Okay.  If any of my questions are unclear or

24   you need me to rephrase, please just ask me to do so.

25        Have you recently consumed any alcohol,

9

1    medications or any other substances that would impair

2    your ability to testify today?

3        A    No.

4        Q    Is there any other reason that we cannot get

5    your best testimony today?

6        A    No.

7        Q    Did you review any documents before coming in

8    for your deposition today?

9        A    Today, no.

10       Q    All right.  Did you review any documents to

11   refresh your recollection for your deposition today?

12       A    There was information that was provided by

13   Counsel several weeks ago concerning the case.

14       Q    Okay.  What information was that?

15            MR. HARRELL:  That's attorney/client

16   privilege.  Instruct the Witness not to answer.

17            MR. GASPARD:  Any documents that he's reviewed

18   to refresh his recollection for today's deposition, I'm

19   entitled to under the Federal Rules.

20            MR. HARRELL:  I sent him an e-mail --

21            MR. GASPARD:  Okay.

22            MR. HARRELL:  -- that attached the photographs

23   that you showed.

24            THE WITNESS:  That's correct.

25            MR. GASPARD:  All right.  Can you forward that

10

1    e-mail when we're done today?

2              MR. HARRELL:  Absolutely not.

3              MR. GASPARD:  All right.  Well, that's

4    something we'll have to resolve off the record.

5              MR. HARRELL:  Sure.

6              MR. GASPARD:  But I would submit that we're

7    entitled to whatever documents Undersheriff Scott's

8    reviewed for today's deposition.

9              MR. HARRELL:  It wasn't to refresh his

10   recollection.  It was to tell him

11   attorney/client-privileged information.

12             MR. GASPARD:  Okay.  Well, that was not his

13   testimony.

14       Q    Mr. Scott, have you discussed today's

15   deposition with anyone else other than your attorney?

16       A    No.

17       Q    Have you ever been named as Defendant in a

18   lawsuit before?

19       A    Yes.

20       Q    How many times has that happened?

21       A    Probably half a dozen.

22       Q    All right.  Were any of those employment

23   cases?

24       A    Yes.

25       Q    Was one of those cases the Anderson matter in

11

1   Orange County?

2        A    Yes, it was.

3        Q    Other than this lawsuit and the Anderson

4   matter, have you been sued in your capacity as an

5   Orange County employee in employment matters?

6        A    No.

7        Q    All right.  Do you currently live in

8   Orange County?

9        A    I do.

10        Q    I want to ask a few background questions about

11   your education and stuff before we get started.

12             Did -- what year did you graduate high school?

13        A    1965.

14        Q    All right.  Where was that from?

15        A    Mark Keppel High School in Alhambra.

16        Q    At some point after graduating from high

17   school, did you obtain an undergraduate degree?

18        A    Yes, I did.

19        Q    And from what university was that?

20        A    I attended -- I received an AA degree from

21   Cerritos College, a Bachelor's degree from Redlands and

22   a Master's degree from Pepperdine University.

23        Q    Go Waves.

24        A    Yes, we are.

25        Q    What was your Bachelor's degree in Redlands?

STEARNS  WILLIAMS  REPORTING  (909)  803-0091

12

1    What was the focus of that degree?

2         A    Management.

3         Q    And your Master's from Pepperdine?

4         A    Public Communication.

5         Q    Do you have any other advanced degrees?

6         A    No.   Just training and other certificates.

7         Q    All right.   Are you currently a member of any

8    professional organizations?

9         A    Just some of the State -- Sheriff's

10   Association and Fraternal-type Orders.

11        Q    And you're currently employed by, you said,

12   the Orange County Sheriff's Department; correct?

13        A    That's correct.

14        Q    When did your employment with Orange County

15   begin?

16        A    In August of 2008.

17        Q    Prior to August 2008, you mentioned that you

18   were employed by the Los Angeles County Sheriff's

19   Department?

20        A    Yes.

21        Q    All right.   And what years did you work there?

22        A    That would be 1969 to 2005.

23        Q    And when you were first hired by LASO, was

24   that as a Deputy Sheriff?

25        A    Yes.

13

1    Q    And my understanding is you made it -- you

2  made your way through the ranks there.

3        What rank did you leave in 2005?

4    A    Retired as a Division Chief.

5    Q    And what division was that at the time?

6    A    That was over the Custody Operation.

7    Q    And at some point, while you were employed

8  with LASO, you worked with Sandra Hutchens?

9    A    Yes, I did.

10    Q    All right.  Did you have a close working

11  relationship with her?

12    A    Well, she was another Division Chief, so we

13  met each Wednesday.

14    Q    Between the time that you retired from the

15  L.A. Sheriff's Department in 2005 and employed with

16  Orange County Sheriff's Department in August of 2008,

17  were you working?

18    A    No.

19    Q    Just enjoying retirement?

20    A    I was.

21    Q    Okay.  I want to talk about how you got hired

22  by Orange County.

23        Did Sandra Hutchens reach out to you?  How did

24  that happen?

25    A    Yes.  Around April of 2008, she reached out to

14

1    me in the form of adviser.  I went around with her to

2    each of the jail facilities and gave her my assessment

3    of the state of the operation.  And that continued until

4    her appointment in June, at which time I was hired as a

5    paid consultant.

6         Q    How much were you initially paid when you were

7    brought on as a consultant?

8         A    It was $100 an hour.

9         Q    And it was your understanding you'd be working

10   full-time?

11        A    As a consultant?

12        Q    Correct.

13        A    No.  As needed.

14        Q    All right.  Were your consulting duties

15   generally related to the Jail Operations, or did it

16   extend further than that?

17        A    The Jail Operations initially and then

18   extended to all of the various divisions within the

19   department.

20        Q    What did Sandra Hutchens tell you, if

21   anything, about why she wanted you brought aboard?

22        A    Well, as I said, initially, it was regarding

23   the Jail Operations.  There had been a pretty

24   substantial incident in Orange County Jail involving the

25   Chamberlain matter and wanted to see what kind of

15

1    changes had occurred as a result of that incident.

2           MR. HARRELL:  That was settled and resolved by

3    me.

4    BY MR. GASPARD:

5      Q    Did she discuss with you -- well, there were

6    conversations you had with her before you were actually

7    hired on; right?

8      A    Yes.

9      Q    And during those discussions, did she talk to

10   you about any issues that she had with her command

11   staff?

12     A    Issues?

13     Q    Reorganization-type things; moving people

14   around, changes she intended to make to the department?

15     A    Yes.  She asked me to conduct a command

16   assessment --

17     Q    Okay.

18     A    -- of those existing divisions and those

19   people that were in place as interims and those people

20   below that appeared to be employees to take on greater

21   responsibility.

22     Q    And what time frame did you conduct the

23   command assessment?

24     A    It was during the time I was consulting; so

25   June through August.

16

1      Q     And specifically what steps did you take as

2  part of the command assessment?  What actions did you

3  take?

4      A     I actually went out to each of the 20

5  divisions and spoke with the Division Commanders and

6  some of the staff, took a look at what was occurring out

7  there.  That was over a long period of time, but

8  eventually hit all 20.

9      Q     Did you ultimately put your findings down on

10  paper, draft any kind of report from the command

11  assessment?

12      A     I briefed her on that in person.

13      Q     Okay.  Do you recall when that briefing took

14  place?

15      A     Well, there were several.  As I went to

16  different locations, I would speak to her about what I

17  found and what I would recommend.

18      Q     Okay.  Was it always just you and

19  Sheriff Hutchens, or were others involved in those

20  meetings?

21      A     It would be me and Sheriff Hutchens until the

22  point where I came on board as the Undersheriff.

23      Q     Okay.  And at that point, others would be

24  invited to the meetings?

25      A     Yes.

17

1  Q Would Mike Hillmann be invited to any of those

2 meetings?

3  A He came on in September of 2008.  And then

4 each Wednesday, we would have a meeting with the full

5 executive staff.

6  Q And when you mean "full executive staff," is

7 that Captains and above?

8  A No.  That would be the Assistant Sheriffs and

9 the Executive Director, the Sheriff and myself.

10  Q During the time that you conducted the command

11 assessment, do you recall that Captain Murray was the

12 Captain in charge of Operations Support?

13  A I don't remember the exact name, but she was

14 in charge of Loma Ridge and that area of operation.

15  Q Okay.  Do you recall any of the briefings you

16 had with Sheriff Hutchens, at this time, involving

17 Captain Murray?

18  A Well, Captain Murray was one of the divisions

19 that was collapsed into other areas.  There was, as you

20 said, a reorganization that took place after her

21 arrival, and so there was a number of changes that were

22 made.

23  Q Do you recall any conversations that you had

24 with Sheriff Hutchens about Captain Murray's

25 performance?

18

1      A     No.  There was just the function that was

2   being provided by each division.

3      Q     Okay.  Now, at some point, after working with

4   Captain Murray for a while, did you develop any kind of

5   opinion as to her proficiency as a Captain?

6      A     Sure.

7      Q     Can you share that with me?

8      A     Sure.  She was extremely competent in my

9   opinion.

10      Q     Do you recall noting any areas where she

11   needed improvement?

12      A     I didn't find that she needed improvement in

13   any areas that she was working.  She seemed to be doing

14   a fine job.

15      Q     Okay.  Now, at some point after being a

16   consultant for a while, you were brought on full-time as

17   the Undersheriff; correct?

18      A     Yes.

19      Q     When did that happen?

20      A     August of 2008.

21      Q     And I apologize if I repeat any questions.

22      A     That's okay.

23      Q     I'm not going through things chronologically,

24   so I have to jump around a bit.

25           MR. HARRELL:  You don't have to, but we're

19

1    listening.

2    BY MR. GASPARD:

3        Q    Now, when you became Undersheriff in August of

4    2008, did you get a pay increase?

5        A    Well, yes.  I was brought on full-time as the

6    Undersheriff and received a salary.

7        Q    Okay.  Do you recall what your salary was at

8    the time?

9        A    No, but it was less than the consulting

10    salary.

11        Q    Okay.

12        A    I think it was $95 an hour.

13        Q    Okay.  Now, do you recall, about the same time

14    frame, around August of 2008, that Captain Murray was

15    transferred from Operations Support to the North

16    Operations Patrol Command?

17        A    Yes.  I don't remember the exact time frame,

18    but it was part of that reorganization.

19        Q    Okay.  Do you know who made the decision to

20    transfer Captain Murray from Operations Support to North

21    Operations?

22        A    Well, there was a collective discussion with

23    the Executive Command on the different divisions that

24    were currently operating and the plan to reconstruct the

25    department.  And part of that included a Homeland

20

1    Security Division, and part of that entailed downsizing

2    some of the divisions to accomplish all of that.

3         So it was discussed, and then the Sheriff made

4    the ultimate determination how that would be carried

5    out.

6    Q    Well, do you recall if you made any

7    recommendation as to whether or not Captain Murray

8    should be transferred from Operations Support to North

9    Operations in August of 2008?

10   A    Again, it was not about individuals.  It was

11   about the function that existed.  So in her case, that

12   division was downsized to a Lieutenant from a Captain.

13   Q    Okay.  And did you recommend that position?

14   A    Or Captain to a Lieutenant.

15   Q    Got it.

16   A    I didn't say that right.

17   Q    Did you recommend that the position be

18   transferred from a Captain position to a Lieutenant

19   position?

20   A    That was one of the recommendations.  But it

21   was a group discussion.  Each of the individuals had

22   some background and experience in the overall department

23   operation.

24   Q    Okay.

25   A    We literally took each division, cut them out

STEARNS WILLIAMS REPORTING (909) 803-0091

21

1    and put them on the board, and repositioned them as we

2    went through the process.

3         Q    Do you recall any conversations between you

4    and Mike Hillmann regarding whether or not -- well,

5    regarding Captain Murray's transfer at that time?

6         A    I'm sure there were conversations about each

7    of them.  It was -- decisions were made.

8         Q    Do you recall that Mike Hillmann was

9    Captain Murray's direct supervisor at the time?

10        A    Yes.

11        Q    But you don't specifically remember if

12   Mike Hillmann advised you, one way or the other,

13   regarding whether or not Captain Murray should be

14   transferred?

15        A    No.  Assistant Sheriff Hillmann was looking to

16   bring in a full Homeland Security Division under one

17   roof, and so that was his focus.

18        Q    All right.  But you don't specifically recall,

19   then, Mike Hillmann providing you with any input as to

20   Christine Murray's transfer in August of 2008?

21        A    No.  Just, again, the transfer of her based on

22   the function that was being downsized, but not as an

23   individual.

24        Q    Do you recall that the first meeting or actual

25   sit-down meeting that you had with Captain Murray

1   them like this?

2       A    I put my initials on them, yes.

3       Q    So you issued this particular memo?

4       A    Yes.

5       Q    And do you see, at the bottom of the memo,

6   where it points out that Captain Murray is being

7   transferred from North Operations to Support Services

8   effective March 27th of 2009?

9       A    Yes.

10      Q    All right.  Whose decision was it to transfer

11  Captain Murray from North Operations to Support Services

12  in March of 2009?

13      A    Well, it's always the Sheriff's decision.

14      Q    What input did you provide, if any, regarding

15  this decision to transfer Captain Murray?

16      A    Well, again, these decisions were made by the

17  Sheriff as a result of discussions and input from the

18  full Executive Command, same individuals I referred to

19  earlier.  There was a restructuring of the department

20  that took place.  And ultimately, the Sheriff made those

21  determinations.

22      Q    Well, do you recall what specific information

23  you provided regarding Captain Murray's transfer in

24  March of 2009?

25      A    Just concurrence on the transfers that were

30

1    recommended to the Sheriff.

2         Q    So you individually recommended to the Sheriff

3    that Captain Murray be transferred?

4         A    Well, I concurred with the group discussion

5    and the recommendations that were made to the Sheriff,

6    yes.

7         Q    Okay.  I guess what I'm trying to figure out

8    is, whose initial recommendation was it?  Would that

9    have come from Mike Hillmann or come from you; or was it

10   just a roundtable discussion?

11        A    Well, it was a roundtable discussion.  There

12   was several discussions concerning reorganization that

13   took place and several changes that have occurred over

14   the years.  This was not the first and it was not the

15   last, but it was an important one.

16        Q    Why was this one important?

17        A    Well, we had to do some consolidation and

18   bring about greater efficiencies, but still get the type

19   of work output that we were seeking in other areas --

20   S.A.F.E. being one of them -- as an accountability piece

21   that the Sheriff wanted to put into full play.

22        Q    Were you aware, at this time, March 13th of

23   2009, of whether or not there were potentially going to

24   be Captains laid off?

25        A    No.

STEARNS WILLIAMS REPORTING (909) 803-0091

31

1       Q      Had you had any discussions with the Sheriff

2   about potential Captain layoffs at this point?

3       A      No.  It wasn't until after the Board of

4   Supervisors rejected our budget in June.

5       Q      Okay.  Do you recall a meeting with

6   Captain Murray, a couple months after this memo around

7   May of 2009, and telling her that you had met with the

8   prior Support Services Division Captains, Wilson and

9   James, and that based on those meetings, there was some

10  consideration of civilianizing the Support Services

11  position that was previously run by a Captain?

12      A      Yes, right about that time frame.

13      Q      Well, what did you tell her?  Did you tell her

14  that you were going to recommend that it be switched to

15  a civilian position or that someone had told you that it

16  might be?

17      A      Well, that's something that was expressed to

18  me by previous Captains based on consistency and

19  longer-term operational involvement.  Captains tended to

20  come and go more frequently.

21      Q      Why is that?

22      A      Pardon me?

23      Q      Why is that, that the Captains would tend to

24  come and go more frequently?

25      A      Well, it could be the result of promotion,

32

1    could be the result of assignment change due to

2    restructuring or just better use of management staff.

3        Q    Well, was -- when you met with Dave Wilson,

4    did he tell you that that would be a better position for

5    a civilian than a Captain?

6        A    Yes.

7        Q    And did Mike James tell you the same thing?

8        A    Yes.

9        Q    And based on the conversations you had with

10   them, were you in general agreement on that issue?

11       A    I was in general agreement regarding the

12   concept, not necessarily imposing it at that time.

13       Q    Did they explain to you what the basis of

14   their opinion was?  Was it that you just don't need a

15   sworn Captain in that position?  Did they explain?

16       A    Well, they said, like other support divisions

17   and functions within the department, having civilian in

18   place gave you a longer-term management that was going

19   to be consistent, was going to be able to rely on

20   historical discussions and decisions that were made as

21   opposed to somebody fresh coming in and starting over

22   each time.

23       Q    Is Support Services Division currently run by

24   a civilian?

25       A    Yes, it is.

33

1        Q    So ultimately, that suggestion was

2   implemented?

3        A    Yes.  It migrated to a civilian.

4        Q    And what's the classification of the civilian

5   that runs the Support Services Division?

6        A    Director.

7        Q    Is that an Admin Manager III position?

8        A    Yes, it is, which is equivalent to a Captain

9   in the sworn rank.

10        Q    As I mentioned, I'm going to skip around a

11   little bit.  So we'll come back to the transfers.  But

12   you had mentioned several of the things that

13   Captain Murray raised, some of the issues when you first

14   met with her.

15        A    Yes.

16        Q    Do you recall another issue that arose

17   regarding use of the transponders for commuting?

18        A    Well, I remember that issue.  I don't know if

19   she brought it to my attention.  I remember there was

20   some concerns that were raised.  I think even the

21   Register might have had an article on it.

22        Q    I'm going to have the Court Reporter hand you

23   a document that we've previously marked as Exhibit 227.

24   As you can see, it's a memo from Mike Hillmann.

25        A    Yes, it is.

47

1    Q    What did he tell you individually about that?

2    A    He said that he had a concern about her being

3    in uniform with a weapon and whether or not she was

4    capable of using it proficiently.

5    Q    Okay.  When Captain Murray was transferred to

6    Support Services, she replaced Captain Dave Wilson;

7    right?

8    A    Yes.

9    Q    Do you recall having conversations with

10   Sheriff Hutchens, around June of 2009, in which she told

11   you that she wanted to obtain a list of the Captains

12   reflecting their age and years of service?

13   A    I had a discussion with her in June of 2009

14   regarding the budget and the need to look at the top

15   management, but I don't recall any specific instructions

16   about a list.

17   Q    Okay.  Who was Jack Anderson at that time?

18   A    Who was he?

19   Q    Uh-huh.

20        MR. HARRELL:  What rank did he hold?

21   BY MR. GASPARD:

22   Q    Yeah.  What was his position within the

23   Sheriff's Department?

24   A    Okay.  He was Assistant Sheriff with the

25   Sheriff's Department.

48

1      Q     Did you have a discussion with Jack Anderson,

2   around that time, June 2009, where you asked him to

3   compile a list of the Captains reflecting their age and

4   years of service?

5      A     Yes.

6      Q     What was the purpose of doing that?

7      A     I had been instructed by the Sheriff to come

8   up with an alternate plan that would not require the

9   layoff of investigators.  And Jack Anderson was involved

10  in the Professional Services side of the shop, which

11  dealt with personnel and processes that would be

12  involved in those discussions.

13     Q     How would obtaining that list of Captains help

14  with figuring out how to avoid layoffs of investigators?

15     A     Well, there was a plan introduced that would

16  reduce the number of Assistant Sheriffs and Captains on

17  the organization.  And so that was one step that was

18  several steps involved with reviewing that potential.

19     Q     Who introduced that plan?

20     A     I introduced it.

21     Q     Okay.  And what were the specifics of that

22  plan?

23     A     Actually, there was --

24           MR. HARRELL:  Without saying names.

25           THE WITNESS:  One plan was to reduce the

49

1    department by a smaller number of executives.  The other

2    plan was to reduce it to what eventually transpired.

3    The reductions had no names attached to it; just

4    positions and functions that would remain.

5    BY MR. GASPARD:

6        Q    Okay.  Was there a specific number of

7    individuals that were going to be cut under that plan?

8            MR. HARRELL:  Vague as to time.  I think the

9    Witness will tell you it was an evolving process.

10           MR. GASPARD:  Okay.  Well, there's no need to

11   testify for him.  I got your objection.

12           MR. HARRELL:  But you need to respond to it.

13   BY MR. GASPARD:

14       Q    When did you first present -- introduce this

15   plan to Sheriff Hutchens?

16       A    That would have been after the June session

17   with the Board of Supervisors where our budget plan was

18   rejected and we now had a shortfall we had to overcome.

19   I don't remember the specific date; would be following

20   that particular session.

21       Q    Okay.  And when you introduced this plan,

22   during that time frame, did it include a specific number

23   of Assistant Sheriffs and Captain positions that should

24   be cut?

25       A    In the beginning, no.  It was just a method of

50

1    attaining her goal.   Later introduced those two plans to

2    the full executive staff with discussion about what it

3    would take to reach the dollar amount that we needed.

4         Q    All right.   Do you recall what the dollar

5    amount was that you were trying to save?

6              MR. HARRELL:   Vague as to time.

7    BY MR. GASPARD:

8         Q    This is all during the same plan, June of

9    2009.

10        A    No.   But it would have been in the records

11   of -- it was about 6 million, as I recall.   But I don't

12   have the specific number.

13        Q    So once the budget was rejected, did the

14   Sheriff tell you how much money -- to come up with a

15   plan and how much money we need to save?   How did that

16   conversation happen?

17        A    The budget was approved for a certain dollar

18   amount, but there was a shortfall of about 6 million, as

19   I recall.   That was the amount that had to be identified

20   in cuts.

21             The original plan was to cut a number of

22   investigators and some other civilian staff from the

23   organization.   She wanted to cut in other areas where it

24   wouldn't impact first-line public safety.

25        Q    So the plan you developed then focused on

51

1    upper management?

2         A    Yes.

3         Q    And how did -- how did that plan evolve into

4    the numbers it did, the two Assistant Sheriffs and the

5    six Captains?

6         A    Well, again, went to the full executive

7    command with the concept, discussion was made,

8    Financial -- in the form of Rick Dostal, our

9    Executive Director -- looked at the numbers based on the

10   two plans and said the first plan, being the shorter

11   number of layoffs, would not meet the goal.  So we went

12   with the second plan, which was the two Assistant

13   Sheriffs and six Captains or seven Captains at the time.

14        Q    Okay.  And the Sheriff was present during

15   those talks; correct?

16        A    Yes.

17        Q    Was there -- were there other alternatives

18   discussed?  For example, was there some discussion of

19   asking the existing Captains to take a demotion or a pay

20   cut?

21             MR. HARRELL:  Well, this is vague as to time.

22             MR. GASPARD:  All right.

23             MR. HARRELL:  Which time frame are we speaking

24   about?

25

52

BY MR. GASPARD:

    Q    Well, all of the Captain layoffs took place in late 2009; right?

    A    Yes.

    Q    Okay.  So all these questions involved the discussions you were having in summer of 2009, around June, when you introduced this plan to reduce the number of Captains and Assistant Sheriffs?

    A    Yes.

    Q    What alternatives, if any, were discussed, other than layoffs, for the Captains, Assistant Sheriffs?

    A    Well, we had discussed the process much in advance of June because we had laid off individuals prior.  We felt we had laid off all of the individuals we could, short of public safety officers, and she did not want to do that.

        So the decision was to cut at the top.  And there was discussion about that, of course.  There was not enough savings just by reducing, because what you end up with is a cascade and people at the bottom that aren't making nearly as much money.  So the cuts had to come without introducing new people behind them.  But -- so there was actually elimination of positions and functions that had to be put into other parts of the

53

1    organization.

2         Q    Was there any discussion about asking the

3    Captains to take a pay cut?

4         A    No.  Well, there was no discussion about --

5    with them, if that's what you're saying.

6         Q    I mean, within the Executive Committee when

7    you were asking these discussions with the Sheriff and

8    the rest of the Executive Committee.

9         A    That was not going to result in the numbers

10   that were missing.

11        Q    I understand that.  But was it discussed?

12        A    Sure.

13        Q    Okay.  So asking the Captains to take pay cuts

14   was discussed, but it was not presented to the Captains;

15   is that right?

16        A    They were never presented with that option.

17        Q    Okay.  During those same discussions as to

18   potentially laying off the Captains, was there talk

19   about rehiring any of those who were -- who would be

20   laid off?

21        A    Yes.  In fact, there was a process for doing

22   just that, with both the Captains and others that had

23   been laid off.

24        Q    What was the substance of that discussion?

25             MR. HARRELL:  Vague as to time.

54

1           Are we still in June?

2           MR. GASPARD:  We are.

3           THE WITNESS:  The discussion was about the

4   rules -- County rules involving layoffs.  And as I

5   recall, there was a two-year period where they could be

6   brought back --

7   BY MR. GASPARD:

8       Q    Well --

9       A    -- if interested.

10          MR. HARRELL:  Counsel, before you get going

11  with your next question -- we've been going for a

12  while -- if we can have a break.

13          MR. GASPARD:  Let's do take a break.

14          MR. HARRELL:  Okay.  Great.

15          THE VIDEOGRAPHER:  We're going off the record

16  at 11:23 a.m.

17          (Brief recess taken.)

18          THE VIDEOGRAPHER:  We're now back on the

19  record at 11:42 a.m.

20  BY MR. GASPARD:

21      Q    Undersheriff Scott, before we went on break,

22  we were talking about meetings that were occurring with

23  the executive staff, with you and the Sheriff, in the

24  summer of 2009 regarding the layoffs of the Captains.

25      A    Yes.

55

1       Q     And specifically, we were talking about -- I

2    believe it was your testimony that the issue of

3    potentially rehiring Captains who were laid off came up

4    as well; right?

5       A     Yes.

6       Q     Well, was it your understanding that the

7    department was going to do whatever it could to try to

8    rehire individuals who were on the rehire list after

9    being laid off?

10      A     Well, there was a process that existed -- it

11   was managed by County HR -- that spelled out two years

12   from the date, able to bring people back if a position

13   was open or the opportunity existed.

14      Q     Okay.  Was Bob Leys present during these

15   discussions?

16      A     He was not present during the executive

17   discussion, but he was consulted both prior to and after

18   the process was determined, yes.

19      Q     Okay.  Let's stick with the talks between the

20   executive staff members --

21      A     Okay.

22      Q     -- or Executive Committee.

23            Is that what you call them, "Executive

24   Committee"?

25      A     Yes, it's Executive Command.  It just kind of

56

1    separates.  And then you have the Division Command, next

2    level down.

3        Q    Okay.  Now, during these Executive Command

4    meetings during the summer of 2009, prior to the layoffs

5    of any of the Captains, you mentioned that the issue of

6    rehire came up; correct?

7        A    Yes.

8        Q    What was said about rehiring those who might

9    be laid off?

10       A    Well, that was something that was going to be

11   available for each and every one, both Captains and

12   Assistant Sheriffs, should the economy turn around and

13   we were able to do that.

14       Q    Okay.  Was it your understanding that any of

15   the laid-off Captains who were on the rehire list would

16   be considered before others who were interested in a

17   vacant position?

18       A    Yes.

19       Q    Now, earlier, we talked about a directive that

20   you gave Jack Anderson regarding compiling a list of the

21   Captains around the summer of 2009.

22            Do you recall that?

23       A    Yes.

24       Q    I'm going to have the Court Reporter hand you

25   a document that we've previously marked as Exhibit 232.

57

```
 1          Did Jack Anderson ultimately provide you with
 2   the list that you requested?
 3      A    Yes, he did.
 4          (Plaintiff's Exhibit 232 was
 5          previously marked for
 6          identification in the Deposition of
 7          Sandra Hutchens and is attached for
 8          reference.)
 9   BY MR. GASPARD:
10      Q    Okay.  Is this the information that was on
11   that list?
12      A    Well, it's something similar to this, if not
13   exactly.
14      Q    Do you recall this being the individuals on
15   the list that he provided you?
16      A    Looks to be correct.
17      Q    Okay.  Did Sheriff Hutchens tell you what she
18   was going to do with the information on the list?
19      A    Well, this is just one piece of information
20   she was provided.  She was going to make a determination
21   in terms of the functions that were going to be
22   eliminated and the resulting personnel that were going
23   to be laid off.
24      Q    Okay.  That's what she told you; right?
25      A    Yes.
```

58

1     Q     During these meetings with the Executive

2 Command in summer of 2009 when you were discussing

3 layoffs -- potential layoffs for the Captains, did the

4 issue of bumping rights come up?

5     A     It was part of the discussion, yes.

6     Q     Do you recall what was said about bumping

7 rights?

8     A     Well, I know that that was one of the issues

9 we took to Bob Ley (sic) and Carl Crown; wanted to

10 understand the full requirements of the layoffs.  So

11 that was discussed both at the exec session and with

12 County Human Resources.

13    Q     Okay.  So before it was -- well, can you

14 explain the progression of how that happened?  In other

15 words, did it first come up at an Executive Command

16 meeting and say, "Well, go find out more about it," and

17 then it was discussed later; or how -- what was the

18 progression of that discussion on bumping rights?  Do

19 you understand?

20    A     Sure.  Well, first of all, there was

21 instruction by the Sheriff to develop a plan.  The plan

22 ultimately led to some organization charts -- Financial

23 to determine the organization chart that had to be used.

24 Then there was discussion about the County regulations

25 on layoffs.  And those discussions led to discussion

59

1    with Carl Crown about how that would actually occur in

2    terms of implementing them.

3        Q    Okay.  So you personally attended a meeting or

4    meetings with Carl Crown and Bob Leys?

5        A    Yes.

6        Q    And was the Sheriff also present?

7        A    Yes.

8        Q    And this is around the same time, around

9    summer of 2009?

10       A    Yes.

11       Q    During those meetings, did you ever review any

12   provision to the PSR?

13       A    Yes.

14       Q    And who presented those?

15       A    Well, initially, Jack Anderson, followed by

16   discussion in exec, followed by a discussion with County

17   HR where Carl Crown and Bob Ley (sic) were present on

18   each of those occasions.

19       Q    Was Sheriff Hutchens present during those

20   meetings where you reviewed the PSR?

21       A    Yes.

22       Q    I'm going to have the Court Reporter hand you

23   a document that we've previously entered as Exhibit 213.

24            As you can see, this is a two-page excerpt of

25   the PSR entitled "Article 14 (sic), Layoff Procedure."

60

1              Do you see that?

2      A    Looks like 16.

3      Q    You're right, 16.

4      A    Yes.

5              (Plaintiff's Exhibit 213 was

6              previously marked for

7              identification in the Deposition of

8              Robert Mark Leys and is attached

9              for reference.)

10   BY MR. GASPARD:

11     Q    Is this the provision that you reviewed with

12   the Sheriff and Executive Command when you were

13   discussing potential layoffs of the Captains?

14     A    That's part of it, yes.

15     Q    Okay.  Did you also review the disciplinary

16   policy?

17     A    Yes, we looked at all of the PSR protocols --

18     Q    Okay.

19     A    -- that were applicable.

20     Q    I'm going to have the Court Reporter hand you

21   a document we've marked as Exhibit 219.

22              (Plaintiff's Exhibit 219 was

23              previously marked for

24              identification in the Deposition of

25              Richard Sanchez and is attached for

61

1          reference.)

2          THE WITNESS:   Thank you.

3    BY MR. GASPARD:

4       Q    And this one is actually Article XIV,

5    Disciplinary Action.

6       A    Okay.

7       Q    You mentioned that this is also one of the

8    portions of the PSR the Executive Command reviewed in

9    the summer of 2009 when discussing potential Captain

10   layoffs?

11      A    Yes.

12      Q    What other provisions of the PSR, if any, were

13   discussed?

14      A    Well, I had asked Jack Anderson to pull all of

15   the areas that pertain to layoffs and anything that

16   would be applicable.  So I remember these two, but there

17   could have been more.

18      Q    Could these also have been the only two?

19      A    Seems like there was other areas, but that was

20   sometime back.  They're the most pertinent.

21      Q    Do you remember specifically which sections of

22   the Layoff Procedure were discussed in these meetings?

23      A    Well, all of the areas were discussed.

24      Q    Okay.  Were those discussions -- was it your

25   understanding that these issues were being discussed to

62

1    make sure that the layoffs complied with the provisions

2    in the PSR?

3         A    Yes.

4         Q    So you just wanted to do it right?

5         A    Yes.

6         Q    Some of the discussion regarding the Layoff

7    Procedure in those same meetings were with Bob Leys and

8    Carl Crown; correct?

9         A    Yes.

10        Q    Were questions asked of them during these

11   meetings as to how these provisions apply?

12        A    There was -- there were questions asked for

13   clarification about certain merits, yes.

14             MR. HARRELL:  Was there an attorney involved

15   in any of the meetings that you're speaking about?  If

16   so, that's attorney/client privileged and we don't need

17   to speak about that.  That's private.  But that's up to

18   you.

19             THE WITNESS:  There were attorneys involved in

20   certain meetings, not in the meeting with Carl Crown.

21   BY MR. GASPARD:

22        Q    Okay.  So in the meeting with Carl Crown --

23   and Bob Leys; right?

24        A    Yes.

25        Q    Did they provide advice as to the

63

1    interpretation of these provisions in the Layoff

2    Procedure?

3         A    I wouldn't say advice.  I would just say

4    clarification.

5         Q    Okay.  Well, if I can have you take a look at

6    Exhibit 213, which is the Layoff Procedure.

7         A    Yes.

8         Q    Take a look at Section 2, Subsection

9    Capital A.

10        A    Yes.

11        Q    It says, "When a reduction in the workforce is

12   implemented, each agency or department head shall

13   determine, subject to CEO approval, which employees are

14   subject to layoff based on the needs of the

15   organization."

16             Do you see that provision?

17        A    Yes, I do.

18        Q    Do you recall discussing that specifically?

19        A    Yes.

20        Q    All right.  And what was the discussion about

21   that?

22        A    Well, just the protocol involved in

23   accomplishing that.

24        Q    And what was your understanding, after having

25   a discussion with the rest of the Executive Command, as

64

1   to what it is that needed to be done to comply with the

2   section?

3        A    Well, the fact that we had discussed how we

4   were going to proceed and the Sheriff made the

5   determination on exactly what that would look like, then

6   we needed to determine the order of layoff and the

7   appropriate layoff procedures.  So that's when we talked

8   with Carl Crown and Bob Leys --

9        Q    Okay.

10       A    -- concerning the matter.  They work directly

11   for the CEO.

12       Q    Well, is it your understanding, after having

13   those discussions, that "Agency/Department Head"

14   referred to the Sheriff here?

15       A    Well, she's a department head, but she's also

16   elected official.

17       Q    Right.

18       A    So she is not subject to the direct

19   supervision of the CEO.

20       Q    Okay.  Although, at this point, she was still

21   an appointed Sheriff.

22       A    Yes, she was.

23       Q    Right.  Are you aware, one way or the other,

24   whether the CEO ever approved Captain Murray as being

25   subject to the layoff?

65

1          MR. HARRELL:  Excluding what he may have heard

2     from his attorneys?

3          MR. GASPARD:  Right.

4          THE WITNESS:  Well, the CEO and the Board of

5     Supervisors ultimately concurred with the layoffs.

6     BY MR. GASPARD:

7     Q    Okay.  And when did that occur?

8     A    It was following the Sheriff's determination

9     of what she was going to do and who would be impacted.

10    Q    Okay.

11    A    So it would have been after June and prior to

12    the actual layoff dates, there was discussion.  And then

13    there was the formal briefing with the Board of

14    Supervisors, part of the open session.

15    Q    All right.  And who was the CEO at the time?

16    A    Tom Mauk.

17    Q    Tom Mauk.  And it's your understanding, during

18    the meeting that you just referenced -- Board of

19    Supervisors meeting?

20    A    Yes.

21    Q    -- that Tom Mauk approved Captain Murray

22    individually by name for a layoff?

23    A    No, I don't believe it was by name.  It was

24    collectively, the process.

25    Q    So it's your understanding that the CEO

66

1     approved a certain number of positions for layoff?

2         A     Yes, in its totality.

3         Q     Okay.  At that time -- if you're aware, at

4     that time, did the CEO have the names of the individuals

5     who were going to be laid off, or was that decision made

6     later?

7         A     I would think, at that point, they had the

8     names because we had to identify and establish the

9     budget requirements to meet the shortfall, and that had

10    to be approved by the CEO and the Board.

11        Q     But they would know the numbers just from

12    having the position; right?

13        A     Yes.

14        Q     They wouldn't have to know individual names?

15        A     Right.

16        MR. HARRELL:  Counsel, the Resolution's

17    available on-line that he's speaking of.

18    BY MR. GASPARD:

19        Q     Okay.  Yeah, I'm just asking --

20        A     At some point, there were names attached to

21    the actual positions.

22        Q     Okay.  Well, did -- just to clean this up a

23    little bit, did you have any part of the process of

24    whether or not the CEO authorized Captain Murray's

25    layoff or not?

STEARNS WILLIAMS REPORTING (909) 803-0091

67

1              MR. HARRELL:  I don't understand that.

2     BY MR. GASPARD:

3        Q    Well, her name apparently is supposed to be

4     presented to the CEO --

5        A    Right.

6        Q    Did you take part of in that process?

7        A    The technical process is handled by our

8     Administrative Services Command.

9        Q    Okay.  So you weren't personally involved in

10    that process; right?

11       A    No.

12       Q    Okay.

13       A    That's our Financial and our --

14       Q    Uh-huh.  If you take a look --

15       A    -- Budget.

16       Q    I'm sorry?

17       A    I said Financial and Budget --

18       Q    Got it.

19       A    -- person.

20       Q    Subsection B of that same Section 2 says, "In

21    considering which employees shall be subject to layoff,

22    consideration shall be given to knowledge and skills

23    related to organizational need and the employee's

24    performance."

25              Do you see that?

68

1      A    Yes, I do.

2      Q    Did you have any conversations with

3  Sheriff Hutchens about Captain Murray's knowledge and

4  skills related to organizational need?

5      A    No.  I had conversations with her about the

6  overall method of arriving at the numbers --

7      Q    Okay.

8      A    -- which positions that were eliminated --

9      Q    Right.

10     A    -- not individuals per se.

11     Q    Okay.  And just to be clear, then, you didn't

12 have any conversations with the Sheriff about

13 Captain Murray's employee performance during those same

14 discussions either; right?

15     A    No.  In fact, I did not know about whom she

16 was going to lay off until just before the layoffs.

17     Q    Okay.  How did you become aware of the

18 individual's names that were going to be laid off?

19     A    Well, she supplied me with those functions

20 that were going to be eliminated and the people that sat

21 on those functions, essentially.

22     Q    Okay.  Was that done by e-mail, or did she

23 call you?

24     A    No.  That was done directly with me in her

25 office.

69

1     Q    Did she hand you a piece of paper like a list

2    or something?

3     A    We had an org chart that we were operating off

4    of.

5     Q    Okay.

6     A    It basically had the various divisions and

7    commands.  And so it was her determination of how that

8    was going to look at the very end.

9     Q    Okay.  Well, I'm trying to -- I don't think I

10    have that document, so I'm trying to envision what it

11    would have looked like.  In other words, was it an

12    organizational chart with lines through the spots that

13    were going away; or was it an itemized list of names and

14    positions or --

15     A    Well, again, at the end of this process,

16    before the layoffs occurred, there was a final

17    organization chart that showed what commands were going

18    to remain and what divisions were going to remain under

19    those commands.  So you had your Assistant Sheriffs that

20    were going to remain, and you had those Captains and

21    Directors that were going to remain.  And that was the

22    determination that she made.  So we knew, at that point,

23    what the organization was going to look like.

24     Q    Okay.  So --

25     A    None of those had any type of individual names

70

1    in them, is what I'm telling you.  And I didn't know

2    about who was going to be in those blocks until I talked

3    to her just before the announcement.

4        Q    Okay.

5        A    Okay.

6        Q    So right before the layoffs -- I want to make

7    sure I got this right.

8             Right before the layoffs, you had a meeting

9    with the Sheriff?

10       A    Yes.

11       Q    And the Sheriff handed you an organizational

12   chart, and that organizational chart was going to be the

13   post-layoff organizational chart; right?

14       A    Yes.

15       Q    And it only listed the job titles, not the

16   individual names --

17       A    Right.

18       Q    -- for the Captains?

19       A    Right.

20       Q    Okay.  So when you received that list, did you

21   interpret it to be a process of elimination, that the

22   people that weren't on the list would now be laid off?

23            MR. HARRELL:  I don't understand that.  It's

24   vague.

25

71

```
1   BY MR. GASPARD:

2       Q    Well, when you walked out of the office, did

3   you understand exactly which eight people were going to

4   be laid off?

5           MR. HARRELL:  By looking at the org chart with

6   no names on it?

7           MR. GASPARD:  I'm trying to figure out exactly

8   how he knew that.

9           THE WITNESS:  Yeah.  Let me see if I can

10  clarify.

11          There were discussions with the full Executive

12  Command about the organizational restructure that would

13  bring about the number of layoffs that would give us the

14  salary reduction.  Once that was established, then the

15  Sheriff determined how that was going to take place.

16  She then met with me individually, not with the rest of

17  the group, and said, "This is what it's going to look

18  like."

19  BY MR. GASPARD:

20      Q    Okay.

21      A    And at that point, she had determined that she

22  was going to reduce the number of actual commands and

23  the actual number of divisions -- so we're going to lose

24  Assistant Sheriffs and Captains -- and how that was

25  going to look with names in it.
```

72

1      Q      Okay.  Did she tell you what your role would

2    be, if any, in the layoffs of the Captains?

3      A      My role initially was going to be to sit in

4    with her on each and every one of the discussions with

5    the individual Assistant Sheriffs and Captains.  So

6    whether they were being laid off or whether they were

7    being retained, there was a personal conference.

8      Q      Okay.

9      A      So that was initially the strategy.

10     Q      Did your role change?

11     A      Then, for the Assistant Sheriffs, Captains, I

12   brought them each individually into my office with our

13   Sheriff's Department Human Relations -- or Resources,

14   rather, Representative and they were provided with a

15   packet, which they -- which was the Layoff Packet.  And

16   that took several days to complete.

17     Q      I'm going to have the Court Reporter hand you

18   a document that we previously marked as Exhibit 233.

19            Now, you can ignore the top portion of the

20   e-mail because it's forwarded.  But if I can point your

21   attention kind of towards the middle where the e-mail

22   shows that it was from you to all Division Commanders on

23   July 9th of 2009.

24     A      Okay.

25   ///

STEARNS WILLIAMS REPORTING (909) 803-0091

73

1          (Plaintiff's Exhibit 233 was

2          previously marked for

3          identification in the Deposition of

4          Sandra Hutchens and is attached for

5          reference.)

6    BY MR. GASPARD:

7        Q    Do you recall sending this e-mail out?

8        A    Well, I'm trying to get my head around it.

9        Q    I'm sorry.  Take your time.  Let me know once

10   you've had a chance to review it.

11       A    Okay.  Yes, I do.

12       Q    All right.  If I can have you take a look at

13   the second full paragraph towards the bottom of the

14   first page of the e-mail.  It says -- it starts in

15   mid-sentence and says, "we have tentatively approved a

16   reorganization that consolidates the existing commands

17   into fewer executives at the top, cutting two

18   Assistant Sheriffs and six Captains from the current

19   organization."

20          Do you see that?

21       A    Yes.

22       Q    Is the tentative approval that you're talking

23   about what you just described, the meeting with the

24   Sheriff?  Is this -- did you send this e-mail shortly

25   after that meeting?

74

```
1        A    Yes.

2        Q    Okay.  And then you go on to say, "That is

3   drastic."

4             Do you see that?

5        A    I do.

6        Q    What did you mean by that?

7        A    Well, it was unprecedented.  I don't think

8   that's ever occurred in the history of the department.

9   And it was the first announcement, I believe, of that

10  plan.  And the reason it's tentative is because I asked

11  them to come back to the table and see if there was

12  anything further that we could do.

13       Q    Okay.  Now, was it your understanding --

14  having met with the Sheriff and the Executive Command at

15  this point when you sent out this e-mail, was it your

16  understanding that the intention of the

17  Executive Command was to do whatever it could to avoid

18  layoffs?

19       A    Yes.

20       Q    Do you believe that the Executive Command --

21  well, do you believe that the Sheriff did everything she

22  could to avoid layoffs?

23       A    I do.

24       Q    All right.

25       A    I truly do.
```

75

1     Q     Now, if you look at the second page of the

2   e-mail, it goes on to basically say that the Captains

3   can make a presentation to sort of try to save their

4   positions; right -- or justify --

5     A     Well, I don't think it's about their position.

6   It's about their operations, their individual commands.

7   What -- we, at the top, you know, believe that we had

8   cut all that we could, but we wanted them to make that

9   acknowledgment.  We wanted them to say -- so that's why

10  it says everyone in the room needs to be circumspect

11  about their operation and understand what the

12  consequence is -- of that was.

13    Q     It was your understanding, you sent this

14  e-mail, it would go out to all the Captains; right?

15    A     Yes, went out to the entire command staff.

16    Q     But my read of this e-mail is that when it

17  went out, the Captains who received it would not have

18  known, at that point, whether or not they were

19  tentatively being --

20    A     Yes.

21    Q     -- considered for layoff; right?

22    A     I don't think that was announced yet.

23    Q     Okay.

24    A     So that was part of a Wednesday meeting that

25  occurred where the full command, all the Captains,

76

1    Directors and executive staff, were available.

2        Q    Okay.

3        A    So I guess it was a final opportunity to cut

4    somewhere else.

5        Q    And you see that e-mail that you sent out was

6    July 9th, 2009; right?

7        A    Yes.

8        Q    Okay.  I'm going to have the Court Reporter

9    hand you a document we've marked as Exhibit 237, and

10   that's dated the following day, July 10th, 2009.

11       A    Right.

12            (Plaintiff's Exhibit 237 was

13            previously marked for

14            identification in the Deposition of

15            Sandra Hutchens and is attached for

16            reference.)

17            MR. HARRELL:  When we use previous exhibits

18   that have already been marked and attached to other

19   transcripts, are they also going to be attached to the

20   transcript of the Witness?  Are they going to be copied

21   again and attached?  One would hope so.

22            THE REPORTER:  Yes.  I copy all -- everything

23   that's introduced, it goes --

24            MR. HARRELL:  I'm not trying to get you on the

25   record.

77

1          THE REPORTER:  That's okay.

2          MR. HARRELL:  Just nod.

3          MR. GASPARD:  That's my understanding as well.

4          MR. HARRELL:  All right.  Great.  Thanks.

5     BY MR. GASPARD:

6     Q     Do you recall sending this memo out on behalf

7     of Sheriff Hutchens?

8     A     Yes.

9     Q     Is that your initials next to her name?

10    A     It is.

11    Q     Okay.  So in this memo, you're announcing the

12    permanent promotions of six Lieutenants; right?

13    A     Yes.

14    Q     Without going down the whole list, to your

15    knowledge, is this list of promotions correct?

16    A     Yes.

17    Q     Okay.  Was there any discussion about delaying

18    these promotions or -- well, is it your understanding

19    that all of these people were going to be given pay

20    raises commensurate with their promotion?

21    A     Yes.

22    Q     All right.  Are you aware if there was any

23    discussion about delaying these promotions?

24    A     Yes.

25    Q     Were those discussions with you and the

78

1   Sheriff?

2       A   Well, it was, again, the discussion with full

3   Executive Command.

4       Q   Okay.  And do you know why the decision --

5   well, can you explain to me what those discussions were,

6   the substance of those discussions?

7       A   Well, the discussions centered around openings

8   that existed and whether those should be filled

9   permanently or with interims.  And it was decided by the

10  Sheriff that all promotions, up to the level of

11  Lieutenant or Admin Manager II, would be filled as

12  necessary.  There were some vacancies, but as critical

13  needs existed.  So that was a determination that was

14  made, that it would be permanent.

15      Q   Okay.  We're going to get into the issue a

16  little bit later on today about the fact that many of

17  the vacant Captain positions after the layoffs were

18  filled with interim Captains.

19      A   Yes.

20      Q   And you understand that those were Lieutenants

21  who were promoted on an interim basis to Captain, but

22  they retained their Lieutenant pay, didn't get the pay

23  raise up front; right?

24      A   That's correct.        .

25      Q   Okay.  So there was some discussion about

79

1    doing that with these individuals on -- below the rank

2    of --

3          A    About interim positions or --

4          Q    Yeah.  I'm sorry.  The discussions you just

5    had -- you just mentioned regarding this memo and these

6    promotions below the rank of Captain --

7          A    Right.

8          Q    -- you mentioned that one of the things that

9    was discussed was kind of doing the same thing, right,

10   giving them interim promotions, but holding off on their

11   pay raises?

12         A    No.  There's a -- there's a protocol for

13   promoting, but not making them permanent.  And then

14   there's a -- and so their accrued time doesn't begin

15   until that becomes permanent, and whether or not to make

16   them permanent on this date.  And the decision was to

17   make them permanent on this date.  The interim positions

18   weren't discussed at that point.

19         Q    Okay.  Did Sheriff Hutchens tell you why she

20   decided against doing that, postponing the promotions?

21         A    Well, I think -- you know, you have to ask

22   her.  But it was partly due to stability.  There was a

23   lot of concern being registered by the ACLEM members,

24   which handle Lieutenants, about whether there's -- they

25   should accept promotions under the economic conditions

80

1    that existed.  So that was a determination she made.

2         Q    Well, did she discuss the potential backlash

3    that she would get from the unions if she delayed all of

4    these promotions?

5         A    No.  I think she was looking more at the

6    protocol that existed and the options that she had.  In

7    her mind, I'm sure she was looking at some of those

8    things, but that was -- that was a discussion she had

9    with herself.

10        Q    Okay.  Now, earlier you mentioned that one of

11   the unfortunate tasks you had in all this was meeting

12   with the individuals who were being laid off; right?

13        A    Yes.  The original meeting with the Sheriff

14   and then the follow-up meeting with the layoff process.

15        Q    Okay.  Do you recall -- I'm sorry.  Strike

16   that.

17             I'm going to have the Court Reporter hand you

18   a document that we've marked as Exhibit 206.

19             Have you ever seen that document before?

20        A    Yes, I have.

21             (Plaintiff's Exhibit 206 was

22             previously marked for

23             identification in the Deposition of

24             Jennifer Monique Ramirez and is

25             attached for reference.)

81

BY MR. GASPARD:

    Q    Okay.  Do you recall meeting with Captain Murray and Sheriff Hutchens on September 17th, 2009?

    A    Was that the date that she was told?

    Q    Yes.

    A    Yes.

    Q    Do you recall providing her with this letter on that date?

    A    I remember the Sheriff did.

    Q    Okay.  Do you know who drafted this letter?

    A    It was probably a combination of Administrative Services and County HR and reviewed by County Counsel, but I can't say whom.

    Q    Well, did you take any part in the substance of this e-mail?

    A    No.

    Q    Did you contribute?  "No."

         Okay.  So this was given to Captain Murray on September 17th as part of her layoff packet that you described; right?

    A    Yes.

    Q    All right.  I'm also going to have the Court Reporter hand you a document that we've marked as Exhibit 209.

82

1          Have you seen this document before?

2     A    Yes.

3          (Plaintiff's Exhibit 209 was

4          previously marked for

5          identification in the Deposition of

6          Robert Mark Leys and is attached

7          for reference.)

8   BY MR. GASPARD:

9     Q    Okay.  Do you recall this being one of the

10  documents that Christine was given -- Captain Murray was

11  given on September 17th as part of her layoff packet?

12    A    That's my recollection.

13    Q    Okay.  Do you see the portion in the middle

14  that says, "You are entitled to a Liberty Interest

15  Hearing"?

16    A    Yes.

17    Q    Okay.  We're going to get back to that later.

18    A    Okay.

19    Q    But did you have any portion -- I'm sorry.

20         Did you have any role in creating this

21  document?

22    A    No.

23    Q    All right.  Did you provide any input as to

24  the substance of this document?

25    A    No.

83

1          Q     All right.   Are you aware of who did create

2     it?

3          A     Again, it's probably the County HR and County

4     Counsel.

5          Q     Okay.

6          A     But I can't say specifically whom.

7          Q     Do you recall, during that September 17th

8     meeting, Captain Murray stating that she -- she wished

9     to have a hearing to challenge her layoff?

10         A     Well, she was provided that opportunity and

11    was given that document that allowed for it.

12         Q     I'm going to have the Court Reporter hand you

13    a document we've previously marked as Exhibit 235.

14              (Plaintiff's Exhibit 235 was

15              previously marked for

16              identification in the Deposition of

17              Sandra Hutchens and is attached for

18              reference.)

19              MR. HARRELL:   That's her handwriting.

20              Counsel, down at the bottom of the exhibit,

21    since you brought it up, Exhibit 235, it references an

22    August 3, 2009 meeting with Sheriff Hutchens.

23              MR. GASPARD:   Right.

24              MR. HARRELL:   And then we have a September

25    letter that you've been asking about -- I'll get the

84

1    exhibit number on it.  Should know it by heart at this

2    point -- 206.

3              MR. GASPARD:  Right.

4              MR. HARRELL:  I don't want the record to get

5    bled together as to which one of these meetings we're

6    referring about.

7              MR. GASPARD:  Sure.

8              MR. HARRELL:  And I know you're not trying to

9    do that.

10             MR. GASPARD:  I was getting to that.

11        Q    Do you recall a subsequent meeting that you

12   had with Captain Murray and the Sheriff regarding her

13   layoff?

14        A    Well, again, there was an initial meeting with

15   each of the Captains and the Assistant Sheriffs during

16   the August period.  And then there was a follow-up

17   meeting with each of the impacted Captains, Assistant

18   Sheriffs in September.

19        Q    Right.

20        A    Okay.  So the first meeting was just the

21   Sheriff, myself and the involved employee.  And the

22   second meeting was myself, the employee and a member of

23   the department, Human Resources.

24        Q    Okay.  Do you recall a meeting with

25   Captain Murray in which she brought these printed

STEARNS  WILLIAMS  REPORTING  (909)  803-0091

85

1    questions with her?

2        A    That was the meeting with the Sheriff and I,

3    which was the first time she was told.

4        Q    Okay.  Did she hand you -- and I'll submit

5    that she took some notes on this one.

6            But other than the handwritten things you see

7    here, did she hand you a printout of these questions?

8        A    She might have handed the Sheriff one.  She

9    was talking to her.

10       Q    Okay.  Do you -- do you recall Captain Murray

11   asking what criteria was used to identify the Captains

12   who would be affected by job elimination?

13       A    Yes.

14       Q    All right.  Did you respond to that question?

15       A    No, I didn't respond to any of them.

16       Q    Okay.  Do you recall Captain Murray asking,

17   "Can I be transferred into another position?"

18       A    Yes.

19       Q    Did the Sheriff tell her "No" because she

20   couldn't achieve savings that way?

21       A    Essentially.

22       Q    Do you recall Captain Murray asking whether a

23   demotion was an option?

24       A    Yes.

25       Q    And do you recall the Sheriff saying, "No"?

1        A     Yes.

2        Q     Do you recall Captain Murray asking, "Is extra

3   help an option?"

4        A     I don't remember that one, but she probably

5   did.   It's on the list.

6        Q     Do you recall Captain Murray asking whether

7   salary reductions was an option?

8        A     Yes.

9        Q     And do you recall the Sheriff telling her

10  "No"?

11       A     I remember her telling her that that was not

12  an option.

13       Q     Okay.   Do you see No. 7?   Do you recall

14  Captain Murray asking whether the -- whether her

15  seniority within the department was considered?

16       A     I remember the seniority question being asked.

17  I don't know if it was stated that way, but I remember

18  definitely the seniority question being asked.

19       Q     Do you recall that the Sheriff said that

20  seniority was not considered in her decision to lay off

21  Captain Murray?

22       A     I think the way that it was explained is that

23  the seniority issue was not the final consideration.

24  That was by function.

25       Q     Okay.   Do you recall Captain Murray asking

1  whether seniority within her rank of Captain was

2  considered?

3       A    Again, it was by function, not by seniority

4  or --

5       Q    Okay.   Now, No. 9 says, "Was retirement

6  eligibility or service years considered?"  Do you

7  remember that issue coming up?

8       A    Yes.

9       Q    In Captain Murray's notes, as I read them,

10 say, "No.  But everyone is eligible to retire that is

11 impacted."

12           Are you aware of whether or not that's true?

13 Were all of the individuals considered for layoff, could

14 they have retired?  Were they that -- did they have that

15 kind of seniority or time on?

16      A    Well, as I recall, those that were actually

17 laid off did retire.

18      Q    Okay.

19           MR. HARRELL:  Have there been employees at the

20 Sheriff's Department that were laid off that had no

21 retirement to fall back on?  Civilians, perhaps?

22           THE WITNESS:  Of the sworn rank?

23           MR. HARRELL:  None-sworn, perhaps?

24           THE WITNESS:  That could have been the case.

25

88

BY MR. GASPARD:

    Q    If you take a look at Page 2 -- and you'll see that on the left column, that some things say, "S," Sheriff, and others say, "U slash S." That's my understanding that would stand for Undersheriff.

    Do you see the first "U slash S" where it says, "C3 cut"?

    A    Right.

    Q    Do you recall mentioning anything about C3 cuts?

    A    Well, probably pertained to what cuts had occurred. And those would be the C3 cuts.

    Q    What does that mean, "C3"?

    A    We went through several different versions of cuts, starting with A, B. Then we went to C. Then it was broken down even more finitely into 1, 2 and 3. And then we actually got to C4. It was just a process over time.

    Q    Okay.

    THE VIDEOGRAPHER:  Two minutes.

    MR. GASPARD:  Let's go ahead and stop there.

    THE WITNESS:  Okay.

    MR. GASPARD:  Go off the record. Take a brief lunch break and then come back.

    THE VIDEOGRAPHER:  We're going off the record

89

1   at 12:30 p.m.  This marks the end of Media No. 1.

2           (Lunch recess taken.)

3           THE VIDEOGRAPHER:  We're now back on the

4   record in the continuing Deposition of John L. Scott.

5   The time right now is 1:30 p.m.  And this is the start

6   of Media No. 2.

7   BY MR. GASPARD:

8       Q    Undersheriff Scott, before we broke for lunch,

9   we were looking at Exhibit 235, which is the notes that

10  Captain Murray took during the meeting -- the layoff

11  meeting.  And I believe you testified earlier that it

12  was your understanding that, at the time of the layoffs,

13  that all the Captains impacted were retirement age;

14  right?

15      A    Well, I know that all of them have since

16  retired, so that's my assumption, yeah.

17      Q    If you look at the notes that Captain Murray

18  took in the bottom left corner of the front page, you

19  see where she says, "but unaware of my age being only

20  48"?

21      A    Right.

22      Q    Do you recall if that was discussed or not

23  during the meeting?

24      A    I don't know if it was discussed, but, as you

25  indicated, there was a sheet with pertinent information

90

1    on it that had been previously made available, so --

2        Q    Okay.   Thank you.   Now, are you aware that

3    sometime after the meeting with Captain Murray in which

4    she received her layoff packet, that she requested a

5    hearing from HR?

6             MR. HARRELL:   Excluding what he's heard from

7    his lawyers?

8    BY MR. GASPARD:

9        Q    Right.   I don't want -- I don't want you to

10   disclose any communications you've had where you were

11   speaking with County Counsel on this issue.

12            MR. HARRELL:   Or your current Counsel.

13            MR. GASPARD:   Right.

14            THE WITNESS:   Okay.   And would you repeat the

15   question?

16   BY MR. GASPARD:

17       Q    I asked if you were aware that Captain Murray

18   requested a hearing from HR sometime after this layoff

19   meeting.

20       A    I became aware of it substantially after the

21   fact.

22       Q    Okay.   Well, when you say, "substantially

23   after the fact," when's the first time you recall

24   hearing about it?

25       A    I think there was an inquiry made about the

91

1    14-day period in which people were going to be making

2    that request, to see if anybody had.  I think just two

3    had, as I recall.

4        Q    Okay.  Do you recall -- it was your

5    understanding that two Captains who were being laid off

6    were requesting hearings?

7        A    Yes.  I think Captain Eason had also made a

8    request.

9        Q    Okay.  Who was it that notified you that

10   Captain Murray made a request for a hearing?

11       A    It was just through the grapevine.  Nobody --

12       Q    You don't recall specific --

13       A    Nobody from County HR.  It was through our own

14   personnel.

15       Q    Okay.  But you don't recall who that was

16   specifically?

17       A    No.  It would have been somebody on our

18   personnel section.

19       Q    Okay.  And we discussed, at length, in some of

20   the other depositions, the fact that the Sheriff's

21   Department has its own HR Department --

22       A    Yes.

23       Q    -- which is separate and apart from the

24   County's HR Department; right?

25       A    Correct.

92

1     Q     And that's what you're referring to?

2     A     Yes.

3     Q     Okay.  Do you recall who was in charge of the

4   Sheriff's Department HR at that time?

5     A     Buffy Reynoso, now O'Neil.

6     Q     Okay.  All right.  I'm going to have you -- if

7   I can direct your attention back to Exhibit 206.  And

8   that is the September 17th, 2009 letter to

9   Captain Murray explaining her layoff.

10    A     Okay.

11    Q     If I can have you take a look at the third

12   full paragraph.

13    A     Okay.

14    Q     Around the middle of the paragraph, it says,

15   "Once you have completed this review, if you have

16   corrections or are requesting a Liberty Interest

17   Hearing, please complete the appropriate Layoff Response

18   Form, also contained in your packet, and return it,

19   within 14 calendar days from the date of notification,

20   to Diane Tapia."

21    A     She works for Buffy O'Neil.

22    Q     Okay.  So is this the 14-day that you were

23   just talking about?

24    A     Yes.

25    Q     Okay.  So it was your understanding that when

93

1     Captain Murray was laid off, that these were her

2     instructions.  If she wanted a Liberty Interest, she

3     should contract Diane Tapia; right?

4          A     Per instructions.

5          Q     And you said that Diane Tapia was with the

6     department's HR -- the Sheriff's Department?

7          A     The Sheriff's Department, yes.

8          Q     Okay.  Are you aware of whether or not

9     Captain Murray actually did complete the Layoff Response

10    Form and turn it in to HR at the Sheriff's Department?

11         A     I don't know if she did or not, but I was told

12    she did not have a hearing.

13         Q     Okay.  I'll have the Court Reporter hand you

14    what's been marked as Exhibit 210.

15               (Plaintiff's Exhibit 210 was

16               previously marked for

17               identification in the Deposition of

18               Robert Mark Leys and is attached

19               for reference.)

20               THE WITNESS:  I can answer that question

21    better.

22    BY MR. GASPARD:

23         Q     Well, as you can see, it's dated the same day.

24    And Captain Murray, here, has checked "Hearing Request."

25               Have you ever seen this document before?

94

1       A     No.

2       Q     All right.  But do you remember, before this

3   document was filled out by Captain Murray, do you recall

4   this being one of the forms that was in her layoff

5   packet?

6       A     Yes, it was one of the forms that was in

7   there.

8       Q     Okay.  But even as you look at it today,

9   you're not certain that she handed this form in

10  completed; right?

11      A     No.  I'm just --

12      Q     Right.

13      A     -- just aware she filled it out.

14      Q     Yeah.  Hang on to those exhibits.

15            But I'm also going to have the Court Reporter

16  hand you what we've marked as Exhibit 211.

17            And you can see this is an e-mail that was

18  sent to Captain Murray from Richard Sanchez.

19            Did you know Richard Sanchez at this time?

20      A     Yes.  He was the individual I referred to

21  earlier as being in the meeting with Christine Murray

22  and myself.

23            (Plaintiff's Exhibit 211 was

24            previously marked for

25            identification in the Deposition of

95

1          Robert Mark Leys and is attached

2          for reference.)

3    BY MR. GASPARD:

4       Q    Okay.  And if I can have you take a look

5    around the middle of the paragraph, it says -- in fact,

6    the third line down, it talks about her Liberty Interest

7    Hearing.  And it says, "Please send your written request

8    to Carl Crown, Human Resources Director."

9       A    Okay.

10      Q    And then it goes on to say, the last sentence,

11   "Please note, the County's Human Resources Department

12   will be responsible for conducting all Liberty Interest

13   Hearings for Law Enforcement Management employees."

14          Now, what I want to ask you about is why the

15   process was changed from Exhibit 206 -- as to the

16   knowledge that you possess, from Exhibit 206 to 211,

17   where she's first told to report to Diane Tapia with the

18   Sheriff's Department HR and then, later, told to seek

19   out Carl Crown with the County's HR.

20          Do you have any knowledge as to why that

21   changed?

22      A    No.

23      Q    Okay.  Makes for a shorter deposition.

24          You said it was your understanding that

25   Captain Murray never actually had a hearing to challenge

96

1    her layoff; right?

2         A    I don't know that for a fact, but that's what

3    I was told.

4         Q    Okay.  Well, you've reviewed the complaint in

5    this case that Captain Murray's filed in the Federal

6    court?

7         A    That's what I was referring to earlier when I

8    said that I had, in some paperwork.

9         Q    Okay.  So you understand the part of her

10   allegations in this complaint involves the layoff

11   process --

12        A    Yes.

13        Q    -- and the hearing; right?

14             After the meeting that we just discussed where

15   she was given the layoff packet, what participation, if

16   any, did you have in Captain Murray's attempt to get a

17   hearing?

18        A    No further involvement.

19        Q    Okay.  Had you heard anything about it after

20   that point, or did others just -- were you involved at

21   all?

22        A    No.

23        Q    Okay.  I want to shift gears a bit and talk

24   about the reorganization and who was moved where.

25        A    Okay.

97

1          Q     I'm going to have the Court Reporter hand you

2    a document that we've marked as Exhibit 239.  We spent

3    quite a bit of time on this document with the Sheriff in

4    her deposition, and I don't want to recreate that.  But

5    I will explain the document because this was created not

6    by the Sheriff's Department, but with organizational

7    charts from the Sheriff's Department to try to distill

8    down the transfers.

9          A     Okay.  Yeah, it didn't look familiar.

10         Q     Right.  It's a document that we created.

11               (Plaintiff's Exhibit 239 was

12               previously marked for

13               identification in the Deposition of

14               Sandra Hutchens and is attached for

15               reference.)

16               MR. HARRELL:  Right.  This is done by

17    Plaintiff's Counsel.

18               THE WITNESS:  Okay.

19    BY MR. GASPARD:

20         Q     Although I'll submit that the Sheriff said

21    that all of this information is accurate.

22               MR. HARRELL:  I don't know if she went that

23    far, but --

24               MR. GASPARD:  We can go through name-by-name.

25         Q     But if you take a look at it, to simplify it,

98

1    if you look at the vertical columns, the first one is

2    April 2009.  So the goal was to reflect who was in what

3    position at that time.  And then, as you move from left

4    to right, there are actually kind of four snapshots in

5    time, if you will, where we move on to

6    September 11th, 2009, February 19th of 2010, and then a

7    year later, February 25th of 2011.

8         A    Okay.

9         Q    And I'm not going to ask you, like I said, to

10   go through name-by-name, but I -- I'll ask you to refer

11   to it as we talk about some of the positions that were

12   consolidated --

13        A    Okay.

14        Q    -- and some of the transfers that were made.

15   And if something stands out as being wrong, you know,

16   feel free to point it out.

17             But if you look at the first column, April

18   2009, that would have been, of course, before any of the

19   Captains or Assistant Sheriffs were laid off; right?

20        A    Right.

21        Q    And at that time, there was you and

22   Sheriff Hutchens.  And she kind of laughed and pointed

23   out that that's the only row that remains static, and

24   there's changes to all the others.  There's four

25   Assistant Sheriffs at that point; Anderson, Davis, James

99

1    and Hillmann.

2           Do you recall that being the case?

3      A    Yeah.   There's actually five.   The fifth one

4    is an Executive Director, so it's a civilian

5    classification.

6      Q    Is that Rick Dostal?

7      A    Yes.

8      Q    Okay.   Yeah, I think this is only supposed to

9    reflect the --

10          MR. HARRELL:   Sworn.

11   BY MR. GASPARD:

12     Q    I think it reflects only the sworn positions.

13     A    Well, there are some --

14     Q    Oh, no.   There are some non-sworn.

15     A    -- Directors.

16     Q    Okay.   Thank you for pointing that out.

17          What position was Rick Dostal filling at that

18   point?

19     A    He was the Administrative Services Command

20   which handle Finance and many of the support functions,

21   including Support Services.

22     Q    Okay.   And then if you move down further, you

23   can see the Captains -- the Captain positions are there.

24          Do you recall that Captain Murray was in

25   Support Services Division at this point?

100

1       A    Yes.

2       Q    And earlier, you testified about the decisions

3   to consolidate certain positions.

4       A    Yes.

5       Q    Do you recall that sometime between April and

6   September of 2009, the Support Services Division and the

7   Crime Lab were consolidated into a single position?

8       A    Yes, that's correct.

9       Q    Okay.  And do you recall that

10  Director Gialamas, who was in charge of the Crime Lab,

11  took over that position?

12      A    Yes.  He took on the additional work of

13  Support Services.  He had been in the Crime Lab

14  position.

15      Q    Right.  So Support Services was not

16  eliminated.  It was just -- this was when Captain Murray

17  was laid off, right, and -- and Gialamas would just take

18  on the obligations of both positions?

19      A    That's correct.

20      Q    And then if you keep moving further right,

21  February of 2010 -- now, in February of 2010, all of the

22  layoffs of the Captains and Assistant Sheriffs had been

23  effected; correct?

24      A    Yes.

25      Q    So the decision was made to unconsolidate

101

1    Support Services and the Crime Lab; correct?

2        A    It was a requirement because Dean Gialamas

3    left the Sheriff's Department.

4        Q    I see.  Was -- well, was that part of the

5    decision, if you're aware, of why it was split back into

6    two divisions, because Gialamas was the only guy that

7    could handle that role; or was it decided, this is too

8    much for one person.  We're going to split it back up.

9            Can you explain that?

10       A    Well, essentially, the Crime Lab was given to

11   one of the underlings.  Administrative Manager II and

12   Support Services was given to a civilian Director --

13       Q    Okay.

14       A    -- Kirk Wilkerson.

15       Q    All right.  And at this point, the decision

16   had been made that Support Services doesn't require a

17   sworn Captain.  It could be a civilian employee; right?

18       A    Yes, that was correct.

19       Q    Now, if you look at the final -- the final

20   column, which is February 25th of 2011, you can see here

21   that there are three Assistant Sheriffs and three

22   Commanders; is that correct?

23       A    Well, again, Rick Dostal would be in there.

24   But as far as sworn, yes.

25       Q    I'm going to come back to that.  I note,

STEARNS  WILLIAMS  REPORTING  (909)  803-0091

102

1   according to this chart, that the first time I see the

2   position of Commander was September of 2009.

3           Is that -- was that a newly-created position?

4   A     It was.

5   Q     Okay.

6   A     There hadn't been a Commander position prior

7   to that.

8   Q     Can you explain the difference to me, as you

9   understand it, between the role of an Assistant Sheriff

10  and a Commander?

11  A     Well, both positions are Executive-Command

12  level, so they're both involved in those high-level

13  meetings.  But the Commander essentially works for the

14  Assistant Sheriff, but is not second person in the car,

15  if you will.  They're -- deal with some of the field

16  issues, and they deal with the other Commanders in terms

17  of policy, personnel and the operation of the

18  department.

19  Q     Okay.

20  A     After we consolidated the commands into

21  greater areas, we placed the Commander position into

22  Assist.

23  Q     Okay.  Is it fair to characterize the

24  Commander as an Assistant Sheriff's peer then?

25  A     Well, by virtue of rank, they would work for,

103

1    but they're an intermediary between the

2    Assistant Sheriff and the Division Commanders; all the

3    Captains and Directors.  But when the Assistant Sheriff

4    is gone, they act in the capacity of Assistant Sheriff.

5    So --

6         Q     Understood.

7         A     -- there's always somebody available that can

8    handle policy and personnel and other operational

9    issues.

10        Q     Is a Commander paid less than an

11   Assistant Sheriff?

12        A     Yes.

13        Q     Okay.  Do you know what an Assistant Sheriff's

14   pay rate is currently?

15        A     No.  At the time that you're referring back in

16   September, they were paid at the Captain level.

17        Q     Okay.

18        A     All the asterisks were paid at the current

19   level.  It's somewhere between Captain and

20   Assistant Sheriff.

21        Q     Okay.  Are you aware now what the normal pay

22   for an Assistant Sheriff is at the Orange County

23   Sheriff's Department?

24             MR. HARRELL:  The normal pay?

25

104

BY MR. GASPARD:

1

2      Q    Well, the regular pay.

3      A    Currently?

4      Q    Right.

5      A    No, I couldn't tell you.

6      Q    Could you estimate?

7      A    Probably in the $80 an hour -- 80 to 85.

8      Q    Assuming that estimate's close, could you

9  estimate what a Commander is paid at the Orange County

10  Sheriff's Department?

11      A    Less.  I'm not sure.  Probably 15-percent

12  difference.

13      Q    Okay.

14          MR. HARRELL:  Rather than have the Witness

15  speculate on these points, there might be a document

16  that could tell you exactly.

17          MR. GASPARD:  Feel free to send them over.

18      Q    Okay.  So, now, February 25th, 2011, we have

19  three Assistant Sheriffs, three Commanders.

20          Do you know what JAMF is?

21      A    That's James A. Musick Facility.

22      Q    And do you know what TLF is?

23      A    That's Theo Lacy Facility.

24      Q    So these positions were initially

25  consolidated?

105

1      A    Yes.

2      Q    And then shortly thereafter unconsolidated;

3    right?

4      A    I wouldn't say shortly, but thereafter.

5      Q    Okay.  Well, sometime between September of '09

6    and February of 2010 --

7      A    Yes.

8      Q    -- they were unconsolidated; right?

9      A    Yes.

10     Q    All right.  Do you know what CJX is?

11     A    That's the Central Jail Complex.

12     Q    And do you -- and then Court Services?

13     A    Right.

14     Q    Those positions were consolidated for a brief

15   period of time, as well; right?

16     A    Yes.

17     Q    And then unconsolidated before February of

18   2010?

19     A    Yes.  20- -- yes, I think you're correct.

20     Q    Okay.  And you see the North Ops and South

21   Ops.  That's the Patrol Divisions; right?

22     A    Yes.

23     Q    And those were also consolidated?

24     A    For a period of time.

25     Q    And then unconsolidated by February of 2010?

STEARNS WILLIAMS REPORTING (909) 803-0091

1    A    Yes.  But when they're unconsolidated, they're

2    unconsolidated with interim personnel working at a lower

3    rank -- at the higher rank, but at the lower pay.

4        Q    Right.  They were -- they were in Captain

5    positions, but being paid as a Lieutenant; right?

6        A    Yes.

7        Q    And I believe you testified earlier that that

8    was an option that Captain Murray was not given, to be

9    paid as a Lieutenant; correct?

10       A    That's correct.

11       Q    Okay.  Now, Support Services and Crime Lab, I

12   think we've already gone through that one.

13            Special Projects was --

14       A    That was eliminated.

15       Q    Yeah.  Do you recall when Special Projects

16   first became a position?

17       A    I can't say with certainty, but it was --

18       Q    Did that exist when you first came over

19   from --

20       A    No.

21       Q    "No"?

22       A    I know that.

23       Q    And then the S.A.F.E. position was eliminated

24   for a period of time and then brought back; right?

25       A    Right.  We had -- well, it wasn't eliminated.

STEARNS WILLIAMS REPORTING (909) 803-0091

107

1      It was handled at a lower level.

2          Q      Okay.

3          A      So that shouldn't say, "Eliminated."  The

4      Captain position may have been eliminated, but not the

5      Operations.  So --

6          Q      Okay.  So that was tasked to someone below the

7      rank of Captain?

8          A      Yes.

9          Q      Okay.  And then it looks like the remaining

10     positions -- do you know what PSD is?

11         A      That's Professional Services Division.

12         Q      Homeland Security, Airport Operations and

13     Investigations remained kind of status quo throughout,

14     although there were people transferred in and out of

15     those positions; right?

16         A      Yes.  Airport Operation was originally subject

17     to layoff, also.  But at the end, the Operation Manager

18     supplied the additional pay for a Captain-level

19     position.

20         Q      Okay.  Did that have something to do with

21     grant monies that were coming in?

22         A      No.  It was just a business decision that the

23     Airport Manager made.

24         Q      That that -- that position was too important

25     to eliminate?

108

1          A      In his mind, yes.

2          Q      Okay.   Now, the Training position, who --

3    Captain Zurn had that apparently --

4          A      Right.

5          Q      -- in April 2009.

6                 That position was also -- I misspoke.   That

7    position was also eliminated for a short period of time;

8    right?

9          A      Well, not eliminated; just a Lieutenant

10   handled it.

11         Q      Okay.

12         A      But the positions all were handled by a

13   lower-level employee in the -- with the exception of

14   Support Services, which would combine with the

15   Crime Lab.

16         Q      Okay.   Well, comparing April 2009 to February

17   of 2011 --

18         A      Uh-huh.

19         Q      -- you can see that the only position that

20   went away was Special Projects?

21         A      Completely.

22         Q      Right.

23         A      Yes.   The others were restored in some

24   fashion.

25         Q      Right.   And instead of having four

STEARNS  WILLIAMS  REPORTING  (909)  803-0091

1      Assistant Sheriffs, there's now three Assistant Sheriffs

2      and three Commanders; right?

3          A    Right.

4          Q    So is it fair to say that in February of 2011,

5      the Orange County Sheriff's Department Executive and

6      Command Staff had more individuals than it did in April

7      2009?

8          A    No.

9          Q    Why not?

10         A    Because you have to discern between the

11     Captains and Assistant Sheriffs and interim, which were

12     at the lower level acting in the capacity of Captains

13     and Assistant Sheriffs.  So if you counted them, you

14     have pretty close to the same numbers.

15         Q    Well, I'm not talking about the fact that they

16     were being paid less.  I just mean how many individuals

17     comprise the Executive and Command staff.

18              MR. HARRELL:  Right.  But you're starting to

19     argue with the Witness.  What I think he is telling you

20     is that interim is not the same thing as permanent.

21              MR. GASPARD:  Okay.

22              MR. HARRELL:  That that's an important

23     distinction that he's making.

24              MR. GASPARD:  All right.

25              THE WITNESS:  Otherwise, I think you're

110

1    correct in terms of the positions and number of

2    employees holding those.

3    BY MR. GASPARD:

4         Q    Well, would it surprise you -- first of all,

5    take a look at the February 2011.  And I do apologize if

6    that was argumentative.

7         A    No.  I'm good with it.  I just want to make

8    sure that we're clear on our terms.

9         Q    Right.  Yeah, there's a lot of information

10   here.  So if I misspeak, feel free to point it out.

11        The individual's asterisks, are you aware that

12   those individuals were interim positions?

13        A    Yes.

14        Q    Okay.

15        A    And there was about 15 of those positions.

16        Q    Right.  And I believe that when the Sheriff

17   went over the same document the other day, she testified

18   that all of these have since become permanent

19   promotions.

20        A    That's correct.

21        Q    Okay.  All right.

22        A    Not all the same people, but most of them.

23        Q    All right.  You mentioned earlier that you

24   took a 5-percent pay cut at some point; right?

25        A    I don't know if I mentioned earlier, but I

111

1   did.

2       Q    Okay.  I'm thinking about the Sheriff,

3   probably.

4       A    Yeah, for a year and a half.

5       Q    Okay.  And when did you first -- you

6   volunteered to take that pay cut?

7       A    No.  That was mandatory.  The Sheriff

8   volunteered.

9       Q    Okay.  She volunteered you for a pay cut?

10      A    No.  The CEO.

11           MR. HARRELL:  The Sheriff volunteered herself

12  to take a pay cut and instructed others that they were

13  going to take a pay cut.

14           THE WITNESS:  Right.

15  BY MR. GASPARD:

16      Q    Is that how it happened?

17      A    Yeah.  The elected officials, they could not

18  require them to.  But they did on their own volition.

19      Q    Okay.  And was that at the same time that the

20  department was making the layoffs in 2009?

21      A    Pretty close, yes, for about a year and a half

22  period.

23      Q    So it was your understanding that the Sheriff

24  took a 5-percent pay cut?

25      A    Yes.

112

1       Q     And you also took a 5-percent pay cut.

2             Did the Assistant Sheriffs take a 5-percent

3    pay cut?

4       A     Yes, the Assistant Sheriffs and the Executive

5    Director.

6       Q     Okay.

7       A     Now, the exception is the interim because they

8    weren't at Executive level by personnel standards; only

9    by interim practice.

10      Q     Okay.  And did these pay cuts last -- if

11   you're aware, did these pay cuts for everyone that you

12   just mentioned last for 18 months?

13      A     Yes.

14      Q     Who -- how was that period of time, the

15   duration -- who determined what the duration would be on

16   the pay cut?

17      A     That was with the CEO recommendation and Board

18   approval.

19      Q     Okay.  So those pay cuts would have expired

20   roughly around the end of 2010?

21      A     I'm not positive.

22      Q     Okay.

23      A     But they were 18 months.  I know that for a

24   fact.  Whenever they started, 18 months after that, they

25   concluded.

113

1    Q    Okay.  So after the 18 months ran, your pay

2   went back to what it was before you took the 5-percent

3   pay cut; right?

4    A    Yes.

5    Q    And have you received a pay increase since

6   then?

7    A    No.

8    Q    All right.  Have any of the Undersheriffs --

9   I'm sorry.  Have any of the Assistant Sheriffs received

10   a pay raise since then?

11    A    The Assistant Sheriffs that were interim were

12   brought up to the same level as existing.

13    Q    But they were made full-time Captains with --

14    A    Yes.

15    Q    -- full-time Captain pay?

16    A    But they weren't given a pay raise.  They were

17   just given an adjustment to that new position.

18    Q    Okay.  And since then, their pay has remained

19   at a steady Captain rate?  It hasn't been --

20    A    Yes.

21    Q    Okay.  Are you aware of how many Assistant --

22   well, taking a look at the February 25th, 2011 column --

23    A    Okay.

24    Q    -- can you explain how that's changed, if it

25   has changed, to the way the department's set up today?

1    A    Well, let me see.  The Sheriff and I remain

2    the same.

3    Q    And I don't mean by individuals.  I just mean

4    by positions.

5    A    There's still three Assistant Sheriffs, three

6    Commanders.  There's an Executive Director and a

7    Senior Director, which would be equivalent to

8    Assistant Sheriff and Commander.  There's somebody new

9    at Musick.  The same positions, but different people.

10   Q    Okay.

11   A    I think that was your question.

12   Q    It is.  So the --

13   A    Yes.  There's been one additional command just

14   recently that -- in 2012.  That's Community Programs and

15   Services.

16        MR. HARRELL:  And, Counsel, I don't have any

17   objection if you want to ask him who holds those jobs

18   now.

19        MR. GASPARD:  Okay.

20        MR. HARRELL:  It seems like you're trying to

21   avoid the subject.  But if you want to ask him --

22        MR. GASPARD:  I actually just don't want to

23   waste time.  The reason I'm asking these questions is

24   just to figure out what the current structure is.

25        THE WITNESS:  Yeah.

STEARNS  WILLIAMS  REPORTING  (909)  803-0091

115

1    BY MR. GASPARD:

2        Q    Okay.  So --

3        A    No more asterisks.

4        Q    Okay.  There's no more asterisks.  Everybody's

5    a regular Captain or Commander or whatever the position

6    is; right?

7        A    Or Director.

8        Q    Okay.  So I want to go back through that real

9    quick.  You mentioned, when you looked at this, that

10   there were two positions -- new positions, if you will,

11   since then.

12            One was a Senior --

13       A    Senior Director.  That would be equivalent to

14   a sworn Commander, but it's a civilian classification.

15   And Executive Director's been there all along; just

16   wasn't included on the sheet here.  That's a civilian

17   position equivalent to Assistant Sheriff.  Used to be a

18   sworn position.  Doug Storm --

19       Q    Okay.

20       A    -- held that.

21            MR. HARRELL:  Doug Storm, I haven't heard that

22   name in a while.

23   BY MR. GASPARD:

24       Q    I thought you mentioned an additional

25   position, though, when we went through the -- from JAMF

116

1    down --

2         A    Uh-huh.

3         Q    -- Captain of Community Services.

4         A    That's a new one, yes, this year.

5         Q    And is that filled by a Captain?

6         A    It is, March of this year, I believe.

7    Everything else remains the same; just the names.

8         Q    Do you remember -- I think Sheriff Hutchens

9    used the term of the Command Staff being "lean."  I

10   think in 2009 she had a meeting where -- were you

11   present at a meeting in 2009 where she said that she

12   already felt the Command Staff was very lean?

13        A    She said that many times.

14        Q    And is your understanding of when she says

15   it's lean, that it's operating with very few people?

16        A    Operating very efficiently with very few

17   people.

18        Q    Right.

19        A    Yes, more so than other County departments, by

20   ratio.  In other words, other County departments have

21   more Senior Managers than our department.

22        Q    And using that lingo, would you say the

23   command was fat, if it was top heavy or had too much

24   Executive --

25        A    I don't think they would, but by comparison.

117

1       Q     Right.  Right.

2             MR. HARRELL:  We're not here to create new

3    lawsuits.

4             MR. GASPARD:  Well -- right.

5       Q     Okay.  Are you aware of whether or not

6    Captain Murray was placed on the rehire list after her

7    layoff?

8             MR. HARRELL:  Excluding what he may have heard

9    from his lawyers?

10            MR. GASPARD:  Right.

11            THE WITNESS:  My understanding is that all of

12   the laid-off personnel in the sworn category were placed

13   on a rehire list.

14   BY MR. GASPARD:

15      Q     Okay.  Now, you mentioned earlier, though,

16   that of the six people laid off, you were only aware --

17   well, strike that.

18            Of the six people laid off, are you aware how

19   many of them immediately retired?

20      A     Well, there was more than six, but there were

21   six captains.

22      Q     Right.

23            MR. HARRELL:  I'm not sure what "immediate"

24   means.

25

118

1    BY MR. GASPARD:

2        Q    Sure.  Are you aware that Captain Murray was

3    the first Captain to be laid off?

4        A    I don't know that for a fact.

5        Q    Okay.  You mentioned earlier, though, that you

6    are aware that all six Captains were laid off around

7    mid-2009; right?

8        A    Yes.

9        Q    Okay.  And also, in that same time frame, the

10   two Assistant Sheriffs were laid off?

11       A    Yes.

12       Q    Okay.  Are you aware of how many of the six

13   Captains retired contemporaneously; in other words,

14   retired when they were given notice that they were being

15   laid off?

16           MR. HARRELL:  Right then and there on the

17   spot?

18   BY MR. GASPARD:

19       Q    Well, let's say within a couple weeks of being

20   notified.

21       A    I don't know for certainty.  I just know they

22   all did eventually.

23       Q    Okay.  Is it your understanding that if one of

24   the Captains was laid off, they were automatically

25   placed on the rehire list, or would they have to ask to

119

1    be placed on the rehire list?

2        A    My understanding was that they were all placed

3    on the rehire list.  That was part of the process.

4        Q    Okay.  Did anyone ever contact you and

5    specifically tell you that Captain Murray was on the

6    rehire list?

7        A    No.

8        Q    Okay.

9            MR. HARRELL:  Undersheriff, how are you doing

10   for coffee?

11           THE WITNESS:  I could use another one.

12           MR. HARRELL:  I'm a trained reader of body

13   language.

14           MR. GASPARD:  Would you like to take a brief

15   break?

16           MR. HARRELL:  Just a brief one.

17           MR. GASPARD:  Okay.

18           THE VIDEOGRAPHER:  Going off the record at

19   2:08 p.m.

20           (Brief recess taken.)

21           THE VIDEOGRAPHER:  Back on the record at

22   2:21 p.m.

23   BY MR. GASPARD:

24       Q    Undersheriff Scott, before we took the break,

25   I had asked you if anyone had specifically notified you

STEARNS  WILLIAMS  REPORTING  (909)  803-0091

120

1    that Captain Murray was on the rehire list after her

2    layoff.

3         A    Right.

4         Q    And you said that, no, no one had; correct?

5         A    No one had officially.

6         Q    Okay.  I'm going to have the Court Reporter

7    hand you a document that we've marked Exhibit 216.  Let

8    me know once you've had a chance to review that.

9         A    Okay.

10              (Plaintiff's Exhibit 216 was

11              previously marked for

12              identification in the Deposition of

13              Robert Mark Leys and is attached

14              for reference.)

15   BY MR. GASPARD:

16        Q    You can see that this is an e-mail dated

17   January 7th from Captain Murray to Sandra Hutchens.  And

18   you're also cc'd on the e-mail.

19              Is that your e-mail address?

20        A    Yes.

21        Q    Okay.  Do you recall seeing this e-mail?

22        A    I do.

23        Q    Okay.  Now, it looks like Captain Murray's --

24   well, if you look at the first line, it says, I'm aware

25   that Dean Gialamas resigned from his position with the

121

1    department.  And she goes on to say that she would like

2    that -- the position to replace him in Director of

3    Support Services.

4              Do -- I think you mentioned that earlier, too.

5              Do you recall that Dean Gialamas, in fact, had

6    left the department?

7         A    Yes.  He had moved to Los Angeles.

8         Q    All right.  In the second paragraph, she tells

9    you that she's on the rehire list for laid-off

10   employees.

11        A    Right.

12        Q    Does that refresh your memory as to whether or

13   not you recall her being on the rehire list in January

14   of 2010?

15        A    Well, again, I don't know officially, but I

16   was under the belief that she was.

17        Q    Right.

18        A    So, yes.

19        Q    What did you do with this information, if

20   anything, when you received this e-mail?

21        A    Well, I wasn't the primary recipient.  But in

22   this case, I forwarded it to our Employee Relations and

23   Personnel section.

24        Q    Do you recall who you forwarded it to?

25        A    Yes.  Steve Kea and to Buffy Reynoso, at the

122

1   time.

2        Q     And those individuals are both with the

3   Sheriff Department's HR?

4        A     Yes.

5        Q     Now, did you have a conversation with

6   Sandra Hutchens about this e-mail?

7        A     Briefly.

8        Q     Okay.  What was the substance of that

9   conversation?

10            MR. HARRELL:  Vague as to time.  This is --

11   was an attorney in the room?

12            THE WITNESS:  No.

13            MR. HARRELL:  Okay.

14            THE WITNESS:  The substance was what to do

15   with the information.

16   BY MR. GASPARD:

17        Q     Okay.

18        A     And that was then relayed to those two

19   individuals.

20        Q     So then you asked -- did you ask

21   Sandra Hutchens what to do with this, and then she

22   instructed you to send it to Steve Kea and

23   Buffy Reynoso?

24        A     She said, "Get it to the proper people."  And

25   I forwarded it to those two individuals because they had

123

1    that involvement.

2         Q    Okay.  After you forwarded this information --

3    well, this e-mail's dated January 7th.

4              Do you recall the time frame for when you

5    forwarded that information to Steve Kea and

6    Buffy Reynoso?  Was it fairly immediately?

7         A    It would have just been shortly after that,

8    yeah.

9         Q    Within a few days, maybe?

10        A    Yes.

11        Q    Okay.  After forwarding that information to

12   Steve Kea and Buffy Reynoso, did you follow up?

13        A    No.

14        Q    "No."

15        A    There was a process in place.

16        Q    Okay.  Did Sandra Hutchens ever contact you,

17   after that point when you forwarded the information, to

18   find out what was going on with Captain Murray?

19        A    No.  She may have asked if -- you know -- had

20   been forwarded or who I forwarded to.  But beyond that,

21   no.

22        Q    All right.  If you look at the last paragraph,

23   where Captain Murray's asking to be reinstated to the

24   position of Division Commander of Support Services, she

25   says, "Having recently filled that position, I am able

124

1  to return and fill the -- fill the role without a

2  lengthy learning or transition process."

3       A    Right.

4       Q    Would you agree with that?

5       A    With her assessment?

6       Q    Right.

7       A    Yeah.  She's capable.

8       Q    Okay.  In the e-mail, Captain Murray is

9  referring to the Division Commander position of

10  Support Services.

11       Do you recall what was done to fill that

12  position once Dean Gialamas left?

13       A    Well, like I said, there was a recruitment

14  process and, subsequent to that, an individual internal

15  to the department was hired.

16       Q    Okay.  Now, you mentioned earlier it was your

17  understanding of the rehire process that, given these

18  circumstances, that Captain Murray, on the rehire list,

19  would have to be considered before other candidates;

20  right?

21            MR. HARRELL:  I don't know that he said that.

22            MR. GASPARD:  Okay.

23            MR. HARRELL:  We may be blending transcripts

24  now.

25

125

BY MR. GASPARD:

     Q     Was that your understanding of the rehire
process?

     A     Yes.   That wasn't the situation that existed
here.

     Q     Okay.   How was that different than what
existed here?

     A     She was laid off as a Captain.

     Q     Okay.

     A     And this was a position for civilian Director.

     Q     For an Admin Manager III; right?

     A     Yes.

     Q     Okay.   I'm going to show you -- well, I'm
going to have the Court Reporter hand you a document
that we've marked as Exhibit 215.

     A     Okay.

           (Plaintiff's Exhibit 215 was

           previously marked for

           identification in the Deposition of

           Robert Mark Leys and is attached

           for reference.)

BY MR. GASPARD:

     Q     Do you know what this is?

     A     Looks like a recruitment with the job specs
for Director of Support Services.

126

1     Q     Do you recall if this was the Job Bulletin for

2 the spot left vacant by Dean Gialamas' departure?

3     A     I believe it is.

4     Q     Okay.  I'm going to have you look back at an

5 exhibit, Exhibit 213.  And that's the Layoff Procedure

6 out of the PSR.

7     A     Okay.  Got it.

8     Q     Okay.  If I can direct your attention to

9 Section 4, "Rehire List."  Subsection A says, "The names

10 of persons laid off shall be placed on an

11 agency/departmental rehire list for each class in the

12 occupational series at or below the level of the class

13 from which laid off."

14     A     Uh-huh.  Okay.

15     Q     Earlier, you mentioned that an

16 Admin Manager III position was a civilian equivalent of

17 a Captain; right?

18     A     Yes.

19     Q     Is it your understanding, after reading

20 Subsection A, Section 4 of the Layoff Procedure, that

21 Captain Murray would have been eligible for rehire as an

22 Admin Manager III?

23          MR. HARRELL:  Lacks foundation and calls for

24 speculation that this Witness has any expertise for the

25 document that you're showing him.

127

1    BY MR. GASPARD:

2        Q    Okay.  You can still answer.

3            MR. HARRELL:  If you feel qualified to render

4    an opinion.

5            THE WITNESS:  Well, I don't.  That's why I

6    said it's different than the layoff classification she

7    was in, and that's why I referred to the people that I

8    referred it to.

9    BY MR. GASPARD:

10       Q    Okay.

11       A    That was not my call.

12       Q    All right.  Yeah.  I think Bob Leys has

13   weighed in on this anyways.

14       A    Okay.

15       Q    Is -- well, going back to what you did

16   individually, not necessarily your understanding of the

17   process, did you send Captain Murray any kind of

18   notification that you believe she wouldn't be qualified

19   or that she wouldn't be -- that the rehire policy in

20   this case wouldn't have applied because of the

21   difference between an Admin Manager III and a Captain?

22       A    Well, first of all, I don't know if it doesn't

23   apply, but I did not send anything.

24       Q    Okay.  Are you aware if anyone, in fact, sent

25   Captain Murray anything to that effect?

128

1        A    No.

2        Q    Okay.  So your only individual participation

3   was that you were cc'd on the e-mail, you went to the

4   Sheriff and the Sheriff told you to take it to HR, which

5   you did; right?

6        A    Right.  I simply relayed her information.

7        Q    Okay.  And after that, you didn't have any

8   more participation in the process?

9        A    No.

10       Q    Okay.  Very good.  I'm going to have the

11   Court Reporter hand you Exhibit 217.

12       A    Okay.

13            (Plaintiff's Exhibit 217 was

14            previously marked for

15            identification in the Deposition of

16            Robert Mark Leys and is attached

17            for reference.)

18   BY MR. GASPARD:

19       Q    All right.  Have you ever seen this letter

20   before?

21       A    I'm aware of it, but I haven't really seen it.

22       Q    Okay.  Well, apparently it's a letter from

23   Commander Wilson telling Captain Murray that, in fact,

24   due to the budget situation, the Sheriff's Department

25   was not moving forward the recruitment for the

129

1    Admin Manager III position.

2            Do you recall who made that decision?

3        A    That was the Sheriff, and that was based on

4    the budget.

5        Q    Okay.

6        A    It was filled with an interim position

7    instead.

8        Q    Well, do you recall whose decision it was to

9    post the bulletin in December for the open position?

10       A    It was probably -- I don't know with

11   certainty; probably --

12           MR. HARRELL:  Wait.  Okay.  I'm just going to

13   interpose an objection, maybe, on speculation.  I hear

14   "I don't know."  I hear "I don't know," and I start to

15   object.

16           THE WITNESS:  I don't know for a fact.

17   They're the responsible party for posting.

18   BY MR. GASPARD:

19       Q    I understand.  Go ahead and keep 216 and 217

20   handy because I want to refer back to those.

21       A    Okay.

22       Q    But I'm going to have the Court Reporter also

23   hand you a document we've marked Exhibit 220.

24       A    Okay.  I see it.

25   ///

130

1           (Plaintiff's Exhibit 220 was

2           previously marked for

3           identification in the Deposition of

4           Richard Sanchez and is attached for

5           reference.)

6    BY MR. GASPARD:

7        Q    Okay.  Now, do you recall that Kirk Wilkerson

8    was, in fact, named the interim Director of Support

9    Services effective March 19th of 2010?

10       A    Yes.

11       Q    And that was two months after Captain Murray

12   was notified that the position was not going to be

13   filled for budgetary reasons?

14       A    That was after that fact, yes.

15       Q    Okay.  So on January 7th, Captain Murray sends

16   this e-mail asking for her old position back, and then a

17   week later, she receives an e-mail from Commander Wilson

18   telling her that they're not going to fill the position?

19       A    That's correct.

20       Q    And then two months later, the position's

21   filled by Kirk Wilkerson?

22           MR. HARRELL:  That's inaccurate.  It's an

23   interim.

24   BY MR. GASPARD:

25       Q    Okay.

STEARNS  WILLIAMS  REPORTING  (909)  803-0091

131

1      A    That was the length of time it took to

2  establish who was going to be selected.

3      Q    Okay.  Are you aware if anybody contacted

4  Captain Murray and told her she could come back to that

5  role if she took a Lieutenant's pay?

6      A    No.  The only communication that I'm aware of

7  was a letter that was sent to her.

8      Q    Okay.  Now, after Captain Murray sent the

9  e-mail dated January 7th on Exhibit 216 where she was

10  expressing her interest to come back, are you aware

11  that, as a result of that e-mail, a meeting was convened

12  with Buffy Reynoso, Steve Kea, County Council,

13  Diane Tapia, Alicia Cavasos and Paul Alvarez?

14      A    I know there was discussion; so all those

15  people would have probably been part of that.

16      Q    Discussion as to what?

17          MR. HARRELL:  Okay.  You just said, "County

18  Counsel."  So aren't we in attorney/client privilege

19  areas now?

20  BY MR. GASPARD:

21      Q    I don't want you to answer about anything that

22  happened in a meeting.

23      A    I wasn't in the meeting, so I couldn't.

24      Q    There you go.

25          MR. HARRELL:  Calls for speculation.

STATE OF CALIFORNIA        )
                           ) ss.
COUNTY OF SAN BERNARDINO    )


    I, Brandy L. Williams, certified shorthand reporter, license No. 11084, do hereby certify:


    That, prior to being examined, the witness named in the foregoing deposition, to wit, JOHN L. SCOTT, was by me duly sworn to testify the truth, the whole truth and nothing but the truth;


    That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to computer-aided transcription under my direction.


    I further certify that I am not interested in the event of the action.


    WITNESS my hand this 4th day of June, 2012.


                    BRANDY L. WILLIAMS, CSR #11084

136

# EXHIBIT 255

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CHRISTINE MURRAY,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀CASE NO. CV10-01675
⠀⠀⠀⠀⠀⠀VS.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀⠀⠀JVS (MLGx)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
COUNTY OF ORANGE, a municipal⠀⠀)
corporation; ORANGE COUNTY⠀⠀⠀⠀)
SHERIFF-CORONER DEPARTMENT;⠀⠀⠀)
SANDRA HUTCHENS, individually⠀⠀)
and as Sheriff of the Orange⠀⠀)
County Sheriff-Coroner⠀⠀⠀⠀⠀⠀⠀)
Department; JOHN SCOTT,⠀⠀⠀⠀⠀⠀)
individually and as Undersheriff )
of the Orange County Sheriff-⠀⠀)
Coroner Department; MICHAEL⠀⠀⠀⠀)
HILLMANN, individually and as⠀⠀)
Former Assistant Sheriff of the⠀)
Orange County Sheriff-Coroner⠀⠀)
Department; and DOES 1 THROUGH⠀⠀)
10 inclusive,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Defendants.⠀⠀)
_____)

DEPOSITION OF ROBERT MARK LEYS

Thursday, April 12, 2012

Reported by:  BRANDY L. WILLIAMS, CSR, RPR #11084

2

```
            I N D E X

DEPOSITION OF ROBERT MARK LEYS

Thursday, April 12, 2012                    PAGE

        Examination By Mr. Gaspard            5


                    EXHIBITS
PLAINTIFF'S
EXHIBIT        DESCRIPTION                  MARKED

208   Memorandum dated September 17, 2009     27

209   Document entitled "Layoff Notice"       38

210   Document dated 9/17/09                  39

211   Document entitled "Layoff Meeting       39
      Follow-Up

212   String of E-mails                       41

213   Document entitled "Article XVI"         64

214   E-mail dated December 16, 2009          77

215   Job Bulletin                            86

216   E-mail dated January 7, 2010            89

217   Memorandum dated January 15, 2010       95

218   String of E-mails                       97


     QUESTIONS ASKED, WITNESS INSTRUCTED NOT TO ANSWER

                PAGE        LINE

                 29          1
```

STEARNS WILLIAMS REPORTING (909) 803-0091

3

```
1                         APPEARANCES

2

3          For the Plaintiff, CHRISTINE MURRAY:

4              LACKIE, DAMMEIER & McGILL APC
               BY:  CHRISTOPHER L. GASPARD
5              367 North Second Avenue
               Upland, California  91786
6              (909) 985-4003

7

8          For the Defendants, COUNTY OF ORANGE,
               ORANGE COUNTY SHERIFF'S DEPARTMENT,
9              SANDRA HUTCHENS, JOHN SCOTT and
               MICHAEL HILLMANN:
10
               LYNBERG & WATKINS
11             BY:  S. FRANK HARRELL
               1100 Town & Country Road
12             Suite 1450
               Orange, California  92868
13             (714) 937-1010

14

15         Also Present:

16             CHRISTINE MURRAY

17             JEREMY JASS

18

19

20

21

22

23

24

25
```

4

1          DEPOSITION OF ROBERT MARK LEYS

2          Pursuant to Notice to Take Deposition, on the

3     12th day of April, 2012, commencing at the hour of

4     1:16 o'clock p.m., at 367 North Second Avenue, in the

5     City of Upland, County of San Bernardino, State of

6     California, before me, Brandy L. Williams, Certified

7     Shorthand Reporter, State of California, Personally

8     Appeared:

9

10               ROBERT MARK LEYS,

11     called as a witness by the Plaintiff, who, being by me

12     first duly sworn, was thereupon examined as a witness in

13     said cause.

14

15

16

17

18

19

20

21

22

23

24

25

5

<pre>
 1                        EXAMINATION

 2


 3    BY MR. GASPARD:

 4         Q    Good morning, Mr. Leys.

 5         A    Morning.

 6         Q    Could you state and spell your name for the

 7    record?

 8         A    My full name is Robert, R-o-b-e-r-t, Mark,

 9    M-a-r-k, Leys, L-e-y-s.

10         Q    Mr. Leys, have you ever been deposed before?

11         A    Yes.

12         Q    How many times?

13         A    Oh, roughly five to seven.

14         Q    What sort of cases were you deposed in?

15         A    Usually employment disputes.

16         Q    Okay.  Have any of those involved the

17    Orange County Sheriff's Department?

18         A    I don't recall any, no -- actually, I'm sorry.

19    Yeah, in -- you know, related to this case --

20         Q    I understand.

21         A    -- I was deposed.

22              MR. HARRELL:  The Anderson matter?

23              THE WITNESS:  Yes.

24    BY MR. GASPARD:

25         Q    Which I think we're all very well aware of.
</pre>

6

1          A     Yeah.

2          Q     The court reporter gave you an oath, and it's

3     the same oath you would take in a court of law.  So in

4     other words, you're testifying under penalty of perjury.

5                Do you understand that?

6          A     Yes.

7          Q     Okay.  I'm going to ask questions and ask you

8     to orally respond.  And your responses are being taken

9     down by the court reporter, who'll put together a

10    booklet or transcript of today's deposition.

11               And you will be given the opportunity to

12    review your responses and make any changes.  But you

13    should know that if you make any substantive changes, it

14    could call into question the credibility of your

15    responses.  So we're trying to make a clear record

16    today.

17               I'll try not to cut off your answers with

18    questions, and I would ask that you do the same in

19    return.  You don't have to make any guesses, but I may

20    ask for your best estimate.

21               Do you know the difference between the two?

22         A     Yes.

23         Q     If you don't understand any of the questions I

24    ask, feel free to ask me to clarify or rephrase.

25               Have you recently consumed any alcohol,

STEARNS WILLIAMS REPORTING (909) 803-0091

7

1    medications or any other substance that would affect

2    your ability to testify today?

3         A    No.

4         Q    Did you review any notes or documents to

5    refresh your recollection today?

6         A    Yes.

7         Q    Okay.  And what documents did you review?

8         A    I had a Declaration in the Anderson matter,

9    which I reviewed.

10        Q    Okay.  Did you review any other documents?

11        A    No.

12        Q    Have you ever been sued before?

13        A    No.

14        Q    Have you ever sued anyone else as a Plaintiff

15   before?

16        A    No.

17        Q    Have you spoken to anyone about your

18   deposition today?

19        A    In what regards?

20        Q    As to what the content of your deposition may

21   include.

22        A    Yes, with Shel and Alex Mihai of his office.

23        Q    And only those two?

24        A    As far as the content, yes.

25        Q    What do you mean by that?

8

1      A    Well, other people knew I was coming to a

2   deposition.  I had to let people know I was going to be

3   out of the office.

4      Q    I understand.  I just want to get a little bit

5   of background information before we get into the meat of

6   the deposition, your education.

7           When did you graduate from high school?

8      A    1980.

9      Q    All right.  And what high school did you

10  attend?

11     A    Temple City.

12     Q    After graduating from high school, did you

13  attend an undergraduate program?

14     A    I went to, yeah, community college and then

15  Cal Poly San Luis Obispo for my Bachelor's degree.

16     Q    And when you graduated from Cal Poly San Luis

17  Obispo with your Bachelor's, what was your major?

18     A    Social Sciences and a concentration in Human

19  Resources Management.

20     Q    And subsequent to that, did you obtain any

21  advanced degrees?

22     A    Yes.

23     Q    And what advanced degrees did you obtain?

24     A    Master's of Science in Psychology and

25  Counseling.

STEARNS  WILLIAMS  REPORTING  (909)  803-0091

9

1       Q      And where did you receive -- what school did

2   you receive your Master's degree from?

3       A      Cal Poly San Luis Obispo, also.

4       Q      It's a nice place to go to school.

5       A      Yeah.

6       Q      Do you have any other advanced degrees?

7       A      No.

8       Q      Are you a member of any professional

9   organizations?

10      A      Yeah, SHRM, the Society of Human Resources

11  Management.

12      Q      Any others?

13      A      No.

14      Q      Where are you currently employed?

15      A      At the County of Orange.

16      Q      And when were you hired by the County of

17  Orange?

18      A      In February of 1999.

19      Q      And were you hired as an entry-level Employee

20  Relations Manager?

21      A      Actually, at that time, it was called a

22  Staff -- I was a Staff Analyst 3.  And subsequent to

23  that, the classification has changed to the

24  Administrative Manager Series.

25      Q      I see.  Well, in that role as Staff Analyst 3,

10

1    what were your job duties?

2         A    I was in Employee Relations.  I would be

3    assigned any employee relations issues.  We would work

4    with labor organizations, negotiating contracts,

5    meet-and-confer issues, any issues that arose between

6    the unions and departments and then special projects as

7    assigned in the Human Resource field.

8         Q    Okay.  And was that in the Human Resources

9    offices for the County of Orange?

10        A    At that time, we were separate.  There was --

11   Employee Relations was within the CEO's office.

12   Subsequent to that, in around 2005, it was put -- Human

13   Resources department became a stand-alone department.

14   And so Human Resources and Employee Relations merged.

15        Q    At some point, were you promoted from

16   Senior Analyst 3?

17        A    Staff Analyst 3.

18        Q    I'm sorry.  Staff Analyst 3?

19        A    Yeah.  I was promoted to a Senior Staff

20   Analyst.  And then in that conversion that I spoke of

21   where we went to the Staff Analyst Series to the

22   Administrative Manager Series, I moved over to the

23   Administrative Manager 2 level from Senior Staff

24   Analyst.

25        Q    Could you kind of summarize the timeline of

STEARNS WILLIAMS REPORTING (909) 803-0091

11

1  how those promotions occurred?

2      A    Let's see.  The Staff Analyst 3 was obviously

3  February of 1999.  I don't recall the date of when I

4  received the promotion to Senior Staff Analyst.  And

5  then it was around 2005 -- 2004/2005 when we merged or

6  changed the classification to Administrative Manager

7  Series.  At that time -- what's the word I'm looking

8  for -- kind of cross-walked over to

9  Administrative Manager 2.

10          So it wasn't a promotion.  It was all

11  Senior Staff Analysts in the County became

12  Administrative Manager 2's.  And then from there, in,

13  gosh, September of 2007, I received a temporary

14  promotion to Administrative Manager 3 in my current

15  position.  And then in November of 2007 is when I

16  received a permanent promotion to my current position.

17      Q    Can you tell me that job title again?

18      A    Yeah.  I'm sorry.  Administrative Manager 3 is

19  what I am now.  So I was promoted from a "2" to a "3."

20      Q    Who's your immediate supervisor now?

21      A    Currently, the interim HR Director is

22  Terri Bruner.  And last name is spelled B-r-u-n-e-r.

23      Q    And who is Terri Bruner replacing?

24      A    Carl Crown.

25      Q    Have you had a chance to review the Complaint

STEARNS WILLIAMS REPORTING (909) 803-0091

12

1    in this lawsuit?

2        A   I believe I have, but it's been quite a while.

3        Q   Okay.  I would represent to you that most of

4    the operative facts giving rise to this Complaint

5    involve a time frame around 2008 to 2009 and

6    thereabouts.

7        At that time, you were working for Carl Crown;

8    right?

9        A   Correct.

10       Q   Can you explain to me generally what the scope

11   of your duties are as an Administrative Manager 3?

12       A   Yeah.  I lead the Services and Support team in

13   the Human Resources department.  And I have -- under my

14   leadership, I have Recruiting.  So I have a

15   Business Manager that supports recruiting in

16   departments.

17       And I have the Service Team Managers.  And

18   what they do is, they're assigned various departments

19   within the County, and they support those departments

20   with all their HR needs.  We all negotiate contracts,

21   meet-and-confer issues, any day-to-day HR issues.

22   Higher-level decisions come to our office.  Each of the

23   departments has an HR team that handles day-to-day

24   issues, investigations, things like that.  And then

25   higher-level issues come to our office.  And typically

13

1    the first point of contact is the Service Team Manager.

2        Q    Do you know what the PSR is, if I refer to the

3    PSR?

4        A    Yes.

5        Q    What is that?

6        A    Personnel and Salary Resolution.

7        Q    And the Personnel and Salary Resolution at

8    issue in the Complaint is from 2003.

9             Is that still the operative PSR?

10       A    Yes.   There's been amendments since then, but

11   that's the last full update.

12       Q    As part of your job duties, is the PSR a

13   document that you feel pretty familiar with?

14       A    Pretty familiar.

15       Q    Is that a document that you frequently have to

16   refer to?

17       A    Not so much the PSR.   It's similar to the

18   Memorandum of Understanding we have with each of the

19   labor organizations.   The PSR covers Executive Managers,

20   usually non-represented employees and then also the

21   ACLEM unit.   Some of their provisions are under the PSR,

22   and some of them are -- the PSR calls out, I believe in

23   an amendment, that they would be under the

24   Administrative Manager MOU.

25       Q    All right.   And I realize that you've already

STEARNS WILLIAMS REPORTING (909) 803-0091

14

1 had to testify as to a lot of the overlapping facts in

2 the Anderson matter that we're going to cover today.  So

3 I apologize if it seems like we're covering scorched

4 earth.

5    What document -- you're aware of the fact that

6 Captain Murray was laid off as a Captain; correct?

7   A Correct.

8   Q You're aware that four other Captains of the

9 Orange County Sheriff's Department were laid off in the

10 same time frame; correct?

11   A I thought there was six total, but maybe I'm

12 counting the Assistant Sheriffs also.

13   Q I won't hold you to that number.

14    But you know the layoffs -- the round of

15 layoffs I'm discussing?

16   A Yeah.  Correct.

17   Q Specifically as to the Orange County Captains,

18 what document did you consider, at the time, to be there

19 to govern their employment with the County?

20   A The Personnel and Salary Resolution.  And I

21 believe that it also refers to the Administrative

22 Manager MOU, which I believe the language in regards to

23 layoffs is the same or very, very similar.

24   Q You testified earlier that you've been with

25 the County since '99.

1        What kind of training have you gotten since

2   then regarding the labor issues that you deal with at

3   the County?

4        A    I've attended CALPELRA classes, which is the

5   California Public Employee Labor Relations Association.

6   I've been to their conferences probably three times

7   and -- you know, it's three days of covering labor

8   issues.

9        We have Liebert Cassidy & Whitmore who provide

10  monthly training on labor issues; so we're part of that

11  consortium.  We have a lot of -- we're on distribution

12  lists for a lot of HR-related -- what do I want to say?

13  Well, just information that's, you know, in e-mail

14  blasts and through workforceweek.com, through SHRM,

15  HR Hero, you know, various areas like that, and then

16  just, you know, through experience of different issues

17  arising.

18       Q    At the conferences or educational events that

19  you're talking about, are there legal updates provided?

20       A    Yes.

21       Q    And do those legal updates involve changes to

22  State statutes that involve public employment?

23       A    Yes.

24       MR. HARRELL:  Calls for -- okay.  You've got

25  to pause a little bit.  Are you a lawyer?

16

1              THE WITNESS:  No.

2              MR. HARRELL:  Calls for a legal opinion; move

3      to strike.

4      BY MR. GASPARD:

5          Q      Okay.  You said you receive e-mail blasts

6      from, for example, Liebert Cassidy Whitmore; correct?

7          A      Correct.

8          Q      And as part of your ongoing training as an

9      HR Executive; correct?

10         A      Correct.

11         Q      Do those e-mails sometimes contain legal

12     updates?

13         A      Yes.

14         Q      Do those -- have you received training related

15     to the Public Safety Officers Procedural Bill of Rights

16     Act?

17         A      I don't believe I've attended formal training.

18     I've worked on POBR issues in the past.  I'm familiar

19     with the Government Code on that.  But I don't believe

20     I've actually attended training just on POBR.

21         Q      Okay.  And by "POBR," you mean an acronym for

22     the --

23         A      Peace Officer Bill of Rights.

24         Q      Right.  Does some of the training you receive

25     also involve best practices for establishing policies

25

1    expert hypothetical questions that you might have.

2         The second line of objections is, he's not a

3    lawyer.  You're asking him for legal opinions and legal

4    conclusions that he's just flat out not competent to

5    give, and you know that.  So that is an objection to the

6    witness.  That being said, ask your next question.

7         MR. GASPARD:  Okay.  Thank you.

8    Q    All right.  Mr. Leys, I think that covers a

9    lot of background material.  And I'd like to shift a

10   little bit.

11        You mentioned that you were working for

12   Carl Crown over the last couple of years; correct?

13   A    Correct.

14   Q    Okay.  And what -- what was his position at

15   the time?

16   A    Director of Human Resources.

17   Q    Is there another Administrative Manager 3 that

18   reports to Carl Crown?

19        MR. HARRELL:  Vague as to time.

20   BY MR. GASPARD:

21   Q    Or within the last couple of years.

22   A    Yes.  There's three total.

23   Q    All right.  So if you were drawing an

24   organizational chart -- for example, last year --

25   regarding the Human Resources, Carl Crown would be the

26

1    senior person as the Director; is that correct?

2        A    Correct.

3        Q    And there would be three individuals,

4    including yourself, at the next level, the

5    Administrative Manager 3 level; is that correct?

6        A    That's correct.

7        Q    And you three all report directly to

8    Carl Crown?

9        A    Correct.

10       Q    When did you first hear the name

11   Christine Murray, if you recall?

12       A    I believe it was in relation to this case.

13       Q    Okay.  Earlier, I asked if you were aware of

14   some of the Captain layoffs that occurred in 2009, and

15   you said you did.

16            When did you first become aware of potential

17   layoffs within the Orange County Sheriff's Department?

18       A    When they notified me.  It would be just prior

19   to the actual layoffs.

20       Q    Okay.  And would that, to you, then be around

21   summer or fall of 2009?

22       A    Yeah, it would be in that time frame.

23       Q    Okay.  I'm going to mark, as Exhibit 208, a

24   document dated September 17th, 2009 from Sandra Hutchens

25   to Christine Murray.

27

1          And if you could hang on to all of these

2     exhibits.  And when we're done, I'll have you give them

3     to the court reporter and it will be part of the record.

4          A    All right.  Do you want me to go ahead and

5     review it or --

6          Q    Please.  And let me know once you've done so.

7               (Plaintiff's Exhibit 208 was marked

8               for identification.)

9               THE WITNESS:  Okay.

10    BY MR. GASPARD:

11         Q    Have you ever seen this document before?

12         A    I believe I have, yes.

13         Q    Do you recall when you first saw this

14    document?

15         A    I probably saw a rough draft of it and

16    reviewed it at that time.

17              MR. HARRELL:  He's asking about this document.

18              THE WITNESS:  Oh, this.  I'm sorry.  This

19    particular version?

20              MR. HARRELL:  Exhibit 208.

21              THE WITNESS:  When -- yeah, I don't recall

22    when I first saw that.

23              MR. GASPARD:  Okay.

24              MR. HARRELL:  Listen to his question.

25              THE WITNESS:  Okay.

28

BY MR. GASPARD:

    Q   I think that was a fair answer.

       So at some point, you saw a draft of this letter; correct?

    A   Correct.

    Q   Do you remember who contacted you -- did you -- could you explain your involvement, whether it was vetting the letter or drafting or editing?  Can you explain what your involvement with the letter was?

    A   It would have been review of the letter along -- all these letters came to us for review -- meaning, HRD -- and then also to County Counsel.

    Q   All right.  And what would your role be in reviewing the letter?

       MR. HARRELL:  What his role would have been or what was it?

BY MR. GASPARD:

    Q   I've reviewed the letter.  I assume that there was some responsibility that you had or were tasked with when they gave you a draft of the letter; correct?

    A   Well, it was -- yes.

    Q   What was that?

    A   It was to make sure there wasn't anything inappropriate in the letter and work with County Counsel to ensure that.

29

1    Q    All right.  Do you recall making any

2   recommendations or changes to the letter?

3              MR. HARRELL:  Is this in the context of

4   meeting and talking with County Counsel that he's asking

5   about now?

6              THE WITNESS:  I don't recall if we actually

7   met or if it was over the phone or e-mail.

8              MR. HARRELL:  However it happened, is this in

9   the context of consulting with an attorney?

10             THE WITNESS:  Yes.

11             MR. HARRELL:  Objection.  Attorney/client

12  privilege.  Instruct the witness not to answer.

13  BY MR. GASPARD:

14    Q    Did you speak to anyone, other than County

15  Counsel, about your review of this letter?

16    A    I don't recall.

17    Q    All right.  And when you spoke to County

18  Counsel about -- is it possible that you worked with

19  someone, other than those in County Counsel, in

20  reviewing this letter?

21             MR. HARRELL:  Is it possible?

22             THE WITNESS:  I mean, I --

23             MR. HARRELL:  It's vague.

24             THE WITNESS:  Yeah.

25

30

BY MR. GASPARD:

1

2        Q    When you said you don't recall, is it possible

3    you spoke to Sandra Hutchens about this letter?

4        A    No, I didn't talk to Sandra Hutchens about the

5    letter.

6        Q    Is it possible that you talked to John Scott

7    about the letter?

8        A    I don't believe I did.

9        Q    All right.  Do you remember speaking to anyone

10   at the Sheriff's Department about this letter?

11       A    I may have, but I don't recall who it would

12   have been.

13       Q    Did you, in fact, make any edits to this

14   letter?

15       A    I don't believe I did.

16       Q    All right.  Let me call your attention to a

17   couple portions -- specific portions of the letter.  If

18   I could direct your attention to the first paragraph, I

19   guess, kind of towards the middle or bottom, it

20   starts -- towards the right side where it says, "The

21   decision of who would be laid off was made as a result

22   of what functions could be eliminated and/or combined

23   without directly impacting our core mission."

24            Do you see that sentence?

25       A    Yes.

31

1    Q    Do you recall if that was the wording on the

2    draft letter that you first received?

3    A    I don't recall.

4    Q    Do you see the sentence after it that says,

5    "These layoffs were not based on performance.  They were

6    based on the elimination or consolidation of functions

7    and were made solely because of our current financial

8    situation"?  Do you see that sentence?

9    A    Yes.

10   Q    Was that your understanding of the -- well,

11   was that your understanding of how the layoffs were

12   being implemented?

13   A    Yes.  They were not based on performance.

14   Q    All right.  Do you know if performance was any

15   factor in those decisions?

16        MR. HARRELL:  Did you make the call on who was

17   going to be laid off?

18        THE WITNESS:  No.

19        MR. HARRELL:  Objection.  Calls for

20   speculation.

21   BY MR. GASPARD:

22   Q    Did you have discussions with Sandra Hutchens

23   or John Scott regarding the implementation of the

24   layoffs?

25        MR. HARRELL:  I'm going to object to that as

32

1    vague.  "Implementation"?  What does that mean?

2           MR. GASPARD:  How they were going to employ

3    their layoff plan.

4           MR. HARRELL:  Well, that's barely much better.

5           Do you understand what he's talking about?

6           MR. GASPARD:  If he's confused, he can ask me.

7    If you're confused, you don't get to ask.

8           MR. HARRELL:  Okay.  Your job is to ask

9    questions; all right?  My job is to make objections.

10           MR. GASPARD:  That's not an objection.

11           MR. HARRELL:  I'm not going to respond to

12    that.

13           MR. GASPARD:  Okay.  I have a list of the

14    objections if you'd like them.

15           MR. HARRELL:  No.  I think maybe you should

16    ask your next question, if you have one.

17    BY MR. GASPARD:

18      Q    I'll ask the question I just asked.

19           Do you understand what I'm asking you?

20      A    Can you repeat it, please?

21      Q    Did you have any conversations with John Scott

22    or Sandra Hutchens as to how the Captain layoffs would

23    be implemented?

24           MR. HARRELL:  That's a compound question.

25           MR. GASPARD:  All right.

33

1          MR. HARRELL:  It's not the same one you just

2     asked.

3     BY MR. GASPARD:

4          Q     If you understand the question, you can still

5     answer.

6          A     Yes, we did speak with them.

7          Q     Did you speak to Sandra Hutchens specifically

8     about that?

9          A     Yes.  Okay.  Sorry.

10          MR. HARRELL:  If there's a lawyer involved in

11     this, we're not going to talk about it.

12          THE WITNESS:  Sorry.

13          MR. HARRELL:  No.  You're doing fine; okay?

14     But pause.  Wait a little bit.  He's not much on asking

15     foundational questions.  So sometimes I have to do it;

16     okay?

17          Next question.

18     BY MR. GASPARD:

19          Q     You don't have to answer anything that would

20     require you to respond to questions where you were

21     seeking legal advice; would be covered under the

22     attorney/client privilege.

23          MR. HARRELL:  Or there's a lawyer involved in

24     the process.

25          MR. GASPARD:  That's not what attorney/client

STEARNS WILLIAMS REPORTING (909) 803-0091

34

1     privilege covers, actually.

2              MR. HARRELL:  We don't agree.

3              MR. GASPARD:  We can get the magistrate on the

4     phone.

5              MR. HARRELL:  Dial away.

6     BY MR. GASPARD:

7        Q     Did you speak to Sandra Hutchens out of the

8     presence of an attorney about the layoffs for the

9     Captains?

10       A     Yes.

11       Q     All right.  On how many occasions?

12       A     I believe just one.

13       Q     And what was the substance of that

14    conversation?

15       A     It was a meeting, actually, with

16    Sheriff Hutchens, with John Scott, Carl Crown and

17    myself.

18       Q     Do you recall when that meeting took place?

19       A     It was -- it would have been in the summer of

20    2009, somewhere in that time frame.

21       Q     And at that point, the Captain layoffs had not

22    occurred; correct?

23       A     Correct.

24       Q     Where did that meeting take place?

25       A     In the Hall of Administration.

35

1    Q    And to the extent that you recall, what was

2  said at that meeting?

3    A    In essence, the -- Sheriff Hutchens and

4  John Scott wanted to find out what they needed to be

5  aware of when it came to the layoffs; and that

6  Carl Crown and I consulted with them and let them know

7  that they needed to comply with the Personnel and Salary

8  Resolution and we pointed them to the layoff provision

9  within that.

10   Q    Okay.  Do you remember more specifically the

11  conversation regarding the PSR, what advice that you

12  gave them?

13         MR. HARRELL:  If, in fact, you gave any.

14         THE WITNESS:  I don't remember, in detail,

15  what -- you know, there was give-and-take, but I don't

16  remember, in detail, what was said.

17  BY MR. GASPARD:

18   Q    Was that the purpose of -- well, how did the

19  meeting come to be?  Did the Sheriff ask you and

20  Carl Crown for the meeting?

21   A    I believe so, yes.

22   Q    All right.  Was it your understanding that the

23  purpose of the meeting was to make sure that they did

24  the layoffs correctly?

25   A    Correct.

36

```
 1        Q    All right.  And do you think that you and
 2   Carl Crown were best situated, as County employees, for
 3   that task?
 4             MR. HARRELL:  It's vague.  What part of the
 5   task?
 6   BY MR. GASPARD:
 7        Q    Well, you mentioned your background and
 8   training in HR, which was extensive.
 9             Do you believe that you and -- well, do you
10   believe that you were qualified to answer the questions
11   they were asking you that day?
12        A    I believe so.
13        Q    And obviously Carl Crown -- it was your
14   opinion that Carl Crown was equally qualified to answer
15   those PSR questions?
16        A    Yeah.
17             MR. HARRELL:  Object on leading grounds.
18             MR. GASPARD:  Okay.  Thank you.
19             MR. HARRELL:  Lacks foundation.
20   BY MR. GASPARD:
21        Q    The Exhibit 208 that you just reviewed which,
22   at the bottom of the first paragraph, we looked at the
23   sentence that says the layoffs were not based on
24   performance, but instead on the elimination and
25   consolidation of functions, you believe that's
```

37

1    consistent with the PSR?

2              MR. HARRELL:  Are you asking a legal opinion

3    now, or are you asking for his lay opinion?

4              MR. GASPARD:  He's the guy that helped draft

5    the letter and advise the Sheriff as to how she should

6    implement the layoffs.  I don't know who else I could

7    ask these questions to.

8              MR. HARRELL:  That misstates the record.

9              MR. GASPARD:  All right.

10             MR. HARRELL:  He said he didn't help draft

11   anything.  He said he looked at it.

12   BY MR. GASPARD:

13        Q    Okay.  Is it your opinion that that statement

14   that the layoffs are not based on performance is

15   consistent with the PSR?

16        A    I don't have the language in front of me.  I

17   believe, when we reviewed it, that it was consistent.

18        Q    Okay.  Thank you.  If you take a look at the

19   third paragraph, there's a statement that says -- and

20   it's in the middle of the paragraph -- that says, "If

21   you -- if you have corrections or are requesting a

22   Liberty Interest Hearing, please complete the

23   appropriate Layoff Response Form," "and return it within

24   14 days to Diane Tapia."

25             Do you see that?

38

1      A     Yes.

2      Q     Who's Diane Tapia?

3      A     She's in Sheriff HR.  I believe she's

4  Administrative Manager 1.

5      Q     And so the Sheriff's Department has its own HR

6  department as opposed to your department, which is the

7  bigger County HR department; correct?

8      A     Every department has an HR team.

9      Q     All right.

10      A     And then we have the Human Resources

11  department for County-wide issues.

12      Q     I apologize for my ignorance on some of this.

13  I'm still trying to figure it out, as we go through the

14  deposition, how the County works.

15           I want to mark, as Exhibit 209, a document

16  entitled "Layoff Notice."  And it's dated September 17th

17  of 2009.

18           Mr. Leys, have you ever seen this document

19  before?

20      A     I don't believe I have.

21           (Plaintiff's Exhibit 209 was marked

22           for identification.)

23  BY MR. GASPARD:

24      Q     Have you ever seen any version of this

25  document before?

39

1        A    Not that I recall, no.

2        Q    All right.  I'm going to mark, as Exhibit 210,

3   a document dated 9-17 of '09 to Diane Tapia from

4   Christine Murray.

5             Have you ever seen this document before,

6   Mr. Leys?

7        A    No.

8             (Plaintiff's Exhibit 210 was marked

9             for identification.)

10   BY MR. GASPARD:

11        Q    Is it your understanding that shortly after

12   Captain Murray received the letter that we've labeled

13   Exhibit 208, that -- the layoff letter, if you will --

14   is it your understanding that after receiving this

15   letter, that Captain Murray did, in fact, request a

16   hearing?

17        A    Yes.

18        Q    I want to mark, as Exhibit 211, a document

19   entitled "Layoff Meeting Follow-Up."  It's to

20   Christine Murray from Richard Sanchez.

21        A    Okay.

22             (Plaintiff's Exhibit 211 was marked

23             for identification.)

24   BY MR. GASPARD:

25        Q    Mr. Leys, have you ever seen this document

STEARNS WILLIAMS REPORTING (909) 803-0091

63

1     that.

2     BY MR. GASPARD:

3          Q     Sure.  What was the next communication from

4     your office that you know of to Captain Murray to answer

5     the questions that she raises in the October 8, 2009,

6     12:08 p.m. e-mail?

7          A     I'm -- I don't know that I'm aware that

8     anybody contacted her.  There may have been, but I don't

9     recall any at this point.

10         Q     Fair enough.  As far as you know, then, that

11    e-mail that you sent at 1:43 p.m. on October 8th was the

12    last communication between Captain Murray and your

13    office regarding the potential of a Liberty Interest

14    Hearing?

15         A     Again, I'll only speak for myself.  I believe

16    that's the last communication I had with her.  Whether

17    other people did or not, you'd have to ask them.

18              MR. GASPARD:  Okay.  Thank you.  Actually

19    would be a good time for a break.  Let's go off the

20    record.

21              (Brief recess taken.)

22    BY MR. GASPARD:

23         Q     Mr. Leys, earlier you testified that,

24    regarding your familiarity with the 2003 PSR -- I'm

25    going to mark, as 213, Article XVI, as a Roman numeral,

64

1    entitled, "Layoff Procedures" from that PSR.

2          Now, we've been talking about Captain Murray's

3    layoff that occurred on September 17th of 2009.

4          Is it your understanding that this particular

5    provision of the PSR is what governed Captain Murray's

6    layoff?

7          MR. HARRELL:  Again, we're calling from a

8    legal angle, and that calls for an expert opinion.

9          (Plaintiff's Exhibit 213 was marked

10         for identification.)

11   BY MR. GASPARD:

12        Q    You can answer the question.

13        A    Did the layoff -- did her layoff pertain to

14   this article?

15        Q    Correct.

16        A    Yes.

17        Q    You mentioned earlier that you and Carl Crown

18   had some input with the Sheriff and Undersheriff as to

19   making sure the layoffs were conducted properly;

20   correct?

21        A    That we had some input?  Well, we -- yeah, we

22   discussed it with the Sheriff and Undersheriff and

23   referred them to this.

24        Q    So when you did this and when you met with the

25   Captain -- I'm sorry -- the Sheriff and Undersheriff,

65

1    this was the provision that you pointed them to?

2        A    Correct.

3        Q    Do you remember specifically, during that

4    meeting, what areas of this Article XVI were discussed?

5        A    I don't recall specifically other than --

6            MR. HARRELL:  First of all, was there an

7    attorney in the room?

8            THE WITNESS:  No.

9            MR. HARRELL:  Okay.

10            THE WITNESS:  I don't remember specifically,

11    but Section 2 was discussed.  I know that was one of the

12    issues that was in question.

13    BY MR. GASPARD:

14        Q    Okay.  Now, Section 2 of Article XVI,

15    Subsection B says -- and I'm going to read it -- "In

16    considering which employees shall be subject to layoff,

17    consideration shall be given to knowledge and skills

18    related to organizational need and the employee's

19    performance."

20            Do you see that?

21        A    Yes.

22        Q    How do you interpret that provision?

23            MR. HARRELL:  Do you know what he's asking

24    you?

25            THE WITNESS:  Well, I mean, I'm -- I think

1   you're asking for my personal interpretation, which, you

2   know, I think there's a few different interpretations;

3   would be legal interpretation, also.

4   BY MR. GASPARD:

5       Q    Was this subsection discussed during the

6   meeting with the Sheriff and Undersheriff?

7       A    I don't know if we read that in the meeting

8   and discussed interpretation or anything like that.  I

9   don't believe we did.  But we outlined that they need to

10  consider this provision.

11      Q    Okay.  Do you remember a specific discussion

12  regarding whether or not the Sheriff had to give

13  consideration to the knowledge and skills related to the

14  organizational need and the employee's performance?

15      A    I don't recall if we got down to that

16  specific.

17      Q    All right.  Do you remember any discussion

18  about the knowledge and skills portion of this section?

19      A    Did we get down to that detail and talk about

20  knowledge and skills?

21      Q    Yes.

22      A    Of just in general or with any particular

23  employee?

24      Q    Sure.  During that meeting with you and

25  Carl Crown and the Sheriff and Undersheriff, was there a

67

1    discussion about whether or not the Sheriff had to

2    consider each Captain's knowledge and skills in her

3    decision regarding who she was going to lay off?

4        A    Again, I don't remember if we went into that

5    much detail.  We pointed she and the Undersheriff to the

6    PSR provisions.  And, you know, the language, I think,

7    speaks for itself as far as what she needs to consider.

8        Q    Okay.  And you mentioned that you've read this

9    provision now and interpreted it.  And I understand

10   there's a standing objection on your opinion.

11            But do you interpret this Subsection B of

12   Section 2 to -- do you interpret it to mean that the

13   Sheriff has to consider the knowledge and skills of each

14   Captain in her decision to lay them off?

15       A    Yeah.  It's a consideration, yeah.

16       Q    Okay.  Can I have you look at the same

17   document, Exhibit 213, Section 4, which involves rehire

18   lists?

19       A    Uh-huh.  Okay.

20       Q    Are you generally familiar -- have you

21   reviewed this provision before?

22       A    Yes.

23       Q    And Section A says the names of the persons

24   laid off will be placed on a rehire list for each class

25   in the Occupational Series at or below the level of the

68

1    class from which laid off.

2              Now, Captain Murray was laid off from being a

3    Sheriff's Captain.

4         A    Correct.

5         Q    What does that mean?  What positions would she

6    be eligible for if she were placed on the rehire list?

7         A    Well, in the County, there's -- how do I want

8    to say it -- Occupational Series.  And so I would

9    imagine -- I would have to look it up.  But my --

10             MR. HARRELL:  Can you answer without looking

11   it up?

12             THE WITNESS:  Not for positive, but --

13             MR. HARRELL:  Is it something you should say

14   then?

15             THE WITNESS:  Yeah.  I mean, again, I'm not

16   positive, but I believe it would be the Captain and

17   Lieutenant.

18   BY MR. GASPARD:

19        Q    Okay.  So she could be considered for rehire

20   positions that were somewhat comparable to Captain,

21   then; is that fair?

22        A    Well, when you say, "comparable," what do you

23   mean?

24        Q    In pay and benefits.  You mentioned she would

25   probably be entitled to or eligible for rehire to the

69

1    position of Captain or Lieutenant; right?

2         A    Well, Captain, yes; Lieutenant, again, I'm not

3    positive.  I believe Lieutenant would be in there.

4         Q    Do you recall if, at the time Captain Murray

5    was laid off, there was an equivalent civilian position

6    with the County?

7         A    Oh, I don't -- any equiv- -- when you say,

8    "equivalent," what does that mean?

9         Q    As far as pay scale equivalent to Captain.

10        A    Well, my position is equivalent to Captain.

11        Q    Okay.

12        A    As far as the range, the pay ranges aren't

13   exactly the same, but they're right in -- if you look

14   organizationally across the County, Admin 3 is around

15   the same layer as a Captain would be.

16        Q    Are there any Admin 3 positions -- were there

17   any Admin 3 positions at the time of the layoffs within

18   the Sheriff's Department?

19        A    I don't know.

20        Q    Okay.  Do you know whether there are currently

21   Admin 3 positions within the Sheriff's Department?

22        A    I don't know.

23        Q    Okay.  And by, "positions," I mean not

24   available positions, but people actually working in that

25   capacity.

70

1      A    Oh, are there people working in that capacity?

2      Q    Right.

3      A    Oh, yes.

4      Q    Okay.  So there are people employed by the

5  Sheriff's Department now that are -- within the

6  Sheriff's Department that are Admin 3 positions?

7           MR. HARRELL:  He's changing the question now

8  from County to Sheriff's Department.

9           THE WITNESS:  Yeah.

10 BY MR. GASPARD:

11     Q    Okay.  Let me clarify.  Are you aware of

12 whether or not the Orange County Sheriff's Department

13 currently employs anyone at the Admin 3 level?

14     A    Yes, they do.

15     Q    Okay.  Can you estimate how many Admin 3

16 positions there currently are within the Orange County

17 Sheriff's Department?

18     A    I have no idea.

19     Q    Do you know if it's more than five?

20     A    I have no idea.

21     Q    Okay.

22     A    I mean, I could write a report on it.  That's

23 how I find out exactly how many.  But I do know they

24 have some.  But I don't know, you know, how many.  I

25 couldn't even give you an estimate.

STEARNS  WILLIAMS  REPORTING  (909)  803-0091

71

1    Q    Are you aware of whether or not, at the time

2    Captain Murray was laid off, that the Sheriff's

3    Department was employing Admin 3 personnel?

4    A    Yeah.  I'm not positive.

5    Q    Okay.  Going back to Subsection A of Section 4

6    in Exhibit 213, you just testified about what positions

7    Captain Murray might be eligible for on rehire under

8    that subsection.

9    A    Right, the Captain, Lieutenant.

10   Q    Okay.  If there were an Admin 3 position

11   available, would that fall under this category of the

12   Sheriff's Department?

13   A    She wouldn't have automatic rights to an

14   Admin 3, but we try to place people in positions -- but

15   she would have to meet the MQ's for the Admin 3

16   position.

17   Q    I understand.  Thank you.  What did you mean

18   "automatic" in your response?

19   A    Well, when people have rights back, they have

20   rights back to their position or a lower position in the

21   series.  For two years, they have the rights back to it.

22   And so that's what she would have rights back to.  She

23   doesn't have rights back to Admin 3 or any other

24   position in the County that has similar pay and

25   benefits.

72

1     Q    Okay.  If Captain Murray were on the rehire

2    list after her layoff and a vacant Captain position came

3    open within the Sheriff's Department, would she be

4    automatically entitled to that position?

5              MR. HARRELL:  Incomplete hypothetical.  Is she

6    retired now or not?

7              MR. GASPARD:  No.  She's sitting home on the

8    rehire list.

9              MR. HARRELL:  Not retired?

10              MR. GASPARD:  Correct.

11              THE WITNESS:  I'd have to look to see if she

12    would be considered or if it's an automatic.  Hang on a

13    second.  Yeah, under Provision B, "persons on the

14    agency/departmental rehire list for that class will be

15    considered prior to eligibles."  So I don't believe it's

16    automatic.  Let me keep going here.  Yeah, they would be

17    considered.

18    BY MR. GASPARD:

19     Q    All right.  Now, you just pointed out

20    Section 4, Subsection B, which says that she would be

21    considered prior to eligibles on other types of eligible

22    lists.

23              What does that mean?

24     A    Like a recruitment list, the way the

25    recruitment's done, if a recruitment was done and there

73

1    was an eligible list established and then there was a

2    need for that position, she would be considered before

3    other people off that established recruitment list.

4         Q    I understand.  So she makes it to the top of

5    the list, so to speak?

6         A    Well, she would be considered, you know,

7    before those others.  I wouldn't say top of the list

8    because there's different lists.

9         Q    I understand.

10              (Off-the-record discussion between

11              Counsel and the Witness.)

12              MR. HARRELL:  Do I understand it right?

13              THE WITNESS:  Yeah.

14   BY MR. GASPARD:

15        Q    Before I leave the layoff procedures, I want

16   to talk about another provision, and that is Section 2,

17   Subsection A.

18              Do you see that provision?

19        A    Uh-huh.  Yes.

20        Q    Now, the portion of it which says, "Each

21   agency or department head shall determine, subject to

22   CEO approval, which employees are subject to layoff

23   based on the needs of the organization," now, applying

24   this to the Captain layoffs --

25        A    Okay.

74

1      Q    -- does that -- does that mean that

2  Sandra Hutchens would have to get CEO approval of which

3  employees were subject to the layoff?

4          MR. HARRELL:  Calls for a legal opinion.

5  BY MR. GASPARD:

6      Q    Based on your read of this provision, is that

7  what it would mean?

8      A    Well --

9          MR. HARRELL:  Same objection.

10  BY MR. GASPARD:

11      Q    It's fine.  You can still answer.

12      A    Well, it's subject to CEO approval.  So -- in

13  this matter, you know, you would have to ask her if she

14  actually went to the CEO and discussed it with him.

15      Q    Right.  Well, setting aside whether or not she

16  actually did that --

17      A    Okay.

18      Q    -- when you read this provision, do you read

19  this provision to mean that Sandra Hutchens, as the

20  department head of the Orange County Sheriff's, would

21  need the CEO's approval regarding which employees were

22  going to be subjected to the layoff?

23          MR. HARRELL:  Calls for a legal opinion.

24          MR. GASPARD:  I understand.

25          THE WITNESS:  Yeah.  My interpretation, again,

```
 1    STATE OF CALIFORNIA       )
                                ) ss.
 2    COUNTY OF SAN BERNARDINO  )

 3

 4         I, Brandy L. Williams, certified shorthand

 5    reporter, license No. 11084, do hereby certify:

 6

 7         That, prior to being examined, the witness

 8    named in the foregoing deposition, to wit,

 9    ROBERT MARK LEYS, was by me duly sworn to testify the

10    truth, the whole truth and nothing but the truth;

11

12         That said deposition was taken down by me in

13    shorthand at the time and place therein named and

14    thereafter reduced to computer-aided transcription under

15    my direction.

16

17         I further certify that I am not interested in

18    the event of the action.

19

20         WITNESS my hand this _____ day of

21    _____, 2012.

22

23                           _____
                             BRANDY L. WILLIAMS, CSR #11084
24

25
```



**LYNBERG & WATKINS**

ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

Los Angeles
888 South Figueroa Street
Sixteenth Floor
Los Angeles, California 90017
Tel 213•624•8700
Fax 213•892•2763

Orange County
1100 Town & Country Road, Suite 1450
Orange, California 92868
Tel 714•937•1010
Fax 714•937•1003

Reply to:          Orange

June 18, 2012

Christopher Gaspard, Esq.
**LACKIE, DAMMEIER & MCGILL**
367 North Second Avenue
Upland, CA 91786

Re:    ***Murray v. County of Orange, et al.***
Date of Incident:    October 9, 2009
USDC Case No.:    8:10 – CV-1675 JVS (MLGx)
Our File No.:    1794-0049

Dear Mr. Gaspard:

Please be advised that Robert Leys has signed his original deposition transcript and has made three (3) changes. I am enclosing a copy of his signature page and correction page for your file.

Should you have any questions or wish to discuss this matter further please do not hesitate to contact my office directly.

Very truly yours,

**ALEX D. MIHAI**

ADM/sms
Enclosure

STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF _Orange_     )


      I, ROBERT MARK LEYS, say I have read the

foregoing deposition and declare under penalty of

perjury that my answers, as indicated, are true and

correct.




_6/7/12_____
(Date)



_____Robert Leys_____
                    (Signature)

### CORRECTION LIST

| PAGE/LINE | FROM | TO |
|-----------|------|-----|
| P.66/22 | "Of" | "OK" |
| 70/22 | "Write" | "Run" |
| 91/19 | "CAVASOS" | "CAVAZOS" |

# EXHIBIT 256

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CHRISTINE MURRAY,                )
                                 )
                   Plaintiff,    )
                                 )   CASE NO. CV10-01675
        VS.                      )            JVS (MLGx)
                                 )
COUNTY OF ORANGE, a municipal    )
corporation; ORANGE COUNTY       )
SHERIFF-CORONER DEPARTMENT;      )
SANDRA HUTCHENS, individually    )
and as Sheriff of the Orange     )
County Sheriff-Coroner           )
Department; JOHN SCOTT,          )
individually and as Undersheriff )
of the Orange County Sheriff-    )
Coroner Department; MICHAEL      )
HILLMANN, individually and as    )
Former Assistant Sheriff of the  )
Orange County Sheriff-Coroner    )
Department; and DOES 1 THROUGH    )
10 inclusive,                    )
                                 )
                   Defendants.   )
_____  )


DEPOSITION OF CARL CROWN

Friday, April 13, 2012

Reported by:  BRANDY L. WILLIAMS, CSR, RPR #11084

2

I N D E X

DEPOSITION OF CARL CROWN

Friday, April 13, 2012                                        PAGE

          Examination By Mr. Gaspard                          5


                        EXHIBITS

    (Previously marked and attached for reference.)

PLAINTIFF'S
EXHIBIT          DESCRIPTION                          MARKED

206   Memorandum dated September 17, 2009              23

209   Document entitled "Layoff Notice"               40

210   Document dated 9/17/09                          43

212   String of E-mails                               45

213   Document entitled "Article XVI"                 56

215   Job Bulletin                                    75

216   E-mail dated January 7, 2010                    78

219   Article XIV, Disciplinary Action                85

220   Memorandum dated March 19, 2010                 80



     QUESTIONS ASKED, WITNESS INSTRUCTED NOT TO ANSWER

                  PAGE         LINE

                   63            3

STEARNS WILLIAMS REPORTING (909) 803-0091

3



APPEARANCES


For the Plaintiff, CHRISTINE MURRAY:

    LACKIE, DAMMEIER & McGILL APC
    BY:  CHRISTOPHER L. GASPARD
    367 North Second Avenue
    Upland, California  91786
    (909) 985-4003


For the Defendants, COUNTY OF ORANGE,
    ORANGE COUNTY SHERIFF'S DEPARTMENT,
    SANDRA HUTCHENS, JOHN SCOTT and
    MICHAEL HILLMANN:

    LYNBERG & WATKINS
    BY:  S. FRANK HARRELL
    1100 Town & Country Road
    Suite 1450
    Orange, California  92868
    (714) 937-1010


Also Present:

    CHRISTINE MURRAY

    MITCH LERMAN, VIDEOGRAPHER

4

1                    DEPOSITION OF CARL CROWN

2          Pursuant to Notice to Take Deposition, on the

3    13th day of April, 2012, commencing at the hour of

4    1:34 o'clock p.m., at 367 North Second Avenue, in the

5    City of Upland, County of San Bernardino, State of

6    California, before me, Brandy L. Williams, Certified

7    Shorthand Reporter, State of California, Personally

8    Appeared:

9

10                        CARL CROWN,

11   called as a witness by the Plaintiff, who, being by me

12   first duly sworn, was thereupon examined as a witness in

13   said cause.

14

15

16

17

18

19

20

21

22

23

24

25

5

1          THE VIDEOGRAPHER:  This is the videotape

2    deposition of Carl Crown in the Matter of

3    Christine Murray versus County of Orange, et al.

4    Today's date is April 13th, 2012.  The time is 1:34 p.m.

5          My name is Mitch Lerman.  I represent

6    Stearns Williams Reporting of Alta Loma.

7          Would Counsel please identify themselves for

8    the record.

9          MR. HARRELL:  Good afternoon.  Shel Harrell

10   for the County of Orange, the Witness and others.

11         MR. GASPARD:  Chris Gaspard appearing on

12   behalf of the Plaintiff, Christine Murray.

13         THE VIDEOGRAPHER:  We're on the record.  Would

14   the court reporter please swear in the Witness.

15         (The Witness was duly sworn in by

16         the Court Reporter.)

17

18                    EXAMINATION

19

20   BY MR. GASPARD:

21      Q    Good afternoon, Mr. Crown.

22      A    Good afternoon.

23      Q    Could you please state and spell your name for

24   the record?

25      A    Carl, C-a-r-l, Crown, C-r-o-w-n.

6

1    Q    Mr. Crown, have you ever been deposed before?

2    A    Yes.

3    Q    How many times?

4    A    Twice.

5    Q    Okay.  What type of case was the first case

6  you were deposed in?

7    A    It was this one -- I'm sorry.  It was a case

8  with -- similar case with other --

9         MR. HARRELL:  The Anderson matter?

10        THE WITNESS:  The Anderson matter, right.

11  BY MR. GASPARD:

12    Q    Thank you.  And what type of case was the

13  second case you were deposed in?

14    A    It was a case regarding Correctional Services

15  Assistants in the jail with the Association of

16  Orange County Deputy Sheriff's.

17    Q    So that was an employment --

18    A    It was an employment case, also, correct.

19    Q    All right.  The court reporter gave you an

20  oath, and that's the same oath you would take in a court

21  of law.  So today, you'll be testifying under penalty of

22  perjury.

23         Do you understand that?

24    A    Yes.

25    Q    Okay.  And I'll ask you questions and ask for

7

1      a verbal response.  Your responses will be taken down by

2      the court reporter and put into a booklet, which later

3      on down the road, you'll have the opportunity to review

4      and make sure that you didn't make any errors in your

5      testimony, although if you make any changes --

6      substantive changes, it could cast some doubt onto the

7      credibility of that testimony.

8              Do you understand?

9      A      I understand.

10     Q      And in order to make a clean record today,

11     I'll try not to cut off your answers with any of my

12     questions, and I would ask that also you do the same in

13     return.

14             You don't have to make any guesses today, but

15     I may ask you for your estimate on certain things.

16             You do understand the difference between a

17     guess and an estimate?

18     A      Yes.

19     Q      And if you don't understand any question,

20     please don't hesitate to ask me to clean up the

21     question.  Sometimes they may be compound or winding

22     long questions.  And just say, you know, "Can you break

23     that up for me," and I'll be glad to do it.

24             Have you recently consumed any alcohol,

25     medications or any other substances that would affect

8

1    your ability to provide the best testimony today?

2        A    No.

3        Q    Did you review any notes or documents in

4    preparation for your deposition today?

5        A    I reviewed my Declaration.

6        Q    All right.  And you mean your Declaration in

7    the Anderson matter?

8        A    Yes.

9        Q    Okay.  Did you review any other notes or

10   documents?

11       A    No.  I think that's the only one that I've

12   reviewed.

13       Q    Have you ever been sued before?

14       A    No.

15       Q    That's good.  Have you ever sued anyone else

16   as Plaintiff before?

17       A    No.

18       Q    Okay.  Have you spoken to anyone, other than

19   your Counsel, about your deposition today?

20       A    No.

21       Q    I'd like to ask some background information

22   about your education.

23            Mr. Crown, what year did you graduate high

24   school?

25       A    1965.

9

1      Q     Okay.  And after you graduated high school,

2  did you attend an undergraduate program?

3      A     Yes.

4      Q     All right.  What school did you attend your

5  undergraduate program at?

6      A     University of Florida.

7            MR. HARRELL:  Boo.

8            THE WITNESS:  Eat 'em up.  Go Gators.

9  BY MR. GASPARD:

10     Q     Is why you're a Gators fan.  That's right.

11           And did you graduate from the University of

12  Florida?

13     A     Yes.

14     Q     What type of degree did you receive from the

15  University of Florida?

16     A     Had a Bachelor of Science in Biology.

17     Q     Do you recall what year that was?

18     A     1970.

19     Q     And after receiving your BS in Biology from

20  University of Florida, did you get any sort of advanced

21  degrees?

22     A     Yes.

23     Q     Okay.  After University of Florida, what was

24  your next degree?

25     A     Master's degree in Organizational Development

STEARNS WILLIAMS REPORTING (909) 803-0091

10

1    and Human Resource Development.

2         Q    What year was that?

3         A    1982.

4              THE VIDEOGRAPHER:   Excuse me.

5    BY MR. GASPARD:

6         Q    And what school did you obtain your Master's

7    from?

8         A    George Washington University.

9         Q    Did you receive any degrees after that?

10        A    No.

11        Q    Have you received any formal education other

12   than the two degrees you just testified about?

13        A    Seminars, things like that, but nothing --

14        Q    Okay.

15        A    -- nothing else.

16        Q    I understand.  Are you currently a member of

17   any professional organizations?

18        A    No, not currently.

19        Q    All right.  Mr. Crown, where are you currently

20   employed?

21        A    With the County of Orange.

22        Q    And when were you first hired by

23   Orange County?

24        A    September of 2000.

25        Q    When you were hired in 2000 by Orange County,

STEARNS WILLIAMS REPORTING (909) 803-0091

11

1    what position were you hired for?

2         A    I was hired as a Senior Project Manager in the

3    Human Resources Department.

4         Q    I gather, since they hired you as a Senior

5    Project Manager, you had some experience with Human

6    Resources prior to being hired by Orange County?

7         A    Yes.

8         Q    All right.  And we'll work our way backwards

9    going through your work history.

10        Just before you were hired by Orange County in

11   2000, where did you work?

12        A    I ret- -- I was with the Coast Guard --

13   U.S. Coast Guard for 28 years.

14        Q    That's a long time.  Thank you for your

15   service.

16        A    Thanks.

17        Q    And what rank did you retire out of the Coast

18   Guard?

19        A    Captain.

20        Q    Did your employment with the Coast Guard

21   involve Human Resources?

22        A    Yes.  About a third of my time I spent in

23   Personnel and Training.

24        Q    Okay.  So roughly nine or so years, you worked

25   in Personnel and Training?

12

1      A     Right.

2      Q     If you could tell me generally what it is the

3   scope of your duties were in Personnel and Training?

4      A     They were usually a regional -- sort of like a

5   Regional Director of Human Resources.  And it was

6   various personnel matters on both the Military and

7   civilian side.  So it was issues of promotion and, you

8   know, various other things.

9      Q     Okay.  Did some -- were you involved in

10  disciplinary matters?

11     A     Yes.

12     Q     And you were involved in promotional

13  administrative type matters as well?

14     A     Yes.

15     Q     Did some of your training with the Coast Guard

16  involve crafting personnel guidelines?

17     A     Yes.

18     Q     Okay.  And policies and procedures?

19     A     Yes.

20     Q     All right.  Once you were hired in 2000 as a

21  Senior Project Manager, is there a classification for

22  Senior Project Manager?

23     A     No.  It's now the equivalent of an

24  Administrative Manager 3.

25     Q     Did they have that Administrative Manager 3

13

1   position at the time in 2000?

2        A    No.  I can't remember what they called it, but

3   they didn't have the Administrative Manager

4   classification at the time.

5        Q    All right.  What's your current job with

6   Orange County?

7        A    Well, I -- well, I'll be physically retiring

8   in the middle of July, but I left the office two weeks

9   ago.  And there, I was the Director of Human Resources.

10       Q    So it's fair to say that you're somewhat in

11  the process of retiring --

12       A    Yes.

13       Q    -- as the Human Resources Director?

14       A    Correct.

15       Q    Okay.  Real quick, if we can just go from

16  being hired as a Senior Project Manager to now retiring

17  as a Human Resources Director, were you promoted from

18  another position after Senior Project Manager?

19       A    I spent three years as the Project Manager,

20  and then I went to be the Director of Client Services

21  for the I.T. organization -- the County's I.T.

22  organization.  I spent a year there.

23            And then I spent two years as the interim

24  Chief Technology Officer and one year that was also -- I

25  was the interim Chief Information Officer.

14

1      Q    Your three years as Senior Project Manager,

2  could you describe your role in Human Resources during

3  those three years?

4      A    I had various duties.  I collected -- I mean,

5  I did like classification studies for department

6  reorganization studies, implemented some systems for

7  Human Resources; projects like that.

8      Q    When were you promoted to Director of HR?

9      A    In September of 2006, I became the interim

10  Director of Human Resources.  And then I believe was

11  about a year later, I was made the permanent Director.

12      Q    So sometime in 2007, you became the permanent

13  Director of HR?

14      A    Permanent Director, correct.

15      Q    At that point, you became the senior person in

16  charge of Human Resources for the County of Orange?

17      A    Yes.

18      Q    All right.  And at the time -- and actually,

19  have you had an opportunity to review the Complaint in

20  this lawsuit?

21      A    Yes.  It was -- it's been a while, though,

22  since I read it.

23      Q    I'll represent to you that it involves layoffs

24  that occurred around 2009.

25           You're familiar with that time frame?

1     A     Yes.

2     Q     All right.  And you're aware that

3  Captain Murray was laid off sometime in 2009?

4     A     Yes.

5     Q     All right.  During that time, while you were

6  Director of Human Resources, is it correct to say that

7  the Orange County Sheriff's Department had its own Human

8  Resources department separate and apart from the

9  County's Human Resources department?

10     A     Yes.

11     Q     All right.  And you were in charge of the

12  County's Human Resources department; correct?

13     A     Yes.  I can explain the reporting

14  relationship.

15     Q     That's what I was going to ask you.

16           Can you explain to me the relationship between

17  those two departments?

18     A     Yes.  Each department in the County has their

19  own Human Resources department.  The Central

20  Organization has some responsibilities that they are --

21  they're the only ones that are responsible.  For

22  example, labor negotiations, contract negotiations are

23  the responsibility of the Central Group.  All employee

24  benefits, administration development, that's the Central

25  Group.  And then some issues where the authority is

16

1    vested in the Human Resources Director -- for example,

2    discharges, settling grievances, those kinds of

3    issues -- are vested in the Human Resources Director.

4        Q    Are you -- the authority you just mentioned,

5    for example, to dismiss employees from employment --

6        A    Yes.

7        Q    -- did the -- I'm sorry.  Strike that.  Let me

8    back up.

9             In 2009, who was in charge of the

10   Orange County Sheriff Department's HR department?

11       A    I don't know if it was Buffy Reynoso.  I think

12   Buffy was there then; either her or it was Karen Kady.

13   So I'm not quite sure when Karen left.

14       Q    And what position was that called?

15       A    Human Resources Director for the Sheriff.

16       Q    Okay.  Did the HR Director of Orange County

17   Sheriff's Department report directly to you?

18       A    No.  Reported to the Sheriff.

19       Q    Okay.  And as HR Director for the County, who

20   did you report directly to?

21       A    The CEO, Tom Mauk.

22       Q    Around 2009, how frequently, on average, would

23   you meet with Tom Mauk?

24       A    At least twice a week in staff conferences and

25   then other times depending on as the situation would

STEARNS WILLIAMS REPORTING (909) 803-0091

17

1  call for.

2      Q   Is it fair to say you had a close working

3  relationship?

4      A   Yes.

5      Q   And Tom Mauk is still the CEO of Orange

6  County; correct?

7      A   Yes.  Two weeks ago, he was.

8          MR. HARRELL:  He still is.

9          THE WITNESS:  I'm just checking.

10 BY MR. GASPARD:

11     Q   In 2009, were you aware of a document

12 typically referred to at the County as the PSR?

13     A   Yes.

14     Q   And what is that document?

15     A   Personnel and Salary Resolution.

16     Q   Was it your understanding, in 2009, that

17 Captain Murray -- scratch that.

18         Were you of the understanding, in 2009, that

19 the PSR governed Captain Murray's employment

20 relationship with the County?

21     A   Yes.

22     Q   And it's your understanding that, at the time,

23 Captain Murray was not classified as an at-will

24 employee; correct?

25     A   Yes.

18

1    Q    Well, can you explain -- if I use the term

2  "at-will employee," you've heard that term before?

3    A    Yes.

4    Q    Okay.  Can you explain your understanding of

5  what it is?

6    A    You know, I'm trying to -- the reason why I

7  hesitated is because when I was thinking of at-will,

8  that's a term that's used for the -- for our executives,

9  and the executives actually sign a document that says,

10  "You are at-will."  The -- Captain Murray and the

11  Lieutenants and Captains don't sign such a document.  So

12  that's why I was looking at the distinction.

13         At-will, to me, means that the County -- that

14  the individual serves at the pleasure of, in this case,

15  the Sheriff.  The executives appointed by the CEO serve

16  at the pleasure of the CEO.  And that's what that means.

17    Q    So it's your understanding that, in 2009, if

18  Captain Murray would have been terminated for-cause,

19  meaning, she was being fired for a performance-based

20  issue, she would be treated differently than an at-will

21  employee; correct?

22    A    If she were being fired for performance-based

23  issue, that's something I would have to approve.

24    Q    Okay.

25    A    That's what I was talking about in terms of

19

1    the discharges.

2        Q     All right.  Can you explain to me what that

3    process would be?

4        A     It would be a matter of -- there would have to

5    be some form of investigation.  There would have to be

6    charges made, some form of investigation.  And then

7    there would be -- whoever the person was would have the

8    opportunity to be represented by their labor

9    organization or by outside counsel if they so chose.

10   They would have the opportunity to present their case,

11   and then a final decision would be made.

12         Once that decision was made, then it would

13   come to me, and I would review all of the information

14   and make the final decision on whether that person

15   should be discharged or not.

16       Q     All right.  Is that hearing that you just

17   described frequently referred to as a Skelly Hearing?

18       A     Yes.

19       Q     All right.  And if you made the determination

20   that the person should be supported -- if you made the

21   determination that the allegations against the employee

22   were sustained and you agreed with the level of

23   discipline that had been proposed -- for example,

24   termination -- would that employee then have a right to

25   a hearing after they were fired?

20

1       A    They could always appeal that, yes.

2       Q    All right.  And for a Captain in 2009, where

3   would I look to to find those appeal procedures?

4       A    The PSR would cover that.

5       Q    Okay.

6       A    And then I believe there -- of course, there

7   are different rules for law enforcement personnel.  So I

8   would have to brush up on exactly what that was.  But

9   there are different rules for law enforcement personnel.

10      Q    Do you know why that is?

11           MR. HARRELL:  Well, I would call for

12   speculation and lacks foundation.

13   BY MR. GASPARD:

14      Q    Right.  I'll back up a bit.

15           Would you say that in 2009, by nature of your

16   position, that you were familiar with the PSR?

17      A    Yes.

18      Q    All right.  Is there someone at the County

19   that would be more qualified than you to speak to the

20   PSR in 2009?

21           MR. HARRELL:  Lacks foundation and calls for

22   speculation.  It's vague, too.

23           From a legal standpoint?  From an HR

24   standpoint?

25

21

BY MR. GASPARD:

    Q   Okay.  You can still answer the question if you understand.

       MR. HARRELL:  County's a big place.

BY MR. GASPARD:

    Q   Mr. Crown, today you'll hear several objections coming from Counsel.  And he'll interpose objections when he deems them necessary.  But unless you're instructed not to answer a question, I'm still entitled to your answer.  And if you understand my question, you can answer it.  And if you don't, you can ask me, and I'll definitely be glad to clarify.

       In this case, I'm asking whether or not you're aware of anybody within the County of Orange that would be more qualified than you to speak to the PSR in 2009.

       MR. HARRELL:  That's vague.  It lacks foundation and calls for speculation.

       THE WITNESS:  Well, I'm having difficulty because if you're talking about from recall --

BY MR. GASPARD:

    Q   Right.

    A   -- that's one thing.  If -- if a circumstance arises that's covered by the PSR, I would always go back and read the PSR and refer to it.

       So at that point in time, I don't think anyone

22

1   else would have any more knowledge than I would.

2        Q    Okay.

3        A    If you're talking about how that came about, I

4   was not there when the PSR was written.

5        Q    Right.

6        A    So --

7        Q    Thank you very much for clarifying that.

8             But would it sometimes be your role to

9   interpret the PSR?

10        A    Yes.

11        Q    All right.  Would you be the final

12   decision-maker within the County as to the

13   interpretation of the PSR?

14        A    In those areas where -- where the Board has

15   given me that authority.

16        Q    All right.  Okay.  And we'll come back to the

17   PSR.  And I actually have some excerpts I'm going to

18   have you look at later in the deposition.

19             We've marked as Exhibit 206 a document dated

20   September 17, 2009.  This is Christine Murray's layoff

21   letter.

22             Mr. Crown, have you ever seen this document

23   before?

24        A    Yes.

25   ///

23

1          (Plaintiff's Exhibit 206 was

2          previously marked for

3          identification in the Deposition of

4          Jennifer Monique Ramirez and is

5          attached for reference.)

6   BY MR. GASPARD:

7       Q    Okay.  And when did you first see this

8   document?

9       A    I don't know that I saw it the one

10  specifically for Captain Murray, but I've seen this

11  document for others.

12      Q    Were you involved in the preparation of these

13  layoff letters?

14      A    No.

15          MR. HARRELL:  Okay.  You need to pause a

16  little bit.  We aren't going to get into others today.

17  It's just Captain Murray.

18          THE WITNESS:  Right.

19  BY MR. GASPARD:

20      Q    Are you aware of who prepared this layoff

21  letter for Captain Murray?

22      A    No.

23      Q    All right.  Are you aware that there was also

24  a layoff packet that she was given with this letter?

25      A    Yes.

24

```
 1        Q     All right.  Are you aware of who prepared that
 2   layoff packet?
 3        A     No.
 4        Q     Do you know if you -- strike that.
 5              When did you first learn that Orange County
 6   was going to lay off some of its Captains?
 7        A     I don't know the -- I don't know the date.  It
 8   was after Sheriff Hutchens came in, but I don't know the
 9   date.
10        Q     Okay.  It was sometime prior to this letter,
11   though; correct?
12        A     Yes.
13        Q     Did you ever speak to Sheriff Hutchens about
14   the layoffs prior to the layoffs being effected?
15        A     No.
16        Q     All right.  If I can direct your attention
17   down to the second to the last paragraph, which begins,
18   "Enclosed in this packet," and then towards the middle
19   of the paragraph, it says, "Once you have completed this
20   review, if you have any corrections or requesting a
21   Liberty Interest Hearing, please complete this Layoff
22   Response Form."
23              Do you see that portion of the document?
24        A     Yes.
25        Q     All right.  Are you aware of that term:
```

56

1       not sure before.

2                   MR. HARRELL:   Is there a question pending?

3       BY MR. GASPARD:

4           Q     Prior to Captain Murray's layoff, how many

5       Liberty Interest Hearings had you personally conducted?

6           A     None.

7           Q     Are you aware of how many Liberty Interest

8       Hearings Bob Leys had conducted at that point?

9           A     No.

10          Q     We've marked, as Exhibit 213, a document

11      entitled "Article XVI, Layoff Procedure."

12                  MR. HARRELL:   Just a moment.

13                  (Plaintiff's Exhibit 213 was

14                  previously marked for

15                  identification in the Deposition of

16                  Robert Mark Leys and is attached

17                  for reference.)

18      BY MR. GASPARD:

19          Q     Take your time, Mr. Crown.  Let me know once

20      you've reviewed.

21          A     Okay.

22          Q     Have you seen this document before?

23          A     Yes.

24          Q     Do you recognize it to be an excerpt from the

25      County's PSR?

57

1      A    Yes.

2      Q    I'm not sure if I asked before or not.  But

3  are you aware that the PSR is available on-line?

4      A    Yes.

5      Q    And the public can access it; correct?

6      A    Yes.

7      Q    At some point prior to Captain Murray's

8  layoff, did you review this particular Article XVI of

9  the PSR?

10      A    Not personally.

11      Q    Okay.  Did you have discussions with

12  individuals within your staff regarding this particular

13  Layoff Procedure?

14      A    Yes.

15      Q    All right.  Who did you talk to?

16      A    Bob Leys and Shelley Carlucci.

17      Q    On multiple occasions?

18      A    Probably more than one.

19      Q    All right.  Do you recall the dates and times

20  of those meetings?

21      A    No.  It was during the general, you know,

22  preparation for the layoff after the decision had been

23  made.

24      Q    All right.  And what were the topics of

25  discussion regarding these Layoff Procedures?

58

1      A      Only that -- you know, just to be sure that we

2   were following the procedures and that rehire rights

3   were being established and were being, you know,

4   appropriately handled, notification was being handled,

5   just being sure that the department was aware of all the

6   issues that needed to be taken care of because, again,

7   these were people covered by the PSR and not covered by

8   labor organization MOU's.

9      Q      And is it your understanding that this is the

10  Layoff Procedure that was applicable to Captain Murray's

11  layoff?

12     A      Yes.

13     Q      What was your specific role in these meetings?

14     A      With my staff?

15     Q      Yes, sir.

16     A      It was just a general -- briefings on what's

17  the status, what's happening, bringing me up to speed on

18  what the procedures are.  And, again, my direction back

19  was to be sure the department was following these and

20  that we monitored to be sure they were following the

21  procedures.

22     Q      Okay.  If I can point your attention to

23  Section 2 of the Layoff Procedure, Subsection A.  And

24  this section is entitled "Order of Layoff."

25             Do you see that section?

59

1      A     Yes.

2      Q     It says, "When a reduction in the workforce is

3   implemented, each agency or department head -- or

4   agency, slash, department head shall determine, subject

5   to CEO approval, which employees are subject to layoff

6   based on the needs of the organization."

7           During the meetings you just described in

8   which you discussed the pending layoffs, was this

9   particular provision discussed?

10     A     I don't know if it was specifically discussed.

11     Q     Would you agree that the layoff of the

12  Captains would qualify as a reduction in the workforce?

13     A     Yes.

14     Q     All right.  And would you agree that the

15  agency/department head of the Orange County Sheriff's

16  Captains would be the Orange County Sheriff,

17  Sandra Hutchens?

18     A     Yes.

19     Q     Can you explain your understanding of the

20  provisions subject to CEO approval?

21     A     Yes.  When layoffs occur, it's discussions

22  generally with the department head or the department

23  staff, together with budget and the CFO.  The CEO is

24  normally involved in discussions with the department

25  head so he knows what's going on.  So it's discussions

STEARNS WILLIAMS REPORTING (909) 803-0091

60

1    like that that would normally occur.

2        Q    So is it your understanding, from reading this

3    provision, that Sheriff Hutchens would need CEO approval

4    prior to selecting Captain Murray to be laid off?

5            MR. HARRELL:  Lacks foundation; calls for

6    speculation; calls for a legal opinion.

7    BY MR. GASPARD:

8        Q    You can still answer the question.

9        A    Yes.  That's what would happen.

10       Q    Are you aware of whether or not

11   Sheriff Hutchens ever obtained CEO approval to lay off

12   Captain Murray?

13           MR. HARRELL:  Calls for speculation; lacks

14   foundation.

15           MR. GASPARD:  I understand.

16           THE WITNESS:  Well, it's -- I mean, I don't

17   know if there was -- I don't know of any specific

18   conversations or the contents of any conversations that

19   the Sheriff and CEO may have had.

20           MR. GASPARD:  Go ahead and read my question

21   back.

22           (Last question was read.)

23           MR. HARRELL:  Can I have my objection, too.

24           (Last objection was read.)

25           THE WITNESS:  No.  I don't know.

61

1    BY MR. GASPARD:

2        Q    Thank you.  Mr. Crown, can you take a look at

3    Subsection B of Section 2, "Order of Layoffs"?

4        A    Yes.

5        Q    And it says, "In considering which employees

6    shall be subject to layoff, consideration shall be given

7    to knowledge and skills related to organizational need

8    and the employee's performance."

9            Do you see that?

10       A    Yes.

11       Q    Applying this provision to Sheriff Hutchens'

12   decision to lay off Captain Murray, can you explain how

13   this provision would apply?

14       A    I don't know how the Sheriff interpreted that

15   and applied that provision.

16       Q    Is your understanding, though, of the language

17   here in the PSR the use of the word "shall" --

18   "consideration shall be given to knowledge and

19   skills" -- do you understand that to mean that prior to

20   laying off Captain Murray, Sheriff Hutchens would be

21   required to consider Captain Murray's knowledge and

22   skills related to organizational need and the employee's

23   performance?

24            MR. HARRELL:  Lacks foundation; calls for

25   speculation; calls for a legal opinion.

62

1          You can answer if you understand it.

2          THE WITNESS:  I can only read what it says,

3     that she shall do that.

4     BY MR. GASPARD:

5          Q    Is that your understanding?

6          A    Yes, that she shall do that.

7          Q    Okay.  Do you have any knowledge of whether or

8     not Sheriff Hutchens did, in fact, consider

9     Captain Murray's knowledge and skill prior to laying off

10    Captain Murray?

11         A    No, I don't know.

12         Q    In looking at the same document, Exhibit 213,

13    Section 4 is "Rehire lists"?

14         A    Yes.

15         Q    Are you familiar with this section?

16         A    Yes.

17         Q    Did you also have discussions with your staff

18    regarding the rehire lists for the retired Captains?

19         A    Yes.  As far -- as far as I recall, I did,

20    yes.

21         Q    I said, "retired."  I meant laid off.

22              Do you understand?

23         A    Yeah.  Yeah, laid off.  I'm sorry.

24         Q    Okay.  And you mentioned earlier that you're

25    aware that Captain Murray was placed on the rehire list

63

1      after her layoff; right?

2          A     Yes, I believe so.

3          Q     Are you aware if any of the other Captains

4      were placed on the rehire list?

5               MR. HARRELL:   Objection.   Rights to privacy.

6      Instruct not to answer.

7               MR. GASPARD:   On what grounds?

8               MR. HARRELL:   Rights to privacy, their rights

9      to privacy.   Their employment history has a zone of

10     privacy around it.   We can meet-and-confer about it

11     later, but he's not going to answer that.

12              MR. GASPARD:   Okay.   Well, let me put my

13     meet-and-confer on the record.

14              MR. HARRELL:   No, that's not when it's done.

15     We make good use of the Witness' time, and that's what

16     we're going to do.   Meet-and-confers are later between

17     lawyers under Local Rule 7.   And I think you know that.

18              MR. GASPARD:   Well, because I don't want to

19     see you or your client subject to any penalties, I will

20     respond to your objection on the record.   And that is

21     that there's no general right to privacy.   If you have a

22     statutory right to privacy to put on record, you can do

23     that, or some sort of case law supporting the fact that

24     individuals being placed on a layoff list is not subject

25     to disclosure.   You can put that on the record.

64

1            However, if you're marking the record or if

2      you are going to stand on your objection, we're going to

3      mark the record for a Motion to Compel.

4            MR. HARRELL:  Here, I'll mark it for you.

5      BY MR. GASPARD:

6      Q      Okay.  Mr. Crown, are you going to not answer

7      the question on the advice of Counsel?

8      A      Yes.

9            MR. HARRELL:  Let me ask you this first.

10            The rehire lists, are they available on-line?

11      Can people look at those?  Members of the public?

12            THE WITNESS:  They're not available on-line.

13            MR. HARRELL:  Can members of the public look

14      at those if they want to -- not the people on the list,

15      but just members of the public?

16            THE WITNESS:  Right.  I don't know.  I've

17      never been asked that.  I would have to ask Counsel.

18            MR. HARRELL:  Okay.  All right.  That's just

19      another question for County Counsel.  If your client

20      happens to know, then that's another matter.

21            MR. GASPARD:  Well, I already know the answer

22      to your question.  I'm not asking for the names of any

23      particular officers or anything involved in their

24      personnel files.  I'm asking if the witness is aware if

25      any other Captains who were laid off were on the rehire

1    list.

2         MR. HARRELL:  Counsel, again, this is not a

3    meet-and-confer.  My understanding of the law is that

4    employment history files at the County are guarded

5    zealously, and they're guarded for a reason, and that's

6    because County Counsel has the opinion that personnel

7    materials -- not just of officers now, but of

8    everybody -- has rights to privacy attached to it.

9         So I do need to instruct my client not to

10   answer that question as it's phrased.  We can look at it

11   further later.  I'm prepared to be educated.  If the

12   material is available on-line or some other way, then of

13   course that's going to alter where I stand.  But I just

14   don't know that to be the case.

15        MR. GASPARD:  Our firm publishes the book on

16   POBR and peace officer privacy.  It's available through

17   CPER.  And if you stand on that objection, you're going

18   to subject yourself and your client to sanctions.

19        MR. HARRELL:  Available to CPER is something

20   else.  Okay.  File a CPER request, maybe, and that will

21   be routed to where it's supposed to be routed in County

22   Counsel.  But I don't have a CPER request.  I just have

23   a question here at a deposition.

24        MR. GASPARD:  Okay.  So you're standing on

25   your objection?

66

1          MR. HARRELL:   Yes.

2     BY MR. GASPARD:

3          Q     Mr. Crown, are you aware of the California

4     Public Records Act?

5          A     Yes.

6          Q     Okay.   And did you have some exposure to

7     the -- I'll call it the CPRA; right?

8                Did you have some exposure to the CPRA in your

9     capacity as an Orange County employee?

10         A     Yes.

11         Q     And what exposure was that?

12         A     We would frequently -- we frequently get CPRA

13    requests from the public, from the press for various

14    matters.

15         Q     All right.

16               MR. HARRELL:   Now, I don't want there to be

17    any confusion.   If you want to ask about your client

18    about whether she's on the rehire list, have at it.   But

19    my understanding of your question was that you're

20    branching out now and asking about others that are

21    non-parties to this case.

22               MR. GASPARD:   I think I made a clear record.

23         Q     Mr. Crown, did County employees ever ask for

24    your input regarding whether or not information should

25    be disclosed regarding CPRA requests?

67

1      A     Yes, but I don't answer them.

2      Q     All right.  Do you refer to County Counsel for

3  those?

4      A     Yes.

5      Q     But you have a general understanding of what

6  information would obviously be disclosable under the

7  CPRA?

8            MR. HARRELL:  I think he just told you he

9  doesn't answer those, so it's an argumentative question.

10  BY MR. GASPARD:

11      Q     Okay.  If someone contacted you now as the HR

12  Director at Orange County, assuming you were -- actually

13  had to show up at your office, unfortunately, would --

14  if you were contacted now and someone asked you or told

15  you they got a CPRA request asking how many marked

16  police units the Sheriff's Department owns, is that

17  something that you understand would be disclosable under

18  the CPRA?

19      A     Yes.

20      Q     Okay.  And that would seem obvious to you?

21      A     Yes.

22      Q     Okay.  If someone sent out a CPRA request

23  asking for police officers' disciplinary files, do you

24  think that would be disclosable under the CPRA?

25      A     I don't believe that would be.  I don't think

68

1    it would be.  But, again, I would ask just to be

2    certain.

3        Q    Okay.  You would go to County Counsel and ask

4    for legal advice?

5        A    Just to be certain.  If I'm going to deny a

6    public records request for the public, I would always

7    ask County Counsel for advice on that.

8        Q    Okay.  So if you were contacted regarding a

9    request to ask how many Sheriff's deputies were on the

10   rehire list after layoffs, is it your understanding that

11   would not be subject to disclosure under the CPRA?

12       A    I don't know.  That's a question I would ask.

13       Q    Okay.

14            MR. HARRELL:  Ask who?

15            THE WITNESS:  I would ask County Counsel that

16   question.

17   BY MR. GASPARD:

18       Q    All right.  Looking, again, at Exhibit 213,

19   the Layoff Procedure --

20       A    Yes.

21       Q    -- specifically Section 4, the Rehire Lists,

22   do you see Subsection A under Section 4 which says, "The

23   names of persons laid off shall be placed on an

24   agency/departmental rehire list," and it goes on.

25            Do you see that provision?

69

1      A    Yes.

2      Q    Is it your understanding, then, that once

3   someone's laid off, they're automatically placed on the

4   rehire list?

5      A    Yes, they would be placed on the rehire list.

6      Q    All right.  And how would they come off of the

7   list?

8      A    Either they're rehired or the time frame

9   that's outlined would expire.

10      Q    Okay.  Is that time --

11      A    Or they could request to come off the list if

12   they were hired by another agency or something like

13   that.

14      Q    And Subsection C talks about being placed on

15   the list for two years.

16          Is that your understanding of the time frame

17   you just mentioned?

18      A    Yes.

19      Q    All right.  So is it your understanding, then,

20   that once Captain Murray was laid off, she was

21   automatically placed on the County's rehire list?

22      A    Yes, she was placed on the rehire list.

23      Q    Section 4, Subsection B, the second sentence

24   says, "If rehire is offered to a class other than that

25   from which the person was laid off, such person must

70

1    meet the minimum qualifications and pass any required

2    performance test for that class."

3         Do you see that provision?

4    A    Where are you?  "D"?

5    Q    I'm on Section 4, Subsection B.  And I'll

6    allow you to read it yourself.

7         MR. HARRELL:  Here, let me assist.  I think

8    he's on Page 79.

9         THE WITNESS:  Oh, I see.  I'm sorry.  I

10   thought you said, "Delta."  It's "Bravo."  I've got it.

11   BY MR. GASPARD:

12   Q    Okay.

13   A    Yes.

14   Q    Can you explain to me what the second sentence

15   of Subsection B means?

16   A    Yes.  If a person has been laid off -- for

17   example, a social worker --

18   Q    Okay.

19   A    -- is laid off.  If an opening comes up for

20   another position -- an Eligibility Technician -- then

21   that social worker would have to meet the qualifications

22   for that -- that's contained in the Eligibility

23   Technician, and then you could hire them.

24   Q    Okay.  In the context of a Sheriff's Captain,

25   since that's what we're talking about here, how would

1    Subsection B apply to Captain Murray?  Can you explain

2    that?

3            MR. HARRELL:  It's an incomplete hypothetical.

4    What is -- what is she doing?

5    BY MR. GASPARD:

6        Q    Well, if Captain Murray -- would you like me

7    to clarify that?

8        A    Yes, if you give me an example.

9        Q    Absolutely.  So Captain Murray was laid off in

10   fall of 2009.  And like you said, she was automatically

11   placed on a rehire list?

12       A    Yes.

13       Q    If an open -- if a position came open for

14   Captain, would she automatically be qualified for that

15   position?

16           MR. HARRELL:  Incomplete hypothetical.

17           Are you including or excluding Subsection C,

18   Paragraph 3, the last line on that page?

19           MR. GASPARD:  Although you don't get to ask

20   questions, I'll explain.

21       Q    Assuming that Captain Murray weren't

22   retired -- were not retired, she's on the rehire list,

23   after being laid off and a Sheriff Captain's position

24   comes open, is she automatically -- does she meet the

25   minimum requirements for that position?

72

1       A    Yes, if those requirements haven't changed.

2       Q    Okay.  You mentioned that the

3  Administrative Management 3 position was the civilian

4  equivalent of a Sheriff's Captain; correct?

5            MR. HARRELL:  I think you might be confusing

6  him with another witness.

7  BY MR. GASPARD:

8       Q    Okay.  Is that correct?

9       A    Roughly the equivalent.

10      Q    Uh-huh.  All right.

11           MR. HARRELL:  Assumes facts not in evidence

12  with regard to this witness.

13           MR. GASPARD:  I already got the answer.  Thank

14  you.

15           THE WITNESS:  When I say, "the equivalent,"

16  let me clarify.  I mean in terms of level of

17  responsibility, for example, but not necessarily in

18  skills required for the job or --

19  BY MR. GASPARD:

20      Q    Correct.

21      A    -- but more level of responsibility, I would

22  say, yes.

23      Q    Thank you.  So, for example, a civilian

24  Administrative Management 3 employee couldn't step into

25  the shoes of a Patrol Division Commander for the

73

1    Sheriff's Department; right?

2        A    Correct.

3        Q    And are there some -- if you're aware, are

4    there positions within the Sheriff's Department -- 2009,

5    were there positions within the Sheriff's Department

6    that could have been filled by either Administrative

7    Management 3 employees or Sheriff's Captains?

8        A    I don't know.

9        Q    All right.  Is that a question better for

10   Sandra Hutchens?

11       A    Yes.  I think I'd have to see what are the

12   positions that you're talking about and then really do a

13   one-for-one.

14       Q    All right.  I do appreciate you clarifying

15   that point.

16            Section 4, Subsection A, again on Page 79, the

17   term "occupational series at or below the level of the

18   class from which laid off," do you see that provision?

19       A    Yes.

20       Q    Now, as applied to Captain Murray's layoff,

21   does that mean that she would be placed on the rehire

22   list for the level of Sheriff's Captain and, I guess,

23   the next lower rank which would be Sheriff's Lieutenant?

24       A    I'd have to check on what the occupational

25   series is.  I just -- I don't have that.

74

1      Q     Without putting specifics --

2            MR. HARRELL:  Were you done with your answer?

3            THE WITNESS:  Yes.

4   BY MR. GASPARD:

5      Q     Okay.  Without putting specific ranks on it,

6   as applies to Captain Murray, would she be placed on the

7   rehire list for the level of Orange County Captain and

8   whatever the next lowest occupational series is?

9      A     I believe so.  But, again, I'd have to check

10  with the -- the occupational series varies --

11     Q     Okay.

12     A     -- depending on the classification.  Some of

13  them are not as obvious as, like, "Well, I was this, and

14  then I was promoted to this."  They're not quite as

15  obvious as that.

16     Q     Right.

17     A     So I would have to check on if Lieutenant was

18  in the occupational series.

19     Q     Oh, I understand.  So --

20     A     Yeah.

21     Q     -- there's some possibility -- you're not

22  sure, but there's some possibility that a Lieutenant or

23  Captain could be in the same occupational series?

24     A     There's a possibility, yes.

25     Q     All right.  How does the County designate

1   those occupational series?  Is there a nomenclature or

2   names given other than police ranks?

3        A    Normally, when you establish a classification,

4   you will establish the series.  If there's an issue of

5   layoff and we are doing a meet-and-confer with the labor

6   organizations, we have to establish the occupational

7   series and get agreement from the labor organization on

8   that's what it is --

9        Q    Okay.

10       A    -- so that you can do bumping rights and

11  things like that.

12       Q    Mr. Crown, are you aware of whether or not

13  Captain Murray ever reapplied for any open positions

14  with the Sheriff's Department after her layoff?

15       A    No.

16       Q    We've marked as Exhibit 215 a job bulletin

17  from the Sheriff's Department.

18       A    Okay.

19            (Plaintiff's Exhibit 215 was

20            previously marked for

21            identification in the Deposition of

22            Robert Mark Leys and is attached

23            for reference.)

24  BY MR. GASPARD:

25       Q    Are you aware that when Captain Murray was

76

1    laid off in 2009, that she was the Director of Support

2    Services?

3          A    No, I don't know what her position was.

4          Q    Have you ever seen this job posting before?

5          A    No.

6          Q    All right.  Have you seen other job postings

7    that the Sheriff's Department has published in the past?

8          A    Yes.

9          Q    Does this bulletin look consistent with the

10   other bulletins that you reviewed?

11         A    Yes.

12         Q    If this bulletin were posted in December of

13   2009, shortly after Captain Murray's layoff, is this a

14   position that you understand she would be qualified for

15   on rehire?

16         A    I don't know.

17         Q    Okay.

18         A    Are you asking --

19              MR. HARRELL:  No.  You've answered the

20   question.  If he has a new one, he'll ask you.

21   BY MR. GASPARD:

22         Q    How familiar are you with Captain Murray's

23   background at the Sheriff's Department?

24         A    I'm not familiar with it.

25         Q    The job bulletin is for an Administrative

77

1    Manager 3.

2          Do you see that?

3     A    Yes.

4     Q    And you testified earlier that Administrative

5    Manager 3 being on the same classification level as a

6    Captain of the Sheriff's Department; correct?

7          MR. HARRELL:  I'm sorry.  I didn't hear the

8    very first part.  I thought I heard the word

9    "yesterday."

10         MR. GASPARD:  No.

11         (Last question was read.)

12         MR. HARRELL:  Okay.  Thanks.

13         THE WITNESS:  I said similar levels of

14   responsibility, yes.

15   BY MR. GASPARD:

16    Q    Okay.  Well, whether she were qualified or

17   not, would Captain Murray be allowed to apply for this

18   position if it had come open in December of 2009?

19    A    Yes.

20    Q    We marked, as Exhibit 216, an e-mail from

21   Captain Murray to Sandra Hutchens dated January 7th of

22   2010.  Let me know once you've had a moment to review

23   that.

24    A    Okay.

25   ///

STEARNS  WILLIAMS  REPORTING  (909)  803-0091

78

1          (Plaintiff's Exhibit 216 was

2          previously marked for

3          identification in the Deposition of

4          Robert Mark Leys and is attached

5          for reference.)

6    BY MR. GASPARD:

7          Q    Have you ever seen this e-mail before?

8          A    No, I don't believe so.

9          Q    Does reading this e-mail jog your memory as to

10   whether or not Captain Murray reapplied for employment

11   while she was on the rehire list?

12         A    No.

13         Q    Okay.  Do you know Director Dean Gialamas?

14         A    Yes.

15         Q    And you're aware that he separated from

16   Orange County in December of 2009?

17         A    Yes.

18         Q    Did you have any conversations with Bob Leys

19   regarding Captain Murray while she was on the rehire

20   list?

21         A    Not that I recall, no.

22         Q    Okay.  Do you recall having conversations with

23   any other Orange County employees regarding

24   Christine Murray while she was on the rehire list?

25         A    No, I don't believe so.

79

1    Q    Are you aware that when Captain Murray was in

2    charge of the Support Services Division in 2009, prior

3    to her layoff, that Dean Gialamas was in charge of

4    Forensic Science?

5    A    I knew that Dean was in charge of Forensic

6    Science, but I don't -- again, I wasn't aware of

7    Captain Murray's position.

8    Q    Are you aware that after Captain Murray was

9    laid off, those two positions were consolidated into

10   one?

11   A    No.

12   Q    Are you aware that in early 2010, after

13   Captain Murray applied for another position while on the

14   rehire list, that a meeting was held with several

15   individuals, including the Sheriff and Undersheriff?

16   A    No.

17   Q    Okay.  Did you ever attend a meeting in which

18   Captain Murray's application for reemployment with the

19   Sheriff's Department was discussed?

20   A    No.

21   Q    Do you know who Kirk Wilkerson is?

22   A    No.  The name sounds familiar, but -- I knew a

23   Captain Wilkerson who was the head of I.T., if that's

24   who you're talking about.

25   Q    Well, we marked, as Exhibit 220, a memo from

80

1      Sheriff Hutchens to all department personnel dated

2      March 19th of 2010.

3          A    Okay.

4               (Plaintiff's Exhibit 220 was

5               previously marked for

6               identification in the Deposition of

7               Richard Sanchez and is attached for

8               reference.)

9      BY MR. GASPARD:

10         Q    Have you ever seen this memo before?

11         A    I don't believe so, no.

12         Q    Okay.  Do you recall that Kirk Wilkerson was

13     appointed to the position of interim Director of Support

14     Services by Sandra Hutchens in March of 2010?

15         A    No, I did not.

16              MR. GASPARD:  Let's take a short break.

17              THE VIDEOGRAPHER:  Off the record.  The time

18     is 3:43 p.m.

19              (Brief recess taken.)

20              THE VIDEOGRAPHER:  We're back on the record.

21     The time is 3:58 p.m., beginning of Tape No. 2.

22     BY MR. GASPARD:

23         Q    Mr. Crown, I want to talk about the

24     promotional process at the Orange County Sheriff's

25     Department to the extent that you're aware of it.

81

1          Is it your understanding that when a vacancy

2    comes open -- for example, Sheriff Sergeant -- that a

3    testing is conducted to fill those vacancies?

4          MR. HARRELL:  Counsel, if I can have a running

5    objection with regard to relevance, not likely to lead

6    to the discovery of admissible evidence with regard to

7    the promotional process.

8          MR. GASPARD:  Yes.

9          MR. HARRELL:  Thanks.

10          THE WITNESS:  I'm not certain if there's a

11    test.  I believe there's a test given, yes.

12    BY MR. GASPARD:

13     Q    Well, are you aware that when vacancies come

14    open, that eligibility lists are created for those

15    positions?

16     A    Yes.

17     Q    All right.  And are you aware that those lists

18    are e-mailed out to department-wide?

19     A    I don't know what the Sheriff Department

20    practice is.

21     Q    Okay.  Have you ever seen an e-mail with a

22    list of eligible candidates for a promotional position?

23     A    No.

24     Q    Okay.  Take a look at Exhibit 213 again, and

25    that's the Layoff Procedure.  Again, if I can direct

82

1     your attention to Section 4, Subsection B.  And if you

2     look at the first sentence, it says, "Persons on the

3     agency/departmental rehire list for that class will be

4     considered prior to eligibles on other types of eligible

5     lists."

6              Do you see that sentence?

7     A    Yes.

8     Q    Okay.  What does that mean?

9     A    The -- what a rehire list does is if you were

10    going to be hiring someone into that -- that kind of a

11    position, then you have to consider those that are on

12    the rehire list first before you consider someone on one

13    of the eligible lists.

14    Q    Okay.  And as it would apply to Captain Murray

15    being laid off as a Sheriff's Captain, would she be

16    placed first on the list if she were the only person on

17    the rehire list and a Captain position came open?

18    A    She would be considered, yes.

19    Q    She would be considered before the other

20    candidates?

21    A    Before the other candidates, yes.

22    Q    Okay.

23              CHRISTINE MURRAY:  Could we take a short

24    break?  I do need to discuss something with you.

25              MR. GASPARD:  Very briefly.

83

1          MR. HARRELL:  Sure.  Yeah.  Agreed.  Here, you

2     want us to leave?  Yeah, we can leave.

3          THE VIDEOGRAPHER:  Off the record.  The time

4     is 4:01 p.m.

5          (Brief recess taken.)

6          THE VIDEOGRAPHER:  We're back on the record.  .

7     The time is 4:11 p.m.

8     BY MR. GASPARD:

9          Q    Mr. Crown, if there were a Captain --

10         MR. HARRELL:  Yes?

11         MR. GASPARD:  Okay?

12         MR. HARRELL:  Yeah.

13    BY MR. GASPARD:

14         Q    Based on your knowledge as the HR Director, if

15    there had been a Captain promotion that occurred in

16    February of 2010, would that promotion have to be made

17    off of an eligibility list?

18         A    Yes.  All promotions would come off of an

19    eligibility list.

20         Q    Okay.  If you're aware, how would the Sheriff

21    go about promoting someone who wasn't on that

22    eligibility list?

23         MR. HARRELL:  Calls for speculation.

24         THE WITNESS:  I don't know how she would do

25    that.

STEARNS  WILLIAMS  REPORTING  (909)  803-0091

84

1   BY MR. GASPARD:

2       Q    Okay.  You aren't aware of any mechanism by

3   which she could do that?

4       A    Not if it's a person covered by the rules of

5   the County.  If it were an executive position, you could

6   do that.

7       Q    Okay.  But a Captain is not an executive

8   position; correct?

9       A    Correct.

10      Q    Okay.

11      A    You're --

12           MR. HARRELL:  Okay.  You've answered the

13   question, unless you need to retract something because

14   you got it wrong.

15           MR. GASPARD:  There's no question pending.

16   Thank you.

17           THE WITNESS:  I do.  That's why I'm --

18           MR. HARRELL:  What?  You do need to retract

19   something?

20           THE WITNESS:  Yeah.

21           MR. HARRELL:  Okay.  Tell him.

22   BY MR. GASPARD:

23      Q    Did you have something to add, Mr. Crown?

24      A    Yeah.  What I wanted to say is that a way --

25   and it goes to one of the things I saw here -- was you

STEARNS WILLIAMS REPORTING (909) 803-0091

85

1    can temporarily promote someone and they're not on an

2    eligibility list.

3         Q    Okay.

4         A    But that has a specific period of time that

5    that person can stay in that position before they have

6    to compete for that position.  So that's a way that you

7    can promote someone not on an eligibility list.

8         Q    Do you know how long that period of time would

9    be?

10        A    I think it's -- I think it's one year right

11   now -- one year, eighteen months.  I can't remember

12   which one.

13        Q    Okay.  Around January and February of 2010,

14   how frequently would you meet with Bob Leys?

15        A    Almost daily we would have interaction.

16        Q    Okay.  Did Bob Leys ever tell you about a

17   meeting he attended regarding Captain Murray's attempt

18   to gain reemployment with the County?

19        A    I don't recall.

20        Q    Okay.  We've marked, as Exhibit 219, an

21   excerpt of the PSR Article XVI, Disciplinary Action.

22        A    Okay.

23             (Plaintiff's Exhibit 219 was

24             previously marked for

25             identification in the Deposition of

86

1              Richard Sanchez and is attached for

2              reference.)

3    BY MR. GASPARD:

4        Q     Prior to Captain Murray's layoff, did you

5    consider whether or not this -- well, let me back up.

6              Have you seen this document before?

7        A     Yes.

8        Q     All right.  And is it, in fact, an excerpt

9    from the PSR?

10             MR. HARRELL:  Asked and answered.

11             THE WITNESS:  Yes.

12   BY MR. GASPARD:

13       Q     Prior to Captain Murray's layoff, did you ever

14   consider whether this particular document would apply?

15       A     No.

16       Q     Okay.  Did you ever have any discussions with

17   anyone else from the County regarding whether or not

18   this document would apply to Captain Murray's layoff?

19       A     No.

20       Q     If I can direct your attention to the bottom

21   of the first page of the document, which is Section 3 of

22   Article XVI, entitled "Pre-Disciplinary Hearing for

23   Suspension, Reduction or Discharge."

24             And I think you reviewed this provision

25   earlier; correct?

```
 1   STATE OF CALIFORNIA        )
                                ) ss.
 2   COUNTY OF SAN BERNARDINO   )

 3

 4          I, Brandy L. Williams, certified shorthand

 5   reporter, license No. 11084, do hereby certify:

 6

 7          That, prior to being examined, the witness

 8   named in the foregoing deposition, to wit, CARL CROWN,

 9   was by me duly sworn to testify the truth, the whole

10   truth and nothing but the truth;

11

12          That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to computer-aided transcription under

15   my direction.

16

17          I further certify that I am not interested in

18   the event of the action.

19

20          WITNESS my hand this      day of

21   _____, 2012.

22

23

     BRANDY L. WILLIAMS, CSR #11084

24

25
```

STEARNS WILLIAMS REPORTING   (909) 803-0091

92



**LYNBERG**
**& WATKINS**
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION

<u>Los Angeles</u>
888 South Figueroa Street
Sixteenth Floor
Los Angeles, California 90017
Tel 213·624·8700
Fax 213·892·2763

<u>Orange County</u>
1100 Town & Country Road, Suite 1450
Orange, California 92868
Tel 714·937·1010
Fax 714·937·1003

Reply to:        Orange

June 18, 2012

Christopher Gaspard, Esq.
**LACKIE, DAMMEIER & MCGILL**
367 North Second Avenue
Upland, CA 91786

Re:   *Murray v. County of Orange, et al.*
Date of Incident:      October 9, 2009
USDC Case No.:      8:10 – CV-1675 JVS (MLGx)
Our File No.:      1794-0049

Dear Mr. Gaspard:

Please be advised that Carl Crown has signed his original deposition transcript and has made four (4) changes.   I am enclosing a copy of his signature page and correction page for your file.

Should you have any questions or wish to discuss this matter further please do not hesitate to contact my office directly.

Very truly yours,

**ALEX D. MIHAI**

ADM/sms
Enclosure

```
1    STATE OF CALIFORNIA   )
                           ) ss.
2    COUNTY OF_____  )

3

4

5           I, CARL CROWN, say I have read the foregoing

6    deposition and declare under penalty of perjury that my

7    answers, as indicated, are true and correct.

8

9

10

11   June 5, 2012
     _____
12        (Date)

13

14                              Carl H. Crown
15                         _____
                                (Signature)
16

17

18

19

20

21

22

23

24

25
```

CORRECTION LIST

| PAGE/LINE | FROM | TO |
|-----------|------|-----|
| 13/24 | That | I |
| 14/5 | Strike "like" | |
| 14/10 | Insert "it" between "believe" + "was" | |
| 16/12 | KADY | Kiddy |

1  Michael A. McGill SBN 231613
2  mcgill@policeattorney.com
   Christopher L. Gaspard, SBN 275763
3  chris@policeattorney.com
4  LACKIE, DAMMEIER & MCGILL APC
   367 North Second Avenue
5  Upland, CA  91786
6  Telephone: (909) 985-4003
7  Facsimile:  (909) 985-3299

8  Attorneys for Plaintiff,
9  CHRISTINE MURRAY

10                **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12

13  CHRISTINE MURRAY,                    Case No.: CV10-01675 JVS (MLGx)

14                  Plaintiff,

15                                       **PROPOSED WRIT OF MANDATE**
         vs.
16

17  COUNTY OF ORANGE, a municipal
    corporation; ORANGE COUNTY
18  SHERIFF-CORONER DEPARTMENT;
19  SANDRA HUTCHENS, individually and
    as Sheriff of the Orange County Sheriff-
20  Coroner Department; JOHN SCOTT,
21  individually and as Undersheriff of the
    Orange County Sheriff-Coroner
22  Department; MICHAEL HILLMANN,
23  individually and as Former Assistant
    Sheriff of the Orange County Sheriff-
24  Coroner Department; and DOES 1
25  THROUGH 10 inclusive,

26

27                  Defendants.

28

---

PROPOSED WRIT OF MANDATE

The People of the State of California

**TO:   RESPONDENTS COUNTY OF ORANGE AND ORANGE
COUNTY SHERIFF'S DEPARTMENT:**

Whereas on _____, judgment having been entered in this action, ordering that a Writ of Mandate be issued from this Court,

**YOU ARE HEREBY COMMANDED** immediately upon receipt of this writ to rescind Christine Murray's layoff and immediately reinstate her to her former position as an Orange County Captain. You are further commanded to make Captain Murray whole, to include restoration of all of her lost compensation and benefits to which she would have been entitled but for her layoff.

**YOU ARE HEREBY COMMANDED** to make and file a return to this writ within 30 days from the date that a copy of this writ has been served on you, setting forth what you have done to comply.

Attest my hand and the Seal of this Court on this _____, 2012.

CLERK,

By: _____
           Deputy

---

[PROPOSED] WRIT OF MANDATE

# Motions

8:10-cv-01675-JVS -MLG Christine Murray v. County of Orange et al
(MLGx), DISCOVERY, PROTORD

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

## Notice of Electronic Filing

The following transaction was entered by McGill, Michael on 6/25/2012 at 4:41 PM PDT and filed on 6/25/2012

| | |
|---|---|
| **Case Name:** | Christine Murray v. County of Orange et al |
| **Case Number:** | 8:10-cv-01675-JVS -MLG |
| **Filer:** | Christine Murray |
| **Document Number:** | 42 |

**Docket Text:**
**NOTICE OF MOTION AND MOTION for Writ of Mandate filed by plaintiff Christine Murray.
Motion set for hearing on 7/23/2012 at 01:30 PM before Judge James V. Selna.
(Attachments: # (1) Appendix, # (2) Exhibit, # (3) Exhibit, # (4) Exhibit, # (5) Exhibit, # (6)
Exhibit, # (7) Proposed Order)(McGill, Michael)**

**8:10-cv-01675-JVS -MLG Notice has been electronically mailed to:**

Alexandru Dan Mihai    adm@lynberg.com

Christopher L Gaspard    chris@policeattorney.com

Keith M Parker    kparker@smithsilbar.com

Michael A McGill    mcgill@policeattorney.com

**8:10-cv-01675-JVS -MLG Notice has been delivered by First Class U. S. Mail or by other means
BY THE FILER to :**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** C:\fakepath\Notice of Motion and Motion for Writ of Mandate.PDF
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=6/25/2012] [FileNumber=13859544-0
] [8a818c87fa1f0467f7714b52df14cf734ba8a6a0946270a82750470c69d0a7022a8
0460380224c951d98585a4dc80f3e8ac4659660c9e9813570bb996b2f687b]]
**Document description:** Appendix
**Original filename:** C:\fakepath\Petitioners Appendix of Evidence ISO Motion for Writ of Mandate.PDF
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=6/25/2012] [FileNumber=13859544-1

] [4b612efb854863dd4ef494a570f1172457a52d2d47239efb88c7befb0ba5ddbfe06
14d9f452f58ffb71a201aab59d198dc07562a5ba8016f62727f0079ef3287]]
**Document description:**Exhibit
**Original filename:**C:\fakepath\Exhibit 206-251.PDF
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=6/25/2012] [FileNumber=13859544-2
] [8ad0d04d2af1f2d591dd3ad720ce1f090208ef8dea3e8e589d596e8ec08ccd1256f
917d07fe086123b29fd6a2e62ecbc93e6fe53a4e5ad9bfebbf599d0674683]]
**Document description:**Exhibit
**Original filename:**C:\fakepath\Exhibit 252.PDF
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=6/25/2012] [FileNumber=13859544-3
] [0c3fba2ec10807426902f8332a6a512cd66ff77749ca7515ccbd38bd4e006cc0b20
4654bc43c7e4972089e216ee460bfc3427121c249d65d28adbe171ca546e0]]
**Document description:**Exhibit
**Original filename:**C:\fakepath\Exhibit 253.PDF
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=6/25/2012] [FileNumber=13859544-4
] [44a54b52b4555066352085579723b175bd9af45e6c33806a 61b2c257a211dc5b6192
479a706e8ad1d1904a23f7ed5d60b0352c1e4efd09013700cc393434de0e0]]
**Document description:**Exhibit
**Original filename:**C:\fakepath\Exhibit 253 (2).pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=6/25/2012] [FileNumber=13859544-5
] [a54326e984a9848d287eb2e4ef8f50b2df7d4dfeaf7b83dfb56daa50c64a2df53c7
b513d4ff351770c0affe62d73bf1cc885301c1265409ed334d723a510147c]]
**Document description:**Exhibit
**Original filename:**C:\fakepath\Exhibit 255-256.PDF
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=6/25/2012] [FileNumber=13859544-6
] [04f405c0ea0b0050a624a69e4d54100985f9e4c5a9ddc77261c05b4d096566d7f81
ad35afb86554bffc18b4057fc91faeaa712c7c50b0fc1c388f0c011448c1c]]
**Document description:**Proposed Order
**Original filename:**C:\fakepath\Proposed Writ of Mandate.PDF
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=6/25/2012] [FileNumber=13859544-7
] [1020b8362b3afbd58f0c7e87c7ad26c08dade1b14cd93f5fb4695b4742e4424d1f8
307b45c44cca0368404391943d89eaea6acc174019d90d555ffb9b30f9a45]]

1   Michael A. McGill SBN 231613
2   mcgill@policeattorney.com
    Christopher L. Gaspard, SBN 275763
3   chris@policeattorney.com
4   LACKIE, DAMMEIER & MCGILL APC
    367 North Second Avenue
5   Upland, CA 91786
6   Telephone: (909) 985-4003
7   Facsimile: (909) 985-3299

8   Attorneys for Plaintiff,
9   CHRISTINE MURRAY

10          **UNITED STATES DISTRICT COURT**
11         **CENTRAL DISTRICT OF CALIFORNIA**
12

13   CHRISTINE MURRAY,                    Case No.: CV10-01675 JVS (MLGx)

14                  Plaintiff,
                                          **NOTICE OF ERRATA**
15
          vs.
16
17   COUNTY OF ORANGE, a municipal
     corporation; ORANGE COUNTY
18   SHERIFF-CORONER DEPARTMENT;
19   SANDRA HUTCHENS, individually and
     as Sheriff of the Orange County Sheriff-
20   Coroner Department; JOHN SCOTT,
21   individually and as Undersheriff of the
     Orange County Sheriff-Coroner
22   Department; MICHAEL HILLMANN,
23   individually and as Former Assistant
     Sheriff of the Orange County Sheriff-
24   Coroner Department; and DOES 1
25   THROUGH 10 inclusive,
26
27                  Defendants.
28

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

     Plaintiff hereby submits this Notice of Errata regarding Docket Number #42, Notice of Motion and Motion for Writ of Mandate filed on June 25, 2012. Attached hereto, is Exhibit 254 of Plaintiff's Notice of Motion and Motion for Writ of Mandate which was inadvertently omitted from the original filing.

Dated:  June 26, 2012

                                                      Respectfully Submitted,

                                                     LACKIE, DAMMEIER & MCGILL APC

                                                   _____

                                                   Michael A. McGill, Esq.
                                                   Christopher L. Gaspard, Esq.
                                                   *Attorneys for Plaintiff,*
                                                   CHRISTINE MURRAY

LACKIE, DAMMEIER & MCGILL
A PROFESSIONAL CORPORATION

# Miscellaneous Filings (Other Documents)

8:10-cv-01675-JVS -MLG Christine Murray v. County of Orange et al
(MLGx), DISCOVERY, PROTORD

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**

The following transaction was entered by McGill, Michael on 6/26/2012 at 11:53 AM PDT and filed on
6/26/2012

**Case Name:**     Christine Murray v. County of Orange et al
**Case Number:**   8:10-cv-01675-JVS -MLG
**Filer:**         Christine Murray
**Document Number:** 43

**Docket Text:**
**NOTICE OF ERRATA filed by Plaintiff Christine Murray. correcting MOTION for Writ of
Mandate[42] (Attachments: # (1) Exhibit)(McGill, Michael)**


**8:10-cv-01675-JVS -MLG Notice has been electronically mailed to:**

Alexandru Dan Mihai   adm@lynberg.com

Christopher L Gaspard   chris@policeattorney.com

Keith M Parker   kparker@smithsilbar.com

Michael A McGill   mcgill@policeattorney.com

**8:10-cv-01675-JVS -MLG Notice has been delivered by First Class U. S. Mail or by other means
BY THE FILER to :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\Notice of Errata.PDF
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=6/26/2012] [FileNumber=13864207-0
] [7da2df4a4bca86abc666a8e2e5f87cbaa013f9f7390319ce1ecfacd5cd7f6dd38f6
bb2f2a9c884aa69e38d0fcb033d31aabbb456bd4d5fdb2eb36833e8eaf564]]
**Document description:**Exhibit
**Original filename:**C:\fakepath\Exhibit 254.PDF
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=6/26/2012] [FileNumber=13864207-1
] [510a0c16fc67299a81018fefa9786014511fc6924473174f91bfdeeb5eb6b5b3d35
cee44c7ae20ff7dbb36a46baf4eb15a4ae8b4a725978dc0a663debbe4857f]]

# EXHIBIT 257

# DECLARATION OF CHRISTINE MURRAY

I, Christine Murray, hereby declare and state that I am over 18 years of age and competent.  This declaration is based upon my personal knowledge, or is based upon information and belief, and if called upon to testify, I could and would testify to the following:

1.  I was hired as a deputy sheriff by the County of Orange on August 8, 1980.

2.  During my 29 year career with the County of Orange, I have worked the jails, patrol, criminal investigations, and held the ranks of Deputy, Investigator, Sergeant, Lieutenant, and Captain.

3.  During that time, I received numerous commendations including two Medals of Merit for my investigative efforts, as well as local, state and national recognition for my leadership role in the Samantha Runnion kidnap and murder investigation. In addition, I played an important role in the creation and development of a county, state and national AMBER Alert system.

4.  On June 24, 2004, I was promoted by then-Sheriff Carona to Captain and assigned to North Operations Patrol Division.

5.  In the spring of 2005, then-Sheriff Mike Carona was involved in a hotly contested re-election contest for the position of Orange County Sheriff.  I publically supported Carona in his re-election bid by attending campaign and fund raising events. I also submitted an endorsement card on Carona's behalf, which was publicized by Carona's campaign staff.

6.  In or about May 2005, I made telephone calls to most of the lieutenants and captains on the Orange County Sheriff's Department soliciting their support for Sheriff Mike Carona in his re-election bid. These telephone calls formed the basis for subsequent criminal allegations against me regarding

LACKIE, DAMMEIER & McGILL
A PROFESSIONAL CORPORATION

LACKIE, DAMMEIER & McGILL
A PROFESSIONAL CORPORATION

1  campaign finance laws, which were widely reported in the Southern California

2  media.

3      7.  In or about August 2008, during my first one on one meeting with

4  newly appointed Sheriff Hutchens, she raised issues regarding my association with

5  former Sheriff Mike Carona, the prior criminal allegations against me, and her

6  belief that I had been convicted of a crime. I corrected her by advising that the

7  charges against me had been dismissed, Sheriff Hutchens replied that she had been

8  told I was actually convicted. I again told Sheriff Hutchens I had not been

9  convicted of any crimes and offered to provide a more detailed explanation of the

10  case circumstances, but she declined. She expressed concern about the issues

11  surrounding Carona's time as Sheriff and shared her desire that the department

12  move forward under her tenure without embarrassing scandals and maintaining

13  public trust.

14      8.  In or about February or March 2009, I sent a letter of support on

15  behalf of former Sheriff Mike Carona to the U.S. District Court for consideration

16  in Carona's criminal sentencing. The letter was publicized in the media and made

17  available online by various news outlets.

18      9.  On or about March 13, 2009, I received a memorandum from Sheriff

19  Hutchens announcing a reorganization that resulted in my being transferred from

20  Captain of the North Operations Division to the Support Services Division. A true

21  and correct copy of that memorandum is attached hereto as **Exhibit 229**.

22      10.  As Director of Support Services, my job responsibilities were

23  restricted to the oversight of existing IT projects already underway and to support

24  the new initiatives created by Sheriff Hutchens.  I was instructed by Undersheriff

25  Scott to consult with and seek guidance from Captain Dave Wilson and Assistant

26  Sheriff Mike James, both of whom had held the Director of Support Services prior

27  to my transfer.  I also was directed by my immediate supervisor, Assistant Sheriff

28  Jack Anderson, to keep him informed of any project updates or questions regarding

DECLARATION OF CHRISTINE MURRAY

the Sheriff's initiatives or projects.  I also was responsible for the management of the Records component and Property and Evidence Bureau contained with Support Services Division.

11.    When all Division Commanders were directed to make budget cut recommendations in July 2009, Assistant Sheriff Anderson oversaw my efforts, reviewing and editing all of my proposals prior to my submission to Sheriff Hutchens.  My budget recommendations were subsequently met with criticism by the Sheriff and her Executive Command and were not recommended for adoption.

12.    As the Director of Support Services, I oversaw the IT section but was not expected to have the technical knowledge to program or service computers— contract employees handled those roles.  The Records Management Section was supervised and run by civilian employees, as was Property and Evidence. All of the Division employees were civilians with the exception of one sergeant who supervised the Property and Evidence room. At the time of my transfer, Undersheriff Scott told me he had received recommendations from the prior captains assigned to the Division to civilianize the position of Director of Support Services, and he was considering this option.

13.    As Captain of North Operations I oversaw the patrol operations for all North Orange County unincorporated communities, and the contract cities of Stanton and Villa Park, and contract partner Orange County Transit Authority.   I was also in charge of the County's Emergency Communication Center, to include a 24-7  Dispatch Center and emergency communications interface for all county law enforcement and the communication interoperability during emergency events such as natural disaster, or a large scale criminal or terrorist incident. I managed over 200 employees, the majority of whom were sworn law enforcement officers. The number of employees in my command could swell to over 300 in the event of an emergency incident, and included law enforcement officers from other divisions and at times other police agencies. My transfer to the Support Services Division

DECLARATION OF CHRISTINE MURRAY

LACKIE, DAMMEIER & McGILL
A PROFESSIONAL CORPORATION

1  cut my daily personnel oversight by over 50% and I was no longer responsible for

2  any law enforcement duties, functions or the oversight or management of

3  emergency incidents. I only had one sworn law enforcement officer working under

4  my command.

5    14. During my tenure as a Captain with the Orange County Sheriff's

6  Department I was never authorized to speak on behalf of Sheriff Hutchens or

7  former Sheriff Carona. I have on several occasions met with elected officials, such

8  as council members or members of the Board of Supervisors, but only at the

9  direction of an Assistant Sheriff, Undersheriff, or the Sheriff.  Additionally, with

10  few exceptions, the meeting was also attended by an Assistant Sheriff,

11  Undersheriff, or the Sheriff.  On those occasions when a higher ranking Sheriff's

12  Department official was not present, my role was to provide a briefing that had

13  been previewed by my supervisor, or to receive a complaint or inquiry, which I

14  then passed on to my supervisor.  These meetings occurred while I was assigned to

15  as the Captain of Operations Support and North Operations and encompassed

16  briefings on our response to major events or in response to citizen inquiries made

17  to Board of Supervisor members regarding the level of patrol services they were

18  receiving.  Contact with elected officials did not occur while I was Director of

19  Support Services, nor did I anticipate a similar need for briefings due to the

20  absence of law enforcement specific duties in the assignment.

21    15. During the administration of Sheriff Carona, a Media Relations

22  Bureau was established, which was maintained by Sheriff Hutchens when she was

23  appointed Sheriff.  By policy, all department media contacts and press releases

24  originated from this office which was part of the Sheriff's Executive Command.

25  As a captain I was not authorized to make contact or information releases to the

26  media unless directed to do so by members of the Media Relations Bureau.

27    16. As Director of Support Services, I was not responsible for the

28  development of, or recommendation to change or create any policy.  I found

LACKIE, DAMMEIER & McGILL<br>A PROFESSIONAL CORPORATION

DECLARATION OF CHRISTINE MURRAY

1  myself in a position that required me to consult with two other managers (Wilson

2  and James) and to keep my supervisor well informed due to the main projects

3  underway in the division being pursued at the Sheriff's direction. An example of

4  this was my supervisor requiring me to present my shift change recommendations

5  to a budget meeting for approval, rather than just allowing me to change the hours

6  of 8 employees to meet their work load and reduce costs.

7       17.    During my tenure as a captain with the Sheriff's Department I was

8  required to obtain approval, to include the signature of an Assistant Sheriff or

9  higher on purchase orders over $3000.00 or petty cash purchases over $1000.00.

10       18.    On July 9, 2009, I received an email from Undersheriff Scott

11  explaining the Sheriff's tentative plan to lay off two Assistant Sheriffs and six

12  Captains. A true and correct copy of that email is attached hereto as **Exhibit 233**.

13       19.    On August 3, 2009, I met with Sheriff Hutchens and Undersheriff

14  Scott to discuss the Sheriff's decision to lay me off. In preparation for that

15  meeting, I prepared printed questions to ask of them. I provided both of them with

16  a copy of the written questions. As I asked Hutchens and Scott questions, I took

17  notes regarding their answers on my own copy of the questions. I asked what

18  criteria were used to identify which Captains would be affected by the job

19  eliminations. Sheriff Hutchens told me that the layoff selection was not

20  performance-based and that Hutchens did not consider performance, experience, or

21  seniority in making her selection for layoffs.  Instead, she relied solely on the

22  particular position each Captain happened to be in at the time of the layoff. During

23  the meeting, I was told that I would not be able to transfer or accept a demotion in

24  order to avoid layoff. I was further told that a salary reduction was not an option.

25  Sheriff Hutchens also mistakenly told me that all of the individuals that were being

26  laid off were eligible for retirement. I informed the Sheriff that I was only 48 years

27  old and that while I could retire I would not be fully vested until I turned 50 years

28  of age. Undersheriff Scott responded by saying that he thought I was 50 because I

LACKIE, DAMMEIER & McGILL
A PROFESSIONAL CORPORATION

DECLARATION OF CHRISTINE MURRAY

LACKIE, DAMMEIER & McGILL, A PROFESSIONAL CORPORATION

1  had 29 years of service. I told them I had hired on at age 19, not 21, and the Sheriff

2  responded that she didn't realize I had been hired on so young. A true and correct

3  copy of my printed questions and handwritten notes from the August 3, 2009

4  meeting is attached hereto as **Exhibit 235**.

5       20.    On September 17, 2009, I met with Undersheriff Scott and Richard

6  Sanchez of Sheriff's Department Personnel/HR.  They provided me with a layoff

7  packet, which included a letter signed by Sheriff Hutchens explaining that I was

8  being laid off, effective October 9, 2009. A true and correct copy of that letter is

9  attached hereto as **Exhibit 206**.

10       21.    Also included in the layoff packet was a document entitled "LAYOFF

11  NOTICE." A true and correct copy of that letter is attached hereto as **Exhibit 209**.

12       22.    I was never offered a *Skelly* hearing to challenge my employment

13  dismissal. Instead, I was offered a "Liberty Interest" hearing, to be conducted by

14  the Director or Assistant Director of County Human Resources. Because the

15  Director of Human Resources was on vacation, the earliest available hearing date I

16  was offered was October 9, 2009—the effective date of my employment

17  separation. October 8, 2009 was my last actual day of work. A true and correct

18  copy of the email string between me and personnel at Human Resources regarding

19  my hearing request is attached hereto as **Exhibit 212**. Because I was not provided

20  with a hearing date in advance of my employment dismissal, and because I was

21  told that any hearing would be before County Human Resources, it was apparent to

22  me that I was not being offered a meaningful opportunity to respond to my

23  employment termination.

24       23.    On December 16, 2009, I sent an email to Bob Leys explaining that I

25  was not retired and wanted to ensure that I was placed on the County's rehire list.

26  Mr. Leys responded by email stating, "I will make sure your name remains on the

27  list according to the provisions in the Personnel and Salary Resolution (PSR)." A

28  true and correct copy of that email exchange is attached hereto as **Exhibit 214**.

DECLARATION OF CHRISTINE MURRAY

24.     The last assignment I held prior to my layoff was Captain of the Support Services Division. Director Dean Gialamas was in charge of the crime lab.

25.     In or about December 2009, I was online and found that the Orange County Human Resources Department had posted a bulletin advertising a job opening for my former position, Director of Support Services. I printed the bulletin but was unable to locate the second page of the printout.   A true and correct copy of that partial printout of the job bulletin is attached hereto as **Exhibit 215**.

26.     On January 7, 2010, I sent an email to Sheriff Hutchens asking for reinstatement and reassignment to my former position of Director of Support Services. I cc'd Undersheriff Scott and Bob Leys on the email. A true and correct copy of that email is attached hereto as **Exhibit 216**.

27.     I received a letter dated January 15, 2010, thanking me for my "interest in returning to the Division Commander position," but stating that "the Sheriff's Department has decided not to move forward with the recruitment for this Administrative Manager III position." A true and correct copy of that letter is attached hereto as **Exhibit 217**. I received copies of the letter by email, First Class postage, and a registered a mail.

28.     In March of 2010, while still on the rehire list, I was online and found that the Orange County Human Resources Department had posted a bulletin advertising a job opening for my former position, Captain. A true and correct copy of that job bulletin is attached hereto as **Exhibit 250**.

29.     In response to the bulletin, I submitted a timely application for the open Captain's position. I received a letter from the County, dated April 1, 2010, acknowledging my application for the Captain position and stating that I was on the rehire list, but that I would no longer be eligible for rehire if I filed for retirement. A true and correct copy of that letter is attached hereto as **Exhibit 251**.

30.     I was never notified or contacted regarding the four lieutenant promotions made by Sheriff Hutchens in May 2010.

7

DECLARATION OF CHRISTINE MURRAY

31.     On May 7, 2010, due to financial necessity, I was forced to file for retirement.  Filing for retirement before I turned 50 resulted in a reduced lifetime benefit – I received approximately 2.7% for each year of service rather than 3% per year if I had reached age 50 before retirement. Filing for retirement also removed me from eligibility for rehire.

32.     During my entire time on the rehire list with the County of Orange, I was never offered to be rehired.

33.     Attached hereto as **Exhibit 252** is a true and correct copy of relevant excerpts of the Personnel and Salary Resolution which governed my employment with the Orange County Sheriff's Department.

I declare the foregoing to be true and correct, under penalty of perjury, under the laws of the State of California.  Executed on July 8, 2012, in _Placentia_, California.

_CHRISTINE MURRAY_

LACKIE, DAMMEIER & MCGILL
A PROFESSIONAL CORPORATION

DECLARATION OF CHRISTINE MURRAY

# EXHIBIT 258

**DECLARATION OF JACK ANDERSON**

I, Jack Anderson, hereby declare and state that I am over 18 years of age and competent.  This declaration is based upon my personal knowledge, or is based upon information and belief, and if called upon to testify, I could and would testify to the following:

1.      I was a career law enforcement officer employed by the Orange County Sheriff's Department from 1986 to 2010.

2.      From April 2007 to January 2010, I held the rank of Assistant Sheriff with the Orange County Sheriff's Department.

3.      In or about June 2009, Undersheriff Scott asked me to research the County's layoff procedures for department managers and command staff. He told me that his request was related to the County's budget problems. He asked that I provide him with a list of Captains and Lieutenants, including their dates of birth, hire dates with the County/years of service, and current assignments.

4.      As directed by Undersheriff Scott, I researched the Orange County Personnel and Salary Resolution (PSR), Article XVI "Layoff Procedure," which sets forth the required procedures for layoffs. During my research, I contacted Carl Crown, Director of the County of Orange's Human Resources Department. I recall asking Mr. Crown two specific questions. First, I asked him about the order of layoffs. Specifically, I asked him whether employees who were laid off had to be returned in the same order in which they had been laid off. His answer was no. Next, I asked him what would happen if a promotion to a rank previously laid off was needed, whether the laid off employee would be returned to work, or whether someone from inside the organization be promoted to that position. (For example, if a Captain were laid off and that position subsequently needed to be filled, would that Captain be returned to work, or could an active Lieutenant be promoted to the Captain position.) Mr. Crown told me that the promotion could be made from

1   within and the laid off employee not be returned to work; however, he said there
2   would have to exist a good reason not to return the laid off employee to work, such
3   as performance problems in the past.

4        5.     After speaking to Mr. Crown and finishing my research, I briefed
5   Sheriff Hutchens and Undersheriff Scott of my findings and discussion with Mr.
6   Crown. I provided the Sheriff and Undersheriff with copies of the relevant portions
7   of the PSR, including Article XVI. I outlined the elements of XVI's Sections 2a
8   and 2b and pointed out knowledge, skills and performance must be considered
9   however seniority was not a requisite consideration. To which the Sheriff asked,
10  "We don't have to consider their seniority on the Department?" I explained that in
11  the County of Orange, service in any County agency adds to seniority however the
12  PSR does not require that seniority be considered in determining the order of
13  layoffs for those employees covered by the PSR.

14       6.     On July 6, 2010, I presented Undersheriff Scott with a list of Captains
15  and Lieutenants that contained the following information about each: name, work
16  assignment, date of birth, date of hire, and years of service. A true and correct copy
17  of the information I provided to the Undersheriff regarding the Captains is attached
18  hereto as **Exhibit 232.** (I provided the complete dates of birth, although they have
19  been partially redacted on Ex. 232.)

20       7.     In or around August 2009, I was notified by Sandra Hutchens that I
21  was being laid off. She also told me that Assistant Sheriff John Davis was being
22  laid off, along with Captains Brian Cossairt, Deanna Berquist, Robert Eason,
23  Catherine Zurn, and Christine Murray.

24       8.     During this same time, the Assistant Sheriff position was classified as
25  an at-will position while the Captain position was classified as a regular civil
26  service position. I was advised that my separation from the Sheriff's Department
27  would be executed in accordance with my at-will agreement, as opposed to being
28

LACKIE, DAMMEIER & MCGILL
A PROFESSIONAL CORPORATION

DECLARATION OF JACK ANDERSON

1  laid off. As such, I was provided with a 90-day severance package, which made my

2  effective separation date January 7, 2010.

3      9.     I completed a retirement application with the Orange County

4  Employee Retirement System for a retirement date effective January 7, 2010. I

5  have been retired since that date. It was my understanding that due to my

6  retirement and the conditions of my at-will agreement, I was not eligible for rehire,

7  so I was never placed on the County's rehire list.

8

9      I declare the foregoing to be true and correct, under penalty of perjury, under

10  the laws of the State of California.  Executed on June 25, 2012, in Rantoul, Illinois.

11

12

13

                    JACK ANDERSON

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LACKIE, DAMMEIER & McGILL
A PROFESSIONAL CORPORATION

3

DECLARATION OF JACK ANDERSON

**EXHIBIT 259**

# DECLARATION OF JOHN B. DAVIS

I, John B. Davis, hereby declare and state that I am over 18 years of age and competent. This declaration is based upon my personal knowledge, or is based upon information and belief, and if called upon to testify, I could and would testify to the following:

1.     I was a career law enforcement officer employed by the Orange County Sheriff's Department from 1981 to 2010.

2.     From August 2008 to January 2010, I held the rank of Assistant Sheriff with the Orange County Sheriff's Department.

3.     In or around August 2009, I was notified by Sandra Hutchens that I was being laid off. Over the next several days, I learned that Assistant Sheriff Jack Anderson was being laid off, along with Captains Brian Cossairt, Deanna Berquist, Robert Eason, and Christine Murray. I recall that Captain Catherine Zurn was also mentioned as a candidate for layoff, however she retired prior to the layoffs being executed.

4.     On or about September 24, 2009, I was informed by Undersheriff John Scott that the Assistant Sheriff position was classified as an at-will position while the Captain position was classified as a regular civil service position. I was advised that my separation from the Sheriff's Department would be executed in accordance with my at-will agreement, as opposed to being laid off. As such, I was provided with a 90-day severance package, which made my effective separation date January 7, 2010.

5.     I completed a retirement application with the Orange County Employee Retirement System for a retirement date effective January 7, 2010. I have been retired since that date. It was my understanding that due to my retirement and the conditions of my at-will agreement, I was not eligible for rehire, so I was never placed on the County's rehire list.

LACKIE, DAMMEIER & McGILL
A PROFESSIONAL CORPORATION

1

DECLARATION OF JOHN B. DAVIS

I declare the foregoing to be true and correct, under penalty of perjury, under the laws of the State of California.  Executed on June 25, 2012, in

MISSION VIEJO , California.

JOHN B. DAVIS

LACKIE, DAMMEIER & McGILL
A PROFESSIONAL CORPORATION

2

DECLARATION OF JOHN B. DAVIS

**EXHIBIT 260**

# DECLARATION OF BRIAN COSSAIRT

I, Brian Cossairt, hereby declare and state that I am over 18 years of age and competent. This declaration is based upon my personal knowledge, or is based upon information and belief, and if called upon to testify, I could and would testify to the following:

1.      I was a career law enforcement officer continuously employed by the County of Orange from 1981 to 2009. I was first hired by the Orange County Sheriff's Department in 1981, then transferred to the Marshal's Department in 1984 by way of merger, then returned to the Sheriff's Department by merger in 2000.

2.      From October 2005 to October 2009, I held the rank of Captain with the Orange County Sheriff's Department.

3.      In or around August 2009, I was notified by Sandra Hutchens that I was being laid off. Prior to my layoff, I became aware that Assistant Sheriffs Jack Anderson and John Davis were being noticed for layoff, as well as Captains Deanna Berquist, Robert Eason, Catherine Zurn, and Christine Murray.

4.      On or about September 24, 2009, I was provided with a layoff notice advising me that my layoff was effective October 9, 2009.

5.      I immediately submitted my application with the Orange County Employees Retirement System, with an effective retirement date of October 9, 2009, so as to ensure that I continued to have a source of income. I have been retired since October 9, 2009.

6.      It was my understanding that due to my retirement, I would not be eligible for rehire, so I was never placed on the County's rehire list.

1    I declare the foregoing to be true and correct, under penalty of perjury, under

2    the laws of the State of California.  Executed on June 25, 2012, in

3    _Rancho Santa Margarita_____, California.

4

5

6    BRIAN COSSAIRT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LACKIE, DAMMEIER & McGILL
A PROFESSIONAL CORPORATION

2

DECLARATION OF BRIAN COSSAIRT

# EXHIBIT 261

# DECLARATION OF DEANA BERGQUIST

I, Deana Bergquist, hereby declare and state that I am over 18 years of age and competent. This declaration is based upon my personal knowledge, or is based upon information and belief, and if called upon to testify, I could and would testify to the following:

1.  I was a career law enforcement officer employed by the City of Tustin (1979 – 1990) and the County of Orange (first by the Orange County Marshal's Department, then by the Orange County Sheriff's Department - 1990 to 2009).

2.  From May 2002 to October 2009, I held the rank of Captain with the Orange County Sheriff's Department.

3.  In or around August 2009, I was verbally notified by Sandra Hutchens that I was being terminated/laid off (effective date was yet to be determined).

4.  On or about September 24, 2009, I was provided with a written termination/layoff notice advising me that my layoff was effective October 9, 2009.

5.  Shortly after receiving my termination/layoff notice, I submitted my application with the Orange County Employees Retirement System (OCERS), with an effective retirement date of October 9, 2009. I have been retired since October 9, 2009.

6.  I had no viable income option at that time, other than to retire, in order to maintain a source of income for myself and my family, therefore, I was ineligible to be placed on the County's rehire list.

I declare the foregoing to be true and correct, under penalty of perjury, under the laws of the State of California. Executed on June 25, 2012, in Lake Forest, California.



DEANA BERGQUIST

1
DECLARATION OF DEANA BERGQUIST

LACKIE, DAMMEIER & McGILL
A PROFESSIONAL CORPORATION

# EXHIBIT 262

# DECLARATION OF ROBERT EASON

I, Robert Eason, hereby declare and state that I am over 18 years of age and competent. This declaration is based upon my personal knowledge, or is based upon information and belief, and if called upon to testify, I could and would testify to the following:

1.     I was a career law enforcement officer who formerly served as Chief of Police for the City of Stanton Police Department. Upon the disbanding of the Stanton Police Department in February 1988, I was hired at the rank of Captain by the Orange County Sheriff's Department.

2.     In or around August 2009, I was one of several Captains identified for layoff by Sheriff Hutchens.

3.     On or about September 28, 2009, I was provided with a layoff notice advising me that my layoff was effective October 9, 2009.

4.     Prior to my effective layoff date, I submitted my application with the Orange County Employees Retirement System (OCERS) and with CalPERS, with an effective retirement date of October 9, 2009. However, both agencies informed me that I would not actually be retired until I received my first retirement payment and it was either cashed or deposited.

5.     Due to a clerical discrepancy in my projected retirement income made by OCERS, and my desire to remain on the County's rehire list, I delayed receiving my retirement benefit.

6.     During the week of October 11, 2009, I contacted Orange County Human Resources to have my name placed on the rehire list. I was advised by Human Resources that I was ineligible for rehire because they had received notification from OCERS that a retirement application had been submitted. I was further advised by HR that OCERS' determination of my effective retirement date

1

1 | did not change HR's determination that I was ineligible for rehire based on the date
2 | of the *submission* of my OCERS retirement application.

3 |      7.    I began receiving retirement benefits on or about April 1, 2010,
4 | retroactive to October 9, 2009.

5 |

6 |     I declare the foregoing to be true and correct, under penalty of perjury, under
7 | the laws of the State of California.  Executed on June 25, 2012, in Lake Forest,
8 | California.

9 |

10 | ROBERT EASON

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 263

**Chris Gaspard**

| | |
|---|---|
| **From:** | Chris Gaspard |
| **Sent:** | Tuesday, June 19, 2012 8:11 PM |
| **To:** | 'Alexandru Mihai' |
| **Cc:** | Michael McGill |
| **Subject:** | Summary Judgment - Meet and Confer Scheduling |

Alex,

      I just read over your letter, dated today, in which you request a meet and confer prior to filing a motion for summary judgment in the *Murray* matter. Since tomorrow is the deadline for doing so, I'd be glad to meet with you. Did you want to discuss over the telephone? What time is good for you?

      We can also discuss plaintiff's intention to file a motion for summary judgment. Laying off Captain Murray without providing her with a pre-deprivation hearing violates 42 U.S.C. § 1983. *See Levine v. City of Alameda*, 525 F.3d 903 (9th Cir. 2008). Plaintiff's First Amended Complaint (FAC) states a Due Process violation. Paragraph 116 states: "Plaintiff was dismissed without just cause for termination and was not provided with a pre-deprivation (*Skelly*) hearing or a post-deprivation hearing as required under the terms of the PSR." Regardless of the pretext, the evidence shows that Christine Murray was terminated for cause and that she was denied a pre-deprivation and a post-deprivation hearing. Failure to provide Captain Murray with a hearing triggers the Due Process clause. *See, e.g., Skelly v. State Personnel Bd.*, 15 Cal.3d 194 (1975).

      In addition to Plaintiff's Section 1983 Due Process claim, we intend to seek summary adjudication of Count 9—Plaintiff's petition for writ of mandate. There exists no material issue of fact regarding whether the City violated the provisions of the PSR. The Sheriff's testimony makes it clear that she did not seek the CEO's specific approval to lay-off Christine Murray before doing so. Furthermore, she <u>unequivocally</u> stated that she did not consider Captain Murray's knowledge and skills prior to laying her off. Finally, the Sheriff's testimony shows that she violated the rehire provision of the PSR.

      We can discuss this in further detail tomorrow when we discuss the stated basis for your client's motion. Let me know what time you'll be available.

Thanks,

CHRIS GASPARD
ATTORNEY AT LAW
LACKIE, DAMMEIER & MCGILL, APC
367 N. SECOND AVENUE
UPLAND, CA 91786
OFFICE: (909) 581-6115
FAX:   (909) 985-3299
CHRIS@POLICEATTORNEY.COM

**CONFIDENTIALITY NOTICE:** The information contained in this electronic message and any attachments to this message are privileged and confidential, and intended solely for the use of the individual or entity named above. This e-mail may contain confidential, private proprietary, or legally privileged information.  No confidentiality or privilege is waived or lost by any mis-transmission.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or unauthorized use of this communication is strictly **PROHIBITED**. If you have received this electronic message in error, please notify the sender and delete or destroy any copy of this message without reading it.   Thank you.